No. 23-40653

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF WEST VIRGINIA; STATE OF KANSAS; STATE OF MISSISSIPPI,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security; TROY MILLER, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; PATRICK J. LECHLEITNER, Acting Director of U.S. Immigration and Customs Enforcement; UR M. JADDOU, Director of U.S. Citizenship and Immigration Services; JASON D. OWENS, Chief of the U.S. Border Patrol,

Defendants-Appellants,

MARIA ROCHA; JOSE MAGANA-SALGADO; NANCI J. PALACIOS GODINEZ; ELLY MARISOL ESTRADA; KARINA RUIZ DE DIAZ; CARLOS AGUILAR GONZALEZ; LUIS A. RAFAEL; DARWIN VELASQUEZ; JIN PARK; OSCAR ALVAREZ; DENISE ROMERO; JUNG WOO KIM; ANGEL SILVA; HYO-WON JEON; ELIZABETH DIAZ; BLANCA GONZALEZ; MOSES KAMAU CHEGE; MARIA DIAZ,

Intervenor Defendants-Appellants,

STATE OF NEW JERSEY,

Intervenor-Appellant.

On Appeal from the United States District Court for the Southern District of Texas

## BRIEF FOR FEDERAL GOVERNMENT APPELLANTS

*Of Counsel:*

JONATHAN E. MEYER
*General Counsel*

*U.S. Department of Homeland Security*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ALAMDAR HAMDANI
*United States Attorney*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
NICHOLAS S. CROWN
*Attorneys, Appellate Staff*
*Civil Division, Room 7259*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1201*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as the federal defendants-appellants are governmental parties.

*s/ Nicholas S. Crown*
Nicholas S. Crown

## STATEMENT REGARDING ORAL ARGUMENT

This case presents substantial legal questions that profoundly affect the lives of hundreds of thousands of Deferred Action for Childhood Arrival (DACA) recipients and the federal government's power to administer the Nation's immigration laws. Oral argument is warranted for full consideration of these issues.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................v

INTRODUCTION ...........................................................................................1

STATEMENT OF JURISDICTION ...................................................................3

STATEMENT OF THE ISSUES........................................................................3

STATEMENT OF THE CASE ...........................................................................4

     A.    Statutory And Regulatory Background........................................4

     B.    Factual Background .....................................................................7

     C.    Prior Proceedings.......................................................................10

SUMMARY OF ARGUMENT..........................................................................13

STANDARD OF REVIEW ..............................................................................15

ARGUMENT ................................................................................................16

I.    PLAINTIFF STATES LACK STANDING TO CHALLENGE A FEDERAL
    POLICY BASED ON INCIDENTAL COSTS ............................................16

     A.    Plaintiff States Cannot Establish Standing Based On Unproven,
         Incidental Healthcare And Education Costs ...............................16

         1.    Plaintiffs are not entitled to special solicitude in the
              standing analysis .............................................................16

         2.    Plaintiffs cannot establish standing based on indirect effects
              on state spending..............................................................19

         3.    Plaintiffs cannot challenge the federal government's
              exercise of enforcement discretion...................................27

         4.    The district court's contrary reasoning is erroneous ......30

B.     Plaintiff States Cannot Assert *Parens Patriae* Standing Against The Federal Government ...................................................................32

II.     PLAINTIFFS DO NOT HAVE A CAUSE OF ACTION UNDER THE APA .............. 33

III.     THE DACA RULE IS CONSISTENT WITH THE INA ............................................. 34

IV.     THE DISTRICT COURT'S REMEDIAL ORDER IS UNLAWFUL ................................ 38

A.     The District Court Lacked Jurisdiction To Enjoin And Vacate The DACA Rule ......................................................................39

B.     The APA Does Not Authorize "Vacatur"....................................41

C.     The District Court Disregarded The DACA Rule's Express Severability Provision ..........................................................43

D.     The District Court Abused Its Discretion By Issuing Nationwide Relief ...........................................................................49

E.     DHS Should Be Charged With Making Policy Judgments About The Timing And Conditions Of Any Wind-Down...................................51

V.     AT A MINIMUM, THIS COURT SHOULD MAINTAIN THE STAY PENDING FURTHER REVIEW .............................................................................................. 53

CONCLUSION ................................................................................................. 54

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
  458 U.S. 592 (1982) ................................................................................................32

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ................................................................................22

*Barnhart v. Walton,*
  535 U.S. 212 (2002) ..............................................................................................35

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ..........................................................................................22

*Block v. Community Nutrition Inst.,*
  467 U.S. 340 (1984) ..............................................................................................34

*Bonvillian Marine Serv., Inc., In re,*
  19 F.4th 787 (5th Cir. 2021) .......................................................................... 16, 28

*California v. Texas,*
  141 S. Ct. 2104 (2021) ..........................................................................................42

*Carlson v. Postal Regulatory Comm'n,*
  938 F.3d 337 (D.C. Cir. 2019) ..............................................................................46

*Center for Biological Diversity v. EPA,*
  937 F.3d 533 (5th Cir. 2019) ................................................................................26

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ..............................................................................................16

*Clarke v. Securities Indus. Ass'n,*
  479 U.S. 388 (1987) ..............................................................................................33

*Crane v. Johnson,*
  783 F.3d 244 (5th Cir. 2015) .......................................................................... 15, 23

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ...................................................................30

*Department of Educ. v. Brown*,
  600 U.S. 551 (2023) ...................................................................31

*DHS v. New York*,
  140 S. Ct. 599 (2020) .................................................................50

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ...................... 9, 15, 39, 43, 45, 48-49, 49, 51-52, 52, 53

*Florida v. Mellon*,
  273 U.S. 12 (1927)......................................................................20

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ...................................................................40

*Guajardo v. Texas Dep't of Criminal Justice*,
  363 F.3d 392 (5th Cir. 2004) .....................................................50

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ..............................................................32, 33

*Hecht Co. v. Bowles*,
  321 U.S. 321 (1944) ...................................................................49

*Hernandez v. Reno*,
  91 F.3d 776 (5th Cir. 1996) ..................................................49, 51

*Johnson v. Guzman Chavez*,
  141 S. Ct. 2271 (2021) ...............................................................36

*K Mart Corp. v. Cartier, Inc.*,
  486 U.S. 281 (1988) ...................................................................43

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...................................................................50

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ........................................................28, 29, 34

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................... 18, 27

*Magnolia Marine Transp. Co. v. Laplace Towing Corp.,*
    964 F.2d 1571 (5th Cir. 1992) ........................................................ 3

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ................................................................... 16, 18

*Massachusetts v. Laird,*
    400 U.S. 886 (1970) ..................................................................... 21

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ..................................................................... 42

*MD/DC/DE Broads. Ass'n v. FCC,*
    236 F.3d 13 (D.C. Cir. 2001) ........................................................ 43

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ..................................................................... 27

*Plyler v. Doe,*
    457 U.S. 202 (1982) ..................................................................... 23

*Printz v. United States,*
    521 U.S. 898 (1997) ..................................................................... 20

*Scott v. Schedler,*
    826 F.3d 207 (5th Cir. 2016) ........................................................ 15

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ..................................................................... 33

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
    989 F.3d 368 (5th Cir. 2021) ........................................................ 51

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ........................................................ 15

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ........................................................ 17

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ........................................11, 16, 18, 19, 22, 33, 35,
                                                                              36, 39, 40, 41, 49, 50, 53
*Texas v. United States*:
  86 F. Supp. 3d 591 (S.D. Tex.), *aff'd*,
    809 F.3d 134 (5th Cir. 2015) ...................................................................9
  809 F.3d 134 (5th Cir. 2015) ............................................................ 31, 39

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ............................................................................50

*United States v. Texas (Immigration Priorities)*,
  599 U.S. 670 (2023) ............................................12, 16, 17, 18, 19, 21, 26, 28,
                                                        29, 30, 31, 32, 34, 40, 42, 43
*United States v. Texas*,
  579 U.S. 547 (2016) ..................................................................................9

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 701(a)(1) ........................................................................ 33, 34
  5 U.S.C. § 702 .........................................................................................33
  5 U.S.C. § 702(1) ....................................................................................49
  5 U.S.C. § 703 ................................................................................. 41, 43
  5 U.S.C. § 706(2) ............................................................................ 41, 42

Consolidated Appropriations Act, 2016,
  Pub. L. No. 114-113, div. F, tit. II, 129 Stat. 2242, 2497 (2015) ...................5

Farm Labor Contractor Registration Act Amendments of 1974,
  Pub. L. No. 93-518, § 11(a)(3), 88 Stat. 1652, 1655.................................. 6-7

Immigration Act of 1990,
  Pub. L. No. 101-649, 104 Stat. 4978:
    § 301(a)(2), 104 Stat. at 5029 .................................................................7
    § 301(g), 104 Stat. at 5030 .................................................................. 6, 7

Immigration and Nationality Act (INA):
  8 U.S.C. § 1103(a) ..................................................................................2
  8 U.S.C. § 1103(a)(1).....................................................................4, 14, 35

8 U.S.C. § 1103(a)(3) ............................................................ 4, 14, 35

8 U.S.C. § 1158(d)(2) ..................................................................... 6

8 U.S.C. § 1182(a)(9)(B)(ii) ......................................................... 36

8 U.S.C. § 1182(d)(5) ............................................................. 37, 38

8 U.S.C. §§ 1221-1232 ................................................................. 39

8 U.S.C. § 1225 ............................................................................ 39

8 U.S.C. § 1225(b)(1)(A)(i) ............................................................ 5

8 U.S.C. § 1226 ............................................................................ 39

8 U.S.C. § 1227 ............................................................................ 39

8 U.S.C. § 1229a .......................................................................... 39

8 U.S.C. § 1229b .......................................................................... 39

8 U.S.C. § 1229c .......................................................................... 39

8 U.S.C. § 1231 ............................................................................ 39

8 U.S.C. § 1231(a)(7) .................................................................... 35

8 U.S.C. § 1252(b)(9) .................................................................... 34

8 U.S.C. § 1252(f)(1) ....................................................... 15, 39, 40

8 U.S.C. § 1252(g) ........................................................................ 34

8 U.S.C. § 1324a(b)(2) .................................................................. 35

8 U.S.C. § 1324a(h)(3) ............................................................. 6, 35

Immigration Reform and Control Act of 1986 (IRCA),
    Pub. L. No. 99-603, 100 Stat. 3359 ............................................. 6

REAL ID Act of 2005,
    Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 302, 313 ................. 6, 35

USA Patriot Act of 2001,
    Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361 ......................... 35

Tex. Transp. Code Ann. § 521.142 ............................................. 26

6 U.S.C. § 202(5) ................................................... 2, 4, 14, 35

6 U.S.C. § 557 ............................................................................... 6

8 U.S.C. § 1611(b)(2) .................................................................. 36

28 U.S.C. § 1292(a)(1) ................................................................... 3

28 U.S.C. § 1331 ............................................................................ 3

28 U.S.C. § 1346(a)(2) ...........................................................................3

28 U.S.C. § 1361 ...................................................................................3

**Regulatory Materials:**

8 C.F.R. § 1.3(a)(4)(vi).....................................................................35, 36

8 C.F.R. § 212.5(f) ...............................................................................37

8 C.F.R. § 236.21(c)(1) .........................................................................38

8 C.F.R. § 236.23(a)(4) .........................................................................38

8 C.F.R. § 236.24 ...........................................................................30, 43

8 C.F.R. § 236.24(a) .............................................................................44

8 C.F.R. § 236.24(b) ......................................................................10, 44

8 C.F.R. § 274a.12(c)(14) ....................................................................5, 6

42 C.F.R. § 435.139 .............................................................................22

42 C.F.R. § 435.406(b) .........................................................................22

42 C.F.R. § 440.255(c).......................................................................22-23

Exec. Order No. 13,768, § 5, 82 Fed. Reg. 8799 (Jan. 30, 2017), *revoked by*
   Exec. Order No. 13,993, § 2, 86 Fed. Reg. 7051 (Jan. 25, 2021)...............4-5

**Legislative Materials:**

Cong. Research Serv., *Analysis of June 15, 2012, DHS Memorandum,*
   *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the*
   *United States as Children* (2012), https://perma.cc/42DA-L8V6 ...................5

S. Doc. No. 79-248 (1946) .....................................................................41

**Other Authorities:**

Designating Aliens for Expedited Removal,
  69 Fed. Reg. 48,877 (Aug. 11, 2004) ...............................................................5

46 Fed. Reg. 25,079 (May 5, 1981).......................................................... 6, 35

71 Fed. Reg. 27,585 (May 12, 2006) .................................................................37

86 Fed. Reg. 53,736 (Sept. 28, 2021) ......................................................9, 47, 48

87 Fed. Reg. 53,152 (Aug. 30, 2022).........................................4, 9, 10, 23, 25, 30, 31, 38,
                                                                           44, 45, 46, 47, 48, 51, 53

Memorandum from Alejandro N. Mayorkas, Secretary, DHS,
  to Tae D. Johnson, Acting Director, ICE,
  *Guidelines for the Enforcement of Civil Immigration Law*
  (Sept. 30, 2021), https://perma.cc/4GDP-9M9X ...........................................4

Tex. Dep't of Pub. Safety:
  *Driver License Fees*, https://perma.cc/L72F-668U.......................................27
  *Verifying Lawful Presence* (July 2013), https://perma.cc/EG3Y-BG44 ........................26

USCIS:
  *Count of Active DACA Recipients by Month of Current DACA Expiration
    as of September 30, 2023*, https://perma.cc/Y6T2-KQ6A ................................ 10, 50
  Form I-131, *Instructions for Application for Travel Document*,
    https://go.usa.gov/xevHF .......................................................................37

*Webster's New International Dictionary of the English Language*
  (2d ed. 1958) ..............................................................................42

## INTRODUCTION

For over a decade, the U.S. Department of Homeland Security (DHS) has deferred the removal of certain undocumented immigrants who were brought to the United States as children years ago and know only this country as home. This policy, known as Deferred Action for Childhood Arrivals (DACA), allows DHS to deploy its limited enforcement resources wisely, while furthering significant humanitarian interests. DACA allows DHS to focus on noncitizens who threaten national security, public safety, and border defenses—individuals who are much higher priorities for removal from the United States than the law-abiding students, veterans, healthcare professionals, and other individuals who compose the DACA population.

DACA was first set out in a 2012 memorandum, and subsequently adopted through notice-and-comment rulemaking. In a prior appeal in this case, this Court held the memorandum unlawful but remanded for the district court to consider the legality of the rulemaking. The district court erred in enjoining and vacating that final rule. Plaintiffs—a minority of States that object to the policy choices underlying DACA—lack standing or a cause of action. Plaintiffs claim they are injured by indirect effects on state spending, which attend many federal policies. Last Term, the Supreme Court held that States may not use such diffuse harms to bring analogous challenges to a federal immigration-enforcement policy, and this Court can and should revisit its earlier standing analysis in light of this intervening precedent.

In any event, the DACA rule is faithful to the text of the Immigration and
Nationality Act (INA) and Homeland Security Act. DACA is a straightforward
exercise of DHS's statutory authority to administer and enforce the Nation's
immigration laws, 8 U.S.C. § 1103(a), and to "[e]stablish[] national immigration
enforcement policies and priorities," 6 U.S.C. § 202(5). It accords with decades of
agency practice, approved by Congress and the Supreme Court, to grant deferred
action (or exercise similar forms of enforcement discretion) and issue work
authorization in comparable circumstances. The district court erred in holding
otherwise, and while this Court is currently bound by a prior panel's conclusion on
this point, the government preserves its arguments for further review.

Finally, the district court issued (though partially stayed) overbroad relief: an
injunction and vacatur invalidating the entire DACA rule nationwide. The federal
government has previously explained, and preserves its arguments, that the court
lacked jurisdiction to issue such relief. The court likewise lacked statutory authority to
vacate the rule, and it disregarded bedrock equitable principles by granting remedies
to parties (and non-parties) that did not even try to show that DACA harmed them.
Even apart from these errors, the district court wrongly dismissed the DACA rule's
express severability provision. That provision, which this Court has never considered,
unequivocally states DHS's intent to maintain a forbearance-only policy if the rule's
work-authorization provisions are invalidated. And compounding these mistakes, the
district court ordered that DACA terminate immediately upon the expiration of a

stay—despite the Supreme Court's clear admonitions that any wind-down of DACA involves policy choices reserved for DHS in the first instance.

## STATEMENT OF JURISDICTION

Plaintiffs asserted jurisdiction in district court under 28 U.S.C. §§ 1331, 1346(a)(2), and 1361. ROA.33382. On September 13, 2023, the district court granted summary judgment to plaintiffs on some claims and entered a permanent injunction and vacatur, which the court partially stayed. ROA.36360, 36400. On November 9, 2023, the government filed a notice of appeal. ROA.36411. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), which extends to the grant of summary judgment. *E.g.*, *Magnolia Marine Transp. Co. v. Laplace Towing Corp.*, 964 F.2d 1571, 1580 (5th Cir. 1992).

## STATEMENT OF THE ISSUES

1. Whether plaintiffs lack Article III standing to challenge federal immigration policy embodied in DACA.

2. Whether plaintiffs lack a cause of action.

3. Whether DACA is consistent with the INA.

4. Whether the district court erred in ordering vacatur and a nationwide injunction of the entire DACA rule that would take immediate effect upon lifting of the partial stay.

## STATEMENT OF THE CASE

### A.    Statutory And Regulatory Background

1.  Congress granted the Secretary of DHS broad discretion to administer and enforce the Nation's immigration laws.  He is empowered to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and carry out the "administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a)(1); *see id.* § 1103(a)(3) (authorizing the Secretary to "establish such regulations," "issue such instructions," and "perform such other acts as he deems necessary for carrying out his authority under [the INA]").

Enforcement discretion is essential to DHS's mission.  Each year, Congress allocates DHS resources sufficient to remove only a small fraction of individuals who are removable from the United States.  For example, from 2016 to 2020, U.S. Immigration and Customs Enforcement (ICE) removed an annual average of approximately 235,000 individuals out of an estimated undocumented population of over 11 million.  87 Fed. Reg. 53,152, 53,185 (Aug. 30, 2022).  Accordingly, the Secretary has long prioritized criminals, threats to national security, and recent border crossers for immigration enforcement.  *See, e.g.*, Memorandum from Alejandro N. Mayorkas, Secretary, DHS, to Tae D. Johnson, Acting Director, ICE, *Guidelines for the Enforcement of Civil Immigration Law* (Sept. 30, 2021), https://perma.cc/4GDP-9M9X; Exec. Order No. 13,768, § 5, 82 Fed. Reg. 8799, 8800 (Jan. 30, 2017), *revoked by* Exec.

Order No. 13,993, § 2, 86 Fed. Reg. 7051 (Jan. 25, 2021); Designating Aliens for

Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004).  Congress has endorsed that

approach, directing DHS to focus a significant portion of its limited enforcement

resources on criminals and authorizing expedited removal of certain inadmissible

individuals arriving at the border or encountered in the interior within a given period.

*See, e.g.*, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. F, tit. II,

129 Stat. 2242, 2497 (2015); 8 U.S.C. § 1225(b)(1)(A)(i).

One measure DHS uses to implement these enforcement priorities is deferred

action, which permits the agency to identify individuals who are lower priorities for

removal, freeing up resources to focus on higher-priority targets.  As the government

explained over 30 years ago, deferred action is an "act of administrative convenience

to the government that gives some cases lower priority" by deferring removal for a

temporary period.  8 C.F.R. § 274a.12(c)(14).  Deferred action does not confer any

legal right to remain in the United States, and DHS still may remove those individuals.

DHS and its predecessors have implemented more than 20 policies granting deferred

action or related temporary, discretionary reprieves from removal since the 1950s,

including the 1990 Family Fairness policy which made an estimated 1.5 million people

categorically eligible to apply for relief.  *See* Cong. Research Serv., *Analysis of June 15,*

*2012, DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who*

*Came to the United States as Children* 20-23 (2012), https://perma.cc/42DA-L8V6.

Congress subsequently approved several such policies, including Family Fairness. *See, e.g.*, Immigration Act of 1990, Pub. L. No. 101-649, § 301(g), 104 Stat. 4978, 5030 (IMMACT). Congress has also recognized the agency's authority to grant deferred action. *See, e.g.*, REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 302, 313 (listing "approved deferred action status" as one way to establish eligibility for a federally accepted state identification card). At no point, despite repeatedly amending the INA, has Congress ever prohibited or restricted the Secretary's (and formerly the Attorney General's) longstanding practice of granting deferred action to individuals who are low priorities for removal.

2. Congress also has authorized DHS to grant work authorization to noncitizens. When Congress amended the INA in the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (IRCA), the federal government had for years been granting work authorization to deferred-action recipients, including under a regulation adopted in 1981. *See* 8 C.F.R. § 274a.12(c)(14); 46 Fed. Reg. 25,079, 25,081 (May 5, 1981). In IRCA, Congress ratified this practice, expressly permitting the employment of noncitizens who are "authorized to be so employed by … the Attorney General" (now, the Secretary). 8 U.S.C. § 1324a(h)(3); *see* 6 U.S.C. § 557 (modifying statutory terms to refer to the Secretary). Similarly, other statutes reflect Congress's recognition of DHS's authority to grant work authorization to noncitizens. *See, e.g.*, 8 U.S.C. § 1158(d)(2) (asylum applicants); Farm Labor Contractor Registration Act Amendments of 1974, Pub. L. No. 93-518,

§ 11(a)(3), 88 Stat. 1652, 1655 (prohibiting certain employment of an undocumented immigrant "who has not been authorized by the Attorney General to accept employment").

DHS and its predecessors have extended work authorization under every deferred-action and similar policy since at least the 1970s.  *See, e.g.*, ROA.6595-6596, 7655-7656; *see also* ROA.7100 (Family Fairness).  Just as Congress entrenched in statute multiple policies offering deferred action, Congress has approved many specific work-authorization policies initiated by the Executive Branch, including authorization for those afforded deferred action under Family Fairness.  *See, e.g.*, IMMACT, § 301(a)(2), (g), 104 Stat. at 5029-5030.

**B.    Factual Background**

1.  In June 2012, the Secretary of DHS issued a memorandum establishing the DACA policy.  The memorandum announced how the agency would exercise its enforcement discretion concerning "certain young people" who were brought to the United States as children and "know only this country as home."  ROA.18762.  The memorandum explained that "additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities."  ROA.18762.  Accordingly, DACA recipients generally would not be "placed into removal proceedings or removed from the United States," and U.S. Citizenship and Immigration Services (USCIS) was instructed to "accept applications to determine

7

whether these individuals qualify for work authorization" during a two-year, renewable period of deferred action.  ROA.18763-18764.  Like previous deferred-action policies, the memorandum cautioned that this "exercise of discretion" conferred "no substantive right, immigration status or pathway to citizenship." ROA.18764.

The DACA memorandum provided that individuals may be considered for deferred action if they came to the United States before age 16; were not above the age of 30 when the memorandum issued; continuously resided in this country since June 2007; had not been convicted of a felony, a significant misdemeanor, or multiple other misdemeanors, and did not otherwise pose a threat to national security or public safety; and were enrolled in school, had graduated from high school or obtained a general-education-development certificate, or were an honorably discharged veteran. ROA.18762.  Requests for deferred action were considered on a case-by-case basis by immigration officers, who reviewed whether the individual satisfied those guidelines and whether other factors militated against deferred action.  ROA.18763.

2.  In November 2014, the Secretary issued another memorandum that permitted other individuals to request deferred action under a policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). ROA.22735-22736.  The DAPA memorandum also broadened DACA's guidelines for deferred action.  ROA.22734-22735.

Twenty-six States challenged the legality of the 2014 memorandum. They did not challenge the 2012 DACA memorandum or seek to enjoin DACA in its original form. The district court preliminarily enjoined implementation of DAPA and the DACA expansion, and a divided panel of this Court affirmed. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015). The Supreme Court affirmed by an equally divided Court. *United States v. Texas*, 579 U.S. 547 (2016) (per curiam).

3. In 2017, DHS rescinded the 2012 DACA memorandum, and various plaintiffs challenged that rescission. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020). In its *Regents* decision, the Supreme Court vacated the rescission as arbitrary and capricious under the Administrative Procedure Act (APA), holding that DHS failed to adequately consider alternatives to terminating DACA and failed to address the reliance interests of DACA recipients, their families, and their communities. *Id.* at 1910-1916.

4. In 2021, DHS published a notice of proposed rulemaking regarding DACA. 86 Fed. Reg. 53,736 (Sept. 28, 2021). The following year, after considering extensive comments, DHS published a final rule replacing the 2012 DACA memorandum. 87 Fed. Reg. 53,152. That rule continues the DACA policy in largely the same form as established in 2012. Individuals who meet the same threshold criteria may request deferred action, which the rule explains is "a form of enforcement discretion" under which the Secretary decides "not to pursue the removal of certain aliens for a limited

period in the interest of ordering enforcement priorities in light of limitations on available resources." *Id.* at 53,298. USCIS may also grant employment authorization to DACA recipients who demonstrate an economic need. *Id.*

Unlike the DACA memorandum, the final rule addresses severability, making clear DHS's determination that "although there are significant benefits to providing work authorization alongside forbearance, forbearance remains workable and desirable without work authorization, and DHS would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized." 87 Fed. Reg. 53,248-53,249. The DACA regulation specifies that various work-authorization provisions "are intended to be severable from one another" and from provisions regarding forbearance from removal. 8 C.F.R. § 236.24(b).

There are more than half a million current DACA recipients. USCIS, *Count of Active DACA Recipients by Month of Current DACA Expiration as of September 30, 2023*, https://perma.cc/Y6T2-KQ6A.

### C.    Prior Proceedings

1. In 2018, six years after the DACA policy's adoption and shortly after its attempted rescission, ten plaintiff States filed this suit. ROA.4196. They claimed that the 2012 DACA memorandum violated the APA's notice-and-comment rulemaking requirements, the INA, and the Take Care Clause. ROA.4256-4264. Certain DACA recipients and New Jersey intervened as co-defendants. *See* ROA.25184 & n.2. After

denying plaintiffs' motion for a preliminary injunction, ROA.15490, the district court stayed the case until the Supreme Court decided the challenge to DACA's rescission in *Regents*.

In July 2021, the district court granted summary judgment to plaintiffs. ROA.25184-25260. The court concluded plaintiffs have standing because DACA recipients' presence increases Texas's emergency-healthcare and public-education expenditures; that the DACA memorandum was procedurally unlawful because it was instituted without notice-and-comment rulemaking; and that DACA conflicts with the INA. ROA.25197-25256. The court declined to reach plaintiffs' Take Care Clause claim. ROA.25256-25257. The court vacated the DACA memorandum, remanded for further administrative proceedings, and entered a nationwide permanent injunction prohibiting the government "from administering the DACA program and from reimplementing DACA without compliance with the APA." ROA.25259-25260, 25263-25264. The court stayed the injunction as to existing DACA recipients. ROA.25264.

The government and defendant-intervenors appealed. In October 2022, this Court affirmed in part, including as to the vacatur of the 2012 DACA memorandum, but preserved the partial stay. *Texas v. United States*, 50 F.4th 498, 529-530 (5th Cir. 2022). However, the Court declined to review DHS's final rule, which had issued during the appeal, remanding to the district court to consider challenges to the rule in the first instance. *Id.* at 511-512.

11

2.  On remand, plaintiffs filed a supplemental complaint alleging that the final rule is contrary to law, violates the Take Care Clause, and is arbitrary and capricious. ROA.33371, 33411-33412.  The parties filed cross-motions for summary judgment. ROA.36360.  Plaintiffs acknowledged that the 2022 rulemaking resolved their prior procedural challenge to the 2012 DACA memorandum.  ROA.33429.  For its part, the government acknowledged that the DACA rule is substantively the same policy as the 2012 memorandum and therefore that the district court's prior decision (as affirmed by this Court) that the DACA policy is contrary to the INA controlled. ROA.34571.  However, the government preserved its substantive arguments defending the DACA policy for further review and argued that any remedy must account for the final rule's severability clause.  ROA.34566-34603.  Additionally, defendants contended that plaintiffs lack standing and defendants are entitled to summary judgment given intervening Supreme Court decisions.  ROA.36033-36037, 36130-36137.

On September 13, 2023, the district court granted plaintiffs' summary-judgment motion and denied defendants' motions.  ROA.36399.  The court reaffirmed its prior decision that plaintiffs have standing, notwithstanding the Supreme Court's recent decision in *United States v. Texas* (*Immigration Priorities*), 599 U.S. 670 (2023), which held that States lacked standing to challenge certain DHS immigration-enforcement guidelines.  ROA.36373-36377.  The court concluded there are no material differences between the DACA rule and the 2012 memorandum; it

therefore deemed the rule unlawful on the same substantive basis. ROA.36378-36387. Finally, despite DHS's explicit statement that it would have implemented each aspect of DACA separately and that the rule's provisions were intended to be severable, the court decided that the rule's provisions must fall together. ROA.36387-36397. The court thus enjoined and vacated the rule in its entirety. ROA.36399, 36400-36401. As before, the district court stayed the effective date of its order "as to all DACA recipients who received their initial DACA status prior to July 16, 2021." ROA.36400. But the court did not permit DHS to craft an orderly "wind down" following expiration of the stay in the event the rule is ultimately found unlawful. The court stated that it was not yet entering a final judgment in the case. ROA.36401.

## SUMMARY OF ARGUMENT

**I.** Texas lacks Article III standing. The DACA rule applies only to individuals, not States, and the Supreme Court has repeatedly held that the Executive Branch's alleged non-enforcement of federal laws against individuals does not cause a State any cognizable injury. That is particularly true when, as here, certain States attempt to overturn national immigration policies, which the Constitution and Congress entrusted to the federal government. Just last Term, the Supreme Court rejected each of the arguments on which Texas relies: special solicitude, incidental costs Texas alleges it incurs in providing social services, and *parens patriae* standing. Although this Court affirmed Texas's standing in the prior appeal, it should revisit that conclusion

13

and remand with instructions to dismiss on Article III grounds given the intervening Supreme Court decisions.

**II.**  Even if plaintiffs could establish standing, they lack a cause of action. Plaintiffs invoke the INA, but they are not within the zone of interests protected by that statute, which instead precludes review here.  Nothing in the INA's text, structure, or purpose suggests that Congress intended to permit States to invoke incidental and attenuated effects of federal immigration policies to bring suit over their validity.

**III.**  DACA is consistent with the INA.  Congress charged the Secretary with "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and granted the Secretary broad authority to administer the immigration laws, 8 U.S.C. § 1103(a)(1), which Congress has empowered him to carry out by issuing "regulations" or "instructions," *id.* § 1103(a)(3).  These authorities plainly permit a deferred-action rule like DACA, under which certain people who entered the country as children, who are low priorities for enforcement, and who have strong humanitarian equities are given temporary forbearance from removal.  Longstanding agency practice, congressional approval, and judicial precedent reinforce DACA's lawfulness.  The district court's criticisms—focusing on concepts such as work authorization, advance parole, and unlawful presence—ignore plain statutory text, attack the Secretary's implementation of features of the INA separate and apart from DACA, and fail to address DACA's forbearance aspects.

14

**IV.**  The district court's nationwide remedies enjoining and vacating DACA are unlawful.  The court lacked jurisdiction to issue those remedies under 8 U.S.C. § 1252(f)(1).  Plaintiffs' asserted cause of action under the APA, moreover, does not authorize "vacatur" at all.  And the district court profoundly erred in striking down the entire DACA rule based on its own policy views, rather than leaving the rule's forbearance aspects intact.  The court simply disregarded DHS's clearly articulated severability provision and policy judgment that a stand-alone forbearance policy would be workable and valuable.  At a minimum, this Court should:  limit any remedy to the discrete portions of the DACA rule it deems unlawful; narrow the nationwide scope of any relief ordered to Texas (the only State attempting to show any cognizable injury); and permit DHS to make any policy judgments about the timing and conditions of a "wind-down," consistent with the Supreme Court's explanation that such questions involve important policy choices that DHS must make.  *Regents*, 140 S. Ct. at 1910, 1914.

## STANDARD OF REVIEW

This Court reviews questions of standing de novo.  *Crane v. Johnson*, 783 F.3d 244, 250 (5th Cir. 2015).  The Court's "review of a permanent injunction is segmented," assessing "'findings of fact under the clearly erroneous standard'" and "'conclusions of law under the *de novo* standard.'"  *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam).  The Court likewise reviews an injunction's scope de novo.  *Texas v. EEOC*, 933 F.3d 433, 450 (5th Cir. 2019).

# ARGUMENT

## I.    PLAINTIFF STATES LACK STANDING TO CHALLENGE A FEDERAL POLICY BASED ON INCIDENTAL COSTS

### A.    Plaintiff States Cannot Establish Standing Based On Unproven, Incidental Healthcare And Education Costs

To establish Article III standing, plaintiffs must demonstrate an injury that is (1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged conduct; and (3) redressable by a favorable ruling. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The asserted injury must be "legally and judicially cognizable." *Immigration Priorities*, 599 U.S. 670, 676 (2023) (quotation marks omitted). Although this Court previously held that plaintiffs had standing to challenge DACA, that decision has been abrogated by recent Supreme Court decisions. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (explaining that "there is no hard-and-fast requirement[] … that a Supreme Court decision explicitly overrule the circuit precedent at issue" to conclude that a prior decision is abrogated because it "has fallen unequivocally out of step with some intervening change in the law"). Under intervening Supreme Court precedent, plaintiffs cannot establish standing.

### 1.    Plaintiffs are not entitled to special solicitude in the standing analysis

In the prior appeal, this Court held that plaintiff States warrant "special solicitude" under *Massachusetts v. EPA*, 549 U.S. 497 (2007). *See Texas v. United States*, 50 F.4th 498, 517 (5th Cir. 2022). That conclusion is inconsistent with the Supreme

16

Court's intervening decision in *Immigration Priorities*, 599 U.S. 670, which held that Texas and Louisiana lacked standing to challenge DHS guidelines for immigration enforcement, without according the plaintiff States any special solicitude in the standing analysis.

The plaintiffs in *Immigration Priorities* argued—and this Court had concluded—that they were entitled to special solicitude under *Massachusetts* because they had a procedural right to sue "under the APA" and were challenging an agency's alleged "failure to protect certain formerly 'sovereign prerogatives that are now lodged in the Federal Government,'" specifically, the "power to admit or exclude aliens" and "the 'quasi-sovereign interests in the health and well-being[] …[]of [the State's] residents in general.'" Brief for Respondents at 16-17, *Immigration Priorities*, 599 U.S. 670 (No. 22-58) (alterations and quotation marks omitted); *see Texas v. United States*, 40 F.4th 205, 216 & n.4 (5th Cir. 2022) (per curiam) (holding that Texas warranted special solicitude based on its sovereign interest in "immigration policy and enforcement"). The Supreme Court specifically rejected that argument, explaining that reliance on *Massachusetts* was misplaced because that case "involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion." *Immigration Policies*, 599 U.S. at 685 n.6.

The Supreme Court's refusal to extend *Massachusetts* to permit States to challenge asserted underenforcement of immigration laws makes sense. In affording a

State "special solicitude" in *Massachusetts*, the Supreme Court explicitly relied on two features absent here. 549 U.S. at 520. First, *Massachusetts* involved the threatened loss of the State's sovereign territory—a harm long been treated as distinctive and legally cognizable. *See id.* at 518-519. This case, in contrast, involves "indirect effects on state revenues or state spending"—a commonplace consequence of federal policies. *Immigration Policies*, 599 U.S. at 680 n.3. Second, *Massachusetts* attached "critical importance" to the State's "procedural right" under the Clean Air Act to challenge the denial of a petition for rulemaking on emissions standards. 549 U.S. at 516, 518, 520. "[A] person … accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). The INA, however, creates no procedural right for third parties to challenge a deferred-action policy, nor did the Supreme Court accept the States' invitation in *Immigration Priorities* to locate such a specific right in the APA.

Plaintiffs' standing arguments here mirror those rejected in *Immigration Policies*. *See* ROA.35410. And the extension of special solicitude to Texas was a prominent feature of this Court's prior conclusion that plaintiffs here have standing. *See Texas*, 50 F.4th at 517 ("Texas warrants special solicitude because of its procedural right under the APA to challenge DACA and Texas' quasi-sovereign interest in alien classification, an area in which the State would like to, but cannot, regulate."); *id.* at 520 (concluding that, "[e]specially with the benefit of special solicitude," Texas had

standing). This Court should revisit its standing analysis without affording special solicitude to plaintiffs.

### 2.   Plaintiffs cannot establish standing based on indirect effects on state spending

a. The Supreme Court's decision in *Immigration Priorities* also abrogates this Court's prior reliance on plaintiffs' asserted social-services expenditures to conclude that Texas had established a cognizable injury. *See Texas*, 50 F.4th at 517-520. As here, the plaintiffs in *Immigration Priorities* argued that the challenged policy increases the number of unlawful immigrants in the United States, and that, in response, the States increased education and healthcare expenditures. *See Immigration Priorities*, 599 U.S. at 674; Brief for Respondents at 13, *Immigration Priorities*, 599 U.S. 670 (No. 22-58). The Supreme Court dismissed that argument, explaining that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Immigration Priorities*, 599 U.S. at 680 n.3. When a State asserts "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* Thus, the Court held that the plaintiffs' assertions regarding increased education and healthcare costs failed to "overcome[] the fundamental Article III problem with th[eir] lawsuit." *Id.*

Plaintiffs' assertions of standing here suffer from the same flaw that the Supreme Court recognized in *Immigration Priorities*. Plaintiffs do not assert—and this Court did not previously find—that the DACA rule has caused them any direct injury

19

by, for example, requiring them to act or to refrain from acting, determining their federal funding, or depriving them of a legal right. Rather, plaintiffs contend that the DACA rule has had incidental effects on Texas by causing immigrants to choose to stay in Texas when they might otherwise have left the country, thus slightly increasing the Texas population, to which the State will respond by making additional expenditures for emergency healthcare services and public education. *See* ROA.33459-33462. Such indirect, incidental effects that the DACA rule may have on plaintiffs are not judicially cognizable injuries.

A contrary rule would be at odds with bedrock principles of our federal system, in which the United States and the States share sovereignty over the same territory and people. When a State suffers a "direct injury" at the hands of the federal government, it may be able to sue the United States. *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (holding that Florida lacked the necessary direct injury to challenge a federal inheritance tax alleged to have economic effects on the State). But a State cannot sue the federal government based on the indirect effect of the United States' policies regulating the people within the State. Such policies will inevitably have derivative consequences for the State itself, but deeming legally and judicially cognizable States' interest in avoiding such incidental effects is inconsistent with the autonomy of the national and state sovereigns to act directly upon individuals "'within their respective spheres.'" *Printz v. United States*, 521 U.S. 898, 920 (1997). That is particularly true

20

where, as here, those effects derive from the independent actions of individuals in the State.

Plaintiffs' theory of standing has startling implications. On their view, any federal action that increases, even indirectly, the number of immigrants in a State creates standing because the State may increase its expenditures in response. Other States could use equivalent logic to claim injury from any federal action *reducing* their noncitizen populations, on the theory that noncitizens pay state taxes or otherwise contribute economically to the State. If such incidental financial effects satisfied Article III, every immigration-policy dispute between the federal government and the States would end up in federal court.

Nor is the problem limited to immigration. Virtually any federal action—from prosecuting crime to imposing taxes to managing federal property—could incidentally affect state finances. The Supreme Court's decision in *Massachusetts v. Laird*, 400 U.S. 886 (1970), *cited in Immigration Priorities*, 599 U.S. at 680 n.3, shows where plaintiffs' theory leads. There, Massachusetts sued the Secretary of Defense to enjoin the Vietnam War. The Court summarily rejected the suit, *Laird*, 400 U.S. at 886, but Justice Douglas argued in dissent that the State had standing, *id.* at 887-891. On plaintiffs' theory, the Court was wrong, and Justice Douglas was right. Surely the Vietnam War had at least one dollar of indirect effects on Massachusetts of the sort plaintiffs invoke here, such as the loss of drafted residents' taxable income. Because almost every federal policy will affect the people within the States, almost every

federal policy will indirectly affect the States themselves.  If such effects satisfy Article III, "what limits on state standing remain?" *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022).[1]

b.  Even assuming a federal rule's indirect effects could support state injury, plaintiffs here have not met their burden of satisfying the remaining Article III requirements.  Although this Court previously held that Texas here established its asserted social-services costs were traceable and redressable, that analysis relied on the Court's view that Texas warrants special solicitude under *Massachusetts v. EPA*.  *See Texas*, 50 F.4th at 519-520.  As explained above, intervening Supreme Court precedent has abrogated that reasoning, and this Court accordingly should revisit its conclusions.

Properly viewed, Texas's showing cannot establish either that its asserted injuries are traceable to DACA or that enjoining DACA would redress those injuries.  As the district court recognized, other federal law requires that Texas provide emergency medical services and public education to any undocumented immigrant, whether covered by DACA or not.  ROA.25212; *see* 42 C.F.R. §§ 435.139, 435.406(b),

---

[1] The indirect social-services expenditures plaintiffs allege they will make because of the federal policies challenged in *Immigration Priorities* and this case stand in contrast to the direct injury to Missouri the Supreme Court found in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).  There, the Supreme Court explained that federal plans to discharge certain student-loan debt would directly harm a public instrumentality of the State—which had entered contracts with the Department of Education and was created to service student loans—by causing account closures and approximately $44 million in revenue loss.  *Id.* at 2365-2366.  Plaintiffs here do not allege that the DACA rule will cause any comparable direct loss of state revenue or alter anything regarding a federal-State contract.

440.255(c); *Plyler v. Doe*, 457 U.S. 202 (1982); 87 Fed. Reg. 53,173 ("DACA is not a qualifying immigration category for Medicaid eligibility and does not affect access to public schools."). But Texas was "required to demonstrate that the state will incur costs *because of the DACA program*," *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (emphasis added), not because of undocumented immigrants' presence generally. Because it lacks such evidence, Texas's traceability and redressability showing fails.

The district court erroneously reasoned that DACA nevertheless increases Texas's costs by "incentivizing otherwise unlawfully present aliens to remain" in the State rather than leaving the country. ROA.25212. Plaintiffs provided no evidence of a net increase in the number of undocumented individuals in Texas who need social services just because DHS focuses its enforcement efforts on higher-priority noncitizens rather than the DACA population, nor have plaintiffs proven that any DACA recipients would leave absent the policy. Indeed, the record reflects that "DACA-eligible individuals generally would be unlikely to leave the United States if the DACA policy were discontinued." 87 Fed. Reg. 53,173. "Even … when the DACA policy was first announced, DACA-eligible persons would already have been residing in the United States for five years, without deferred action." *Id.* When the rule issued ten years later, DHS found that "many DACA recipients have developed deep ties to the United States and have children and close relations with family and friends" and "know only the United States as home." *Id.*; *see also* ROA.17989, ¶ 43 ("[R]escission of the DACA initiative w[ould not] cause recipients to leave the United

States."); ROA.18097, ¶ 36 (explaining that DACA recipients are unlikely to leave the United States even without deferred action).

The district court's contrary conclusion rests on conjecture. The court cited (ROA.36374 n.28) the declaration of a Texas state demographer, but it had to rely on what the court deemed his "common-sense assertion" that "DACA recipients may lose their jobs and/or leave the United States," given that he had by that point "conceded … that he had not thought through all the implications of DACA recipients losing status." ROA.25214 n.25. Indeed, the demographer admitted he had never researched the reasons that undocumented immigrants come to or leave the United States, ROA.18442, and was unfamiliar with any research on the return migration of DACA recipients, ROA.18470. In concluding that DACA recipients actually would depart, the court also put misplaced reliance (ROA.36374 n.28) on a question in a DACA-recipient survey suffering from serious methodological errors. ROA.18082-18083, ¶¶ 15-16. Similarly, the court erroneously relied on Texas's estimates of financial harm, which lacked factual basis and were expressly repudiated by the witness to whom they were attributed, ROA.18079-18087, as DHS maintained below, ROA.34580-34581. At the very least, the district court could not properly grant summary judgment to plaintiffs based on this disputed evidence.

Nor does the administrative record indicate that plaintiffs would "bear some costs resulting from the Final Rule" or otherwise "confirm" standing, as the district court asserted. ROA.36374. In fact, DHS stated that "while the final rule could result

24

in some indirect fiscal effects on State and local governments, the size *and even the direction* of the effects is dependent on many factors." 87 Fed. Reg. 53,173 (emphasis added). DHS thus did not find that plaintiffs would necessarily bear *any* costs resulting from the final rule. Instead, DHS explained that "because the DACA policy permits DACA recipients to obtain lawful employment" and thus private, employer-sponsored health insurance, "eliminating DACA could increase State and local healthcare expenditures." *Id.* at 53,174. Rather than supporting plaintiffs' assertion that DACA increases Texas's social-services expenditures, the final rule is entirely consistent with the conclusion that DACA decreases those expenditures. *See also* ROA.18026, ¶ 56 ($18 million in emergency Medicaid savings).[2]

c. On remand, plaintiffs introduced a new theory of standing in their summary-judgment reply brief, arguing that Texas was injured by its subsidization of driver's licenses for DACA recipients. ROA.35417-35419; *see* ROA.36377 n.37. Plaintiffs forfeited this driver's-license theory of standing (which the district court found unnecessary to consider), and this Court should decline to address it. Plaintiffs did not include that theory in their complaint, amended complaint, supplemental

---

[2] The district court incorrectly stated that the final rule "acknowledges some[] … DACA recipients would leave the country if the program were rescinded." ROA.36374 n.29. In fact, DHS "acknowledge[d]" data submitted by commenters, explained why that data may be unreliable, and stated only that "some DACA recipients *might* leave the country if the program did not exist" but that "DACA-eligible individuals generally would be unlikely to leave the United States if the DACA policy were discontinued." 87 Fed. Reg. 53,165, 53,173 (emphasis added).

complaint, original motion for summary judgment, motion for summary judgment on remand, or, indeed, any filing before their reply brief on remand. "Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived." *Center for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019). This Court has declined to consider a standing argument alleging new injuries in a reply brief, *see id.*, and the district court (had it considered the issue) should have done so as well, particularly given that plaintiffs' failure to raise the issue earlier deprived defendants of any opportunity to test plaintiffs' belated factual allegations. If this Court were to revive this argument, additional discovery would be required. *See* ROA.35563, 35579-35582.

In any event, this eleventh-hour standing argument is meritless. First, Texas's expenditures on driver's licenses are like the healthcare and education expenditures that the *Immigration Priorities* plaintiffs unsuccessfully invoked—an "indirect effect[] on state revenues or state spending" of the variety that the Supreme Court warned "attenuate[s]" any claims of standing. *Immigration Priorities*, 599 U.S. at 680 n.3.

Second, Texas has opted into any subsidization of driver's licenses for deferred-action recipients. Texas decided to issue licenses based on "authorize[d]" presence, Tex. Transp. Code Ann. § 521.142, which it chose to define with its own list of immigration categories, *see* Tex. Dep't of Pub. Safety, *Verifying Lawful Presence* 2-7 (July 2013), https://perma.cc/EG3Y-BG44. "No State can be heard to complain about damage inflicted by its own hand," such as when it chooses to tie "a tax credit"

or other subsidy to the actions of another entity. *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam).

Third, even absent discovery to test plaintiffs' belated assertions, plaintiffs' license-related evidence does not establish injury. Texas's declaration does not explain how the alleged cost—from $0.30 to about a dollar—per customer that the State pays to verify immigration status, *see* ROA.35427, injures the State given that it collects $33 from each license applicant, *see* Tex. Dep't of Pub. Safety, *Driver License Fees*, https://perma.cc/L72F-668U. Nor does Texas support its cursory allegation that DACA will result in the State hiring additional employees and renting more office space to accommodate license requests. *See* ROA.35427. Such gaps highlight the necessity of permitting defendants to take discovery and allowing the district court to weigh the evidence in the first instance should this Court decide to address this forfeited argument.[3]

### 3. Plaintiffs cannot challenge the federal government's exercise of enforcement discretion

The Supreme Court's decision in *Immigration Priorities* requires this Court to reexamine its earlier jurisdictional analysis for an additional reason: that case confirms that plaintiffs generally lack standing to seek an order requiring the Executive Branch

---

[3] The district court suggested plaintiffs' standing "is about to be buttressed" by a "pending" rule concerning DACA recipients' eligibility for certain healthcare-related benefits. ROA.36376. But no final rule on this topic has issued, and a proposed rule cannot establish injury. *See Lujan*, 504 U.S. at 560. Whether any final rule that issues affects plaintiffs' standing will of course depend on the rule's content.

to increase its enforcement actions given the "principle of enforcement discretion over arrests and prosecutions [that] extends to the immigration context." *Immigration Priorities*, 599 U.S. at 679.  Although the Supreme Court declined to "resolve the Article III consequences of" a policy "that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status," *id.* at 683, this Court does not require "a Supreme Court decision explicitly overrul[ing]" circuit precedent before concluding such precedent is no longer good law, *Bonvillian Marine*, 19 F.4th at 792.

In *Immigration Priorities*, the Court reiterated its conclusion in *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), that "a citizen lacks standing to contest the policies of the prosecuting authority 'when he himself is neither prosecuted nor threatened with prosecution.'"  599 U.S. at 677.  The Court cited the lack of historical precedent for such suits and noted the importance of "'history and tradition'" in determining the types of cases an Article III court can entertain.  *Id.* at 676.  Furthermore, lawsuits alleging that the Executive Branch has brought an insufficient number of prosecutions "run up against the Executive's Article II authority to enforce federal law," *id.* at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices," *id.* at 679.  The Court also confirmed that the "principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement

discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Id.*

Plaintiffs' claims here likewise implicate Article II's assignment to the Executive Branch, not the judiciary, of the "authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Immigration Priorities*, 599 U.S. at 678.  Here too, the Executive Branch has identified circumstances where it "elects *not* to arrest or prosecute" and thus "does not exercise coercive power over an individual's liberty or property" or "infringe upon interests that courts often are called upon to protect."  *Id.*  And DACA, like the policy at issue in *Immigration Priorities*, rests on the reality that the Executive Branch "invariably lacks the resources to arrest and prosecute every violator of every law" and must "constantly react and adjust to the ever-shifting public-safety and public-welfare needs of the American people."  *Id.* at 680.

Nor does the fact that DACA enables temporary work authorization for the period during which the Executive has deferred enforcement actions against low-priority individuals alter its fundamental nature as an exercise of enforcement discretion.  Such collateral authorizations have long been a natural consequence of deferred-action decisions, not benefits programs unto themselves.  *See supra* pp. 5-7.  Indeed, the DACA rule—which the Supreme Court has never addressed—makes explicit that DACA's forbearance aspects are so central to the policy that they should

stand alone, even unattended by work authorizations. *See* 87 Fed. Reg. 53,248; 8

C.F.R. § 236.24; *infra* pp. 43-49. Furthermore, parties ordinarily lack a judicially

cognizable interest in preventing the provision of government benefits to someone

else, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-346 (2006), and this context is

no different.

### 4.    The district court's contrary reasoning is erroneous

The district court incorrectly concluded that two limitations in the *Immigration*

*Priorities* analysis support plaintiffs' standing here.

First, the Supreme Court stated in *Immigration Priorities* that "the standing

calculus might change if the Executive Branch wholly abandoned its statutory

responsibilities to make arrests or bring prosecutions." 599 U.S. at 682. The district

court mistakenly stated that plaintiffs had "raised that very issue in this case" by

alleging that "DHS has abdicated or abandoned its enforcement duties and, by doing

so, violated the Take Care Clause of the Constitution." ROA.36376. The court

misconstrued the complaint, however, which alleges garden-variety contrary-to-law

claims, *see* ROA.33390-33393, not that "the Executive has entirely ceased enforcing

the relevant statutes," *Immigration Priorities*, 599 U.S. at 683.

Far from abdicating its enforcement responsibilities, DHS has utilized its

enforcement resources to make an average 131,771 administrative arrests and 235,120

removals per year from 2016 to 2020—but its resources fall far short of those

necessary to remove the more than 11 million undocumented noncitizens currently

living in the United States.  *See* 87 Fed. Reg. 53,185.  The DACA rule allows "DHS to utilize its limited resources efficiently by targeting high-priority cases, such as those that pose a threat to public safety, national security, or border security."  *Id.* at 53,190; *see also id.* at 53,155 (recognizing "that enforcement resources are limited[ and] that sensible priorities are vital to the effective use of those resources").  Just like the enforcement-priorities guidelines in *Immigration Priorities*, the DACA rule balances "resource constraints and … public-safety and public-welfare needs" in support of the Executive Branch's enforcement responsibilities.  599 U.S. at 680.

Second, the district court invoked the Supreme Court's statement in *Immigration Priorities* that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." 599 U.S. at 683 (citing *Regents* and *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015)); *see* ROA.36375.  But as discussed, the fact that a person accorded deferred action in the exercise of enforcement discretion may also be accorded benefits under other provisions of law does not cause *the plaintiffs here* any cognizable injury.  Plaintiffs' reliance on any incidental effects that such federal benefits may have on state expenditures is too attenuated to accord them standing in these circumstances.  *See Department of Educ. v. Brown*, 600 U.S. 551, 568 (2023) (holding that plaintiffs lacked standing to challenge a program providing benefits to other borrowers on the theory that eliminating that benefit "might have some incidental effect" on the plaintiffs);

31

*Immigration Priorities,* 599 U.S. at 680 n.3 (citing cases that did not involve challenges to enforcement policies).  The attenuated nature of Texas's alleged injury thus underscores plaintiffs' lack of standing, regardless of whether the challenged rule is viewed as an enforcement-discretion policy or a benefits program.

### B.     Plaintiff States Cannot Assert *Parens Patriae* Standing Against The Federal Government

Plaintiffs have also claimed *parens patriae* standing to assert the interests of their citizens in avoiding labor-market competition from DACA recipients.  ROA.33456-33459.  This Court did not address this argument in the prior appeal, nor did the district court on remand.  The Supreme Court recently confirmed that this argument is meritless, reiterating that "a State does not have standing as *parens patriae* to bring an action against the Federal Government."  *Haaland v. Brackeen,* 599 U.S. 255, 295 (2023) (alteration omitted) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 610 n.16 (1982)).

Plaintiffs have argued that *Brackeen*'s holding on *parens patriae* standing applies only when a State brings a constitutional challenge to a federal statute, not when it brings a statutory challenge to a regulation.  ROA.36163.  But the clear statement in *Brackeen* precluding *parens patriae* standing in a suit against the United States contains no such qualification, and the Court's longstanding explanation why such standing is unavailable—because "the Federal Government[ is] the ultimate *parens patriae* of every

American citizen," *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), *cited in Brackeen*, 599 U.S. at 294—applies regardless of the nature of the claim asserted.

In any event, the record reflects a genuine dispute of material fact underlying Texas's assertion of labor-market injury due to DACA, and thus this Court could not affirm the grant of summary judgment to plaintiffs based on this standing theory. Despite the district court's earlier speculation that some employers might prefer DACA recipients over other applicants, ROA.25209, plaintiffs did not identify any employer who has done so. To the contrary, as defendants asserted below, DACA has not prompted "any overall decline in employment for U.S. born workers" and has no negative effect on wages. ROA.10377, 18012-18013, ¶ 30.

## II.    PLAINTIFFS DO NOT HAVE A CAUSE OF ACTION UNDER THE APA

The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it bars a suit where review is precluded by statute, 5 U.S.C. § 701(a)(1), and it provides a cause of action only to plaintiffs "adversely affected or aggrieved by agency action within the meaning of a relevant statute," *id.* § 702. "'[T]he interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question.'" *Clarke*, 479 U.S. at 396 (alteration omitted).

This Court previously held that plaintiffs "have an interest in seeing the INA enforced" and that their claims "fall within the zone of interests." *Texas*, 50 F.4th at 520-521. That conclusion is inconsistent with the Supreme Court's affirmation in

33

*Immigration Priorities* that a plaintiff lacks a cognizable interest in the enforcement of the immigration laws against a third person. *See* 599 U.S. at 677 (citing *Linda R.S.*, 410 U.S. at 619). And even if plaintiff States could establish Article III standing, they do not fall within the zone of interests Congress sought to protect in the INA. Nothing in the statute's text, structure, or purpose suggests that it protects a State's interest in controlling incidental healthcare and public-education expenditures, or limiting competition in its labor markets—or that an injury to those interests would provide grounds to contest the validity of the federal government's immigration-enforcement policies. *See Immigration Priorities*, 599 U.S. at 676-677. And plaintiffs can identify no statutory provision protecting a State from resident noncitizens obtaining deferred action, work authorization, or potential eligibility for federal benefits. To the contrary, the INA's detailed review scheme affords only noncitizens-—not States or other third parties—an opportunity to challenge removal policies, *see* 8 U.S.C. § 1252(b)(9), (g) (providing that review is available only for an "alien"), and thus precludes judicial review by third parties, *see* 5 U.S.C. § 701(a)(1); *Block v. Community Nutrition Inst.*, 467 U.S. 340 (1984).

## III.   THE DACA RULE IS CONSISTENT WITH THE INA

The DACA rule is a lawful and straightforward exercise of the Secretary's expansive statutory authority to administer and enforce the Nation's immigration laws and to set national immigration-enforcement policies and priorities. The Secretary is charged with "[e]stablishing national immigration enforcement policies and priorities,"

6 U.S.C. § 202(5), and has broad authority to administer and enforce the immigration laws, 8 U.S.C. § 1103(a)(1), which Congress has empowered him to implement by issuing "regulations" or "instructions," *id.* § 1103(a)(3). These authorities plainly encompass deferred-action policies like DACA, as reflected in other statutory provisions. *See, e.g.*, REAL ID Act § 202(c)(2)(B)(viii), 119 Stat. at 313 (authorizing States to issue driver's licenses to individuals with "approved deferred action status").

Moreover, the INA explicitly permits the employment of noncitizens "authorized to be so employed by this chapter *or by the Attorney General*," 8 U.S.C. § 1324a(h)(3) (emphasis added); *see also id.* § 1324a(b)(2) (referring to "an alien who is authorized under this chapter or by the Attorney General to be hired, recruited, or referred for … employment"). Congress has further acknowledged the Secretary's discretion to grant work authorization, referring to it by limiting it in certain cases, *see id.* § 1231(a)(7), and encouraging it in others, *see, e.g.*, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361. Decades-old regulations (which plaintiffs do not challenge) reflect the same understanding of statutory authority on which DACA is based, *see, e.g.*, 8 C.F.R. § 1.3(a)(4)(vi); 46 Fed. Reg. 25,079, 25,081 (May 5, 1981), and such "'longstanding'" interpretations are entitled to "'particular deference,'" *Barnhart v. Walton*, 535 U.S. 212, 220 (2002). In discussing DACA recipients' work authorization in its prior decision, this Court previously did not grapple with these authorities. *Texas*, 50 F.4th at 525-528.

The DACA rule's treatment of lawful presence is likewise consistent with the governing statutes and longstanding regulations (which plaintiffs do not challenge). *See* 8 U.S.C. § 1182(a)(9)(B)(ii) (defining "unlawful presence" for some immigration purposes as instances in which an "alien is present in the United States *after the expiration of the period of stay authorized by the Attorney General*" (emphasis added)); *id.* § 1611(b)(2) (lifting eligibility bar on certain federal public benefits for certain individuals "lawfully present in the United States as determined by the Attorney General"); 8 C.F.R. § 1.3(a)(4)(vi) (pre-DACA regulation interpreting § 1611(b)(2) as applying to recipients of "deferred action").[4]

Notwithstanding these points, this Court previously held that the DACA memorandum is inconsistent with the INA. *See Texas*, 50 F.4th at 525-528. As the government has explained, "the final [DACA] rule is materially indistinguishable from the 2012 memorandum for purposes of plaintiffs' contrary-to-law claims." Federal Appellants' Supplemental Brief at 13, *Texas*, 50 F.4th 498, (No. 21-40680). The government thus recognizes that its merits arguments concerning the DACA rule's consistency with the INA are foreclosed at this stage. The government respectfully disagrees with this Court's previous holding and preserves for further review all arguments raised in prior proceedings, *see, e.g.*, Federal Appellants' Opening Brief at 27-53, *Texas*, 50 F.4th 498 (No. 21-40680); *supra* pp. 34-35, that DACA is lawful.

---

[4] *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2280 n.1 (2021) (Secretary empowered to enforce INA provisions referring to the Attorney General).

While largely relying on the "same reasons" articulated in its prior INA analysis, ROA.36387, the district court on remand made two additional observations it considered to "demonstrate … problems with the Final Rule," ROA.36382.  First, it noted the concept of "advance parole." ROA.36382-36385.  But advance parole has no bearing on DACA's legality, as it is not a feature of DACA; it is a practice rooted in the INA, which provides that "any alien applying for admission to the United States" may be paroled into the country "temporarily … on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5).  Noncitizens currently in the United States may request that DHS exercise its discretion to issue an advance-parole document, which generally permits the recipient to appear at a port-of-entry to seek parole into the United States after leaving the country.  *See* 8 C.F.R. § 212.5(f); 71 Fed. Reg. 27,585, 27,586 n.1 (May 12, 2006) (describing the function and limitations of "advance parole").  Advance parole is not specific to DACA recipients, being a DACA recipient does not guarantee DHS will issue an advance-parole document, and having an advance-parole document does not guarantee DHS will parole the individual.  *See* USCIS, Form I-131, *Instructions for Application for Travel Document* 4-5, https://go.usa.gov/xevHF.[5]  Dissatisfaction with

---

[5] The district court asserted that the DACA rule "resurrected" so-called "categories" of advance parole, ROA.36384, but the court grounded its conclusion on a document instructing applicants how to seek advance parole.  Those instructions describe USCIS's general practices without dictating the outcome of any parole request.

advance parole is not an objection to DACA but to the separate, well-established scheme under 8 U.S.C. § 1182(d)(5), which is not challenged here and will continue to operate even absent DACA.

Second, the district court reasoned that the DACA rule is unlawful because, in its view, the rule is not "a temporary measure" and lacks "temporal limits." ROA.36385. That is incorrect. Like other forms of deferred action, DACA "is by its nature temporary" and "can be terminated at any time." 87 Fed. Reg. 53,180; *see also* 8 C.F.R. § 236.21(c)(1) (describing DACA as "temporary forbearance from removal"). DACA recipients, moreover, must request a renewal of deferred action, which lasts for "2 years, subject to DHS's discretion." 8 C.F.R. § 236.23(a)(4). And the court's observation (ROA.36387) that DACA has remained in place since 2012 without an identified end does not reflect unlawfulness; it reflects the undisputed fact that individuals in the relevant population "have grown into adulthood and built lives for themselves and their loved ones in the United States," 87 Fed. Reg. 53,154, and that they "remain[] a low priority for enforcement" given the Executive's limited resources, *id.* at 53,183.

## IV.    THE DISTRICT COURT'S REMEDIAL ORDER IS UNLAWFUL

At a minimum, the district court erred by ordering a nationwide injunction and wholesale vacatur of the DACA rule. The court lacked jurisdiction and statutory authority to issue such remedies; it disregarded the rule's express severability provision; it improperly granted universal relief; and it failed to respect the Supreme

Court's admonition that it would be "the agency's job" to determine how to wind-down the DACA policy, *Regents*, 140 S. Ct. at 1914.

### A.   The District Court Lacked Jurisdiction To Enjoin And Vacate The DACA Rule

The district court lacked jurisdiction to order an injunction or vacatur.  Under 8 U.S.C. § 1252(f)(1), "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1232]," the INA provisions governing arrest, detention, and removal.  That is exactly what the district court did when it enjoined and vacated the DACA rule.  DACA guides DHS in the exercise of its enforcement authorities relating to arrest, detention, and removal.  Indeed, in deeming the rule to be unlawful, the district court incorporated (ROA.36382) its prior conclusions that the Executive's implementation of the DACA policy is inconsistent with 8 U.S.C. §§ 1225, 1226, 1227, 1229a, 1229b, 1229c, and 1231.  *See* ROA.25234-25238 (relying on analysis in *Texas*, 809 F.3d 134).  The court therefore lacked jurisdiction to issue its remedial order.

Nonetheless, this Court rejected the government's arguments under § 1252(f)(1) in the prior appeal, *Texas*, 50 F.4th at 528, and the government recognizes that this holding regarding the limits of the statute currently binds the Court.  Once again, the government respectfully disagrees with that holding and preserves the issue

for further review.  But the government observes that this Court's disposition of this question assumed that the district court's stay "as to those who have been granted DACA status" is a permanent feature of the relief ordered here.  *See id.* at 529 (reasoning that "§ 1252(f)(1) [does not] apply to the injunction" given the stay and that "[n]o present DACA recipient is subject to removal under the district court's existing judgment").  The government agrees that the injunction should not go fully into effect pending further appellate review, *see infra* pp. 53-54, but if further court orders alter the contours of the current stay, this Court's prior § 1252(f)(1) analysis— which does not address an injunction untempered by an indefinite stay with respect to current DACA recipients—would no longer control, and a panel of this Court should revisit this issue.

Moreover, the Court's prior analysis regarding the unstayed portion of the injunction incorrectly concluded that enjoining DHS's implementation of DACA would implicate § 1252(f)(1) only if the injunction required the removal of noncitizens from the country.  *See Texas*, 50 F.4th at 529.  Nothing in the text of § 1252(f)(1) permits "restrain[ts]" on the "operation" of covered provisions as long as the restraints stop short of requiring the removal of a noncitizen.  8 U.S.C. § 1252(f)(1). Section 1252(f)(1) precludes any court, other than the Supreme Court, "from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022).

## B.    The APA Does Not Authorize "Vacatur"

The district court's nationwide vacatur has another independent flaw: the APA does not authorize vacatur of a rule. *See, e.g., Immigration Priorities*, 599 U.S. at 695-699 (Gorsuch, J., concurring in the judgment).

Section 703 governs remedies under the APA.  It states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" authorizing a court to act directly upon an agency order or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703.  Because plaintiffs do not purport to identify any applicable "special statutory review proceeding," § 703 affords them traditional party-specific remedies like "declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." *Id.*; *see also* S. Doc. No. 79-248, at 36-37 (1946) (referring to § 703 as governing remedies).  That does not include nationwide "vacatur."

Although this Court deemed vacatur an appropriate remedy as to the DACA memorandum, *see Texas*, 50 F.4th at 529-530, it did not address the antecedent question whether the APA provides for such relief.  Any assumption that 5 U.S.C. § 706(2) authorizes such relief, *see* 50 F.4th at 525 & n.190, is incorrect because that section does not pertain to remedies at all.  It defines the scope of review, stating that a "reviewing court shall[] … hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary[ and] capricious," "without observance of

procedure required by law," or "otherwise not in accordance with law." 5 U.S.C.

§ 706(2). Those provisions direct the court to disregard unlawful "agency action,

findings, and conclusions" in resolving the case before it, consistent with basic

principles of judicial review. *Id.*; *see Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923);

*Immigration Priorities*, 599 U.S. at 695-699 (Gorsuch, J., concurring in the judgment). In

enacting § 706, Congress did not intend to create a novel remedy of universal vacatur

that operates "'on legal rules in the abstract'" rather than granting traditional equitable

relief "'with respect to specific parties.'" *California v. Texas*, 141 S. Ct. 2104, 2115

(2021).

Although the district court did not address the government's arguments on this

score when considering the contours of new relief with respect to the DACA rule, *see*

ROA.34593-34595, 35572, it appears to have relied on the phrase "set aside" in 5

U.S.C. § 706(2) as a basis to vacate the rule, *cf.* ROA.25228. But those words cannot

bear such weight. In context, "set aside" means "[t]o put to one side; discard;

dismiss" and "[t]o reject from consideration; overrule." *Webster's New International*

*Dictionary of the English Language* 2291 (2d ed. 1958). This understanding makes sense

of the phrase "set aside" in all settings where § 706(2) applies. For example, it would

make no sense for a court to *vacate* an agency's "findings" and "conclusions." 5

U.S.C. § 706(2). But it is entirely sensible for a court to *disregard* unfounded agency

findings and conclusions in resolving the case before it. Similarly, the APA permits

challenges to be raised in "actions for declaratory judgments" or "habeas corpus"

actions, *id.* § 703, but "no one thinks a court adjudicating a declaratory action or a habeas petition 'vacates' agency action along the way," *Immigration Priorities*, 599 U.S. at 699 (Gorsuch, J., concurring in the judgment). Instead, courts ignore—set aside—a regulation in determining whether to grant habeas or declaratory relief.

The district court lacked authority under the APA to "vacate" the DACA rule and should have awarded, at most, party-specific relief consistent with traditional equitable principles.

### C.    The District Court Disregarded The DACA Rule's Express Severability Provision

Even if the district court had power to enjoin and vacate the final rule, it still erred by extending its remedial order to the forbearance aspects of DACA. In striking down the entirety of the DACA rule, the court disregarded both the rule's express severability provision, 8 C.F.R § 236.24, and the Supreme Court's conclusion that "forbearance and benefits are legally distinct and can be decoupled," *Regents*, 140 S. Ct. at 1913. "Whether the offending portion of a regulation is severable depends upon the intent of the agency *and* upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *see K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). Here, both considerations warrant severance if the non-forbearance (or any) aspects of the DACA rule are found unlawful.

1.  The Secretary expressed his unequivocal intent that, to the extent any portion of the DACA rule is deemed unlawful, it should be severed.  The rule explicitly provides that if any provision is held "invalid and unenforceable in all circumstances," then that "provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof."  8 C.F.R. § 236.24(a).  In addition, the severability provision emphasizes the Secretary's intent to preserve the rule's "forbearance" aspects.  *Id.* § 236.24(b) ("The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from one another, from this subpart [regarding forbearance] and any grant of forbearance from removal resulting from this subpart[]….").

The express severability provision reflects the Secretary's policy judgments.  The Secretary determined that, even were a portion of the DACA rule invalidated, any "remaining provisions will remain workable and [would be] preferable to a regime in which none of the provisions operate at all."  87 Fed. Reg. 53,294.  Indeed, the rule underscores that "although there are significant benefits to providing work authorization alongside forbearance, … DHS would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized."  *Id.* at 53,248-53,249; *see also id.* at 53,201 (explaining that "even if a court were to hold that DHS lacked authority to grant discretionary work authorization to DACA recipients," then only the work authorization provision

should be severed "from the rest of the regulation, leaving DACA's forbearance component intact"); *id.* at 53,208 (similar for lawful presence).

The Secretary engaged in this careful policy analysis, moreover, after the Supreme Court held it unlawful *not* to consider DACA's various features independently. In *Regents*, the Court explained that, insofar as the receipt of deferred action under DACA makes recipients eligible for certain "benefits" such as "work authorization," those "benefits" do not "flow inexorably from forbearance." 140 S. Ct. at 1911 & n.5. Thus, because DACA's "forbearance and benefits" aspects "are legally distinct and can be decoupled," the Supreme Court concluded that the then-Secretary acted unlawfully by failing to consider "the option of retaining forbearance without benefits"—a policy that would have "remained squarely within the discretion of" the Secretary. *Id.* at 1912-1913.

The district court disregarded the Secretary's plainly stated intent to use that discretion and maintain a forbearance-only policy if the rest of the rule were deemed unlawful. Instead, the court replaced the Secretary's clear statement of intent with its own surmise that if the non-forbearance aspects of the rule were deemed unlawful, the Secretary actually meant to have no DACA policy *at all*. ROA.36389-36394. The court based that conclusion on the agency's recognition that DACA recipients have indisputable "reliance interests" in their ability to work, ROA.36390, that work authorization is "important" and would increase the overall "net benefit" of the rule, ROA.36390, and that the Secretary preferred to include an express severability

provision instead of "adopt[ing] an unbundled DACA program," ROA.36393.  None of these rationales supports the court's failure to heed the Secretary's announcement of his own intent regarding severability.  The Secretary's preference to include *additional* aspects of the rule in no way suggests that the Secretary considered DACA an all-or-nothing proposition, a theory the preamble and express severability provision repeatedly and unequivocally repudiate.  Indeed, under the court's reasoning, no express severability provision could ever have effect because its existence would show that an agency "had the chance and purposefully chose not to adopt an unbundled" policy.  ROA.36393.  That would eviscerate the severability doctrine.

2.  A forbearance-only version of the DACA rule, though less beneficial than DACA with work authorization, would also "'function sensibly.'"  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 352 (D.C. Cir. 2019).  "[T]he realities of the limited resources available to remove every noncitizen lacking lawful status from the United States" demand that the Secretary exercise "prosecutorial discretion" in administering the immigration laws, 87 Fed. Reg. 53,163, and DACA's formal forbearance aspects are a critical part of the Secretary's discharge of that duty.  The formalized policy "recognizes that enforcement resources are limited, that sensible priorities are vital to the effective use of those resources, and that it is not generally the best use of those limited resources to remove from the United States those who arrived here as young people."  *Id.* at 53,155.

The rule's forbearance provisions enable DHS to avoid expending resources to determine whether to initiate enforcement proceedings each time it encounters an individual who is a low priority for removal, and this aspect of DACA would function in the same manner as a stand-alone policy.  For example, as the agency explained, if an immigration officer encounters a noncitizen granted deferred action under the formalized DACA policy, then the officer can quickly verify that the agency already has determined that the individual is a low priority for removal based on the specific criteria established through reasoned rulemaking.  *See* 87 Fed. Reg. 53,178.  The officer can rely on that prior determination—renewed at the agency's discretion every two years—and focus on events postdating the most recent grant of deferred action. *See id.*  Similarly, ICE may rely on USCIS's review of a DACA recipient's immigration and criminal history to decide to continue, administratively close, or dismiss without prejudice removal proceedings to allow higher-priority cases to progress more quickly through the busy immigration courts.  *See id.*; *see also* 86 Fed. Reg. 53,752.  In addition, several benefits DHS identified in its rulemaking stem from forbearance alone.  *See, e.g.*, 87 Fed. Reg. 53,162 (noting "avoided costs associated with enforcement action against low-priority noncitizens"); *id.* at 53,293 (explaining that a "forbearance-only alternative … would confer a range of benefits to DHS, while also conferring benefits to DACA recipients and their families, in the form of increased security, reduced fear and anxiety, and associated values"); 86 Fed. Reg. 53,752 (noting forbearance-related

benefits of providing "reassurance to people who present low or no risk to the United States, their families, and their communities"); *id.* at 53,796-53,797 (similar).

The DACA rule reflects these distinct benefits by creating distinct processes. Forbearance and work authorization, for instance, are handled independently under the rule, and each is evaluated on unique criteria. 87 Fed. Reg. 53,211 ("[Employment Authorization Documents] for all deferred action recipients, including DACA recipients, are available based on a determination of economic need.").

As with the first prong, the district court misapplied this aspect of the severability analysis. The court principally relied on its view that "DHS does not need a rule to enable it to not prosecute someone." ROA.36395; *see* ROA.36389 (stating that "forbearance with no benefits would be superfluous"). This view simply ignores the Secretary's evaluation of the benefits of a forbearance-only DACA regulation. And the relevant question here is not whether a court considers a severed regulation necessary—a matter rife with policy judgments—but rather only whether the remaining provision would "function sensibly," which the court identified no reason to doubt. The examples discussed above and in the administrative record show that a formalized forbearance-only policy would be workable and valuable.

The district court's remaining grounds for rejecting a forbearance-only DACA policy are entirely unsupported by the authorities it cited. Citing *Regents*, the court stated that "DACA is primarily a benefits rule." ROA.36394. But the Supreme Court said the opposite: "the heart of DACA" is "the forbearance policy." *Regents*, 140 S.

Ct. at 1912.  Likely for those reasons, *Regents* observed that the agency could "exclude DACA recipients" from "benefits" and nonetheless maintain "the forbearance policy," *id.* at 1911 n.5, 1912 n.6, just as the Secretary envisioned through DACA's unequivocal severability provision.  The district court erred in declining to honor that policy decision.  To be clear, work authorization is a valuable aspect of DACA and should be preserved.  But the district court plainly erred in its severability analysis.

### D.    The District Court Abused Its Discretion By Issuing Nationwide Relief

The district court also erred by issuing a nationwide injunction and vacatur applying beyond plaintiff States.  Even if injunctive relief and vacatur were available here, *but see supra* pp. 38-43, such relief would be subject to the background rule that statutory remedies are construed according to "traditions of equity practice."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  The APA provides that its authorization of judicial review does not affect "the power or duty of the court to … deny relief on any … equitable ground."  5 U.S.C. § 702(1).

This Court previously upheld the separate nationwide injunction as to the DACA memorandum because it involved "'immigration law,'" *Texas*, 50 F.4th at 530-531, but it should decline to adopt that assessment in reviewing the current injunction of the DACA rule.  Even in immigration-related cases, equitable remedies may not afford more relief than "necessary to give the prevailing party the relief to which he or she is entitled."  *Hernandez v. Reno*, 91 F.3d 776, 781 & n.16 (5th Cir. 1996) (narrowing

an injunction affecting immigration policy); *see DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of stay) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit.").

The district court erred by granting nationwide relief when just ten States sought DACA's invalidation, while several other States have sought to maintain DACA. In fact, most DACA recipients live in States that strongly support DACA and welcome their presence. *See* Amicus Brief of 22 States and the District of Columbia at 1, *Texas*, 50 F.4th 498 (No. 21-40680); https://perma.cc/Y6T2-KQ6A. And since this Court's opinion in the prior appeal, the "significant reliance interests that DACA has engendered" across the country, *Texas*, 50 F.4th at 530 (quotation marks omitted), have only grown stronger. Any relief, then, should be limited to Texas—the only State that even attempted to show harm caused by DACA—because "[c]ourts have no power to presume and remediate harm that has not been established." *Lewis v. Casey*, 518 U.S. 343, 360 n.7 (1996); *see Guajardo v. Texas Dep't of Criminal Justice*, 363 F.3d 392, 397 (5th Cir. 2004) (per curiam) ("[T]he Supreme Court has required system-wide injury for system-wide injunctive relief."). This principle of "providing equitable relief only to parties" protects against "[m]isuses of judicial power" that could otherwise "threaten 'the general liberty of the people'" by allowing courts to adjudicate more than "the rights of 'individuals.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-2428 (2018) (Thomas, J., concurring) (alteration omitted).

Nationwide relief is not "necessary to remedy the wrong" that Texas, alone, has allegedly suffered. *Hernandez*, 91 F.3d at 781. The negative effects of the district court's injunction and vacatur on DACA recipients, their families, their home States and communities—and on educational institutions, U.S. businesses, and the U.S. economy more generally—weigh decisively against a nationwide injunction and vacatur. *See* 87 Fed. Reg. 53,154-53,155.

### E.    DHS Should Be Charged With Making Policy Judgments About The Timing And Conditions Of Any Wind-Down

Regardless of the availability and geographic scope of any relief here, the district court erred in failing to make clear that the appropriate remedy if DACA is ultimately found unlawful would be a remand to the agency to craft an orderly wind-down. *Cf. Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) ("'[O]nly in "rare circumstances" is remand for agency reconsideration not the appropriate solution.'"). Instead, the court's injunction bars DHS from "implementing" the DACA rule, ROA.36400, which presumably means that absent the stay currently in place, each recipient would lose their grant of DACA as soon as their most recent two-year renewal period expires.

*Regents* underscores the impropriety of such a blunt remedy in the DACA context. "[D]eciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA"—and "[t]hose policy choices are for DHS." *Regents*, 140

S. Ct. at 1910. In other words, "[m]aking th[e] difficult decision" about how to weigh factors such as "reliance interests," "policy concerns," and "other interests" is "the agency's job." *Id.* at 1914. The Supreme Court emphasized that "DHS has considerable flexibility in carrying out [that] responsibility," noting that the previous "wind-down" accompanying the attempted recission of DACA is an "example of the kind of options available." *Id.* The Court likewise provided examples of how the agency might have chosen to exercise its flexibility, including "a broader renewal period based on the need for DACA recipients to reorder their affairs," or adopting "more accommodating termination dates for recipients caught in the middle of a time-bounded commitment" in light of, *e.g.*, educational, military-related, or medical needs. *Id.* Thus, "winding down the program"—and the many policy-based choices that endeavor entails—fall within the "scope of [the agency's] discretion." *Id.* at 1910-1911.

DHS, not a court, is best positioned to consider these difficult questions were DACA ultimately found unlawful. That is especially true considering the devastating impacts of terminating a critical policy benefiting over half a million noncitizens living in the United States, and the "'serious reliance interests that must be taken into account.'" *Regents*, 140 S. Ct. at 1913. Given these powerful reliance interests, the district court's prior order concerning the 2012 DACA memorandum explained that "it is not equitable for a government program that has engendered such significant reliance to terminate suddenly." ROA.25263; *see* ROA.25263 ("[E]quity will not be

served by a complete and immediate cessation of DACA."). Yet, if DACA were ultimately found unlawful, that appears to be what would happen under the injunction that the district court erroneously entered. This Court should clarify that if DACA is held unlawful following exhaustion of all available review, the matter should be remanded to DHS to determine the duration and conditions of an orderly wind-down.

## V.   AT A MINIMUM, THIS COURT SHOULD MAINTAIN THE STAY PENDING FURTHER REVIEW

If this Court concludes that the DACA rule is unlawful and affirms any aspect of the district court's remedy, the Court should maintain the present stay, thus allowing current DACA recipients to continue to retain and renew DACA. The district court recognized that a renewed stay was proper, ROA.36400-36401, and this Court previously endorsed and "preserve[d] the stay as to existing recipients" until further order of this Court or the Supreme Court, *Texas*, 50 F.4th at 531-532; *see supra* pp. 39-40 (explaining that this Court's prior § 1252(f)(1) analysis assumed the indefinite continuation of the stay). At a minimum, the Court should do the same here, particularly given DACA's "profound significance," *Texas*, 50 F.4th at 531, and the potential for its termination to cause enormous disruption in the lives of millions, including hundreds of thousands of "U.S.-citizen children," *Regents*, 140 S. Ct. at 1914, and their communities, *see* 87 Fed. Reg. 53,154. Those concerns powerfully weigh

against an immediate end to DACA—at the very least, until the Supreme Court has an opportunity to review the matter.

## CONCLUSION

The Court should reverse the grant of summary judgment, vacate the permanent injunction and the order of vacatur, and remand with instructions for further proceedings as appropriate.

Respectfully submitted,

*Of Counsel:*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

JONATHAN E. MEYER
*General Counsel*
*Department of Homeland Security*

ALAMDAR HAMDANI
*United States Attorney*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL

*s/ Nicholas S. Crown*
NICHOLAS S. CROWN
*Attorneys, Appellate Staff*
*Civil Division, Room 7259*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1201*

January 2024

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Nicholas S. Crown*
Nicholas S. Crown

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,985 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Nicholas S. Crown*
Nicholas S. Crown

**ADDENDUM**

## TABLE OF CONTENTS

6 U.S.C. § 202...........................................................................................A1

8 U.S.C. § 1103.........................................................................................A1

8 U.S.C. § 1182.........................................................................................A2

8 U.S.C. § 1252.........................................................................................A3

8 U.S.C. § 1324a.......................................................................................A4

8 U.S.C. § 1611.........................................................................................A4

8 C.F.R. § 1.3............................................................................................A5

8 C.F.R. § 236.24......................................................................................A6

8 C.F.R. § 274a.12.....................................................................................A6

## 6 U.S.C. § 202

### § 202. Border, maritime, and transportation responsibilities

The Secretary shall be responsible for the following:

…

(5) Establishing national immigration enforcement policies and priorities.

…


## 8 U.S.C. § 1103

### § 1103. Powers and duties of the Secretary, the Under Secretary, and the Attorney General

(a) Secretary of Homeland Security

(1) The Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, Attorney General, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.

(2) He shall have control, direction, and supervision of all employees and of all the files and records of the Service.

(3) He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.

(4) He may require or authorize any employee of the Service or the Department of Justice to perform or exercise any of the powers, privileges, or duties conferred or imposed by this chapter or regulations issued thereunder upon any other employee of the Service.

(5) He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.

…

A1

**8 U.S.C. § 1182**

**§ 1182. Inadmissible aliens**

(a) Classes of aliens ineligible for visas or admission

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

…

(6) Illegal entrants and immigration violators

(A) Aliens present without admission or parole

(i) In general

An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.

…

(9) Aliens previously removed

…

(B) Aliens unlawfully present

(i) In general

Any alien (other than an alien lawfully admitted for permanent residence) who—

(I) was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 1254a(e) of this title) prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, or

(II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States,

is inadmissible.

(ii) Construction of unlawful presence

For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.

…

(d) Temporary admission of nonimmigrants

  …

  (5)

  (A) The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

…

**8 U.S.C. § 1252**

**§ 1252.  Judicial review of orders of removal.**

…

  (f) Limit on injunctive relief.

  (1) In General. Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

…

A3

**8 U.S.C. § 1324a**

**§ 1324a. Unlawful employment of aliens**

(a) Making employment of unauthorized aliens unlawful

  (1) In general

  It is unlawful for a person or other entity—

  (A) to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3)) with respect to such employment, …

…

(h) Miscellaneous provisions

  …

  (3) Definition of unauthorized alien

  As used in this section, the term "unauthorized alien" means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General.

…

**8 U.S.C. § 1611**

**§ 1611. Aliens who are not qualified aliens ineligible for Federal public benefits**

(a) In general

Notwithstanding any other provision of law and except as provided in subsection (b), an alien who is not a qualified alien (as defined in section 1641 of this title) is not eligible for any Federal public benefit (as defined in subsection (c)).

(b) Exceptions

  …

  (2) Subsection (a) shall not apply to any benefit payable under title II of the Social Security Act [42 U.S.C. 401 et seq.] to an alien who is lawfully present in the United States as determined by the Attorney General, to any benefit if nonpayment of such benefit would contravene an international agreement described in section 233 of the Social Security Act [42 U.S.C. 433], to any benefit

A4

if nonpayment would be contrary to section 202(t) of the Social Security Act [42 U.S.C. 402(t)], or to any benefit payable under title II of the Social Security Act to which entitlement is based on an application filed in or before August 1996.

(3) Subsection (a) shall not apply to any benefit payable under title XVIII of the Social Security Act [42 U.S.C. 1395 et seq.] (relating to the medicare program) to an alien who is lawfully present in the United States as determined by the Attorney General and, with respect to benefits payable under part A of such title [42 U.S.C. 1395c et seq.], who was authorized to be employed with respect to any wages attributable to employment which are counted for purposes of eligibility for such benefits.

(4) Subsection (a) shall not apply to any benefit payable under the Railroad Retirement Act of 1974 [45 U.S.C. 231 et seq.] or the Railroad Unemployment Insurance Act [45 U.S.C. 351 et seq.] to an alien who is lawfully present in the United States as determined by the Attorney General or to an alien residing outside the United States.

…

## 8 C.F.R. § 1.3

### § 1.3.  Lawfully present aliens for purposes of applying for Social Security benefits.

(a) Definition of the term an "alien who is lawfully present in the United States." For the purposes of 8 U.S.C. 1611(b)(2) only, an "alien who is lawfully present in the United States" means:

   …

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure:

   …

   (vi) Aliens currently in deferred action status;

…

**8 C.F.R. § 236.24**

**§ 236.24. Severability.**

(a) Any provision of this subpart held to be invalid or unenforceable as applied to any person or circumstance shall be construed so as to continue to give the maximum effect to the provision permitted by law, including as applied to persons not similarly situated or to dissimilar circumstances, unless such holding is that the provision of this subpart is invalid and unenforceable in all circumstances, in which event the provision shall be severable from the remainder of this subpart and shall not affect the remainder thereof.

(b) The provisions in § 236.21(c)(2) through (4) and § 274a.12(c)(14) and 274a.12(c)(33) are intended to be severable from one another, from this subpart and any grant of forbearance from removal resulting from this subpart, and from any provision referenced in those paragraphs, including such referenced provision's application to persons with deferred action generally.

**8 C.F.R. § 274a.12**

**§ 274a.12. Classes of aliens authorized to accept employment.**

…

(c) Aliens who must apply for employment authorization. An alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions stated in the regulations or cited on the employment authorization document. USCIS, in its discretion, may establish a specific validity period for an employment authorization document, which may include any period when an administrative appeal or judicial review of an application or petition is pending.

…

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment.

…