No. 23-40653

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
_____

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF WEST VIRGINIA; STATE OF KANSAS; STATE OF MISSISSIPPI,

*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, ACTING COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION; PATRICK J. LECHLEITNER, ACTING DEPUTY DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; UR M. JADDOU, DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES,

*Defendants-Appellants*

ELIZABETH DIAZ; JOSE MAGANA-SALGADO; KARINA RUIZ DE DIAZ; JIN PARK; DENISE ROMERO; ANGEL SILVA; MOSES KAMAU CHEGE; HYO-WON JEON; BLANCA GONZALEZ; MARIA ROCHA; MARIA DIAZ; ELLY MARISOL ESTRADA; DARWIN VELASQUEZ; OSCAR ALVAREZ; LUIS A. RAFAEL; NANCI J. PALACIOS GODINEZ; JUNG WOO KIM; CARLOS AGUILAR GONZALEZ; STATE OF NEW JERSEY,

*Intervenor Defendants-Appellants*

_____

On Appeal from the United States District Court for the
Southern District of Texas, Brownsville Division; No. 1:18-cv-68
_____

## BRIEF OF INTERVENOR DEFENDANT-APPELLANT
## STATE OF NEW JERSEY
_____

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM
*State Solicitor*
MAYUR P. SAXENA
*Assistant Attorney General*
Ashleigh B. Shelton
Samuel L. Rubinstein
Viviana M. Hanley
*Deputy Attorneys General*
New Jersey Attorney General's Office
124 Halsey St., 5th Floor
Newark, New Jersey 07101
*Attorneys for Intervenor*
*Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Plaintiffs-Appellees

State of Texas

State of Alabama

State of Arkansas

State of Kansas

State of Louisiana

State of Mississippi

State of Nebraska

State of South Carolina

State of West Virginia

*Represented by*

   Joseph N. Mazzara, Office of the Solicitor General of Texas

   James Mackenzie, Office of the Solicitor General of Texas

   Aaron Nielson, Solicitor General of Texas

   Ryan Daniel Walters, Office of the Attorney General of Texas


Defendants-Appellants

United States of America

Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security

Troy Miller, Acting Commissioner, U.S. Customers and Border Protection

Patrick J. Lechleitner, Acting Director, U.S. Immigration and Customs Enforcement

Ur M. Jaddou, Director, U.S. Citizenship and Immigration Services

*Represented by*

Melissa Patterson, U.S. Department of Justice, Civil Division

Nicole S. Crown, U.S. Department of Justice, Civil Division

Joshua Koppel, U.S. Department of Justice, Civil Division

James J. Walker, Trial Attorney, U.S. Department of Justice, Office of Immigration Litigation

Intervenor Defendants-Appellants

Elizabeth Diaz

Jose Magana-Salgado

Karina Ruiz De Diaz

Jin Park

Denise Romero

Angel Silva

Moses Kamau Chege

Hyo-Won Jeon

Blanca Gonzalez

Maria Rocha

Maria Diaz

Elly Marisol Estrada

Darwin Velasquez

Oscar Alvarez

Luis A. Rafael

Nanci J. Palacios Godinez

Jung Woo Kim

Carlos Aguilar Gonzalez

*Represented by*

    Nina Perales

    Carlos Moctezuma Garcia

    Douglas H. Hallward-Driemeier

    Emerson A. Siegle

    Mark A. Cianci

State of New Jersey

*Represented by*

    Jeremy M. Feigenbaum
    Mayur P. Saxena

/s/ Mayur P. Saxena
Mayur P. Saxena
*Counsel of record for Intervenor*
*Defendant-Appellant State of New Jersey*

## <u>REQUEST FOR ORAL ARGUMENT</u>

New Jersey respectfully requests oral argument, which will illuminate the parties' positions regarding the propriety of the district court's injunction.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

REQUEST FOR ORAL ARGUMENT ................................................................. iv

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ........................................................................4

STATEMENT OF ISSUES ................................................................................5

STATEMENT OF FACTS AND OF THE CASE ....................................................5

SUMMARY OF THE ARGUMENT ...................................................................18

STANDARD OF REVIEW ...............................................................................20

ARGUMENT .................................................................................................20

   I.   THE DISTRICT COURT ERRED IN FAILING TO ACCOUNT FOR
   RELIANCE INTERESTS IN CRAFTING ITS REMEDIAL ORDER..............21

   II.  THE DISTRICT COURT ERRED IN FAILING TO REMAND
   TO DHS TO DETERMINE THE APPROPRIATE NEXT STEPS. ..................41

   III.   THE COURT SHOULD MAINTAIN THE STAY
   PENDING APPEAL...........................................................................45

CONCLUSION ..............................................................................................47

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967)..............................................................................31

*Alcatel USA, Inc. v. DGI Techs., Inc.*,
  166 F.3d 772 (5th Cir. 1999) ............................................................31

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
  78 F.4th 210 (5th Cir. 2023) ............................................................23

*Amoco Prod. Co. v. Gambell*,
  480 U.S. 531 (1987)..........................................................................40

*Andrade v. Lauer*,
  729 F.2d 1475 (D.C. Cir. 1984)........................................................28

*Arizona v. United States*,
  567 U.S. 387 (2012)............................................................................5

*Benisek v. Lamone*,
  138 S. Ct. 1942 (2018)......................................................................22

*Brumfield v. La. State Bd. of Educ.*,
  806 F.3d 289 (5th Cir. 2015) ..............................................................5

*Campaign for S. Equal. v. Bryant*,
  773 F.3d 55 (5th Cir. 2014) ..............................................................38

*Chaudhry v. Holder*,
  705 F.3d 289 (7th Cir. 2013) ..............................................................7

*Chirco v. Crosswinds Communities, Inc.*,
  474 F.3d 227 (6th Cir. 2007) ............................................... 28, 31, 36

*Club Retro, L.L.C. v. Hilton*,
  568 F.3d 181 (5th Cir. 2009) ..............................................................4

*Connor v. Williams*,
  404 U.S. 549 (1972) ............................................................28

*Crane v. Johnson*,
  783 F.3d 244 (5th Cir. 2015) .............................................8, 9

*Ctr. for Biological Diversity v. Ross*,
  480 F. Supp. 3d 236 (D.D.C. 2020) ....................................37

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ................................................. passim

*Dresser-Rand Co. v. Virtual Automation, Inc.*,
  361 F.3d 831 (5th Cir 2004) ...............................................40

*eBay v. MercExchange, LLC*,
  547 U.S. 388 (2006) ............................................................22

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ............................................................23

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric*
  *Admin. Nat'l Marine Fisheries Serv.*,
  109 F. Supp. 3d 1238 (N.D. Cal. 2015) ..............................25

*League of Wilderness Defenders/Blue Mts. Biodiversity Proj. v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) ..............................................37

*Monsanto v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ..................................................... 23, 42

*N. Plains Resource Council v. U.S. Army Corps of Eng'rs.*,
  460 F. Supp. 3d 1030 (D. Mont. 2020) ......................... 25, 32

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................23

*Perez v. Ledesma*,
  401 U.S. 82 (1971) ..............................................................32

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
572 U.S. 663 (2014) ....................................................................... 28, 31

*Radiator Specialty Co. v. Pennzoil-Quaker State Co.*,
207 F. App'x 361 (5th Cir. 2004) .......................................................23

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) .............................................................................6

*Rondeau v. Mosinee Paper Corp.*,
422 U.S. 49 (1975) .............................................................................36

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*,
239 F. Supp. 3d 77 (D.D.C. 2017) ................................................ 28, 31

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*,
540 F. Supp. 3d 45 (D.D.C. 2021) ......................................................26

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ................................................... passim

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ...................................................... 29, 32

*Texas v. Biden*,
646 F. Supp. 3d 753 (N.D. Tex. 2022) ..............................................23

*Texas v. United States*,
328 F. Supp. 3d 662 (S.D. Tex. 2018) ........................................ passim

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ..............................................................23

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) ....................................... 17, 20, 34, 45

*Texas v. United States*,
549 F. Supp. 3d 572 (S.D. Tex. 2021) ......................................... 12, 13

*Texas v. United States*,
86 F. Supp. 3d 591 (S.D. Tex.) ...................................................................9

*United States v. Texas*,
143 S. Ct. 1964 (2023)...............................................................................23

*Valentine v. Collier*,
993 F.3d 270 (5th Cir. 2021) ...................................................................20

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)..................................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................... 22, 36, 38, 40

**Statutes**

28 U.S.C. § 1291 ..............................................................................................4

28 U.S.C. § 1292 .................................................................................. 4, 5, 41

28 U.S.C. § 1331 ..............................................................................................4

6 U.S.C. § 202 ...........................................................................................5, 15

8 U.S.C. § 1103 ...........................................................................................5, 6

8 U.S.C. § 1225 ..............................................................................................6

Consolidated Appropriations Act 2014, Pub. L. No. 113-76, sec. 8, tit. II, 128 Stat.
5, 251..........................................................................................................6

**Regulations**

8 C.F.R. § 236 ...............................................................................................13

8 C.F.R. § 274 ................................................................................... 6, 8, 13

8 C.F.R. §. 106 ...............................................................................................13

Documentary Requirements: Nonimmigrants; Waivers; Admission of Certain Inadmissible Aliens; Parole; Revision of Border Crossing Card Procedures, 46 Fed. Reg. 25,081 (May 5, 1981) ........................................................................8

Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53,152 (Aug. 30, 2022) ................................................................................................................ passim

## Other Authorities

11A Wright & Miller, Fed. Prac. & Proc. § 2948.1 ................................................39

15B Wright & Miller, Fed. Practice & Proc. § 3914.28 (2d ed. 2023) ..................41

Brief for 143 U.S. Business Associations and Companies as Amici Curiae Supporting Respondents, *Regents*, 140 S. Ct. 1891 .............................................15

Memorandum from Janet Napolitano, Sec'y of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Prot., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the U.S. as Children* (June 15, 2012) .........................................................................................8

# **INTRODUCTION**

This appeal concerns the fate of roughly 600,000 people who have structured their lives around a federal policy that has been in place for more than a decade—as well as their families, businesses, state and local governments, and even U.S.-citizen children who rely on them. In 2012, the Department of Homeland Security (DHS) issued a memorandum that set forth an enforcement policy, which it termed Deferred Action for Childhood Arrivals (DACA). Consistent with a long history of deferred action policies, DACA offered guidance for granting deferred action to noncitizens who arrived in the United States as children and who had been residing continuously here for years. In return for coming forward and providing the Federal Government with their information, individuals who received deferred action would—consistent with longstanding regulations—obtain authorization to work lawfully. For a decade, hundreds of thousands of DACA recipients have been relying on the policy. And in 2022, the Federal Government codified these provisions by regulation.

Although the district court held that the DACA regulation is inconsistent with the Immigration and National Act (INA) and thus vacated the policy, that is only the beginning of the remedial inquiry. After all, even where a policy has been vacated, courts engage in a separate inquiry to decide how to accommodate reliance interests that developed throughout the years in which the policy was in effect. That makes sense: vacating a policy annuls that policy, but sometimes it is too late to restore the

status quo ante. Significant actions may already have been taken: a pipeline has been built; markets have developed; crops have been planted; and military exercises have been planned. And once the proverbial egg has been scrambled, proper attention to the equities is necessary to craft a careful remedy that avoids leaving parties and the public worse off than the status quo ante due to their prior reliance on that policy.

It is difficult to imagine a case in which attention to those equities and reliance interests matters more. DACA has been in place for more than a decade. By the end of 2014, the vast majority of individuals to take part in DACA had already applied and been accepted. Today, approximately 600,000 current recipients rely on DACA. Hundreds of thousands of recipients have enrolled in or completed degree programs, started businesses, and purchased homes. DACA recipients have gotten married and had children. They have joined the military or taken positions in law enforcement or in health care. Businesses and governments have hired DACA recipients into hard-to-fill roles and have invested in them. And all of that took place because Plaintiffs-Appellees declined to challenge the policy for nearly six years—in sharp contrast to their swift challenges to other federal policies in this Court.

Because of Plaintiffs-Appellees' deliberate choice, terminating DACA today would produce sharply different results than terminating the policy at its inception. Termination would lead to monumental, unprecedented disruption. It would lead to abrupt removal of hundreds of thousands of recipients from the workforce, harming

all of the "employers who have invested time and money in training" current DACA recipients. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020). It would erase billions in Federal, state, and local tax revenues—far more than the costs Plaintiffs-Appellees asserted from DACA's existence. And it would produce instability for thousands of families, with the parents of U.S citizen children losing work authorization and, with it, their only lawful source of income.

This Court should adopt a remedy that avoids this tremendous harm to current DACA recipients and their families, employers and employees, their state and local governments, and their U.S.-citizen children. Given these unique and overwhelming equities, the district court should have held that while vacatur of DACA terminated the policy as to *prospective* applicants—granting Plaintiffs-Appellees considerable relief—DHS may nevertheless maintain the status quo for *current* DACA recipients, avoiding tremendous harms to them and their communities. At the very least, if the court itself would not preserve the status quo, it should have remanded to DHS for the agency to account for reliance in the first instance. Any other remedy terminating DACA for current recipients would never unscramble the egg; it would simply leave thousands of persons in a worse position than before.

Rarely has a case been of such profound and tangible consequence on the lives of so many. Yet the district court failed to take these equitable considerations into account. The court vacated DACA and enjoined implementation of the policy. But

in crafting the scope of its remedy, it did not consider the profound reliance interests at stake. It did not consider the role Plaintiffs-Appellees' delay played in generating that reliance. It did not evaluate a careful remedy that would protect the status quo for current recipients, or one that leaves these questions to DHS. And although the court accounted for these equities in staying the *effective date* of its remedial order, that is no substitute for carefully evaluating what the remedy should *be*. This Court should therefore reverse the district court's remedial order.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. In the order below, the district court granted summary judgment to Plaintiffs and entered a permanent injunction. *See* ROA.23-40653.36399 (summary judgment); ROA.23-40653.36400-01 (Supplemental Order of Injunction).

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1). Ordinarily, this Court has jurisdiction under 28 U.S.C. § 1291 to review the grant of summary judgment, because summary judgment is a final decision that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 214 (5th Cir. 2009). But the court below stated expressly that notwithstanding the grant of summary judgment, "[a] Final Judgement has not been entered in this case." ROA.23-40653.36401. However, since the court continued and modified its previously entered injunction—applying that injunction

to a new Final Rule—there is plainly jurisdiction under 28 U.S.C. § 1292(a)(1). *See*

*Brumfield v. La. State Bd. of Educ.*, 806 F.3d 289, 296 (5th Cir. 2015).

## STATEMENT OF ISSUES

I.     Whether the district court erred by failing to consider the equities when

crafting a remedial order as to current DACA recipients.

II.    Whether the district court erred in declining to remand to DHS for the

agency to determine the proper next steps in the first instance.

## STATEMENT OF FACTS AND OF THE CASE

A.     The INA And History Of Deferred Action.

The INA grants the Secretary of DHS the authority to administer and enforce

U.S. immigration laws and to "[e]stablish national immigration enforcement policies

and priorities." 6 U.S.C. § 202(5); *see also* 8 U.S.C. § 1103(a)(1). Although over 11

million undocumented immigrants are present in the United States, DHS estimates

that it only has the resources to remove approximately 400,000 immigrants a year—

less than four percent of the undocumented population. *See* 87 Fed. Reg. 53,185;

*Arpaio v. Obama*, 27 F. Supp. 3d 185, 192-93 (D.D.C. 2014). A "principal feature

of the removal system" is therefore "the broad discretion exercised by immigration

officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

For a person here unlawfully, the Executive has discretion to "decide whether

it makes sense to pursue removal at all," or to afford forms of "discretionary relief

allowing [the person] to remain in the country." *Id.* DHS also maintains "discretion to abandon the [removal] endeavor" entirely. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). In exercising such discretion, DHS may be guided both by "immediate human concerns" and its need to prioritize limited resources. *Arizona*, 567 U.S. at 396. After all, Congress authorized DHS to "perform such ... acts as [it] deems necessary for carrying out [its] authority," 8 U.S.C. § 1103(a)(3), and to prioritize removals of criminal aliens and aliens detained at the border. *See* Consolidated Appropriations Act 2014, Pub. L. No. 113-76, sec. 8, tit. II, 128 Stat. 5, 251; 8 U.S.C. § 1225.

Deferred action is one of the longstanding ways in which DHS has exercised this discretion. "Deferred action" is simply the Executive's term for a decision to exercise enforcement discretion to forbear from removing a particular inadmissible or deportable noncitizen for a given period of time. *See Reno*, 525 U.S. at 483-84 (explicitly approving of Executive's "regular practice" of affording deferred action "for humanitarian reasons or simply for its own convenience" and stressing that this does not depend on any "express statutory authorization"); 8 C.F.R. § 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some cases lower priority"). Because deferred action reflects merely a "discretionary reprieve[]," however, immigrants who are present in violation of the INA "do not have a statutory defense against removal based on the reprieve itself,"

and instead remain removable pursuant to the INA. ROA.23-40653.34452; *see also Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (agreeing that the noncitizen may have a "period of stay authorized by the Attorney General" even while they lack lawful status and thus lack a defense from removal under the INA).

Since the 1950s, the Executive Branch has established more than 20 policies for exercising deferred action or other forms of prosecutorial discretion to forbear from removal classes of undocumented immigrants from the United States. ROA.23-40653.34365-68. Early examples include: (a) President Eisenhower's parole of Hungarian refugees, ROA.23-40653.34353; (b) the parole of more than 600,000 Cubans via a series of discretionary programs that took place over the course of four Presidential administrations, ROA.23-40653.34358-59; (c) President Kennedy's establishment of the Hong Kong Parole Program, ROA.23-40653.34366-67; and (d) President Ford's parole of Vietnamese refugees, ROA.23-40653.34355-56. More recently, the Family Fairness policies of 1987 and 1990 allowed forbearance and work authorization for up to 1.5 million undocumented spouses and children of legalized immigrants or those in the process of legalizing their status. ROA.23-40653.34390-91; ROA.23-40653.34416-18. As with DACA, these deferred action policies each targeted large populations of otherwise-removable noncitizens.

Deferred action has also long been associated with work authorization. Those granted deferred action have been permitted to apply for work authorization since

the 1970s. ROA.23-40653.7652-62 (1975 guidance by INS general counsel finding noncitizens can apply for work authorization when the INS "do[es] not intend or [is] unable to enforce the alien's departure"). That practice was codified via regulation in 1981, *see* Documentary Requirements: Nonimmigrants; Waivers; Admission of Certain Inadmissible Aliens; Parole; Revision of Border Crossing Card Procedures, 46 Fed. Reg. 25,081 (May 5, 1981), and again in 1987 following enactment of the Immigration Reform and Control Act of 1986 (IRCA), *see* 8 C.F.R. § 274a.12(c)(14) (permitting individuals granted deferred action to apply for work authorization if they can "establish[] an economic necessity for employment").

    B.    <u>The DACA Memorandum And Procedural History</u>.

    1. On June 15, 2012, Secretary of Homeland Security Janet Napolitano issued a memorandum (2012 DACA Memorandum) laying out criteria to consider when evaluating whether to defer action against removal of "low priority" noncitizens: "'certain young people who were brought to [the U.S.] as children and know only this country as home.'" *Crane v. Johnson*, 783 F.3d 244, 248 (5th Cir. 2015) (quoting Memorandum from Janet Napolitano, Sec'y of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Prot., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the U.S. as Children* (June 15, 2012)); ROA.23-40653.34420-22. Under that memorandum, a person who (1) arrived in the United States before turning 16; (2) had continuously resided in the United States

8

since before June 15, 2007; (3) was in school, had graduated from high school, had obtained a GED, or was honorably discharged from the military; (4) had not been convicted of a felony or significant misdemeanor, and did not otherwise pose a threat to national security or public safety; and (5) was not older than 30 as of June 15, 2012, could seek a discretionary grant of deferred action for a renewable two-year period. ROA.23-40653.34420. DHS specified that applications were "to be decided on a case by case basis," while recognizing that discretion "is especially justified" to defer removal of these "productive young people," "many of [whom] have already contributed to our country in significant ways." ROA.23-40653.34421.

Texas and other Plaintiffs-Appellees declined to challenge the 2012 DACA Memorandum for six years.[1] Indeed, they declined to do so even as they challenged a separate DHS memorandum governing deferred action for parents of U.S. Citizens in 2014. *See Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). Their delay was consequential. The vast majority of individuals who had received deferred action did so within those first few years: by the end of the Fiscal Year (September 30) 2012, there were just 2,019 active DACA recipients, but that number swelled to

---

[1] Mississippi, by and through Governor Phil Bryant, did sue on August 23, 2012, challenging the validity of the 2012 DACA Memorandum. But the district court dismissed the lawsuit for lack of standing, and the Fifth Circuit affirmed, finding that Mississippi had not demonstrated that it would incur any costs "because of [] DACA." *Crane*, 783 F.3d at 252. No other State participated in that suit.

472,880 in Fiscal Year 2013, and 608,037 in Fiscal Year 2014. 87 Fed. Reg. 53,274. And the total number of DACA recipients continued to grow, until reaching roughly 700,000 by the time Plaintiffs-Appellees filed the instant challenge. *Id.*

3. Plaintiffs-Appellees first filed the instant lawsuit and sought a preliminary injunction against DACA in May 2018—almost six years after Secretary Napolitano had issued the 2012 DACA Memorandum. A number of decisions followed.

First, in August 2018, the district court denied Plaintiffs-Appellees' motion for a preliminary injunction. The court first emphasized that Plaintiffs-Appellees had waited for six years before filing suit, which reflected an implicit "concession or an indication that the alleged harm does not rise to a level that merits an injunction." *Texas v. United States*, 328 F. Supp. 3d 662, 738 (S.D. Tex. 2018). During that time, "individuals have continued to apply for and renew their DACA status." *Id.* at 742. In other words, as a result of Plaintiffs-Appellees' decision to wait six years before challenging DACA, tremendous reliance interests had developed in the interim. *Id.* (noting both that hundreds of thousands of DACA recipients and "society" generally "had developed a reliance" on DACA). Not only were recipients' interests at stake, but States too "could lose residents whom they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries." *Id.* at 741. In other words, even though the court thought DACA to be unlawful, the equities that developed over six years had foreclosed preliminary

relief: the "interests of the Defendant-Intervenors and the public outweigh those of the Plaintiff States." *Id.* at 742. Said bluntly, "the egg has been scrambled. To try to put it back in the shell [by enjoining DACA] ... perhaps at great risk to many, does not make sense nor serve the best interests of this country." *Id.* Plaintiffs-Appellees did not appeal the denial of their preliminary-injunction motion.

Second, in June 2020, the Supreme Court issued a decision in a separate lawsuit involving DACA. That lawsuit challenged a decision by then-Acting DHS Secretary Elaine Duke to rescind the policy, based on the then-Attorney General's conclusion that DACA was unlawful. In 2020, in *Regents*, the Court held the rescission violated the Administrative Procedure Act (APA). 140 S. Ct. at 1915. The Court recognized that Secretary Duke was bound by the Attorney General's findings as to the legality of DACA, but emphasized that the legality of DACA and the questions whether and how to accommodate the reliance interests that developed based on the policy in the years since were distinct analyses. *Id.* at 1910, 1915-16. The Court thus found that Secretary Duke had violated the APA by failing to consider that this "longstanding polic[y] may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 1913 (citation omitted); *see also id.* at 1914 (detailing some relevant reliance interests, including that DACA recipients "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance on the" policy, and noting

reliance interests extended to "DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them") (citation omitted). Even were DACA unlawful, the Court added, DHS could take the reliance interests into account in considering a range of next steps. *Id.* at 1915. And because "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA," DHS had to consider these interests in the first instance. *Id.* at 1910.

Third, in October 2020, eight years after the 2012 Memorandum was issued, Plaintiffs-Appellees sought summary judgment, ROA.23-40653.22391-447, which the district court granted in July 2021. *Texas v. United States*, 549 F. Supp. 3d 572 (S.D. Tex. 2021). The court held that DACA violated APA procedural requirements and was inconsistent with the INA, and vacated the policy. *Id.* at 596-621, 624. And in its remedial order issued with the opinion, the court enjoined DHS from granting or renewing deferred action under the 2012 Memorandum. ROA.23-40653.25261-65. The district court held that "Plaintiff States have demonstrated" irreparable harm because Texas had established Article III injury. ROA.23-40653.25262. It held that Plaintiffs-Appellees' harms outweighed the Federal Government's own harms, without considering the harms to Defendants-Intervenors, because "the Government

has no legitimate interest in the continuation of an illegally implemented program." *Id.* And it found the public interest "is always served by the cessation of a program that was created in violation of law and whose existence violates the law." *Id.*

But the district court also stayed that injunction pending appeal as to current DACA recipients—allowing them to retain deferred action, and allowed the Federal Government to renew their grants of deferred action. The court found "[h]undreds of thousands of individual DACA recipients, along with their employers, states, and loved ones, have come to rely on" DACA, and stressed these interests are "the most significant equitable interests to consider." ROA.23-40653.25263. Since it was "not equitable" for a policy that had "engendered such significant reliance to terminate suddenly," the court found a temporary stay was needed "until a further order of this Court," the Fifth Circuit, or the Supreme Court. ROA.23-40653.25263-64.

4. On August 30, 2022, after notice and comment, DHS published a final rule codifying DACA. *See* 87 Fed. Reg. 53,152 (codified at 8 C.F.R. pts. 106, 236, 274a) ("DACA Final Rule" or "Final Rule").

In explaining DHS's decision to continue the DACA policy, the Final Rule included comprehensive findings regarding the reliance interests that had developed since issuance of the 2012 Memorandum. *See, e.g.*, 87 Fed. Reg. 53,169 (noting that "over the 10 years in which the DACA policy has been in effect, DACA recipients have made major good faith investments in both themselves and their communities,

and their communities have made major good faith investments in them"). Without DACA, the 590,070 individuals who have been granted deferred action through the policy would lose their jobs, livelihoods, and/or health coverage. *See* ROA. 23-40653.34503; 87 Fed. Reg. 53,205 (concluding that without work authorization, these current "recipients would be unable to engage in lawful employment to support themselves and their families, potentially exposing them to exploitation and crime"). That loss of income could, in turn, result in DACA recipients being unable to pay for education or pay back their loans. *See* 87 Fed. Reg. 53,164 (finding that DACA "increased graduation rates and expanded access to both earned income ... and financial aid, which DACA recipients have used to fund undergraduate, graduate, and professional degrees"); 87 Fed. Reg. 53,154 (finding DACA "encouraged its recipients to make significant investments in their careers and education"). That harm would likewise extend to the recipient's children. *See* 87 Fed. Reg. 53,296 (finding "[m]ore than 250,000 children have been born in the United States with at least one parent who is a DACA recipient").

Private businesses, too, had come to rely on DACA, and would face dramatic disruption from its termination. In general, DHS explained, a wide range of private companies hired DACA recipients and invested years and money in training them, including in hard-to-fill roles. *See* 87 Fed. Reg. 53,176 (finding that schools relied on DACA recipients as additional teachers amidst "teacher shortages"); 87 Fed. Reg.

53,196 (recognizing that "DACA recipients fill critical roles in the healthcare field," notable given "current healthcare staffing shortage[s]")). The impacts would be felt in particular in a number of important industries. *See* 87 Fed. Reg. 53,154 (noting 30,000 DACA recipients serve as healthcare workers); 87 Fed. Reg. 53,196 (noting evidence that "DACA-recipient physicians will collectively care for … more than 5.1 million U.S. patients over the course of their careers"). Moreover, current DACA recipients who are business owners—over 6% of all recipients—could be forced to close their businesses, *see* 87 Fed. Reg. 53,195, putting 86,000 other U.S. workers at risk of losing their jobs. *See* Brief for 143 U.S. Business Ass'ns & Cos. as Amici Curiae, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891 (2020), Nos. 18-587, 18-588, 18-589, 2019 WL 4954999; ROA.23-40653.34510.

The harms to government entities would be no less profound. *See* 87 Fed. Reg. 53,172-74 (finding States benefit from tax revenues due to contributions of DACA recipients, and DACA reduces States' law enforcement, healthcare, and education costs). If DACA were terminated, DACA recipients would be less willing to interact with law enforcement to report crime. *See* 87 Fed. Reg. 53,173. Moreover, thousands of recipients are enrolled in post-secondary education, including in New Jersey, 87 Fed. Reg. 53,164; the State's colleges and universities would be harmed by the loss of these valued students and their contributions to campus life. 87 Fed. Reg. 53,176. Ending DACA also would have dramatic downstream impacts on the Armed

Services who rely on DACA recipients as members of the military, 87 Fed. Reg. 53,170, and "would harm the States' reliance interests because they would lose the critical skills of [their] employees and their investments in these employees, while also incurring costs associated with terminating their employment and the additional costs of recruiting, hiring, and training their replacements." 87 Fed. Reg. 53,172. And because DACA recipients can "obtain lawful employment, in many cases giving them access to private health insurance and reducing their dependence on state-funded healthcare, eliminating DACA could increase State and local healthcare expenditures." 87 Fed. Reg. 53,174. Finally, DACA recipients in New Jersey currently contribute an estimated $18.7 million per year in income tax. *See* ROA.23-40653.34555; 87 Fed. Reg. 53,270-71 n.334 (noting that the "'States and local governments could lose $1.25 billion in tax revenue each year'" (quoting *Regents*, 140 S. Ct. at 1914)). In a detailed cost-benefit analysis, DHS explained that DACA does not pose a net economic harm to any State; rather, the benefits of DACA far outweigh any costs. *See* 87 Fed. Reg. 53,174 (finding the "benefits of the rule outweigh the potential negative impacts identified by some commenters"); 87 Fed. Reg. 53,271-94 (cost-benefit analysis).

5. Finally, this Court and the district court have issued two decisions relating to DACA since DHS published the Final Rule in August 2022.

First, in October 2022, this Court—on appeal from the district court's 2021 summary-judgment decision—considered the lawfulness of the 2012 Memorandum. *See Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) (*Texas II*). This Court found that the 2012 Memorandum was substantively unlawful and affirmed the district court order. *Id.* at 528. The Court also affirmed the decision to stay its order as to current DACA recipients pending appeal, emphasizing "that, in the similar *DAPA* case, the Supreme Court was equally divided," and recognizing that DACA's "profound significance to recipients and many others in the ten years since its adoption." *Id.* at 531 (adding a stay mitigates the "inevitable disruption that would arise from a lack of continuity and stability"). But while this Court ruled on the validity of the 2012 Memorandum, it acknowledged that the DACA Final Rule was not before it, and thus remanded to the district court to consider the regulation in the first instance. *Id.* at 511-12.

On remand, the district court again granted summary judgment to Plaintiffs-Appellees, finding the Final Rule substantively the same as the 2012 Memorandum. ROA.23-40653.36400-01. The district court therefore "reaffirmed" its prior decision and "expanded" its "original injunction and order of vacatur" to "cover Final Rule DACA." ROA.23-40653.36400. That is, the district court "enjoined" DHS "from implementing Final Rule DACA until a further order of this Court, the Fifth Circuit Court of Appeals, or the Supreme Court." *Id.* "As it did before," however, the court

"stay[ed] the effective date" of its remedy "as to all DACA recipients who received their initial DACA status prior to July 16, 2021," meaning that DHS could "process[] and grant[] DACA renewal applications for" them. ROA.23-40653.36400-01. The district court also "retain[ed] jurisdiction of this matter for purposes of construction, modification, and/or enforcement of the terms of the original and this Supplemental Injunction." ROA.23-40653.36401 (emphasizing that a "Final Judgment has not been entered in this case, so all matters not being addressed by an appellate court are still pending in this Court and subject to its jurisdiction").

This appeal followed.

## SUMMARY OF THE ARGUMENT

I.      Even where a court finds a policy unlawful and vacates it, courts retain the authority and the obligation to engage in a separate remedial inquiry to evaluate whether and how to accommodate reliance interests that have developed in the years in which the policy was in effect. The need to accommodate such reliance interests is particularly apparent in this case. Hundreds of thousands of DACA recipients—who have lived continuously in this country since they were kids—have structured their lives and employment in reliance on this policy. Their families, employers and employees, state and local governments, and U.S.-citizen children would similarly experience unprecedented disruption should recipients lose access to deferred action or work. *See Regents*, 140 S. Ct. at 1914 (acknowledging that an order terminating

DACA "would 'radiate outward' to" their "families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them"). And Plaintiffs-Appellees share responsibility for that state of affairs: they declined to challenge the policy for six years, allowing reliance interests to develop. Given these equities, the district court should have held that while DHS cannot grant deferred action to *new* individuals under the since-vacated DACA policy, DHS can maintain the status quo for *current* recipients. Such an order would still provide Plaintiffs-Appellees with considerable jurisprudential and practical relief, yet would avoid the unprecedented disruption that Plaintiffs-Appellees' belated suit invites. At the very least, this Court should reverse because the district court never even considered these equities when determining the scope of its remedial order, only its effective date.

II.     If this Court selects a remedy that maintains the status quo for current DACA recipients, it would address the exceptional reliance interests that developed in the past twelve years. But if it declines to do so—such that the decision in this case risks disrupting those unique reliance interests—then this Court should remand to DHS in the first instance to determine the appropriate next steps, rather than affirm the district court's injunction. As the Supreme Court explained in *Regents*, even if DACA is unlawful, "deciding how best to address a finding of illegality"—and how

best to avoid or mitigate the disruption that would otherwise follow—"can involve important policy choices." 140 S. Ct. at 1915. Those choices are for DHS. *Id.*

III.    Regardless of which remedy this Court holds is appropriate, this Court should maintain the existing stay pending appeal to avoid needless disruption while Appellants seek further review from the U.S. Supreme Court.

## STANDARD OF REVIEW

When reviewing a district court's grant of a permanent injunction, this Court "review[s] the district court's findings of fact under the clearly erroneous standard, and the conclusions of law under the *de novo* standard." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). Further, "[a] district court abuses its discretion if it (1) relies on clearly erroneous factual findings or erroneous conclusions of law when deciding to grant the injunction, or (2) misapplies the factual or legal conclusions when fashioning its injunctive relief." *Id.* (citation omitted).

## ARGUMENT

Even assuming that the district court was correct to hold the DACA Final Rule is unlawful and therefore should be vacated,[2] the district court's remedial order errs

---

[2] As New Jersey has consistently argued, the DACA policy is lawful under the INA and is consistent with a long history of deferred action policies. Although this Court previously held the DACA Memorandum substantively unlawful, *see Texas II*, 50 F.4th at 528-29, DHS's conclusions as to the history of deferred action and as to the scope of DACA as part of the Final Rule further demonstrate the errors inherent in that conclusion. That said, given Fifth Circuit panel precedent, New Jersey focuses

in two profound ways. Primarily, the court should have considered the extraordinary equities in crafting a remedy that avoids disruption to current DACA recipients, their families, businesses, state and local governments, and U.S.-citizen children who rely on them. Alternatively, the court should have remanded to DHS to determine how to protect the reliance interests that its order otherwise would disturb.

## I.     THE DISTRICT COURT ERRED IN FAILING TO ACCOUNT FOR RELIANCE INTERESTS IN CRAFTING ITS REMEDIAL ORDER.

Although the district court held that the DACA Final Rule is inconsistent with the INA and therefore vacated the policy, that is only the beginning of the remedial inquiry. After all, even where a policy has been vacated, courts engage in a separate inquiry to evaluate how to accommodate reliance interests that had developed in the years in which a policy was in effect. Those traditional equitable considerations, as the U.S. Supreme Court has noted and the Final Rule sets forth, are overwhelming here. Hundreds of thousands of DACA recipients—who have lived continuously in this country since they were kids—have structured their lives and their employment relying on this policy. And their families, employers and employees, state and local governments, and even U.S.-citizen children would also experience unprecedented disruption should current DACA recipients lose access to deferred action or work authorization. The district court should therefore have clarified that DHS may leave

in this brief on the remedial issues, while reserving its right to challenge this Court's conclusions on the merits en banc or to the U.S. Supreme Court.

the status quo in place for current recipients. And this Court should at the very least reverse because the district court never even considered the equities in crafting the scope of its remedial order, let alone explained its decision not to accommodate the reliance interests of current DACA recipients.

1. Even where a court finds a policy unlawful, courts have both the authority and the obligation to engage in a separate remedial inquiry to evaluate whether and how to accommodate reliance interests that have developed in the years in which the policy was in effect.

Indeed, the Supreme Court has long recognized that a court's selection of the appropriate final remedy "is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (even if it would be unlawful for the Navy to engage in military exercises without first performing an environmental impact study, holding it would be an "abuse of discretion" to enjoin such exercises, since the harm resulting from failure to comply with environmental law was outweighed by the harm to the military); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (identifying the "well-established principles of equity" that govern injunctive relief); *Monsanto v. Geertson*

*Seed Farms*, 561 U.S. 139, 158 (2010) (same); *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 F. App'x 361, 362 (5th Cir. 2004) (agreeing that both "breadth and flexibility are inherent in equitable remedies").

That obligation remains even once the underlying DACA Final Rule has been vacated. Vacatur is "the act of annulling or setting aside" a particular agency action. *Texas v. Biden*, 646 F. Supp. 3d 753, 768 (N.D. Tex. 2022). Unlike an injunction, it does not go further and "'tell[] someone what to do or not to do.'" *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022) (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). Said simply, under this Court's binding precedent, "vacatur neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), *overruled on other grounds*, *United States v. Texas*, 143 S. Ct. 1964 (2023); *id.* at 219 (identifying "meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy'" (quoting *Monsanto*, 561 U.S. at 165)); *see also All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023) ("vacatur does not order the defendant to do anything; it only removes the source of the defendant's authority"). The parties agree that vacatur nullifies the Final Rule as a matter of law, precluding DHS from granting requests for deferred action to *new* applicants under its auspices, and thus granting Plaintiffs-Appellees considerable jurisprudential and practical relief. But declaring DACA unlawful and vacated says nothing regarding

23

the proper relief that the court or DHS may afford to accommodate reliance interests that had already developed by the time Plaintiffs belatedly sued.

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021), offers an especially illuminating illustration. That case involved an easement the U.S. Army Corps of Engineers had granted to allow the Dakota Access Pipeline to traverse federally owned land. *Id.* at 1039. The D.C. Circuit found that the Corps violated the National Environmental Policy Act by granting an easement without issuing an environmental impact statement and therefore vacated the easement. *Id.* at 1039, 1050-53. But the D.C. Circuit also recognized that the pipeline had been constructed and was in operation, and the remedial question of what relief should be ordered as to that active pipeline was separate. *See id.* at 1039 (treating as distinct the merits question whether the easement required an environmental impact statement and the question "if so, what should be done about that failure").

Notably, although the district court had seemed to believe vacatur alone would require the owner to terminate the pipeline's use, the D.C. Circuit disagreed. *Id.* at 1053-54 (reversing district court order mandating "the oil to stop flowing and the pipeline to be emptied within 30 days" after finding that the order "cannot be squared with *Monsanto*"). Instead, the D.C. Circuit explained, "[i]f a district court could, in every case, effectively enjoin agency action simply by recharacterizing its injunction as a necessary consequence of vacatur," then vacatur orders would "circumvent" the

venerable rule that final equitable relief should only "issue under the traditional four-factor test." *Id.* at 1054. Vacatur thus had an important role to play: it meant that the pipeline should not have been built in the first place, and if the pipeline had not yet been built, that would have been the end of the matter.

But the separate question what to do with "an easement already in use (rather than a construction or operating permit)" was one that turns on traditional equitable principles, not one that vacatur itself could answer. *Id.* The district court thus could not order an *end* to the conduct that was previously, albeit unlawfully, approved— that is, to order an already-constructed "pipeline to be shut down"—without "making the findings necessary for injunctive relief." *Id.* And if the equities were sufficiently strong, the court added, the proper remedy could even permit the owner to continue making use of the pipeline, notwithstanding the legal infirmity inherent in its original construction. *Id.*; *see also N. Plains Resource Council v. U.S. Army Corps of Eng'rs.*, 460 F. Supp. 3d 1030, 1034, 1040 (D. Mont. 2020) (vacating permit that authorized construction of pipelines after determining issuance was unlawful, then modifying remedial order to preclude only construction of *new* pipelines under vacated permit while allowing the maintenance of *existing* pipelines); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1240, 1247-48 (N.D. Cal. 2015) (despite finding a federal agency's permit unlawful under the Endangered Species Act, allowing intervenor company to

engage in logging activities, which the company had secured State's permission to do premised on having obtained valid permits). Indeed, on remand in *Standing Rock*, the district court assessed the equitable factors and declined to order any permanent injunctive relief. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*, 540 F. Supp. 3d 45, 55, 64-65 (D.D.C. 2021).

The Supreme Court could hardly have been clearer that similar considerations apply to DACA. Four years ago, in *Regents*, the Court confronted an effort by DHS to rescind DACA based on the Attorney General's finding that DACA was unlawful. 140 S. Ct. at 1901. Although DHS was bound by that finding, the Court emphasized that the legality of DACA and how to accommodate the extraordinary reliance interests that previously developed were distinct analyses. *Id.* at 1915. While the Federal Government had argued that "DACA is illegal, so any actions under DACA are themselves illegal," and so DACA had to "cease immediately," the Court disagreed. *Id.* Instead, the Court explained, the agency's remedy still had to "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 1913 (citation omitted); *see id.* at 1914 (discussing extensive reliance interests). In short, "nothing about" finding DACA illegal "foreclosed or even addressed" this remedial analysis, including the import of "particular reliance interests." *Id.* at 1915.

Indeed, Plaintiffs-Appellees appear to agree that courts have the discretion to order an equitable remedy that accommodates reliance interests even after that court has vacated the underlying policy. After all, in their briefing before the district court, Plaintiffs-Appellees argued that Judge Hanen should both vacate the Final Rule and issue a separate remedial order that establishes "an orderly winding down" of DACA over a two-year period, including an order that allows DHS to approve any "renewal applications" for up to "two years" from judgment. ROA.23-40653.33432. But allowing current DACA recipients to retain deferred action and work authorization for 2-4 years (including one renewal) is only possible if courts retain some equitable remedial discretion once the agency's policy has been vacated. Plaintiffs-Appellees, to their credit, did not suggest otherwise; to the contrary, in supporting their remedy, they specifically acknowledged that "in light of the reliance interests that do exist," a vacatur order could be "tempered with" a more tailored "injunction and remedy" that would reduce the "disruptive consequences." ROA.23-40653.35385, 35390. Said another way, although the parties disagree on the appropriate *scope* of an equitable remedy, Plaintiffs-Appellees concede that some such equitable remedy still would be appropriate notwithstanding vacatur of the Final Rule.

Finally, in exceptional cases—especially where reliance interests developed at least in part due to the plaintiffs' delay —courts may exercise this equitable power to maintain the status quo, not merely for a time-bounded period. *See, e.g.*, *Petrella*

*v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 686-87 (2014) (finding such actions appropriate in "extraordinary circumstances," and noting as an example that it would be "inequitable" ever to order "total destruction" of a "book [that] had been printed, packed, and shipped," where the challenger delayed two years in filing suit); *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 235-36 (6th Cir. 2007) (affirming refusal to order destruction of homes that were constructed in violation of a copyright where delay in filing suit enabled "109 individuals or families [to] actually occup[y] what they hoped to make their homes" and destruction of those buildings "smack[ed] of the inequity … which the judicial system should abhor") (discussed with approval in *Metro-Goldwyn-Mayer*, 572 U.S. at 685-86); *Connor v. Williams*, 404 U.S. 549, 550-52 (1972) (per curiam) (refusing to invalidate elections conducted pursuant to an admittedly unlawful reapportionment plan or to require that officeholders vacate their offices); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*, 239 F. Supp. 3d 77, 86-87 (D.D.C. 2017) (barring injunction where plaintiffs waited two years to sue to enjoin pipeline project, during which time defendant-intervenor company had built pipeline to near completion). *Cf. Andrade v. Lauer*, 729 F.2d 1475, 1499 (D.C. Cir. 1984) (emphasizing the need to "protect citizens' reliance on past government actions" in de facto officer doctrine context).

2. Given the compelling equities, the district court should have held that even though DHS cannot grant deferred action to *new* individuals under the since-vacated

DACA policy, the agency may maintain the status quo for *current* recipients. Such a vacatur order would provide Plaintiffs-Appellees considerable jurisprudential and practical relief, but would avoid the unprecedented disruption they invite.

As the DHS Final Rule lays out in detail, the equities here are extraordinary. Relying on promises from the Federal Government, nearly 600,000 current DACA recipients have voluntarily provided their personal information, including names and addresses to the Federal Government, despite the risks to them if DACA terminates. Recipients chose to enroll in school, *see supra* at 11, 14-15, even taking out loans on the belief they could obtain employment after they completed their education. Some recipients entered the armed forces, *see supra* at 15-16, with the intent to remain enrolled in the military. Other recipients started families, *see supra* at 11, 14, on the reasonable belief that their employment would provide them necessary financial means to support their U.S.-citizen children. The reliance is so great that it would be impossible "to restore the status quo ante" from almost twelve years ago. *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002).

Nor would the devastating impacts stop at current recipients themselves. *See Regents*, 140 S. Ct. at 1914 (acknowledging that any final order terminating DACA "would 'radiate outward' to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them"). As the record

29

reflects, domestic businesses hired hundreds of thousands of DACA recipients, and have spent years and capital investing in and training them—including in specialized roles. *See supra* at 14-15. Knowingly or not, thousands of other U.S. workers are currently employed at businesses run by current DACA recipients, which themselves are subject to collapse if leadership cannot work any longer. *See supra* at 15. State and local governments, too, invested in current DACA recipients as employees and valued members of universities. *See supra* at 15-16. And U.S.-citizen children count on DACA for their parents' incomes. *See supra* at 14.

The financial impacts would also be profound. Nationwide, "DACA recipients and their households pay about $5.6 billion dollars in annual Federal taxes and approximately $3.1 billion in State and local taxes." 87 Fed. Reg. 53,154. They make $566.7 million in annual mortgage payments, $2.3 billion in rental payments, and also buy cars, apply for lines of credit, and open businesses. *Id.* DACA recipients helped to fill a substantial labor shortage when the number of positions exceeded the number of job seekers by over 1.5 million, 87 Fed. Reg. 53,169, including roughly 200,000 critical infrastructure workers, 30,000 frontline healthcare workers, and 9,000 teachers. *See* 87 Fed. Reg. 53,194-95, 53,169, 53,176; *see also* 87 Fed. Reg. 53,180, 53,224 (describing benefits to law enforcement). Neither the parties nor the district court have identified another judicial order that interfered with such reliance interests—let alone one that produced such disruption.

Plaintiffs-Appellees cannot justify such a traumatic result, because Plaintiffs-Appellees played an important role in creating this unique problem: they delayed in challenging DACA, waiting six years to file suit, and never offered a reason for this delay beyond their own litigation strategy. Had Plaintiffs-Appellees wished to avoid a situation where 600,000 recipients would have offered their names, addresses, and personal information to the Federal Government, where they would have structured their lives in reliance on DACA for over a decade, and where their families, employers and employees, state and local governments, and U.S.-citizen children would have relied on the policy, they could have sued to enjoin DACA immediately after the policy's issuance, as they did for DAPA. *See Texas v. United States*, 328 F. Supp. 3d at 742 (contrasting challenges to DAPA and DACA). Their delay has tremendous bearing on the remedy that they can now obtain. *See, e.g.*, *Metro-Goldwyn-Mayer*, 572 U.S. at 685 (laches may bar or curtail relief); *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967) (laches could apply in an APA action); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 794 (5th Cir. 1999) (court considering equitable relief must consider whether a plaintiff acted with "unclean hands"); *Standing Rock*, 239 F. Supp. 3d at 86-87 (allowing illegally constructed pipeline to continue operation due to plaintiffs' two-year delay in bringing challenge, during which time intervenor had relied to its detriment in building pipeline to near completion); *Chirco*, 474 F.3d at 235-36 (allowing illegally constructed homes to

remain occupied, where plaintiffs delayed 2.5 years in filing suit, during which time "109 individuals or families" had moved in).

This extraordinary situation requires a remedy to match: a clarification that while DHS could not grant deferred action to *new* individuals under a DACA policy that has been vacated, DHS may maintain the status quo for *current* recipients. *See Perez v. Ledesma*, 401 U.S. 82, 112 (1971) (Brennan, J., concurring in part and dissenting in part) (noting declaratory orders "declare[] conclusively and finally the rights of parties in litigations over a contested issue, a form of relief which often suffices to settle controversies"). *Cf. N. Plains Resource Council*, 460 F. Supp. 3d at 1041 (modifying vacatur order to preclude only construction of *new* pipelines while allowing maintenance of *existing* pipelines). This vacatur order would still provide significant jurisprudential and practical relief to Plaintiffs-Appellees; it would hold DACA unlawful and make clear it cannot be applied to new individuals. But it would avoid the extraordinary disruption that would otherwise follow.

While New Jersey is unaware of a case answering what remedy follows from finding a policy invalid after 600,000 individuals relied on it for over a decade to live openly, start families with U.S.-citizen children, obtain education and jobs, hire U.S. workers, and provide their personal identifying information to DHS, putting themselves and their families at risk, the equities make clear the need to preserve the status quo. *Cf. Sugar Cane Growers*, 289 F.3d at 97 (in deciding whether to vacate

a policy that was "launched" and where "crops were plowed under" in reliance on its terms, finding the "egg has been scrambled and there is no apparent way to restore the status quo ante" and that any attempt to do so would be "an invitation to chaos"). Any other remedy—no matter how far the end date for terminating DACA—would leave thousands in a worse position than had DACA been enjoined in 2012. Had Plaintiffs-Appellees sought relief in 2012, current recipients would not have taken out loans; businesses would not have spent years training current recipients in hard-to-fill roles; employees would not have been hired by current recipients; and citizen children would not be relying on current recipients' lawful incomes. But Plaintiffs-Appellees declined to do so. And as explained above, given this extensive passage of time, federal courts have equitable authority to clarify precisely whether and how vacatur of a policy interferes with actions taken in reliance on that policy—including authority to permanent accommodate those prior actions. *See supra* at 22-28. If ever a situation demanded such an equitable result, this is it.[3]

---

[3] Nor does the fact that DACA itself was both revocable by the Federal Government and renewable change this analysis. To the contrary, as the district court itself noted, "the reality of the situation is that … many DACA recipients and others nationwide have relied upon it for the last six years," notwithstanding these features, a reliance based at least in part on Plaintiffs-Appellees' decision not to challenge DACA. *Texas v. United States*, 328 F. Supp. 3d at 742. Moreover, were this Court to issue an order allowing DHS to maintain the status quo, those features would remain: DHS could still revoke the policy or deny renewal to individual DACA recipients.

Plaintiffs-Appellees, by contrast, cannot justify the relief that they demand— the completion of "an orderly winding down" of DACA for all recipients within 2-4 years, with one last renewal period. ROA.23-40653.33432. Even assuming that the termination of deferred action and work authorization for 600,000 people could take place in an "orderly" manner in 2-4 years, *id.*, that would still have a tremendously disruptive effect. It would require removing hundreds of thousands of individuals from the workforce, including healthcare workers, military servicemembers, and law enforcement. It would also leave thousands of U.S. families and U.S.-citizen children without incomes. It would require massive investments of both time and money for employers to find and train replacement employees. It would likewise interfere with "time-bounded commitment[s]," including completing a "course of study," "military service," or "medical treatment regimen." *Regents*, 140 S. Ct. at 1914. And it would have all these effects even though Texas has never tried to establish that the harms of allowing recipients to continue receiving deferred action and work authorization exceed the benefits. *See* ROA.23-40653.523 (Texas receives over $1.2 billion per year in taxes from current DACA recipients).[4] That stands in sharp contrast to record evidence that terminating DACA for current recipients

---

[4] Although the district court found that Texas had demonstrated sufficient Article III injury, that jurisdictional test—unlike the equitable analysis—is not an "accounting exercise" and does not require courts to consider "whether the injury is outweighed by benefits the plaintiff has enjoyed." *Texas II*, 50 F.4th at 518. An equitable analysis *does* require engaging in such an inquiry, and Texas failed to meet this burden.

would profoundly harm New Jersey and the other States that have relied on them for over a decade.

3. At the very least, this Court should reverse because the district court never appropriately considered the equities, let alone explained its failure to accommodate reliance interests for current recipients, in determining the scope of its remedy.

Despite the gravity of the equities and reliance interests, the district court gave them little consideration when developing its final remedy. In the order on review, the court simply "expanded" its "original injunction and order of vacatur" to cover the Final Rule. ROA.23-40653.36400-01. But that order gave the equities short shrift when evaluating the final remedy's scope. ROA.23-40653.25262. The district court first found that "Plaintiffs States have demonstrated" irreparable harm based only on its finding that Texas alone had done enough to establish Article III injury. *Id.* As to the balance of equities, it considered the harms only of Plaintiffs-Appellees and the Federal Government, refusing to consider intervenors' interests, and reasoned that DHS could not be harmed because "the Government has no legitimate interest in the continuation of an illegally implemented program." *Id.* And finally, as to the public interest, the court offered merely one sentence of analysis: that the "public interest of the nation is always served by the cessation of a program that was created in violation of law and whose existence violates the law." *Id.*

This analysis improperly conflated the merits with the remedy. As explained above, courts have repeatedly cautioned that the proper final remedy "is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter*, 555 U.S. at 32; *see also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61 (1975) (noting "several hundred years of history" support the notion that the selection of a proper equitable remedy does not follow automatically from a statutory violation); *Standing Rock*, 985 F.3d at 1039. *Cf. also Regents*, 140 S. Ct. at 1901. That error is fatal, because although the district court formally named the appropriate equitable factors, the order below treated the merits as dispositive of each criterion— finding that the policy's illegality dictated its consideration of both the balance of harms and public interest. Strikingly, under that logic, the Navy would have had "no legitimate interest" in engaging in military testing without a proper environmental analysis, *but see Winter*, 555 U.S. at 32 (identifying national security interests, regardless of the merits); the public could have only been served by the "cessation" of pipeline operations when the construction lacked a proper easement, *but see Standing Rock*, 985 F.3d at 1039; equity would have demanded the destruction of a hundred homes built in violation of copyright law, *but see Chirco*, 474 F.3d at 235-36; and reliance would have no role to play in the treatment of current DACA recipients, *but see Regents*, 140 S. Ct. at 1901. That is not the law.

Perhaps because of this core error, the district court never even *considered* the reliance interests or the remedial options that would accommodate them. In both the original and supplemental orders, the district court did not consider the interests of DACA recipients or of the States—even though multiple recipients and New Jersey have long participated as intervenors. *See League of Wilderness Defenders/Blue Mts. Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 765-67 (9th Cir. 2014) (holding an intervenor's interests should be considered in assessing the balance of the equities and the public interest); *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 255 (D.D.C. 2020) (same). Moreover, in determining the scope of its remedial order, the district court never assessed the interests of families, employers and employees, or U.S.-citizen children. And because the court did not consider these interests when crafting its remedy, it did not consider options to accommodate them; the court did not even mention the possibility of maintaining the status quo for current recipients after appeals are exhausted, let alone explain its reasons for not doing so.

That the district court gave these equities and reliance interests great attention in crafting the *stay* of its remedial order pending appeal does not solve the problem. To its credit, after the district court established its final injunction, the district court recognized the "significant equitable interests" of "the DACA recipients"—*i.e.*, that "hundreds of thousands of individual DACA recipients, along with their employers, states, and loved ones, have come to rely on" DACA. ROA.23-40653.25263 (noting

those interests were discussed in *Regents*). But the district court only considered whether "such significant reliance" warranted a stay pending appeal. *See* ROA.23-40653.25263 (in supplemental order, "staying the effective date" of its remedy in light of reliance interests, not narrowing the remedy's scope); ROA.23-40653.25264 (original order) (same) (citing *Campaign for S. Equal. v. Bryant,* 773 F.3d 55, 57 (5th Cir. 2014)). The court overlooked that when the chosen remedy can *take effect* and what the particular remedy should *be* are two distinct questions. Said another way, accounting for reliance interests by delaying a remedy does not absolve a court of its longstanding obligation to assess the equities when selecting the remedy that will ultimately govern when the case concludes.

The remedial precedents discussed above—which involved situations where a court had reached final judgment, not merely where appeals were pending—make this clear. In *Winter*, the Court held that a permanent injunction as to naval military exercises would be an abuse of discretion; it did not indicate that enjoining military exercises would be permissible so long as the injunction was stayed pending appeal. *See* 555 U.S. at 24, 26, 32-33. In *Standing Rock*, the D.C. Circuit held the district court needed to consider the traditional equities in evaluating whether to shut down a previously-constructed pipeline; it did not limit that inquiry to the period in which the parties were seeking certiorari. 985 F.3d at 1039. Decisions like *Collins*, *Connor*, and *Andrade* likewise involve courts engaging in the hard questions regarding what

the final remedy should be, not merely when the remedy should kick in. And in the administrative context, *Regents* acknowledged that although DHS was "bound" by the Attorney General's opinion (and obviously could not appeal it), DHS still had to consider reliance interests in crafting the appropriate next steps. 140 S. Ct. at 1914-15. A stay does not allow a court to avoid that central inquiry.

The district court's final remedial order is particularly hard to square with its prior, well-reasoned opinion rejecting Plaintiffs-Appellees' motion for a preliminary injunction. In its 2018 opinion, the district court sensibly found that enjoining DACA renewals for current recipients "does not make sense nor serve the best interests of this country." *Texas v. United States*, 328 F. Supp. 3d at 742. As the district court explained at the time, Plaintiffs-Appellees had delayed for *six years* in challenging DACA—a sharp departure from their approach to DAPA—reflecting an implicit "concession or an indication that the alleged harm does not rise to a level that merits an injunction." *Id.* at 739 (citing 11A Wright & Miller, Fed. Prac. & Proc. § 2948.1). And in those years, hundreds of thousands of current DACA recipients and "society had developed a reliance" on DACA. *Id.* at 742; *see also id.* at 741 (emphasizing the States "could lose residents whom they consider to be valuable members of their communities or employees who are integral to various schools, municipalities, and industries"). In other words, while the court held that grants of deferred action to *new* DACA recipients would be inappropriate, equity required a separate inquiry on

how best to accommodate the already-accumulated reliance interests engendered by DACA. *See id.* at 742 (finding the "reality of the situation is that … many DACA recipients and others nationwide have relied upon it for the last six years"); *see also id.* (adding that when it came to current recipients, "the egg has been scrambled" and it could never truly be "put [] back in the shell").

The district court provided no clear justification for diverging so dramatically when it came to its final remedial orders. As this Court and the Supreme Court have noted, however, the factors to grant a permanent injunction are "essentially the same as for a preliminary injunction," except that actual success on the merits replaces the "likelihood of success" prong. *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 847 (5th Cir 2004) (citing *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 546 n.12 (1987)); *see also, e.g.*, Winter, 555 U.S. at 32 (same). It is still the case that Texas had delayed in seeking relief, which undermines its argument that it will suffer real harm if DHS maintains DACA for current recipients. It is still the case that recipients and society writ large have relied on DACA; it is only truer today, another six years later. And it is still the case that "the egg has been scrambled" and cannot be "put [] back in the shell." *Texas v. United States*, 328 F. Supp. 3d at 742. The very same considerations that led the district court to deny preliminary relief should at least have been evaluated in the final remedy.

Finally, nothing about this analysis changes because the district court reserved the power to amend the remedy in the future. In its remedial order, the district court emphasized that "[a] Final Judgment has not been entered in this case" and that the district court thereby "retains jurisdiction of this matter for purposes of construction, modification, and/or enforcement of the terms of the original and this Supplemental Injunction." ROA.23-40653.36401. The court's intent is unclear: traditionally, the grant of summary judgment would be a final judgment, especially when paired with a coercive injunction. *See* 15B Wright & Miller, Fed. Practice & Proc. § 3914.28 (2d ed. 2023). Regardless, this caveat has no bearing on the question before this Court—whether the injunction ordered below is proper. Under 28 U.S.C. § 1292(a)(1), that question is on review. And the answer is clear: the district court was obligated to consider the equities in selecting a remedy, not just in selecting the effective date. It should have selected—or at least evaluated—options to accommodate the reliance interests of current recipients, families, businesses, state and local governments, and U.S.-citizen children. Its failure to do so requires reversal.

## II. THE DISTRICT COURT ERRED IN FAILING TO REMAND TO DHS TO DETERMINE THE APPROPRIATE NEXT STEPS.

If this Court crafts a remedy that maintains the status quo for current DACA recipients, that addresses the exceptional reliance interests that have developed over the past twelve years. But if it declines to do so—such that the judicial decision in this case risks disrupting those unique reliance interests—it should remand to DHS

41

in the first instance to determine the appropriate next steps. After all, *Regents* already found that before these reliance interests could be undermined, DHS must have the opportunity to make a number of important policy calls.

Courts repeatedly have acknowledged that even where an agency's policy has been vacated as unlawful, that agency has an important role to play in evaluating the appropriate next steps. As the Supreme Court explained in *Monsanto*, that a specific policy on review has been vacated does not prevent the agency from considering and adopting a narrower policy in response. *See* 561 U.S. at 159 (explaining that while a court had found the agency's "decision to *completely* deregulate" a particular crop was invalid, "[a]t that point, it was for the agency to decide whether and to what extent it would pursue a *partial* deregulation"). Nor would it be appropriate to enjoin such action in advance; until the agency actually considers those next steps, "any judicial review of such a decision is premature." *Id.* at 160. This approach is just as appropriate when considering how to handle already-accumulated reliance interests. *See Standing Rock*, 985 F.3d at 1054 (finding that "how and on what terms the Corps will enforce its property rights" against a pipeline that is now operating without any easement "is, absent a properly issued injunction, a matter for the Corps to consider in the first instance" given "the discretion owed" to it).

The Supreme Court has already made crystal clear that affording DHS similar choices in the first instance is necessary before terminating DACA for the 600,000

current recipients who rely on it. As explained above, in *Regents*, the Court rejected the notion that merely finding DACA illegal meant it had to "cease immediately." 140 S. Ct. at 1915. To the contrary, the Court held that "deciding how best to address a finding of illegality moving forward can involve important policy choices." *Id.* at 1910. And it expressly reasoned that before undermining DACA recipients' reliance interests, there were "policy choices" for DHS to make first. *Id.* Plaintiffs-Appellees have thus admitted that "weighing the DACA recipients' reliance interests against competing policy concerns ... involves important policy choices that Congress has reserved for the DHS," and this Court should agree. ROA.23-40653.22445.

Indeed, *Regents* identified a number of reasons why it was important for DHS to make these decisions before the termination of DACA for current recipients. For one, DHS retained "considerable flexibility" in assessing specific "reliance interests of DACA recipients" and was better situated to consider them. *Regents*, 140 S. Ct. at 1914. DHS could consider how to handle "noteworthy" practical "concerns"— namely, the impact terminating DACA would have for these current recipients, who "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children"; the harm it would inflict on "families," "U.S.-citizen children," "schools," and "employers"; and the harsh consequences of removing so many from the labor force. *Id.* DHS, *Regents* held, can consider a wide range of options to accommodate such reliance interests—including but not limited

43

to retaining some forbearance; adopting a policy that "give[s] salient weight to …
reliance interests" in individualized agency decisions; and/or evaluating a "broader
renewal period" and "more accommodating termination dates" when terminating the
policy. *Id.* at 1912, 1914. Especially given the "administrative complexities" that the
Court identified, DHS was the appropriate entity to make the "difficult" decisions
regarding a policy "with the breadth of DACA." *Id.* at 1910, 1914.

The district court's order is inconsistent with this instruction. Since the district
court declined to maintain the status quo for current recipients generally, its remedial
order will have a tremendous impact on their reliance interests. Consequently, had it
followed the path laid out by *Regents*, the district court would have remanded to the
agency and allowed DHS to consider the appropriate next steps in the first instance.
Instead, the district court issued a sweeping injunction directly, while reserving for
itself—not DHS—a right to make modifications. *See* ROA.23-40653.36401 (court
"retains jurisdiction of this matter for purposes of construction, modification, and/or
enforcement of the terms of the original and this Supplemental Injunction").[5] And
worse still, the district court again offered no reasoning for diverging from *Regents'*
path. It did not explain why it would not allow the agency to first consider the options

---

[5] In the same way, Plaintiff-Appellants' proposed remedy—in which the *Court*
would decide whether their 2-4 year winddown, with one renewal period, properly
accounts for reliance interests—puts this question in a court not in DHS, and
disregards the "considerable flexibility" the agency is supposed to have in answering
it. *Regents*, 140 S. Ct. at 1914.

*Regents* had described, nor how it could surmount the Court's clear instruction that these "policy choices are for DHS." 140 S. Ct. at 1910. Accordingly, if this Court does not itself craft an equitable remedy preserving the status quo for existing DACA recipients or require the district court to do so, it should remand the question to DHS to consider how best to accommodate these extraordinary reliance interests.

## III.    THE COURT SHOULD MAINTAIN THE STAY PENDING APPEAL.

Regardless of which remedy this Court ultimately finds appropriate, this Court should maintain the existing stay pending appeal to avoid needless disruption while Appellants seek further review from the U.S. Supreme Court.

The district court and the parties below all agreed that a stay pending appeal should continue in this case, and this Court has already found that the district court did not abuse its discretion in granting it. *See Texas II*, 50 F.4th at 531. As the district court rightly held, because "[h]undreds of thousands of individual DACA recipients, along with their employers, states, and loved ones" have long relied on that policy, "it is not equitable for a government program that has engendered such significant reliance to terminate suddenly" while further appellate review is ongoing. ROA.23-40653.25263. And as this Court confirmed, "uncertainty of final disposition and the inevitable disruption that would arise from a lack of continuity and stability" while the case remains ongoing strongly merit a continuing stay. *Texas II*, 50 F.4th at 531. Plaintiffs-Appellees will not be harmed by continuation of the status quo, as DACA

has been in place for more than a decade, largely because Plaintiffs-Appellees waited six years to file their lawsuit. But the roughly 600,000 current DACA recipients—and individuals, businesses, and governments that rely on them—would be severely and irreparably harmed by the disruption that would inevitably occur if the stay were lifted. Although New Jersey reiterates that these equities should be considered as to the *scope* of the remedy, not just the effective date, the stay must be continued to avoid immediate and widespread disruption.

## **CONCLUSION**

This Court should reverse the Supplemental Order of Injunction.

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW
JERSEY

By: /s/ Mayur P. Saxena

MAYUR P. SAXENA
*Assistant Attorney General*
JEREMY M. FEIGENBAUM
*Solicitor General*
ASHLEIGH B. SHELTON
SAMUEL L. RUBINSTEIN
VIVIANA M. HANLEY
*Deputy Attorneys General*

New Jersey Attorney General's Office
124 Halsey St., 5th Floor
Newark, New Jersey 07101
PO Box 45029-5029
Phone: (973) 877-1280
Fax: (973) 648-4887
mayur.saxena@law.njoag.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2024, I filed the foregoing Brief of Intervenor Defendant-Appellant State of New Jersey with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ Mayur P. Saxena
Mayur P. Saxena

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,378 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point regular font.

Dated:      January 25, 2024

/s/ Mayur P. Saxena
Mayur P. Saxena