No. 23-40653

# In the United States Court of Appeals for the Fifth Circuit

State of Texas; State of Alabama; State of Arkansas; State of Louisiana; State of Nebraska; State of South Carolina; State of West Virginia; State of Kansas; State of Mississippi,

*Plaintiffs – Appellees,*

v.

United States of America; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs & Border Protection; Patrick J. Lechleitner, Acting Director of U.S. Immigration & Customs Enforcement; Ur M. Jaddou, Director of U.S. Citizenship & Immigration Services; Jason D. Owens, Chief of the U.S. Border Patrol,

*Defendants – Appellants,*

María Rocha; José Magaña-Salgado; Nanci J. Palacios Godínez; Elly Marisol Estrada; Karina Ruíz De Díaz; Carlós Aguilar González; Luis A. Rafael; Darwin Velásquez; Jin Park; Óscar Álvarez; Denise Romero; Jung Woo Kim; Ángel Silva; Hyo-Won Jeon; Elízabeth Díaz; Blanca González; Moses Kamau Chege; María Díaz,

*Intervenor Defendants – Appellants,*

State of New Jersey,

*Intervenor – Appellant.*

On Appeal from the United States District Court
for the Southern District of Texas, Brownsville Division

## BRIEF OF INTERVENOR DEFENDANTS - APPELLANTS

Nina Perales
Fátima Lucía Menéndez (*of counsel*)
MEXICAN AMERICAN LEGAL
DEFENSE & EDUCATIONAL FUND
110 Broadway Street
San Antonio, TX 78205
(210) 224-5476

Douglas H. Hallward-Driemeier
Emerson A. Siegle
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 508-4600

*Additional Counsel Listed on Inside Cover*

Mark A. Cianci
Heather M. Romero (*of counsel*)
Anna K. Blanco (*of counsel*)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

Patrick S. Doherty (*of counsel*)
Krystal A. Vazquez (*of counsel*)
Lauren C. Brady (*of counsel*)
Laura C. Medina (*of counsel*)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Philip P. Ehrlich (*of counsel*)
Francis X. Liesman (*of counsel*)
ROPES & GRAY LLP
191 North Wacker Drive
Chicago, IL 60606
(312) 845-1200

Carlos Moctezuma García
GARCÍA & GARCÍA, ATTORNEYS AT
LAW P.L.L.C.
P.O. Box 4545
McAllen, TX 78502
(956) 630-3889

*Counsel for Intervenor Defendants - Appellants*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

<u>Plaintiffs-Appellees</u>

State of Texas

State of Alabama

State of Arkansas

State of Kansas

State of Louisiana

State of Mississippi

State of Nebraska

State of South Carolina

State of West Virginia

*Represented by*

> Ryan D. Walters, Chief, Special Litigation Division, Office of the Attorney General of Texas
>
> James A. Mackenzie, Office of the Solicitor General of Texas
>
> Ari Cuenin, Office of the Attorney General, Solicitor General Division

<u>Defendants-Appellants</u>

United States of America

Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security

Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs & Border Protection

Patrick J. Lechleitner, Acting Director, U.S. Immigration and Customs Enforcement

Ur M. Jaddou, Director, U.S. Citizenship and Immigration Services

Jason D. Owens, Chief of the U.S. Border Patrol

*Represented by*

    Joshua M. Koppel, U.S. Department of Justice, Civil Division

    Melissa N. Patterson, U.S. Department of Justice, Civil Division

    Nicholas S. Crown, U.S. Department of Justice, Civil Division

    James J. Walker, Trial Attorney, U.S. Department of Justice, Office of Immigration Litigation

<u>Intervenor Defendants-Appellants</u>

María Rocha

José Magaña-Salgado

Nanci J. Palacios Godínez

Elly Marisol Estrada

Karina Ruíz De Díaz

Carlós Aguilar González

Luis A. Rafael

Darwin Velásquez

Jin Park

Óscar Álvarez

Denise Romero

Jung Woo Kim

Ángel Silva

Hyo-Won Jeon

Elízabeth Díaz

Blanca González

Moses Kamau Chege

María Díaz

*Represented by*

     Nina Perales

     Fátima Lucía Menéndez (of counsel)

     Carlos Moctezuma García

     Douglas H. Hallward-Driemeier

     Mark Cianci

     Emerson Siegle

     Heather M. Romero (of counsel)

     Anna K. Blanco (of counsel)

     Patrick S. Doherty (of counsel)

     Krystal A. Vazquez (of counsel)

     Lauren C. Brady (of counsel)

     Laura C. Medina (of counsel)

     Philip P. Ehrlich (of counsel)

Francis X. Liesman (of counsel)

State of New Jersey

*Represented by*

Matthew J. Platkin

Mayur P. Saxena

Jeremy M. Feigenbaum

*/s/Nina Perales*

Nina Perales

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Maria Rocha and the other Intervenor Defendants-Appellants respectfully request oral argument.  Oral argument in this case of national importance will help illuminate the positions of the parties and aid the Court in reaching a decision.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ........................................... i

STATEMENT REGARDING ORAL ARGUMENT ...............................v

TABLE OF AUTHORITIES ................................................... viii

INTRODUCTION ......................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................4

STATEMENT OF THE CASE................................................................5

    A.    The History of Deferred Action in the Immigration Context. ..............5

    B.    The Memorandum, DAPA, and the Rescission Cases.........................7

    C.    The *Texas (Memo)* Litigation..............................................8

    D.    The 2022 Rule. ...................................................................11

    E.    The Proceedings on Remand...............................................13

SUMMARY OF THE ARGUMENT ....................................................15

STANDARD OF REVIEW ..................................................................17

ARGUMENT ..................................................................................19

I.    THE DISTRICT COURT ERRED IN ITS DISPOSITION OF THE CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO STANDING...................................................................................19

    A.    Contrary to the District Court's Holding, *Texas (Memo)* Should Not Have Predetermined the Outcome of Intervenor-Appellants' Challenge to Appellees' Standing on Remand to Challenge the Rule. ...............................................................19

    B.    The District Court's Limited Engagement with Changes in the Facts and Law Only Underscores that Appellees Lack Standing. ......25

        1.    The District Court misinterpreted *Immigration Priorities*. ......26

        2.    As even the District Court's opinion makes clear, the administrative record cannot support Appellees' standing. .................................................................30

        3.    The District Court erred in considering evidence outside the summary judgment record. ...............................................32

C.    At the Very Least, the District Court Should Have Denied the
      Summary Judgment Motions and Set the Case for Trial. ...................34

II.   THE DISTRICT COURT ERRED IN FINDING THAT THE RULE
      VIOLATES THE APA. .................................................................................36

      A.    The Rule Does Not Exceed the INA's Broad Grant of
            Discretion to DHS. .............................................................................38

      B.    The District Court's Analysis of the Rule's Substantive
            Provisions Only Confirms that the Rule Complies with the
            APA. .....................................................................................................43

III.  THIS COURT SHOULD VACATE THE DISTRICT COURT'S
      ORDER PERMANENTLY ENJOINING DACA AND VACATING
      THE RULE. ...................................................................................................47

      A.    Under 8 U.S.C. § 1252(f)(1), the District Court Lacked
            Jurisdiction to Enjoin or Vacate the Rule. ........................................48

      B.    Even if the District Court Had Jurisdiction to Enjoin or Vacate
            the Rule, It Erred in Granting a Nationwide Remedy........................50

            1.    Nationwide injunctions are disfavored. ....................................51

            2.    The district court's nationwide injunction is inequitable. ........52

CONCLUSION ..................................................................................................56

CERTIFICATE OF SERVICE .........................................................................59

CERTIFICATE OF COMPLIANCE.................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Al Otro Lado, Inc. v. Mayorkas*,
    619 F. Supp. 3d 1029 (S.D. Cal. 2022)................................................48

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................4

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) .........................................................51

*Arizona v. United States*,
    567 U.S. 387 (2012)...............................................................28, 40

*Avitia v. Metro. Club of Chicago*,
    49 F.3d 1219 (7th Cir. 1995) .........................................................52

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023)................................................................41

*Brown v. Allen*,
    344 U.S. 443 (1953)..................................................................53

*Carroll v. Metro. Ins.*,
    166 F.3d 802 (5th Cir. 1999) .........................................................18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................18

*Collins v. Lew*,
    642 F. Supp. 3d 577 (S.D. Tex. 2022)................................................53

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021)............................................................47, 53

*Ctr. for Bio. Diversity v. U.S. EPA*,
    937 F.3d 533 (5th Cir. 2019) .........................................................25

*In re Deepwater Horizon*,
   928 F.3d 394 (5th Cir. 2019) ............................................................20

*Dep't of Homeland Sec. v. New York*,
   140 S. Ct. 599 (2020)......................................................................51

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)............................................................8, 55, 56

*El Paso Cnty. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ............................................17, 19, 34

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)........................................................................37

*Fleming v. Bayou Steel BD Holdings II, L.L.C.*,
   83 F.4th 278 (5th Cir. 2023) ............................................................18

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022)...........................................................1, 17, 49, 50

*Gilbert v. Donahoe*,
   751 F.3d 303 (5th Cir. 2014) ............................................................20

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018)....................................................................51

*Haaland v. Brackeen*,
   599 U.S. 255 (2023)...............................................................*passim*

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944).........................................................................52

*Heckler v. Chaney*,
   470 U.S. 821 (1985).........................................................................37

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ............................................................45

*Johnson v. Maestri Murrell Prop. Mgmt.*,
   555 F. App'x 309 (5th Cir. 2014) (per curiam) ................................20

*Joseph Eichelberger & Co. v. Comm'r of Internal Revenue*,
  88 F.2d 874 (5th Cir. 1937) ................................................................53

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020)..........................................................44, 45, 46

*United States ex rel. Little v. Shell Expl. & Prod. Co.*,
  602 F. App'x 959 (5th Cir. 2015) ......................................................20

*Louisiana ex rel. Louisiana Dep't of Wildlife & Fisheries v. Nat'l
  Oceanic & Atmospheric Admin.*,
  70 F.4th 872 (5th Cir. 2023) ..............................................................31

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) (per curiam) .........................................51

*M.P. v. Joyce*,
  2023 WL 5521155 (W.D. La. Aug. 10, 2023), *report and
  recommendation adopted*, 2023 WL 5517263, at *5 (W.D. La.
  Aug. 25, 2023) ....................................................................................48

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)............................................................................27

*Patterson v. Houston Indep. Sch. Dist.*,
  570 F. App'x 367 (5th Cir. 2014) ......................................................34

*In re Paxton*,
  60 F.4th 252 (5th Cir. 2023) ..............................................................47

*Propes v. Quarterman*,
  573 F.3d 225 (5th Cir. 2009) .............................................................21

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
  279 F. Supp. 3d 1011 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th
  Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020)
  (describing programs since 1975)........................................................6

*Reno v. Am.-Arab Anti- Discrimination Comm.*,
  525 U.S. 471 (1999)............................................................................41

*Ryder v. United States*,
  515 U.S. 177 (1995)............................................................................53

x

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct.
  2528 (2022) .................................................................................................32

*Texas v. United States*,
  - F. Supp. 3d -, 2023 WL 5951196 (S.D. Tex. Sept. 13, 2023).................*passim*

*Texas v. United States*,
  2021 WL 3022434 (S.D. Tex., July 16, 2021) .................................................3, 9

*Texas v. United States*,
  2023 WL 5950808 (S.D. Tex., Sept. 13, 2023).................................4, 15, 49, 56

*Texas v. United States*,
  328 F. Supp. 3d. 662 (S.D. Tex. 2018) ................................................................8

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ......................................................................*passim*

*Texas v. United States*,
  549 F. Supp. 3d 572 (S.D. Tex. 2021)........................................................*passim*

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ..............................................................................42

*Texas v. United States*,
  86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir.
  2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016)....................7, 42

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021).............................................................................................19

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018)........................................................................................51

*United States v. Armstrong*,
  517 U.S. 456 (1996)............................................................................................37

*United States v. Texas*,
  579 U.S. 547 (2016) (per curiam)........................................................................7

*United States v. Texas*,
  599 U.S. 670 (2023).....................................................................................*passim*

*In re Whitaker Const. Co., Inc.*,
  411 F.3d 197 (5th Cir. 2005) ...............................................................49

*Whole Women's Health v. Paxton*,
  10 F.4th 430 (5th Cir. 2021) ..............................................................18

**Statutes**

6 U.S.C. § 202(5) ....................................................................................5

8 U.S.C. § 1103(a)(1).............................................................................5

8 U.S.C. § 1182(d)(5)..........................................................6, 29, 38, 44

8 U.S.C. § 1252(f)(1) ....................................................................*passim*

8 U.S.C. § 1324a(h)(3)................................................................5, 29, 38

8 U.S.C. § 1611(b)(2)........................................................................5, 38

28 U.S.C. § 1292(a)(1)............................................................................4

28 U.S.C. § 1331 ....................................................................................3

28 U.S.C. § 1346(a)(2) ...........................................................................3

28 U.S.C. § 1361 ....................................................................................3

**Legislative Materials**

H.R. 2202, 104th Cong. § 524 (1995) ..................................................44

**Rules**

Fed. R. Civ. P. 56(c)(2).........................................................................34

**Regulations**

8 C.F.R. § 1.3(a)(4)(vi) .........................................................................29

8 C.F.R. § 274a.12(a)(19)......................................................................54

8 C.F.R. § 274a.12(a)(20)......................................................................54

8 C.F.R. § 274a.12(c)(18).......................................................................54

87 Fed. Reg. 53152 (August 30, 2022)............................................................*passim*

**Other**

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice &
    Procedure* § 4478.5 (3d ed. 2022) ......................................................................21

USCIS, Number of Form I-821D Requests,
    https://www.uscis.gov/sites/default/files/document/data/daca_perfo
    rmancedata_fy2023_q3.pdf ........................................................................40, 42

## **INTRODUCTION**

Despite the District Court's holding to the contrary, this Court has not already decided this case. For more than four years, the parties had been litigating the "Memorandum," the Department of Homeland Security's June 2012 directive regarding deferred action for childhood arrivals ("DACA"). ROA.18762-18764. Then, in August 2022, DHS promulgated the "Rule." ROA.25785. The Rule is not the Memorandum: It explicitly directs immigration officials to use case-by-case discretion at multiple points during individualized DACA adjudications, and it applies to a narrower population with even stronger ties to the United States. This Court explicitly declined to review the Rule in October 2022, and it remanded to the District Court to consider the Rule afresh. *See Texas v. United States* ("*Texas (Memo)*"), 50 F.4th 498, 512 (5th Cir. 2022).

In the meantime, the law has changed to favor Intervenor-Appellants. In *United States v. Texas* ("*Immigration Priorities*"), 599 U.S. 670 (2023), and *Haaland v. Brackeen*, 599 U.S. 255 (2023), the Supreme Court reined in the extravagant theories of state standing the Appellees had previously invoked. And in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), which had not previously been fully briefed or argued before this Court, the Supreme Court held that 8 U.S.C. § 1252(f)(1) means what it says: lower courts lack jurisdiction to enjoin or restrain

the executive agencies' enforcement or implementation of relevant provisions of the Immigration and Nationality Act ("INA").

Because of those changes in the law and the facts, the District Court had an obligation to ensure that Appellees had standing to challenge the Rule; to evaluate whether the Rule complies with the INA; and to assure itself of jurisdiction to grant Appellees' requested relief. But the District Court did not engage in the analysis required by *Immigration Priorities* and *Haaland*, and it granted Appellees' request for a universal vacatur and nationwide injunction without addressing its jurisdiction or the equities. *Texas v. United States* ("*Texas (Rule)*"), — F. Supp. 3d —, 2023 WL 5951196, at *24 (S.D. Tex. Sept. 13, 2023). In doing so, the District Court failed to fully consider the reliance interests of hundreds of thousands of DACA recipients who "know only this country as home." ROA.18762.

The District Court erred. Appellees lack standing to challenge the lawful Rule, and the District Court lacked jurisdiction and justification to vacate or enjoin it. Intervenor-Appellants respectfully request that this Court vacate the District Court's Order and remand to the District Court for further proceedings. If this Court instead affirms, it should maintain the present stay pending any further appellate review.

## STATEMENT OF JURISDICTION

The State of Texas and other Appellees[1] brought a complaint on May 1, 2018, alleging violations of the Administrative Procedures Act ("APA") and the Take Care Clause of the Constitution. ROA.156. On July 16, 2021, the District Court entered a Memorandum and Order on the parties' competing motions for summary judgment. *See Texas (Memo)*, 549 F. Supp. 3d 572 (S.D. Tex. 2021) (summary judgment decision); 2021 WL 3022434 (order). On October 5, 2022, this Court affirmed in part and remanded to the District Court with instructions to assess the Rule. *Texas (Memo)*, 50 F.4th 498 (5th Cir. 2022). Appellees filed a Supplemental Complaint as to the Rule on January 3, 2023, alleging identical violations of the APA and the Take Care Clause. ROA.33371. Appellees invoked the District Court's subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1346(a)(2), and 1361. ROA.33382. For the reasons discussed below, however, Appellees *lack* Article III standing as to the Rule, and the District Court lacked jurisdiction to review Appellees' claims. Under 8 U.S.C. § 1252(f)(1), the District Court also lacked authority to "enjoin or restrain" the Rule.

The District Court granted Appellees' motion for summary judgment, denied the Intervenor-Appellants' cross-motion for summary judgment, and entered a

---

[1] Plaintiff-Appellees comprise the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and Mississippi. ROA.33371.

Memorandum and Order and Supplemental Order of Injunction on September 13, 2023. *Texas (Rule)*, 2023 WL 5951196 (summary judgment decision); 2023 WL 5950808 (order). Intervenor-Appellants filed a timely notice of appeal on November 9, 2023. ROA.36414. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), but this Court, like the District Court, lacks authority to "enjoin or restrain" the Rule under 8 U.S.C. § 1252(f)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court erred in denying Intervenor-Appellants' motion for summary judgment as to standing to challenge the Rule and granting Appellees' cross-motion when Appellees set forth no specific facts demonstrating an actual injury-in-fact caused by the Rule and redressable by its termination; when "federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions," *Immigration Priorities*, 599 U.S. at 680; and when the portions of the administrative record highlighted by the District Court showed that, at the very least, "reasonable minds could differ," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986), regarding whether Appellees demonstrated standing.

2.    Whether the Rule, which was promulgated through notice-and-comment rulemaking, which explicitly requires DHS to exercise individualized

discretion, which is consistent with previous exercises of prosecutorial discretion, and which narrows the population eligible for an exercise of discretion, violates the APA or the INA, which authorizes DHS to exercise enforcement discretion.

3.    Whether Section 1252(f)(1) of the INA, which strips lower courts of jurisdiction to "enjoin or restrain" the Executive's implementation of relevant portions of the INA, prohibited the District Court from vacating the Rule and enjoining it nationwide—an overbroad remedy that failed adequately to weigh Appellees' speculative theories of harm against the real and profound damage that the Rule's rescission would cause DACA recipients, their families, and their communities.

## STATEMENT OF THE CASE

### A.    The History of Deferred Action in the Immigration Context.

The INA empowers the DHS Secretary (the "Secretary") with broad discretion to "administ[er] and enforce[] . . . all [ ] laws relating to [ ] immigration and naturalization," 8 U.S.C. § 1103(a)(1), to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), to "determine[]" which immigrants are "lawfully present in the United States," 8 U.S.C. § 1611(b)(2), to determine which immigrants are "authorized to be [ ] employed," 8 U.S.C. § 1324a(h)(3), and further authorizes the Attorney General to parole into the United

States "any [immigrant] applying for admission" in the Attorney General's "discretion." 8 U.S.C. § 1182(d)(5)(A). Congress's statutory command that the Secretary and Attorney General exercise discretion in these respects is also a practical necessity, as Congress has allocated to DHS resources to remove or return just under four percent of the immigrants potentially subject to removal each year. *See* ROA.18238, 19485-19491.

In the exercise of that discretion, the Secretary has frequently relied on "deferred action." Deferred action is "an exercise of the Secretary's broad authority to establish national immigration enforcement policies and priorities," and is "a form of enforcement discretion not to pursue [ ] removal . . . for a limited period in the interest of ordering enforcement priorities in light of limitations on available resources, taking into account humanitarian considerations and administrative convenience." Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53152, 53298 (August 30, 2022) (to be codified at 8 C.F.R. pts. 106, 236, 274a). For over 50 years, the Secretary and the Secretary's statutory predecessors have granted discretionary relief from removal to both individuals and various classes of non-U.S. citizens through deferred action. *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.* ("*Regents*"), 279 F. Supp. 3d 1011, 1019-22 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. 1891 (2020) (describing programs since 1975). Through the Family Fairness Program, for

6

example, the Immigration and Naturalization Service made available deferred action and employment authorization to approximately 1.5 million people whom Congress repeatedly failed to address through contemplated legislation. *See* ROA.593-594, 616, 618-620.

**B.     The Memorandum, DAPA, and the Rescission Cases.**

In 2012, the Secretary issued the Memorandum, which provided guidelines for the exercise of discretion to grant deferred action to non-U.S. citizens who arrived in the United States as children and who meet certain criteria. ROA.18762-18764. In 2014, DHS announced a distinct policy, referred to as Deferred Action for Parents of Americans ("DAPA"), which covered a potential group of up to 4 million parents of U.S. citizens and lawful residents. ROA.18262-18295, 33759-33764.[2] Almost immediately, a number of states challenged the legality of DAPA—but not DACA—culminating in this Court affirming a ruling by the District Court that the Secretary's adoption of DAPA exceeded his authority. *DAPA*, 809 F.3d 134, 188 (5th Cir. 2015). The Supreme Court granted review but did not reach the merits. *DAPA*, 579 U.S. 547, 548 (2016) (per curiam). In 2017, the Trump Administration

---

[2] Although DAPA also made changes that would have expanded DACA, those changes never went into effect because DAPA was enjoined. *Texas v. United States* ("*DAPA*"), 86 F. Supp. 3d 591, 677-78 & n.111 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547, 548 (2016). DACA, however, was "not before the Court and [was] not addressed by [its] opinion." *Id.* at 606.

7

attempted to rescind DACA, *see* ROA.18315-18323, but the Supreme Court held the recission was arbitrary and capricious, *see Regents*, 140 S. Ct. 1891, 1916 (2020). The Court emphasized that, before rescinding the Memorandum, DHS should have considered the "noteworthy" reliance interests of DACA recipients, their families, and their communities. *Id.* at 1914.

### C.     The *Texas (Memo)* Litigation.

On May 1, 2018—nearly six years after the Secretary issued the DACA Memorandum—Appellees filed suit in the District Court challenging, for the ***first*** time, the Memorandum's lawfulness. ROA.156. The next day, Appellees filed a motion for a preliminary injunction, ROA.305, which the District Court denied after limited discovery, citing Appellees' six-year delay. *See Texas (Memo)*, 328 F. Supp. 3d. 662, 738-40, 743 (S.D. Tex. 2018). The District Court also held that vacatur of DACA on the then-existing record did "not make sense nor serve the best interests of this country." *Id.* at 742.

The parties then proceeded to merits discovery. On February 4, 2019—before discovery closed—Appellees filed a motion for summary judgment. ROA.15928. Appellees filed a second summary judgment motion on October 9, 2020. ROA.22391. On July 16, 2021, the District Court granted Appellees' motion, denied Intervenor-Appellants' cross-motion, and issued a permanent injunction against the enforcement of DACA. *Texas (Memo)*, 549 F. Supp. 3d at 624. Although the

District Court recognized that Intervenor-Appellants had presented "contrary evidence in the record" creating a "fact issue" as to whether Appellees suffered damages either directly or as *parens patriae*, *see id.* at 595-96, it held that Appellees were entitled to special solicitude and thus had standing. *Id.* The District Court then held that the Memorandum should have gone through notice-and-comment rulemaking and thus violated the procedural requirements of the APA. *Id.* at 603. The District Court also held that the Memorandum was contrary to the INA. *Id.* at 609-10. It ordered that enforcement of the Memorandum cease as to new applicants, but it stayed its order with respect to current DACA recipients in recognition of the "significant equitable interests" of the "[h]undreds of thousands of individual DACA recipients, along with their employers, states, and loved ones." *Texas (Memo)*, 2021 WL 3022434, at *2.

Intervenor-Appellants appealed, ROA.25337, and this Court affirmed in part. *Texas (Memo)*, 50 F.4th at 508. With respect to standing, this Court granted Appellees special solicitude to challenge the Memorandum. With that special solicitude, the Court was satisfied that Appellees had demonstrated concrete, redressable injuries traceable to the ***Memorandum*** through indirect social services expenditures. *Id.* at 519-20. Crucially, however, this Court went no further. *Id.* at 512 ("Today, we consider only the challenges to the 2012 DACA Memorandum.").

9

On the merits, this Court first addressed whether the Memorandum complied with the APA's procedural requirements, *id.* at 524, an issue no longer relevant with respect to the Rule, which was promulgated through notice-and-comment rulemaking. This Court likewise affirmed the District Court's holding on Appellees' substantive APA challenge to the Memorandum's lawfulness, *id.* at 524-28, but it did not address Appellees' Take Care Clause claim.

Based only on Rule 28(j) letters, and without the benefit of full briefing or argument, the Court also held that, despite the Supreme Court's late-breaking opinion in *Aleman Gonzalez* and the jurisdiction-stripping provisions in 8 U.S.C. § 1252(f)(1), the District Court retained authority to vacate and enjoin the Memorandum. *Id.* at 529. And, although this Court affirmed the District Court's vacatur, injunction, and declaratory judgment as to the Memorandum, it left in place the District Court's stay pending appeal. *Id.* at 531. It did so because "DACA has had profound significance to recipients, and many others in the ten years since its adoption," and because DACA's termination would result in "inevitable disruption . . . from a lack of continuity and stability." *Id.* (cleaned up). With that, this Court remanded to the District Court to "determine whether [its] holdings as to the 2012 Memorandum fully resolve issues concerning the Final Rule." *Id.* at 512.

### D.    The 2022 Rule.

On September 28, 2021, DHS published a Notice of Proposed Rule Making ("NPRM") for the establishment of regulations related to "the Deferred Action for Childhood Arrivals (DACA) policy" to "defer removal of certain noncitizens who years earlier came to the United States as children, meet other criteria, and do not present other circumstances that would warrant removal." ROA.25591. Explicitly responding to the District Court's July 16, 2021, Order, DHS's NPRM requested public comment on features of the proposed rule, with emphasis on "forbearance from enforcement action, employment authorization, and lawful presence." ROA.25618. The NPRM further noted, "DHS takes seriously the district court's suggestion that it may enact a forbearance-only policy, and that features of the DACA policy may be modified through the rulemaking process." *Id.* Section V of the NPRM included an assessment of regulatory alternatives (including those with and without a lawful presence component), as well as analyses of wages earned and tax revenues from DACA recipients, the labor market impacts of the proposed rule, and a discussion of reliance interests and potential effects of the proposed rule identified by the District Court. *See generally* ROA.25627-25669.

DHS received 16,361 public comments on the NPRM, and most commenters expressed broad support. *See* ROA.25795. Texas was the only state to submit a comment expressing any opposition. ROA.25805. DHS vetted the commenters'

requests carefully. It considered but rejected several proposals that the Rule implement longer grant periods, citing the two-year grant period as "an appropriate frequency for review and decision on whether to continue to favorably exercise discretion in the form of deferred action." ROA.25874. DHS also rejected several comments calling for a "path to citizenship," noting that DHS lacks "legal authority to amend the rule to provide a direct procedure for a DACA recipient to attain citizenship" consistent with DHS's position that "the DACA policy represents an exercise of enforcement discretion." ROA.25814-25816. And DHS refused to vary or expand the grounds for advance parole, emphasizing that DACA recipients, like all non-U.S. citizens, are already eligible for advance parole for certain "humanitarian, educational, or employment related reasons" under the INA. ROA.25882.

DHS also considered but ultimately rejected proposals to decouple work authorization from deferred action. A "policy of forbearance without work authorization," DHS reasoned, would, among other things, "disrupt the reliance interests of hundreds of thousands of people, as well as the families, employers, schools, and communities that rely on them" and result in "adverse fiscal implications" for Federal, state, and local governments "due to reduced tax revenues." ROA.25889, 25926 (cleaned up). DHS recognized that the District Court believed that "DHS lacked authority to provide employment authorization and

benefits such as Social Security benefits to DACA recipients," ROA.25926, but DHS noted that even the District Court acknowledged that "'the individualized notion of deferred action' is an approach 'that courts have found permissible in other contexts,'" *id.* (quoting *Texas (Memo)*, 549 F. Supp. 3d at 620-21). DHS thus decided to continue to make individualized, discretionary grants of work authorization available to DACA recipients. Following its careful and reasoned decision-making, DHS promulgated the Rule on August 30, 2022. ROA.25785.

### E.    The Proceedings on Remand.

Appellees filed a Supplemental Complaint as to the Rule on January 3, 2023, and a motion for summary judgement on January 31, 2023. ROA.33371, 33420. On March 2, 2023, Intervenor-Appellants filed a response to Appellees' motion and a cross-motion for summary judgement. ROA.34872, 34877. In their motion and opposition, Intervenor-Appellants argued that Appellees had failed to introduce evidence establishing their standing to challenge the Rule. ROA.34899-34907. In their combined reply and response, Appellees attempted, ***for the first time in this litigation***, to demonstrate standing by arguing that the Rule increases Texas's costs of issuing driver's licenses. ROA.35416. Intervenor-Appellants objected to Appellees' belated attempts to introduce supposed evidence of driver's license injuries, especially considering that Appellees had, for years, told the District Court and this Court that driver's license costs were not at issue in this case and Intervenor-

Appellants had no opportunity to test Appellees' unsupported declaration. ROA.35648-35651. The District Court heard oral argument on the motions for summary judgment on June 1, 2023. ROA.36916.

After oral arguments in the remand phase of this case, the Supreme Court issued opinions in several cases relevant to the District Court's decision. On June 15, 2023, the Supreme Court held that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland*, 599 U.S. at 294-95. One week later, the Supreme Court found that "federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecution," *Immigration Priorities*, 599 U.S. at 680, and that states have "no judicially cognizable interest in procuring enforcement of the immigration laws by the Executive Branch," *id.* at 677 (internal quotation omitted). The parties filed notices of supplemental authority as to these decisions. ROA.36214, 36257, 36298, 36332.

On September 13, 2023, the District Court granted Appellees' motion for summary judgment and denied Intervenor-Appellants' cross-motion. 2023 WL 5951196, at *24. It held that Appellees have standing, *id.* at *8-11, "that there are no material differences between the Final Rule and the 2012 DACA Memorandum," *id.* at *12, and that the Rule is not severable, *id.* at *17-22. The District Court also reaffirmed its prior order and, without considering its jurisdiction under 8 U.S.C.

§ 1252(f)(1), expanded its original injunction and vacatur to the Rule. 2023 WL 5950808. The District Court also acknowledged DACA recipients' strong reliance interests and stayed its order with respect to current DACA recipients. *Id.* at *1. The District Court stopped short, however, of entering final judgment, *id.*, and this appeal ensued.

## SUMMARY OF THE ARGUMENT

The District Court mistakenly assumed that the outcome of the parties' cross-motions for summary judgment was a foregone conclusion. But material differences between the Rule and the Memorandum, such as the Rule's explicit direction to use individualized discretion in individual adjudications and its application to a narrower and older population, and recent Supreme Court decisions in *Immigration Priorities*, *Haaland*, and *Aleman Gonzalez*, created new issues of law and fact as to standing, the merits, and the proper remedy.

To start, the District Court erred by attempting to avoid the issue of Appellees' standing to challenge the Rule, despite changes in the law and facts that required a fresh analysis and that decidedly favor Intervenor-Appellants. The Rule applies to an even smaller population than the Memorandum and is unambiguously discretionary, making the already speculative and entirely unproven argument by Texas (the only Appellee that has even attempted to prove standing) that some DACA recipient somewhere must somehow increase Texas's social services

15

expenditures even more speculative and insufficient. Zero plus zero is zero, and the District Court erred in relying on Texas's insufficient speculation about social services costs under the ***Memorandum*** to bolster Texas's insufficient speculation about social services costs under the ***Rule***. That is especially true because *Immigration Priorities* held that states are not entitled to special solicitude when they invoke supposed social services expenditures to challenge "the Executive's enforcement discretion." *See* 599 U.S. at 685 n.6; *id.* at 689 (Gorsuch, J., concurring) (in future cases, "lower courts should just leave [special solicitude] on the shelf"). And to the limited extent the District Court did consider whether Appellees have standing to challenge the Rule, it misinterpreted *Immigration Priorities*, latched on to ambiguous portions of the administrative record, and relied on speculation about potential future administrative action. The District Court should have concluded that the States lack standing to challenge the Rule, or, at the very least, that genuine disputes of material fact preclude summary judgment.

On the merits, the District Court erroneously believed that the Rule merely codified the Memorandum. But the Rule is far more than the formalization of the three-page Memorandum. It is the culmination of a months' long notice-and-comment process, in which the public submitted more than 16,000 comments and DHS replied with nearly 150 pages of reasoning. Through that process, DHS cured the issues in DACA this Court identified with respect to the Memorandum, and it

crafted a materially different Rule, which fits comfortably within the INA's broad grant of discretion.  In holding otherwise, the District Court ignored the statutory text and DHS's long history of exercising enforcement discretion.

Finally, the District Court lacked jurisdiction to enjoin or vacate the Rule.  In *Aleman Gonzalez*, the Supreme Court held that lower courts do not have jurisdiction to "'enjoin or restrain the operation of' the relevant statutory provisions" of the INA.  596 U.S. at 548.  The "relevant statutory provisions" are precisely those at issue in this case.  Yet the District Court ignored the Supreme Court and the plain text of the INA when it entered a nationwide injunction and vacatur.  Furthermore, even if the District Court could take these steps, which the Supreme Court has emphasized it may not, the injunction and vacatur are contrary to the public interest.  The Rule prevents the very real, harmful consequences—both to DACA recipients and the wider public—of ending DACA.  It also honors the weighty reliance interests of the hundreds of thousands of individuals who have only ever known the United States as home.  The District Court's nationwide injunction and vacatur were thus inequitable, and this Court should vacate them.

## STANDARD OF REVIEW

This Court reviews the grant and denial of cross-motions for summary judgment—including summary judgment motions presenting questions of standing and jurisdiction—de novo.  *See El Paso Cnty. v. Trump*, 982 F.3d 332, 337 (5th Cir.

2020).  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In contrast, the Court must reverse the entry of summary judgment where a district court improperly resolves disputes of fact that are "reserved to the finder of fact, whether judge or jury, at the trial stage of such proceedings." *See Carroll v. Metro. Ins.*, 166 F.3d 802, 808 (5th Cir. 1999); *see also Fleming v. Bayou Steel BD Holdings II, L.L.C.*, 83 F.4th 278, 298 (5th Cir. 2023) (even in a bench trial, "[s]quaring [the] evidentiary circle is the task of the finder of fact, not the stuff of summary judgment").

This Court reviews a district court's grant of a permanent injunction for abuse of discretion.  *Whole Women's Health v. Paxton*, 10 F.4th 430, 438 (5th Cir. 2021) (citations omitted).  A "district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief."  *Id.* (cleaned up).

18

# ARGUMENT

## I. THE DISTRICT COURT ERRED IN ITS DISPOSITION OF THE CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO STANDING.

Although this Court previously held that Appellees had standing to challenge the Memorandum, the facts and the law related to standing changed on remand. Appellees challenged a different agency action based on a different administrative record, and recent Supreme Court decisions soundly rejected the extravagant theories of state standing, like *parens patriae* and special solicitude, on which Appellees previously relied. Appellees' evidence and the District Court's analysis, however, did not keep pace. Appellees purported to rely largely on stale speculation about the Memorandum to demonstrate standing, and the District Court implicitly invoked the doctrine of law of the case to avoid considering standing afresh. And to the limited extent the District Court did engage with the facts and the law on remand, the District Court's analysis only confirmed that Appellees lack standing to challenge the Rule.

### A. Contrary to the District Court's Holding, *Texas (Memo)* Should Not Have Predetermined the Outcome of Intervenor-Appellants' Challenge to Appellees' Standing on Remand to Challenge the Rule.

"Standing must exist at all stages of the litigation," *El Paso Cnty.*, 982 F.3d at 341, and it "is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Standing can also disappear: new facts or law can extinguish a

plaintiff's standing and end the required Article III case or controversy. *See, e.g.*, *Gilbert v. Donahoe*, 751 F.3d 303, 313 (5th Cir. 2014) (plaintiff's retirement "destroy[ed] her standing to bring claims for injunctive relief" related to her employment). And evaluating Appellees' standing to challenge the Rule was well within this Court's broad mandate to the District Court on remand: "determine whether [this Court's] holdings as to the 2012 DACA Memorandum fully resolve issues concerning the Final Rule." *Texas (Memo)*, 50 F.4th at 512. The District Court thus had an obligation to consider standing afresh.

Yet, by mistakenly limiting the scope of this Court's remand and implicitly (and erroneously) relying on the doctrine of law of the case, the District Court held that its hands were tied. This Court's remand, the District Court believed, was "very specific" and "limited" because, "unless ultimately set aside by the Fifth Circuit *en banc* or by the Supreme Court," *Texas (Memo)* demonstrates that Appellees "have established standing." *Texas (Rule)*, 2023 WL 5951196, at *8 ("Accordingly, the topic of standing is not before this Court."). That was error. This Court has admonished district courts for cherry picking issues to address on remand or narrowing this Court's mandates. *See In re Deepwater Horizon*, 928 F.3d 394, 398-400 (5th Cir. 2019); *United States ex rel. Little v. Shell Expl. & Prod. Co.*, 602 F. App'x 959, 965-66 (5th Cir. 2015); *Johnson v. Maestri Murrell Prop. Mgmt.*, 555 F. App'x 309, 311-12 (5th Cir. 2014) (per curiam). And the law of the case doctrine

should rarely, if ever, be applied to matters of standing. *See Propes v. Quarterman*, 573 F.3d 225, 228 (5th Cir. 2009) (Article III issues "more likely to be considered because of their conceptual importance"); 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4478.5 (3d ed. 2022) (reconsideration of subject-matter jurisdiction and justiciability "particularly appropriate").

That is especially true here because the facts and the law have changed. *See Propes*, 573 F.3d at 228 (recognizing "substantially different" evidence as an exception to the law of the case doctrine). To start, the Rule narrows the population eligible for DACA. Although the Rule has the same threshold criteria as the Memorandum, *see* ROA.25796, individuals who were eligible for DACA under the Memorandum but "subsequently obtained a lawful immigration status . . . would no longer be eligible for DACA" under the Rule. ROA.28742. Moreover, under the Rule, DHS unequivocally retains discretion to reject applicants who satisfy the threshold criteria, and to terminate an individual's DACA "at any time in its discretion." 87 Fed. Reg. 53152, 53299. As a result, fewer people are eligible for DACA under the Rule than under the Memorandum. In turn, the likelihood that an Appellee state can demonstrate that any individual DACA recipient will increase an Appellee state's social services expenditures—which Appellees entirely failed to prove with respect to the Memorandum, *see Texas (Memo)*, 549 F. Supp. at 593 (acknowledging that Texas's evidence of social services expenditures "also

21

encompass[ed] the costs incurred due to non-DACA recipients")—is even lower under the Rule.

Due to the passage of time, the characteristics of the population eligible for DACA under the Rule are also distinct from the characteristics of the population initially eligible under the Memorandum.  To qualify for DACA under the Rule, applicants must have been residing continuously in the United States since at least June 15, 2007.  *See* 87 Fed. Reg. 53152, 53298. Thus, the number of eligible adults has risen in recent years and will only continue to increase:  because the cohort of potential DACA recipients under the Rule is fixed, DACA recipients will necessarily get older.  *See, e.g.*, ROA.25934-25935 (showing shift in distribution of ages at time of initial DACA application); ROA.28743 (explaining how date-of-entry requirement impacts age demographics); ROA.28749 (mean and median age of DACA recipients increased from 2017 to 2020).  Because of these demographic shifts, individuals who receive DACA under the Rule are more likely to find employment, be engaged in higher-wage jobs, and be married and have U.S. citizen children.  *See* ROA.25904, 25911-12, 28749.  And the number of individuals who receive DACA under the Rule and who could be enrolled in K-12 public schools is dwindling to none.  *See* ROA.28749-28750.  Appellees introduced absolutely no evidence to account for or address how those demographic shifts under the Rule would affect their still-unproven social services expenditures.

22

The law has also evolved. Last term, in *Immigration Priorities*, the Supreme Court emphasized that states typically lack standing to challenge the Executive Branch's exercise of prosecutorial discretion, because "federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." 599 U.S. at 680. The Supreme Court also directly foreclosed Appellees' theory of *parens patriae* standing to challenge the federal government, *see Haaland*, 599 U.S. at 294-95, and it made clear that, when a state challenges a federal policy based on "indirect effects on state revenues or state spending . . . the State's claim for standing can become ***more*** attenuated"—not less, *Immigration Priorities*, 599 U.S. at 680 n.3 (emphasis added).

Especially considering those changes in the law and facts, Appellees had an obligation to prove, and the District Court had an obligation to consider, Appellees' standing to challenge the ***Rule***. But Texas, the only Appellee to ever even attempt to prove standing, relied on a nearly unchanged evidentiary record focused on the ***Memorandum***. Thirty-four of the thirty-nine substantive exhibits to Appellees' summary judgment motion with respect to the Rule are identical to what Appellees submitted in connection with their challenge to the Memorandum. *Compare* ROA. 22451-53, *with* ROA.33475-77. Yet, as this Court already noted, those exhibits did "not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients," *Texas (Memo)*, 50 F.4th at 517-18, meaning that Appellees ***never***

23

connected a single cent of social services expenditures to a DACA recipient under the Memorandum. To that speculation about the Memorandum, Appellees piled on even more speculation about the Rule. Of Appellees' five new exhibits, two were irrelevant and inapposite declarations about Texas's social services expenditures unconnected to DACA recipients, *see* ROA.34138-65 (estimating Texas's total healthcare expenditures for undocumented immigrants and total education expenditures for unaccompanied immigrant children without tying any healthcare costs to DACA recipients and without accounting for the demographic shifts that make most unaccompanied children ineligible for DACA under the Rule); two were DHS websites confirming that, under the Rule, DHS will make case-by-case discretionary determinations whether to grant DACA, *see* ROA.34166-94; and one confirmed that, as of September 30, 2022, the overwhelming majority of DACA recipients lived in states other than Texas, ROA.34195-204.

With no actual evidence of social services expenditures for DACA recipients under the Rule or the Memorandum, Appellees were forced to rely on a purported syllogism—undocumented immigrants increase social services costs; DACA recipients under the Rule are undocumented immigrants; therefore "the Plaintiff States will bear some [social services] costs resulting from" DACA recipients. ROA.33459-61. But that purported syllogism was insufficient to demonstrate an injury in fact, especially because it fails to address the particular characteristics of

24

recipients eligible for DACA under the Rule. *See Ctr. for Bio. Diversity v. U.S. EPA*, 937 F.3d 533, 545 (5th Cir. 2019) (rejecting, for purposes of standing, purported "truism that water flows downstream [and so] any injury suffered downstream is fairly traceable to unlawful discharges upstream") (cleaned up).

To attempt to prove redressability, Texas likewise relied exclusively on stale speculation: an outdated survey and an uninformed guess, both of which predated the Rule by nearly half a decade, and suffered from methodological flaws and faulty assumptions. *See, e.g.*, ROA.34195-204 (demonstrating potential sources of bias in Dr. Tom K. Wong's 2017 nationwide survey); ROA.17414-16 (Dr. Lloyd B. Potter admitting that his "self-deportation" theory erroneously assumed that DACA recipients could not work if DACA were rescinded). That the District Court nonetheless held that Appellees have standing to challenge the Rule further confirms that the District Court failed to fully assure itself of its jurisdiction, or to comply with this Court's order on remand.

### B.    The District Court's Limited Engagement with Changes in the Facts and Law Only Underscores that Appellees Lack Standing.

Although the District Court did purport to "revisit the standing issue," *Texas (Rule)*, 2023 WL 5951196, at *8, it analyzed just three "recent developments" in the facts and law: (1) a misreading of dicta in *Immigration Priorities*, which the District Court erroneously believed preordained state standing in "DACA and DACA-related cases," *id.* at *9-10; (2) inconclusive portions of the administrative record,

including a purported "admission" by DHS that DACA "*could* result in some *indirect* fiscal effects on State and local governments," albeit noting "the size *and even the direction of the effects* is dependent on many factors," *id.* at *9 (emphasis added); and (3) evidence outside the summary-judgment record, including a newly proposed, yet-unchallenged rulemaking that, *if* codified, *may* expand federal health care programs' coverage to DACA recipients, *id.* at *10 & n.37. None of these "recent developments" supported the District Court's conclusion. To the contrary, each confirms that Appellees lack standing to challenge the Rule.

1.    The District Court misinterpreted *Immigration Priorities*.

If there were any doubt that the Court should grant Intervenor-Appellants' motion for summary judgment as to Appellees' lack of standing, *Immigration Priorities* put it to rest. In *Immigration Priorities*, eight Justices reiterated the limited role of the courts in refereeing political disputes, agreed that Texas lacked standing to challenge an exercise of enforcement discretion in the immigration context, and reversed the United States District Court for the Southern District of Texas's opinion that Texas had standing. The Justices held that standing "prevent[s] the judicial process from being used to usurp the powers of the political branches." 599 U.S. at 676 (cleaned up); *see id.* at 704 (Gorsuch, J., concurring) (standing "filter[s] out [plaintiffs] with generalized grievances that belong to a legislature to address" and prevents "government by lawsuit") (cleaned up). Through their

26

reasoning, the eight Justices adopted the very arguments that Intervenor-Appellants have consistently advanced in this case to explain why Texas's generalized policy disagreements with the federal government, no matter how strongly held, do not give Texas standing to challenge the United States' exercise of authority over immigration—a power expressly granted to the federal government under our constitutional system.

To start, the eight Justices emphasized that "bedrock Article III constraints" apply "in cases brought by States against an executive agency or officer." *Id.* at 680 n.3; *see id.* at 687 (Gorsuch, J., concurring) ("[n]othing in [Article III] suggests a State may have standing when a similarly situated private party does not"). In fact, the Court clarified that state injuries premised on "indirect effects on state revenues or state spending" may in fact be "***more attenuated***" than other theories of harm. *Id.* at 680 n.3 (emphasis added). In so holding, the Court explained that *Massachusetts v. EPA*, 549 U.S. 497 (2007), which Appellees and this Court previously relied on to justify "special solicitude" in the standing analysis, *see Texas (Memo)*, 50 F.4th at 514-17, simply "does not control" challenges "to an exercise of the Executive's enforcement discretion," *Immigration Priorities*, 599 U.S. at 685 n.6.[3]

---

[3] In *Haaland*, the Supreme Court also unequivocally held that "a State does not have standing as *parens patriae* to bring an action against the Federal Government." 599 U.S. at 294-95 (cleaned up).

The Court also made clear that, to prove standing, any "asserted injury [must be] traditionally redressable in federal court." *Id.* at 676. That limitation is particularly apposite in the immigration context, where Congress has historically limited the states' power and expressly prohibited courts from enjoining federal immigration policies. *See id.* at 689-93 (Gorsuch, J., concurring) (describing Texas's redressability problems in light of 8 U.S.C. § 1252(f)(1)); *see also Arizona v. United States*, 567 U.S. 387, 421 (2012) (Scalia, J., concurring) ("primary responsibility for immigration policy has shifted from the States to the Federal Government"). Indeed, in *Immigration Priorities*, the Court reiterated that states have "no judicially cognizable interest in procuring enforcement of the immigration laws by the Executive Branch." 599 U.S. at 677 (cleaned up).

Applying *Immigration Priorities*, the District Court should have granted Intervenor-Appellants' motion. Instead, the District Court misread *Immigration Priorities*, asserting that it "directly addressed DACA and DACA-related cases as exceptions to the no standing rule." *Texas (Rule)*, 2023 WL 5951196, at *9. For support, the District Court relied on dicta distinguishing cases involving non-prosecution from those involving non-prosecution with benefits. *See id.* (citing *Immigration Priorities*, 599 U.S. at 683). Yet, in *Immigration Priorities*, the Supreme Court explained merely that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the

Executive Branch's provision of legal benefits or legal status ***could*** lead to a different standing analysis," 599 U.S. at 683 (citing *DAPA*, 809 F.3d at 154) (emphasis altered), not that a state plaintiff would have standing to challenge a policy of non-prosecution with benefits.

Here, Appellees challenge only the Rule, which involves merely an exercise of deferred action. 87 Fed. Reg. 53152, 53298. Work authorization, lawful presence, and any other so-called benefits associated with the Rule flow from entirely separate statutes and regulations, *see* 8 C.F.R. § 1.3(a)(4)(vi) (classifying immigrants "currently in deferred action status" as lawfully present); 8 U.S.C. § 1324a(h)(3) (permitting DHS to "authorize[]" classes of immigrants to be employed); 8 U.S.C. § 1182(d)(5)(A) (authorizing DHS to grant "any" immigrant advance parole), which Appellees do not challenge here, *see Haaland*, 599 U.S. at 296 (rejecting injury-in-fact based on provisions that "operate independently" of and are not "fairly traceable to" challenged statute). And in this case, unlike in *DAPA*, Texas has purported to introduce evidence of only indirect costs, *see* Part I.B.3 (discussing Texas's failure to provide evidence of driver's license costs), which *Immigration Priorities* itself makes clear may be "more attenuated," 599 U.S. at 680 n.3.

The District Court also believed that Appellees here "pleaded into" another of *Immigration Priorities*' "exceptions to the no-standing rule": DHS's supposed

abdication of its statutory responsibilities. *See Texas (Rule)*, 2023 WL 5951196, at

*10. Yet, the Supreme Court merely ***hypothesized*** that "the standing calculus ***might***

change" if the government "***wholly*** abandoned its statutory responsibilities to make

arrests or bring prosecutions," *Immigration Priorities*, 599 U.S. at 682-83 (emphasis

added), not that abdication standing necessarily exists. In fact, in *Immigration*

*Priorities*, the Supreme Court explicitly declined to consider an abdication-standing

argument, *id.*, even though Texas, like Appellees here, "pleaded a claim under the

Take Care Clause," *id.* at 689 (Gorsuch, J., concurring); *see Texas (Rule)*, 2023 WL

5951196, at *10 (noting that Appellees sought abdication standing merely because

they "repeatedly pleaded that DHS . . . violated the Take Care Clause"). Regardless,

Appellees have introduced no ***facts*** demonstrating beyond genuine dispute that DHS

actually—let alone wholly—abdicated its responsibility to enforce the INA, and so

the District Court erred in granting summary judgment on that speculative theory.

> 2.    <u>As even the District Court's opinion makes clear, the
> administrative record cannot support Appellees' standing.</u>

With respect to injury-in-fact, the District Court ascribed significant meaning

to DHS's purported "admissions" in the administrative record that the Rule imposes

indirect social services costs and causes labor-market distortions. *See id.* at *9

(quoting ROA.25806) (DACA "could result in some indirect fiscal effects on State

and local governments"); *id.* at *13 n.52 (quoting ROA.25800) ("DHS admitted that

in principle DACA recipients take jobs" but "discounted this effect because it found

the data 'unquantifiable'"").  Yet neither "admission" stands up to scrutiny.  First, even assuming Texas could ever premise standing on indirect fiscal effects, *but see* Part I.B.1, DHS's highly equivocal statement that the Rule ***could*** affect state governments in ***some*** direction is no admission at all.  Second, DHS's acknowledgement of the Rule's labor-market impacts merely reports economists' predictions and speculation, which are contradictory and "incompatible with each other," as the District Court recognized.  *Texas (Rule)*, 2023 WL 5951196, at *13 n.52.  That inconclusive speculation about what "could happen" is likewise insufficient for standing.  *See, e.g.*, *Louisiana ex rel. Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 883 (5th Cir. 2023).

With respect to traceability and redressability, the District Court reported that some "portions of the administrative record [ ] support" Appellees' contention, based on Dr. Wong's 2017 survey of DACA recipients, that the Rule's termination would cause DACA recipients to self deport, thereby alleviating the states' social-services costs and labor-market distortions.  *Texas (Rule)*, 2023 WL 5951196, at *9. For support, the District Court cited:  DHS's response to a comment regarding the exact same 2017 survey by Dr. Wong.  *See* ROA.25798.  There, DHS "acknowledge[d]" the survey's existence but pointed out the same flaws in Dr. Wong's survey that Intervenor-Appellants identified below:  it is "five years old, calls for some degree of speculation by DACA recipients, and was collected in a

particular time and context." *Id.*; *see also* ROA.34912 (arguing that Appellees failed to "establish ***any*** overlap between the limited number of survey respondents who hypothesized that they might leave the United States if the Memorandum were to end and DACA recipients in Texas," which is the only state that has even attempted to prove any injury). For the same reasons that Dr. Wong's survey fails to demonstrate that the Rule caused any redressable injury, DHS's mere acknowledgement of (and ***disagreement with***) the survey likewise cannot support Appellees' theory of traceability and redressability.

<div style="text-align:center">

3.      <u>The District Court erred in considering evidence outside the summary judgment record.</u>

</div>

Unable to identify facts supporting standing in the administrative or summary judgment record, the District Court went outside them. First, the District Court cautioned that Appellees' standing "is about to be buttressed by the Executive Branch's pending action"—a new rule proposed by the Department of Health and Human Services that the District Court asserted would "expand[] the Affordable Care Act and Medicaid coverage to DACA recipients." *Texas (Rule)*, 2023 WL 5951196, at *10. Yet that proposed rule is not—and may never be—in effect. It was improper for the District Court to base its standing analysis on speculation about what ***might*** happen if the government chooses some future regulatory path. *Texas v. Biden* (*MPP*), 20 F.4th 928, 972-73 (5th Cir. 2021) (standing cannot rely on

<div style="text-align:center">32</div>

"prognosticat[ions]" about "future choices of third parties"), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

Second, the District Court acknowledged, and appeared to credit, Appellees' long-since-waived argument, interjected by Appellees in their summary judgment response brief, that Texas incurs direct costs providing driver's licenses to DACA recipients. *See Texas (Rule)*, 2023 WL 5951196, at *10 n.37 ("Texas recently resurrected its argument that standing exists due to the costs incurred by the state in issuing driver's licenses to DACA recipients. . . . The Defendant-Intervenors objected to Texas's reassertion of this claim . . . . Clearly, if this Court were to reconsider standing it would also have to consider this contention."). But the District Court erred to the extent it factored those supposed driver's licenses costs into its standing analysis. Appellees long ago waived any reliance on driver's license costs to challenge the Memorandum, ROA.36604-36605, precisely because they recognized that "DACA recipients largely already have driver's licenses, and they pay a $24 fee to renew their licenses," *id.* Indeed, in 2022, Appellees acknowledged that their decision not to introduce any evidence of driver's license costs reflected a "litigation strategy." ROA.35538. In addition to disavowing to the District Court any reliance on driver's license costs, Appellees repeatedly chose not to produce in discovery any driver's license-related evidence that Intervenor-Appellants could have explored and challenged. An unsupported declaration, presented long after the

close of discovery, and without Intervenor-Appellants having any chance to test it, is highly prejudicial, was not properly before the District Court, and cannot be relied upon to support Appellees' standing. *See* Fed. R. Civ. P. 56(c)(2); *see also Patterson v. Houston Indep. Sch. Dist.*, 570 F. App'x 367, 369-70 (5th Cir. 2014) (district court did not abuse its discretion in striking summary judgment evidence plaintiff failed to disclose).

### C.    At the Very Least, the District Court Should Have Denied the Summary Judgment Motions and Set the Case for Trial.

Even if Appellees' speculation of possible injury did enough to create genuine disputes of material fact as to Appellees' standing to challenge the Rule (and it did not), Appellees' purported evidence fell far short of resolving them. As even the District Court's cherry-picked citations to the administrative record make clear, with respect to each element of standing, reasonable minds could differ. *See, e.g.*, *Texas (Rule)*, 2023 WL 5951196, at *9 (DACA "could result in some indirect fiscal effects . . . the size and even direction of [which] is dependent on many factors"). "As the party seeking to invoke federal jurisdiction, the [Appellees] [bore] the burden of establishing standing . . . and because there is a final summary judgment and a permanent injunction in this case, the [Appellees] must have adduced evidence to support controverted factual allegations," which evidence must be so one-sided that there is no genuine factual dispute. *El Paso Cnty.*, 982 F.3d at 338. Especially considering the substantial evidence undermining each element of standing,

Appellees fell woefully short: viewing the evidence in the light most favorable to Intervenor-Appellants, there are, at the very least, genuine disputes as to injury-in-fact, traceability, and redressability.

**Injury-in-fact**: The evidence suggests that DACA recipients **_decrease_** law enforcement costs, *see, e.g.*, ROA.9787, and that DACA **_reduces_** government spending on healthcare for DACA recipients, *see, e.g.*, *id.*, ROA.9863-68, ROA.24510, 24532-33. For that reason, the District Court (quoting DHS) noted that "the size and even the direction of" the Rule's indirect effects on Appellees' social services expenditures is unclear and "dependent on many factors," *Texas (Rule)*, 2023 WL 5951196, at *9. At the same time, Texas identified not a single dollar of social services spending on a DACA recipient.

**Traceability**: The record includes evidence that, to the extent Texas does spend money on DACA recipients, it is because those recipients are here, not because they have DACA. ROA.18082.

**Redressability**: There is ample evidence showing that if DACA were rescinded, DACA recipients would remain where they are, as undocumented immigrants, instead of leaving the United States. *See* ROA.14819 (noting Intervenor-Appellants' testimony about their desire to remain in the United States even if DACA ended); ROA.17989 (expert testifying DACA rescission would not cause recipients to leave the U.S.); ROA.18125 (expert testifying that, if DACA

ends, DACA recipients are likely to simply "return to the shadows"). That is

particularly true for the individuals eligible for DACA under the Rule, who, because

they are older, tend to have even stronger ties to this country as compared to those

that had been eligible under the Memorandum. Intervenor-Appellants also adduced

evidence casting doubt on Dr. Wong's outdated survey results and Dr. Potter's

gratuitous speculation that DACA's termination would cause any DACA recipients

to "self-deport." ROA.34114.

*     *     *

Because the evidence on these critical issues was hotly contested, if the Intervenor-

Appellants were not entitled to summary judgment under *Immigration Priorities*, the

District Court should instead have denied each party's summary judgment motions

as to standing and held a trial to resolve disputed questions of fact.

## II.  THE DISTRICT COURT ERRED IN FINDING THAT THE RULE VIOLATES THE APA.

The District Court and Appellees agreed that, by promulgating the Rule

through notice-and-comment rulemaking, DHS remedied the Memo's supposed

procedural flaws. *See Texas (Rule)*, 2023 WL 591196, at *11. The District Court

also wisely declined to reach Appellees' novel argument that the Rule violates the

Take Care Clause and Appellees' wholly unsupported argument that the Rule is

arbitrary and capricious: As Intervenor-Appellants argued below, the Take Care

Clause is a source of executive prosecutorial discretion, including the Executive's

discretion (captured in the Rule) ***not*** to prosecute. *See, e.g.*, *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (because "it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed,'" the Executive has "special province" not to prosecute). And, in promulgating the Rule, DHS easily satisfied the APA's "deferential" arbitrary-and-capricious standard, *see, e.g.*, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), including by carefully considering and explaining DACA's justification and impact in an administrative record comprising approximately 7,600 pages of government studies and academic research papers and analyses, *see* ROA.25566-33254, and by receiving and thoroughly responding to 16,361 overwhelmingly supportive comments, *see* ROA.25795.

Proceeding from the mistaken premise that "there are no material differences between the Final Rule and the 2012 DACA Memorandum," *Texas (Rule)*, 2023 WL 5951196, at *12, however, the District Court concluded that the Rule violates the APA for the same reasons it and this Court held that the Memorandum did: the Rule supposedly grants class-wide relief that is somehow inconsistent with the broad powers delegated to DHS in the INA, *see id.* at *11-14, 17. But two crucial differences between the Rule and the Memorandum undermine the District Court's analysis. First, the Rule unequivocally and explicitly requires adjudicators to exercise ***individualized discretion***, not only with respect to whether to grant DACA,

but also with respect to work authorization, advanced parole, and whether and when to terminate an individual's DACA. Second, because the Rule "does not expand the threshold criteria" under the Memorandum, ROA.25796 (cleaned up), the Rule effectively ***narrows*** the population eligible for an exercise of prosecutorial discretion in the first place. Those differences—which the District Court entirely ignored—distinguish the Rule from the Memorandum and illustrate that the Rule is entirely consistent with the APA.

### A.    The Rule Does Not Exceed the INA's Broad Grant of Discretion to DHS.

In *Texas (Memo)*, this Court recognized that the INA delegates to the Secretary the discretion to "establish national immigration enforcement policies and priorities and to carry out the administration and enforcement of immigration laws, including to establish such regulations, issue such instructions, and perform such other acts as he deems necessary for carrying out his authority." 50 F.4th at 526-27 (cleaned up). This Court also cited 8 U.S.C. § 1182(d)(5), which authorizes the Secretary to parole into the United State "any" immigrant on a "case-by-case basis" in the Secretary's "discretion . . . under such conditions as he may prescribe." *Id.* at 525 n.195. Other provisions of the INA similarly delegate to the Secretary the discretion to "determine[]" which immigrants are "lawfully present in the United States," *see e.g.* 8 U.S.C. § 1611(b)(2), and to decide which immigrants are "authorized to be [ ] employed," 8 U.S.C. § 1324a(h)(3). Despite these broad

statutory delegations to DHS, however, this Court held that the Memorandum exceeded DHS's authority because the Memorandum operated class-wide and made a "new class" of 1.7 million immigrants eligible for relief in one fell swoop. *See Texas (Memo)*, 50 F.4th at 526.

The Rule resolves that concern. Although the Rule and the Memorandum both invoke the Secretary's "discretion," 87 Fed. Reg. 53152, 53298, *see* ROA.18762-63, the Rule ensures, through a series of detailed directives at each step of the DACA application process, that DACA will be granted only in a temporary, contingent, and individualized way. First, the Rule clarifies that USCIS must "in its sole discretion" determine, including by consulting with other government agencies as it "deems appropriate in its discretion," that a DACA applicant has "demonstrat[ed] by a preponderance of the evidence that [the applicant] meets the threshold criteria." 87 Fed. Reg. 53152, 53298-99. Second, the Rule makes clear that an applicant will not necessarily receive DACA even if the applicant satisfies "threshold" eligibility criteria. *Id.* The Rule states plainly that the threshold criteria *precede* USCIS's exercise of discretion, rather than constrain it: "[e]ven if the threshold criteria . . . are all found to have been met, USCIS retains the discretion to assess the individual's circumstances and to determine that any factor specific to that individual makes deferred action inappropriate." 87 Fed. Reg. 53152, 53299. Third, the Rule specifies that work authorization is not automatically tethered to DACA.

39

*See id.* To the contrary, DACA recipients ***may*** receive work authorization, but only "if approved in DHS's discretion." *Id.* And fourth, the Rule makes clear that USCIS "may terminate a grant of [DACA] ***at any time in its discretion***," *id.* (emphasis added), and, moreover, that DACA "does not preclude DHS from commencing removal proceedings ***at any time***," 87 Fed. Reg. 53152, 53298 (emphasis added). As evidence of that discretion, USCIS has already denied more than 1,200 DACA renewal requests (from applicants who had already received DACA under the Memorandum) during the first six months of 2023. *See* USCIS, Number of Form I-821D Requests, https://www.uscis.gov/sites/default/files/document/data/daca_ performancedata_fy2023_q3.pdf.

Thus, the Rule does not entitle a "new class of otherwise removable" immigrants to relief. *Texas (Memo)*, 50 F.4th at 526. Rather, by layering discretion on discretion, the Rule merely allows certain immigrants to apply for an ***individualized*** grant of prosecutorial discretion, which DHS can terminate at any time, in its discretion. DHS's exercise of that individualized discretion is entirely consistent with the INA. *See, e.g.*, *Arizona*, 567 U.S. at 396-97 ("A principal feature of the removal system is the broad discretion exercised by immigration officials.").

DHS's exercise of that individualized discretion is also squarely within the agency's wheelhouse. This Court, implicitly invoking the major questions doctrine, previously held that the Memorandum exceeded DHS's authority because it

"implicate[d] questions of deep economic and political significance" that Congress could not have intended to delegate to DHS. *Texas (Memo)*, 50 F.4th at 526 (cleaned up). Following *Texas (Memo)*, however, the Supreme Court reemphasized that, in major questions cases, an agency's "previous invocations of" and "past practice under" a statute help illustrate the intended breadth of Congress's delegation. *Biden v. Nebraska*, 143 S. Ct. 2355, 2369, 2372 (2023). Here, DHS's previous invocations of and past practice under the INA illustrates that the Rule is well within Congress's grant of authority.

Deferred action is not a recent innovation, but instead longstanding, and widely endorsed. *See, e.g., Reno v. Am.-Arab Anti- Discrimination Comm.*, 525 U.S. 471, 484-85 (1999) (praising deferred action as a "commendable exercise in administrative discretion") (cleaned up). In fact, DACA is strikingly similar to the Family Fairness Program, instituted by President Ronald Reagan in 1987 and extended by President George H.W. Bush in 1990. The Family Fairness Program ultimately offered renewable immigration benefits and work authorization—for an indefinite period of time and on a non–country specific basis—to approximately 1.5 million people who lacked immigration status and who Congress had repeatedly chosen not to address in contemplated legislation. *See* ROA.593-94, 616, 618-20; *see also* ROA.25608 (noting that "the 1987 Family Fairness Memorandum was promulgated against a backdrop of a failed legislative effort" to address the eligible

41

population and that the "1990 Family Fairness Memorandum came amidst rejection of protection from deportation [for the eligible population] in a House bill").

In *DAPA* and *Texas (Memo)*, the Court distinguished DACA from the Family Fairness Program because of DACA's "scale" and because DACA is not "interstitial to a statutory legalization scheme." *Texas (Memo)*, 50 F.4th at 527-28. But DACA's scale under the Rule is narrow, decreasing, and smaller than that covered under the Family Fairness Program. *See* Part I.A. And unlike in *DAPA*, where DHS attempted to "expand[] DACA by making millions more persons eligible," 809 F.3d 134, 147 (5th Cir. 2015), here, DHS intentionally chose to keep DACA's eligibility criteria fixed. *See, e.g.*, ROA.25849-50. The practical effect is that the DACA-eligible population is on the decline. *See* Part I.A.

The Rule also makes clear that DACA remains interstitial. Indeed, DHS reported that, far from abandoning its legislative efforts, "Congress is actively considering legislation to provide substantive immigration benefits to a DACA-like population." ROA.25820. And the number of DACA renewal requests has generally decreased annually for the past 5 years, *see* USCIS, Number of Form I-821D Requests, https://www.uscis.gov/sites/default/files/document/data/daca_performancedata_fy2023_q3.pdf, including potentially because DACA recipients have been able to transition to other immigration statuses. *See, e.g.*, ROA.24501, 25815. DACA is thus in the same position now as the Family Fairness Program was

in 1987 and 1990, and the Rule is thus entirely consistent with DHS's past practice under the INA.  *See* ROA.25820 ("it was by no means assured that Congress would act when legacy-INS implemented" Family Fairness; INS "relied not on an assurance of future Congressional ratification, but on its authority to exercise enforcement discretion").

## B. The District Court's Analysis of the Rule's Substantive Provisions Only Confirms that the Rule Complies with the APA.

Having erroneously concluded that "the Final Rule is, in all pertinent parts, exactly the same as the 2012 DACA Memorandum," *Texas (Rule)*, 2023 WL 591196, at *16, the District Court declined to thoroughly analyze whether the Rule (as opposed to the Memorandum) violates the APA.  Instead, the District Court "focus[ed] on two simple aspects" of the Rule—advance parole and the Rule's supposed "lack of temporal limits"—that, the District Court believed, "demonstrate some of the [Rule's] ongoing problems." *Id.* at *14-17.  Far from demonstrating that the Rule violates the APA or exceeds Congress's delegation of authority, however, the District Court's analysis only underscores that the Rule is entirely consistent with the INA.

First, the District Court found the Rule's continued references to advance parole "problematic." *Id.* at *14-15.  Without the Rule, the District Court reasoned, DACA recipients would be ineligible for advance parole ***at all***, let alone for "academic research, semesters abroad, interviews, overseas assignments, training,

and meetings with clients"—circumstances the District Court believed were "generous[ly]" encompassed by the Rule but wholly unauthorized by Congress. *Id.* The District Court ignored, however, that DACA recipients (and all other non-U.S. citizens) are eligible for advance parole not because of the Rule, but because Congress so provided in the INA.

The Court's "analysis begins and ends with the text," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2380 (2020) (citation omitted), and in the INA, Congress delegated to the Secretary the authority to parole into the United States "***any*** [immigrant] applying for admission" on a "case-by-case basis" in the Secretary's "discretion." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). The INA—***not*** the Rule—also specifies the broadly worded circumstances—"urgent humanitarian reasons or significant public benefit"—under which DACA recipients (and every other non-citizen) may receive advance parole. *Id.* And although the INA explicitly prohibits the Secretary from granting advance parole to certain refugees and crewmembers of boats, aircrafts, or air carriers during a labor dispute, *see id.* (citing 8 U.S.C. §§ 1182(d)(5)(B), 1184(f)), it imposes no other limits on the Secretary's discretion. In fact, when Congress amended the INA, it considered exhaustively listing the circumstances justifying advance parole, *see* H.R. 2202, 104th Cong. § 524 (1995) (proposing that non-U.S. citizens be eligible for advanced parole only for a medical emergency, organ donation, death of a family member, to

assist in law enforcement activity, or to be prosecuted for a crime), but instead used capacious phrases and delegated to the Secretary the authority to give them meaning. The Supreme Court has recognized that, in those circumstances, when Congress instructs an agency to comply with broad terms without an "exhaustive or illustrative list" or "criteria or standards," those broad terms give the agency "virtually unbridled discretion." *Little Sisters*, 140 S. Ct. at 2380; *see also Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 438 (5th Cir. 2021) ("Congress's use of . . . open-textured term[s] suggests an express delegation of authority to the agency to elucidate the provision.") (cleaned up).

In the Rule, the Secretary exercised that discretion by applying to DACA the same interpretations and standards DHS has long used in other contexts, consistent with the INA. For example, DHS chose to apply the same interpretation of "urgent humanitarian reasons or significant public benefits" to DACA recipients as to all other non-U.S. citizens, *see* ROA.25617—despite commenters' requests that DHS "ease or eliminate advance parole requirements for DACA recipients," ROA.25884. And it explained why its case-by-case consideration of applicant's "humanitarian, educational, or employment related" circumstances for advanced parole fit comfortably within the INA's broad language. ROA.25882.

Thus, contrary to the District Court's analysis, DHS did not "expand the application of advance parole" or "decide[] not to comply with the requirements

45

dictated by Congress." *Texas (Rule)*, 2023 WL at \*15.  Rather, DHS exercised the discretion expressly granted by Congress in the INA.  That is entirely consistent with the APA, and the District Court held otherwise only by disregarding the Supreme Court's command that a statute must not be interpreted to "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters*, 140 S. Ct. at 2381.

Second, the District Court highlighted DHS's supposedly "shifting" "position on [DACA's] lack of temporal limits" as a "new problem the administrative record reveals." *Texas (Rule)*, 2023 WL 591196, at \*16.  Because DHS "has no plans to ever terminate the [Rule] unless and until Congress adopts DACA," the District Court believed, DHS "clearly intends to continue this Congressional unauthorized program indefinitely." *Id.*

The administrative record belies the District Court's accusations.  DHS repeatedly emphasized that the Rule "is not a permanent solution for the affected population, and legislative efforts to find such a solution remain critical," ROA.25788; underscored that the Rule does not provide DACA recipients with "permanent protection from removal," ROA. 25796; explained that a "grant of deferred action under DACA is by its nature temporary, and it can be terminated at any time," ROA. 25813; and agreed "that the DACA policy […] is not a permanent solution for affected persons," ROA.25816.  Put differently, DHS anticipates that

the Rule, like the Family Fairness Program, will be "interstitial" to a permanent Congressional fix—and thus the Rule is entirely consistent with the agency's past practice.

## III. THIS COURT SHOULD VACATE THE DISTRICT COURT'S ORDER PERMANENTLY ENJOINING DACA AND VACATING THE RULE.

On remand, Intervenor-Appellants highlighted recent Supreme Court decisions in *Aleman Gonzalez*, *Immigration Priorities*, and *Collins v. Yellen*, 141 S. Ct. 1761, 1789 (2021), which collectively limited lower courts' authority to interfere with DHS's implementation of the INA and emphasized the importance of narrowly tailored relief, *see* ROA.34926-29, 35493.  Those decisions, which were not fully briefed in *Texas (Memo)*, stripped the District Court of power to enjoin or vacate the Rule and required the District Court to fashion an individualized remedy taking reliance interests into account.  The District Court, however, failed even to acknowledge Intervenor-Appellants' repeated arguments that 8 U.S.C. § 1252(f)(1) foreclosed Appellees' requested remedy, and it awarded nationwide relief when only a single Appellee, Texas, ***even attempted*** to demonstrate any injury.  In doing so, the District Court entirely abdicated its "non-discretionary" and "fundamental duty to examine its jurisdiction." *In re Paxton*, 60 F.4th 252, 256-57 (5th Cir. 2023).  Thus, even if this Court holds that Texas has standing and that the Rule is substantively unlawful, it should vacate the District Court's remedy.

### A. Under 8 U.S.C. § 1252(f)(1), the District Court Lacked Jurisdiction to Enjoin or Vacate the Rule.

By its plain text, the INA bars the District Court from issuing an injunction. Section 1252(f)(1) makes clear that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" specified provisions of the INA, including the implementing authority for DACA. The District Court's injunction was thus incompatible with the INA—as well as with decisions from other federal courts that have faithfully applied it. *See, e.g.*, *M.P. v. Joyce*, 2023 WL 5521155 (W.D. La. Aug. 10, 2023), *report and recommendation adopted*, 2023 WL 5517263, at *5 (W.D. La. Aug. 25, 2023) (*Aleman-Gonzalez* "eliminated the possibility of class-wide injunctive relief for constitutional violations related to prolonged post-removal-order detention"); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1047 (S.D. Cal. 2022) (Section 1252(f)(1) "prohibits [the court] from entering a permanent class-wide injunction enjoining [DHS] from turning back noncitizen asylum seekers").

Without the benefit of full briefing, and based only on Rule 28(j) letters, however, this Court previously held that Section 1252(f)(1) did not bar the District Court's injunction and vacatur of the Memorandum. *See Texas (Memo)*, 50 F.4th at 528-29. But the Rule differs from the Memorandum in ways that compel a different result. First, this Court held that Section 1252(f)(1) "prohibits injunctions only as to §§ 1221-1232" of the INA, and nothing in those sections authorized DHS's

implementation of the Memorandum. *Texas (Memo)*, 50 F.4th at 529. Yet, in the Rule, DHS drew its authority for DACA from, and made clear that DACA is consistent with, provisions specifically referenced in Section 1252(f)(1), *see* ROA.25818, 25831 (citing 8 U.S.C. §§ 1225, 1226, 1226a), and Appellees expressly challenged the Rule as contravening Sections 1225, 1226, 1227, and 1229a, ROA.22434, 22437, which also fall within Section 1252(f)(1)'s scope. Because the Rule thus involves DHS's "actions to enforce, implement, or otherwise carry out the specified statutory provisions," *Aleman Gonzalez*, 596 U.S. at 550, Section 1252(f)(1) prohibits its injunction. Second, this Court held that Section 1252(f)(1) did not bar the District Court's injunction of the Memorandum because the District Court stayed its order as to current DACA recipients. *Texas (Memo)*, 50 F.4th at 529. But the District Court's new order permanently and immediately enjoins the Rule, and its stay is, in effect, only applicable to DACA recipients who received DACA under the ***Memo***. *See* 2023 WL 5950808, at *1. Furthermore, the District Court's stay can be lifted at any time. *See id*. The INA cannot be read to permit the District Court to retain jurisdiction to issue an otherwise-prohibited injunction merely by temporarily staying its effect. *See In re Whitaker Const. Co., Inc.*, 411 F.3d 197, 205 (5th Cir. 2005) ("courts should avoid constructions which will render legislation absurd").

Section 1252(f)(1) likewise bars vacatur. Although Section 1252(f)(1) strips

lower courts of jurisdiction only to "enjoin or restrain," the Supreme Court has suggested that phrase encompasses vacatur as well. In *Aleman Gonzalez*, the Supreme Court defined "enjoin" broadly: it held that, when a court "enjoin[s]," it " 'require[s],' 'command[s],' or 'positively direct[s]' . . . or [ ] 'require[s] a person to perform . . . or to abstain or desist from [ ] some act.' " 596 U.S. at 548-49. And, in *Immigration Priorities*, Justice Gorsuch, joined by Justices Thomas and Barrett, argued that vacatur clearly falls within that definition because vacatur, like an injunction, requires federal officials to act. 599 U.S. at 690-91 (Gorsuch, J., concurring). Were it otherwise, Justice Gorsuch reasoned, vacatur could never redress a plaintiff's supposed injuries. *See id.* at 690-92. Following Justice Gorsuch's reasoning, the Appellees' theories of standing and jurisdiction thus cannot both be true at once: either vacatur restrains DHS from implementing the Rule and is precluded by Section 1252(f)(1), or vacatur does not restrain DHS from implementing the Rule, and Appellees lack standing for want of redressability. Either way, this Court should vacate the District Court's order as beyond its statutory authority.

## B.    Even if the District Court Had Jurisdiction to Enjoin or Vacate the Rule, It Erred in Granting a Nationwide Remedy.

Without reweighing the equities, the District Court assumed that, if Appellees succeeded on the merits, a nationwide remedy was a foregone conclusion. That was error, especially considering how the facts and law have changed.

1.    <u>Nationwide injunctions are disfavored.</u>

Since this Court enjoined the Memorandum nationwide, the chorus of courts
and Justices cautioning against nationwide injunctions has only grown louder.  *See,
e.g.*, *Immigration Priorities*, 599 U.S. at 693-95, 702-03 (Gorsuch, J., concurring)
(expressing skepticism of universal injunctions and supporting traditional view that
"when a federal court finds a remedy merited, it provides party-specific relief,
directing the defendant to take or not take some action relative to the plaintiff");
*Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring);
*Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J.,
concurring) (nationwide injunctions are "flaw[ed]" because they dictate "how the
defendant must act towards persons who are not parties to the case"); *Trump v.
Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) (describing
"universal injunctions" as "legally and historically dubious").  And as this Court has
recently emphasized, "nationwide injunctions are [not] required or even the norm."
*Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam).  Instead,
remedies must be "tailored to redress" a plaintiff's injury. *Gill v. Whitford*, 138 S.
Ct. 1916, 1934 (2018).

In this case, the cautions against nationwide injunctions are particularly
weighty, because only a small number of states seek termination of the Rule, and
only one, Texas, even ***attempted*** to show harm.  And Appellees' purported harms

are juxtaposed against a coalition of 14 states—home to 61 percent of all DACA recipients—who have told the federal government through public comment that the Rule causes them no harm at all, and in fact provides material ***benefits***. ROA.25805. If the Court determines that DACA should be enjoined (and it should not), it should do so on a much narrower basis, and limit the injunction's application to Texas, the only state that even attempted to demonstrate an actual injury.

2. The district court's nationwide injunction is inequitable.

No plaintiff has a right to an equitable remedy. "The effect of equitable remedies on third parties, not to mention on the courts that must take the time to supervise them, is the practical reason why there is no 'right' to an equitable remedy, why the plaintiff's claim to such a remedy may have to yield to competing considerations." *Avitia v. Metro. Club of Chicago*, 49 F.3d 1219, 1231 (7th Cir. 1995). For centuries, the "essence of equity jurisdiction has been the power . . . to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs . . ." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

In some cases, that flexibility to take into account "mercy and practicality," along with considerations of the "public interests and private needs," requires a court

to leave unlawful actions unremedied—either to avoid a windfall to the plaintiff, *see Collins v. Lew*, 642 F. Supp. 3d 577, 584 (S.D. Tex. 2022); to maintain stability and trust, *see, e.g.*, *Ryder v. United States,* 515 U.S. 177, 180 (1995) (de facto officer doctrine "seeks to protect the public by insuring the orderly functioning of the government despite technical defects in title to office"); *Joseph Eichelberger & Co. v. Comm'r of Internal Revenue*, 88 F.2d 874, 875 (5th Cir. 1937) (allowing unlawful tax decision to stand because, "[w]hether that decision was right or wrong, the accredited officer of the United States made it"); or to avoid doing injustice, *cf. Brown v. Allen*, 344 U.S. 443, 540 (1953) (Jackson, J., concurring) ("[R]eversal by a higher court is not proof that justice is thereby better done.").

Those principles of equity counsel against a nationwide injunction here. The Rule is an ***individualized*** grant of discretion, which requires an individualized analysis of the appropriateness of any remedy. The Supreme Court explained this analysis in *Collins v. Yellen*, 141 S. Ct. 1761 (2021). There, the Court held that the Appellees were not entitled to relief if they could not show that, but for an illegal restriction on the removal of the Federal Housing Finance Agency's director, the offending executive action in question would not have occurred. *Id*. at 1788-89. Otherwise, the plaintiff would be "put [ ] in a better place than otherwise warranted" by avoiding an alleged injury that the plaintiff would have suffered no matter what. *Collins*, 642 F.Supp.3d at 583-84 (cleaned up). Applying that principle with respect

53

to the Rule, Appellees are not entitled to a class-wide remedy. Rather, they must demonstrate that, in a counterfactual, no-DACA world, each DACA recipient would not have obtained lawful presence and work authorization by other means that Appellees do not challenge.

A counterfactual world without the Memorandum, the Rule, and a decade of deferred action is difficult to construct. But, for DACA recipients (and especially the older cohort eligible for DACA under the Rule), the world would not have stood still. At least some individuals who applied for and received DACA would instead have received work authorization and lawful presence through other channels, such as through U Visas, *see* 8 C.F.R. §§ 274a.12(a)(19)-(20), or an order of supervision, *see* 8 C.F.R. § 274a.12(c)(18), and at least some would have instead acquired lawful permanent residence (which they do not have through DACA), including through marriage to a United States citizen. *See* ROA.28756-60. And, as previously discussed, there is no evidence that DACA recipients would ***leave***, rather than remain, while returning to live in legal shadows. Any injuries those DACA recipients purportedly caused Appellees would have occurred anyway, and thus they are not the result of the Rule or the Memorandum, but "because they are here." ROA.18082 (cleaned up). A nationwide injunction that purports to "remedy" injuries that DACA and the Rule did not cause thus sweeps far too broadly.

That is especially true here because of the weighty reliance interests at stake.

"Since 2012, DACA recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance' on the DACA program." *See Regents*, 140 S. Ct. at 1914 (cleaned up); *see also Texas (Memo)*, 549 F. Supp. 3d at 624 (recognizing the "hundreds of thousands of DACA recipients and others who have relied upon this program for almost a decade" whose "reliance has not diminished and may, in fact, have increased over time").  DACA recipients pay taxes, own businesses, work in a variety of industries, volunteer in their communities, and often advocate for other vulnerable populations.  *See, e.g.*, ROA. 8834-35, 24501, 24506, 24515, 24520, 24537.  DACA recipients have built their lives around their presence in the United States.  *See* ROA.24506 ("DACA has helped me think about the future in a way that is more expansive.").  DACA recipients have embarked on professional careers in the United States.  *See, e.g.*, ROA.24501 (working as a public interest lawyer admitted to the State bar of Texas); ROA.24533 (attending law school).  And they are advocates with deep ties to their local communities.  ROA.24510 (working as a grassroots organizer with connections to the community in New York); ROA.24520 (working as community advocate to alleviate social and economic conditions leading to addiction, crime, violence, and poverty in Los Angeles); ROA.24537 (promoting civic engagement among Korean Americans).

As *Regents* makes clear, the District Court should have taken these reliance

interests into account. *See* 140 S. Ct. at 1914. Yet the District Court did not even

consider the other available remedies the Supreme Court noted in *Regents*, including

granting "a broader renewal period based on the need for DACA recipients to reorder

their affairs," issuing "more accommodating termination dates for recipients caught

in the middle of a time-bounded commitment, to allow them to, say, graduate from

their course of study, complete their military service, or finish a medical treatment

regimen," and providing for the "[instruction of] immigration officials to give salient

weight to any reliance interests engendered by DACA when exercising

individualized enforcement discretion." *Id.* Those are difficult, weighty questions,

which *Regents* made clear that DHS, not a court, is best positioned to address. For

that reason, if the Rule were in fact unlawful, the district court should have remanded

to DHS, rather than granting a permanent injunction with nationwide scope.[4]

## CONCLUSION

For the foregoing reasons, Intervenor-Appellants respectfully request that this

Court reverse and vacate the District Court's Order and enter judgment in their favor,

---

[4] If this Court instead decides to affirm the District Court's remedy, it should, at the very minimum, also affirm the District Court's stay of its injunction pending further proceedings. *See Texas (Memo)*, 50 F.4th at 531 (preserving District Court's stay of its injunction of the Memorandum because the "legal questions DACA presents are serious, both to the parties and to the public," and because DACA's termination would have "profound significance"). That is especially true because the District Court itself recognized that a final judgment has not yet been entered and that there are still remaining issues to address. *Texas (Rule)*, 2023 WL 5950808, at *1.

or in the alternative remand the case to the District Court to resolve pending factual

disputes at trial or to remand DACA to DHS without vacatur.

Respectfully submitted,

Dated: January 25, 2024

Douglas H. Hallward-Driemeier
Emerson A. Siegle
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 508-4600


Mark A. Cianci
Heather M. Romero *(of counsel)*
Anna K. Blanco *(of counsel)*
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000

Philip P. Ehrlich *(of counsel)*
Francis X. Liesman *(of counsel)*
ROPES & GRAY LLP
191 North Wacker Drive
Chicago, IL 60606
(312) 845-1200


Carlos Moctezuma García
GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.
P.O. Box 4545
McAllen, TX 78502
(956) 630-3889

*/s/ Nina Perales*

Nina Perales
Fátima Lucía Menéndez *(of counsel)*
MEXICAN AMERICAN LEGAL
DEFENSE & EDUCATIONAL FUND
110 Broadway Street
San Antonio, TX 78205
(210) 224-5476

Patrick S. Doherty *(of counsel)*
Krystal A. Vazquez *(of counsel)*
Lauren C. Brady *(of counsel)*
Laura C. Medina *(of counsel)*
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

*Counsel for Intervenor Defendants –
Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing has been filed electronically this 25th day of January, 2024, by using the Court's CM/ECF system. All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

<div style="margin-left:40%">

*/s/ Nina Perales*
Nina Perales
MEXICAN AMERICAN LEGAL
DEFENSE & EDUCATIONAL FUND
110 Broadway Street
San Antonio, TX 78205
(210) 224-5476

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the volume limitation provided in Fed. R. App. P. 32(a)(7)(B), in that it contains 12,995 words, excluding parts of the brief exempted under Fed. R. App. P. 32(d), according to the word-count feature of Microsoft Word.  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font, size 14 point.

Dated: January 25, 2024                    */s/ Nina Perales*
                                            Nina Perales