No. 23-40653

═══════════════════════════

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

─────────────────

STATE OF TEXAS, et al.

*Plaintiffs-Appellees,*

v.

UNITED STATES OF AMERICA, et al.

*Defendants-Appellants,*

MARIA ROCHA, et al.; STATE OF NEW JERSEY

*Defendants-Intervenors-*
*Appellants.*

─────────────────

**On Appeal from the United States District Court**
**for the Southern District of Texas**

─────────────────

**BRIEF FOR THE STATES OF CALIFORNIA, NEW YORK, ARIZONA, COLORADO, CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW MEXICO, NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN, AND THE DISTRICT OF COLUMBIA, AS AMICI CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL**

─────────

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA  95814
(916) 445-9555

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY  10005
(212) 416-6279

February 1, 2024

*Additional counsel listed on signature page*

═══════════════════════════

## CERTIFICATE OF INTERESTED PERSONS

Because the amici States are governmental entities, a certification of interested persons is not required.  *See* 5th Cir. R. 28.2.1.


Date:  February 1, 2024                    *s/ Ester Murdukhayeva*

# TABLE OF CONTENTS

**Page**

Introduction and Interests of Amici Curiae ................................... 1

Argument ...................................................................... 3

I.    The District Court's Injunction and Vacatur
Order Should Be Reversed ........................................... 3

    A.    The District Court Failed to Consider
Whether Its Injunction Was Warranted
Under Traditional Equitable Principles ............. 4

    B.    The District Court's Vacatur Order Violates
the Administrative Procedure Act and
Relevant Precedent in Multiple Respects ........... 6

II.    Any Remedy in this Case Must Account for the
Significant Reasonable Reliance Interests of
DACA Recipients and Their States and
Communities ................................................................. 11

    A.    Amici States Rely on DACA's Substantial
Social and Economic Benefits ........................... 11

        1.    DACA recipients are vital to amici
States' communities, public
universities, and economies ..................... 12

        2.    DACA enhances public safety,
promotes self-reliance, and reduces
the strain on social safety net
programs .................................................... 16

        3.    Amici States have structured their
laws and regulations in reliance on
DACA and its benefits .............................. 18

    B.    Abrupt Termination of DACA Would
Disrupt and Harm Amici States ....................... 20

Conclusion .................................................................................. 24

i

# TABLE OF AUTHORITIES

**Page**

C**ASES**

*Armstrong v. Exceptional Child Ctr., Inc.*
575 U.S. 320 (2015) ...................................................................... 4

*Aurelius Inv., LLC v. Puerto Rico*
915 F.3d 838, 862-63 (1st Cir. 2019)........................................ 10

*Buckley v. Valeo*
424 U.S. 1 (1976) ........................................................................ 9

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*
140 S. Ct. 1891 (2020) ............................................................ 8, 9

*eBay Inc v. MercExchange, L.L.C.*
547 U.S. 388 (2006) ................................................................ 4, 5

*EEOC v. CBS, Inc.*
743 F.2d 969 (2d Cir. 1984)..................................................... 10

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*
140 S. Ct. 1649 (2020) ............................................................. 10

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*
45 F.4th 127 (D.C. Cir. 2022) .................................................... 7

*Hecht Co. v. Bowles*
321 U.S. 321 (1944) ................................................................... 4

*Matter of Vargas*
131 A.D.3d 4 (N.Y. App. Div. 2015) ........................................ 19

*Moore v. Madigan*
702 F.3d 933 (7th Cir. 2012) ................................................... 10

# TABLE OF AUTHORITIES
## (continued)

**Page**

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*
   459 U.S. 813 (1982) .................................................................. 10

*Northern Pipeline Construction Co. v. Marathon Pipe
   Line Co.*
   458 U.S. 50 (1982) ............................................................... 9, 10

*Sw. Elec. Power Co. v. U.S. EPA*
   920 F.3d 999 (5th Cir. 2019) ....................................... 7

*Texas v. United States*
   50 F.4th 498 (5th Cir. 2022) .................................. 2, 5, 6

*Weinberger v. Romero-Barcelo*
   456 U.S. 305 (1982) .............................................. 5

*Whole Woman's Health v. Jackson*
   595 U.S. 30 (2021) ............................................. 4

**STATUTES**

6 U.S.C. § 202(5) ................................................... 2

8 U.S.C. § 1103(a)(1) .............................................. 2

20 Ill. Comp. Stat. Ann. 2105/2105-140 ........................... 19

105 Ill. Comp. Stat. Ann. 5/21B-15(f) ............................ 19

705 Ill. Comp. Stat. Ann.
   205/2(a) ....................................................... 19
   205/2(b) ....................................................... 19

Cal. Educ. Code
   § 66021.7 ...................................................... 19
   § 68130.5(a) ................................................... 19

# TABLE OF AUTHORITIES
## (continued)

**Page**

Minn. Stat. Ann. § 135A.043 ........................................................ 19

N.Y. Educ. Law
    § 355(2)(h)(10) ............................................................ 19
    § 661(5)(a) .................................................................. 19
    § 6206(7)(e) ................................................................ 19

## REGULATIONS

Deferred Action for Childhood Arrivals (DACA) Final
    Rule, 87 Fed. Reg. 53,152 (Aug. 30, 2022) ............1, 13, 16-17, 24

## OTHER AUTHORITIES

Atheendar S. Venkataramani et al., *Health
    Consequences of the US Deferred Action for
    Childhood Arrivals (DACA) Immigration
    Programme: A Quasi-Experimental Study*, 2 Lancet
    Pub. Health 175 (2017),
    https://tinyurl.com/5dkmp8r3 .................................................... 17

Cybersecurity & Infrastructure Sec. Agency, U.S. Dep't
    of Homeland Sec., *Identifying Critical Infrastructure
    During COVID-19*, https://tinyurl.com/46dhvtv4 .......... 13, 14, 15

Democrats of the Comm. on Small Bus., *Economic
    Impact of DACA: Spotlight on Small Business*
    (2018), https://tinyurl.com/2p96wrst ................................... 16, 17

G. Thomas Kingsley et al., *The Impacts of Foreclosures
    on Families and Communities*, The Urb. Inst. 13
    (May 2009), https://tinyurl.com/GTKUrban ............................ 21

# TABLE OF AUTHORITIES
## (continued)

**Page**

Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst.: Cato at Liberty (Jan. 18, 2017), https://tinyurl.com/2au7a3cj ..................................................... 21

Ike Brannon & M. Kevin McGee, *The Costs of Closing DACA Initial Enrollments,* Regulation, Winter 2020-2021, https://tinyurl.com/536rzmrr........................................... 21

Jennifer Tolbert et al., *Key Facts About the Uninsured Population,* Kaiser Fam. Found. (Dec. 19, 2022), https://tinyurl.com/2wyb7c6m.................................................... 18

Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 Science 1041 (2017), https://tinyurl.com/3uvz3mvt.................................................... 17

Jose Magaña-Salgado & Tom K. Wong, Immigrant Legal Res. Ctr., *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare* 1 (2017), http://tinyurl.com/423f9ddc........................ 22

Katherine Yun et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization*, 17 MATERN. CHILD HEALTH J. 1913 (2013)................................ 23

Nicole Prchal Svajlenka & Trinh Q. Truong, The Demographic and Economic Impacts of DACA Recipients, Fall 2021 Edition, Ctr. for Am. Progress (Nov. 24, 2021), https://tinyurl.com/5n9awyzf.........13, 15, 16, 23

# TABLE OF AUTHORITIES
## (continued)

**Page**

Office of Health Ins. Programs, N.Y. Dep't of Health,
    GIS 13 MA/011, Children's Health Insurance
    Program Reauthorization Act (CHIPRA) Expanded
    Coverage for Certain Qualified and PRUCOL Aliens
    (May 7, 2013), https://tinyurl.com/4hemznr9 .......................... 19

Press Release, N.Y. State Educ. Dep't, *Board of
    Regents Permanently Adopts Regulations to Allow
    DACA Recipients to Apply for Teacher Certification
    and Professional Licenses* (May 17, 2016),
    https://tinyurl.com/y5dnw9sx..................................................... 19

Stefano Comino et al., *Silence of the Innocents:
    Undocumented Immigrants' Underreporting of
    Crime and Their Victimization*, 39 J. Pol'y Analysis
    & Mgmt. 1214 (2020), https://tinyurl.com/3xx4325j................. 24

Tom K. Wong et al., *DACA Boosts Recipients' Well-
    Being and Economic Contributions: 2022 Survey
    Results*, Ctr. for Am. Progress (Apr. 27, 2023),
    http://tinyurl.com/mwyjsv4f ....................................12, 17, 23, 24

U.S. Citizenship & Immigr. Servs., U.S. Dep't of
    Homeland Sec., *Number of Form I-821D,
    Consideration of Deferred Action for Childhood
    Arrivals Requests by Intake and Case Status, by
    Fiscal Year Aug. 15, 2012-Sept. 30, 2023*,
    http://tinyurl.com/3epcmzwf ..................................................... 11

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

The States of California, New York, Arizona, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia, file this brief in support of defendants-appellants in this lawsuit challenging the lawfulness of the Deferred Action for Childhood Arrivals (DACA) Final Rule, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts. 106, 236, 274a).  Amici States have a substantial interest in the DACA program.  Over 60 percent of all current DACA recipients (nearly 330,000 individuals) live in amici States, where they are valued members of our communities and vital participants in the workforce who contribute to the tax base.

Amici States have relied on DACA for more than a decade. Indeed, they have relied on the program since the federal government first issued guidance in 2012 for granting deferred action on a case-by-case basis to qualifying individuals.  Amici have hired and trained hundreds of DACA recipients and depend on the hundreds of thousands of DACA grantees who contribute to their communities in varied and valuable ways,

including as first responders, healthcare workers, and teachers. In addition, by enabling grantees to work lawfully and to access other benefits that stem from the grant of deferred action, DACA has increased amici's tax receipts and reduced the strain on their social safety net programs.

Amici States agree with appellants that the Final Rule is a lawful exercise of Executive Branch authority and does not violate the Administrative Procedure Act (APA). *See* U.S. Br. 34-38; New Jersey Br. 20-21 & n.2; DACA Recipients Br. 38-47. Although this Court previously concluded that the executive memorandum creating the DACA program in 2012 was substantively and procedurally invalid, *see Texas v. United States*, 50 F.4th 498, 524, 528 (5th Cir. 2022), amici States maintain that DACA is a lawful exercise of the Executive Branch's authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "administ[er] and enforce[]" laws relating to immigration and naturalization, 8 U.S.C. § 1103(a)(1).

In light of this Court's prior ruling, this amicus brief instead focuses on (1) the district court's legal errors and abuse of discretion in selecting a remedy, and (2) the profound reliance interests that DACA has

engendered over the nearly twelve years that the program has been in effect, including the importance of those reliance interests to any remedy that may be adopted. In promulgating the Final Rule, the Department of Homeland Security (DHS) properly considered the costs and benefits of continuing DACA—including the significant reliance interests at stake. This Court should likewise consider those reliance interests in determining what remedy is appropriate to address plaintiffs' claims. As amici have previously noted, any remedy must account for the serious harm that terminating DACA would cause to all who have relied on the policy in structuring their affairs over the past decade. They are hundreds of thousands of individuals who know no home other than this country, as well as their families, communities, employers, and the States in which they reside.

## ARGUMENT

## I. THE DISTRICT COURT'S INJUNCTION AND VACATUR ORDER SHOULD BE REVERSED

Even if the Final Rule were unlawful, any remedy ordered by a federal court would have to abide by relevant statutory law and judicial precedent governing injunctive relief. Here, the district court abused its discretion by issuing an injunction without considering whether

traditional equitable principles warranted such a remedy. And the court's vacatur order—effectively wiping DACA off the books in its entirety without severing its ostensibly unlawful aspects, and without affording DHS or Congress a chance to act first to (at a minimum) responsibly wind down the program—contravenes the Administrative Procedure Act and well-established case law.

## A.   The District Court Failed to Consider Whether Its Injunction Was Warranted Under Traditional Equitable Principles

A federal court's power to "enjoin unlawful executive action" is bounded by "express and implied" limitations. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). Among these limitations is the basic rule that an injunction must comport with "traditional equitable principles." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 42 (2021). Equitable remedies are distinguished by their "[f]lexibility rather than rigidity," which affords the judiciary the power to "mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Of particular relevance here, under "well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc*

*v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The plaintiff must show (1) "irreparable injury," (2) a lack of alternative "remedies available at law," (3) that the "balance of hardships between the plaintiff and defendant" favors injunctive relief, and (4) that an injunction is in the "public interest." *Id.*; *accord, e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-313 (1982).

The district court here failed to undertake any such analysis. It enjoined DHS from administering the DACA program without considering whether that equitable remedy was warranted by the particular circumstances of the case. For example, the court expressed "sympath[y]" for the "predicament of DACA recipients and their families," in light of their strong reliance interests and compelling case for relief. ROA 23-40653.36397. But it did not consider whether that predicament of DACA recipients tipped the balance of equities in favor of the defendants, or affected the public-interest prong of the analysis governing injunctive relief.

To be sure, this Court held that the district court's previous injunction against enforcement of the 2012 guidance was not an abuse of discretion. *Texas*, 50 F.4th at 530-531. But that holding—which

5

primarily addressed the nationwide scope of the injunction, not the four-factor test for injunctive relief—did not eliminate the need for the district court to consider whether its new injunction against enforcement of the Final Rule was warranted under traditional equitable principles. More than two years elapsed between the district court's initial injunction and its new injunction, during which time many DACA recipients have created even more ties to this country by having children, buying homes, and the like—becoming even more deeply rooted in their schools, jobs, communities, and States. *See infra* at 11-24. The district court should have considered whether its new, modified injunction was warranted in light of these strengthened reliance interests, among other factors. Its failure to do so amounts to an abuse of discretion. *See Texas*, 50 F.4th at 530.

## B.  The District Court's Vacatur Order Violates the Administrative Procedure Act and Relevant Precedent in Multiple Respects

In addition to issuing an injunction, the district court vacated the Final Rule in its entirety. ROA 23-40653.36399. Although the district properly stayed its vacatur order pending appeal, *see id.*; *see also* ROA

23-40653.36400-01, the order nonetheless suffers from several defects that warrant reversal.

*First*, the district court should not have vacated the Final Rule in its entirety. Where "one aspect of a rule" violates the APA while other aspects do not, federal courts generally order "partial vacatur" of only the offending portion of the agency's action, while leaving the lawful portions in place. *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022); *see Sw. Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating "unlawful . . . portions" of agency rule). And here, the district court acknowledged that the administrative record "express[ed] the agency's intent that the Court should sever any unlawful portions of the Final Rule." ROA 23-40653.36388. In particular, DHS made clear that if DACA's provisions for work authorization and other benefits were invalidated, the agency would still have adopted DACA's remaining provisions, such as forbearance from initiating immigration enforcement proceedings. *See id.* There is no support for the district court's contrary finding. The court speculated that a forbearance-only version of DACA, without the program's benefits provisions, "would be superfluous" and would not "function sensibly." ROA 23-40653.36389,

7

23-40653.36394. But DHS saw it differently, and the court did not give adequate consideration to its severability guidance.

*Second*, apart from the stay pending appeal, the district court should have stayed the vacatur order for a reasonable period following the final resolution of this litigation to afford DHS an opportunity to modify (or, if necessary, wind down) the program in the first instance. As the Supreme Court has emphasized, even if DACA were found to be unlawful in certain respects, "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1910 (2020). And "[t]hose policy choices are for DHS" to make in the first instance. *Id.* Thus, for example, even when the former Acting Secretary of Homeland Security attempted to terminate DACA in 2017 on the asserted basis that it was unlawful (among other reasons), she exercised discretion in devising a "wind-down" of the program that entailed "two-year renewals for those DACA recipients whose benefits were set to expire within six months." *Id.* at 1914. The Supreme Court later explained that she also "should have considered whether she had similar flexibility in addressing any

reliance interests of DACA recipients"—including, among other things, "a broader renewal period based on the need for DACA recipients to reorder their affairs." *Id.* The district court failed to heed the Supreme Court's guidance about the importance of allowing DHS an opportunity to devise the details of any such wind-down in the first instance, giving due consideration to reliance interests of existing DACA recipients, and their families, communities, and States.

*Third*, the vacatur order should also have been stayed for a reasonable period of time to allow Congress to formulate a legislative response. There is ample precedent for this approach in cases where an immediate judicial remedy would have threatened widespread disruption to long-established practices. For example, in *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court held that the process for selecting commissioners of the Federal Election Commission violated the Appointments Clause, but stayed its judgment for 30 days to give Congress "an opportunity to reconstitute the Commission" without interrupting enforcement of campaign finance law. *Id.* at 143. Similarly, in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), the Court held that Congress could not vest non-Article

9

III judges with jurisdiction over all chapter 11 bankruptcy proceedings. *Id.* at 87. But the decision applied only prospectively, to avoid causing "substantial injustice and hardship" to litigants who had reasonably relied on the bankruptcy courts, and the Court stayed its judgment for a total of approximately six months to "afford Congress an opportunity to reconstitute the bankruptcy courts" in a constitutionally permissible way. *Id.* at 88; *see N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 459 U.S. 813, 813 (1982) (extending initial three-month stay).[1] The same approach is warranted here: Any remedy that would affect existing DACA recipients should be stayed for a reasonable period following the final resolution of this litigation to allow Congress time to act.

---

[1] *See also Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 862-63 (1st Cir. 2019) (staying mandate for 90 days to allow the President and Senate to remedy defective appointments to oversight board or "reconstitute the Board in accordance with the Appointments Clause," and clarifying that the ruling did not "eliminate any otherwise valid actions of the Board prior to the issuance of our mandate in this case"), *rev'd on other grounds sub nom. Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020); *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (staying mandate for 180 days to allow Illinois legislature to craft new legislation after holding that the State's law regulating the carrying of firearms in public violated the Second Amendment); *EEOC v. CBS, Inc.*, 743 F.2d 969, 975-76 (2d Cir. 1984) (staying mandate for approximately four months to afford Congress an opportunity to "take appropriate measures" to remedy the invalid transfer of powers to the EEOC).

## II. ANY REMEDY IN THIS CASE MUST ACCOUNT FOR THE SIGNIFICANT REASONABLE RELIANCE INTERESTS OF DACA RECIPIENTS AND THEIR STATES AND COMMUNITIES

### A. Amici States Rely on DACA's Substantial Social and Economic Benefits

Since 2012, DACA has provided protection from removal and access to work authorization to over 835,000 people, including more than 514,000 current and former residents of amici States.[2]  DACA recipients have grown up in this country, enrolled in degree programs, embarked on careers, purchased homes, and started their own families, all in reliance on the policy.  The benefits of DACA extend far beyond the lives of DACA recipients and their families:  DACA recipients bolster the tax bases and economies of the amici States, work in our essential industries, and enrich the student bodies and faculties of our public universities. Amici States thus have a vital interest in preserving this longstanding policy or, at the very least, minimizing the harms that would flow from the policy's termination.

---

[2] *See* U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals Requests by Intake and Case Status, by Fiscal Year Aug. 15, 2012–Sept. 30, 2023*, http://tinyurl.com/3epcmzwf.

11

### 1. DACA recipients are vital to amici States' communities, public universities, and economies

In the last decade, DACA has enabled hundreds of thousands of immigrants to further their education and find employment. In a 2022 survey of current DACA recipients, approximately nine out of ten individuals reported that they were employed or in school.[3] In addition, 47.4 percent reported obtaining a higher-paying job after receiving DACA, and 46.6 percent reported finding employment with health insurance or other benefits.[4] Because DACA allows recipients to remain in school and pursue further education, the policy has also increased productivity amongst grantees and created more opportunities for high-skilled work. This has benefited amici States, particularly in the critical education and healthcare sectors: approximately 20,000 DACA recipients are employed as teachers in school districts across the country, and an estimated 34,000 DACA recipients serve as healthcare workers.[5]

---

[3] Tom K. Wong et al., *DACA Boosts Recipients' Well-Being and Economic Contributions: 2022 Survey Results*, Ctr. for Am. Progress (Apr. 27, 2023), http://tinyurl.com/mwyjsv4f.

[4] *Id.*

[5] *See* Nicole Prchal Svajlenka & Trinh Q. Truong, The Demographic and Economic Impacts of DACA Recipients, Fall 2021 Edition, Ctr. for Am. Progress (Nov. 24, 2021), https://tinyurl.com/5n9awyzf.

Amici States especially relied on the contributions of DACA recipients during the COVID-19 pandemic. An estimated 343,000 DACA grantees serve in industries deemed essential by DHS,[6] which includes not only healthcare and education, but also food and agriculture.[7] In light of the ongoing labor shortage in these industries, DACA recipients' participation in the workforce is crucial to our ability to cope with, and recover from, the pandemic.[8]

Moreover, amici States themselves have hired and trained hundreds of DACA recipients to fill critical public service positions. As of 2020, California, for instance, employed nearly 300 DACA recipients across its state agencies and departments because of their specialized skills and qualifications.[9] These workers are vital to furthering the State's priorities in public safety, public health, infrastructure, and veterans

---

[6] *Id.*

[7] Cybersecurity & Infrastructure Sec. Agency, U.S. Dep't of Homeland Sec., *Identifying Critical Infrastructure During COVID-19*, https://tinyurl.com/46dhvtv4.

[8] *See* Comment Letter from Att'ys Gen. 27-28 (Nov. 19, 2021), https://tinyurl.com/49hwhujm; *see also* DACA Final Rule, 87 Fed. Reg. at 53,171 (acknowledging that, "if members of the DACA population stopped performing their work, labor shortages could be exacerbated").

[9] As of July 2020, California employed at least 288 DACA recipients across 26 agencies and departments, including the Department of Corrections and Rehabilitation, Department of Health Care Services, Department of Transportation, Department of Water Resources, and Department of Veterans Affairs. *See* Comment Letter from Att'ys Gen., *supra* n.8, at 12.

affairs. Other amici States have also made significant investments in training DACA grantees to work in underserved communities. Illinois, for example, offers interest-free tuition loans to DACA recipients enrolled in higher-degree programs who commit to serving four years in an underserved Illinois community following their graduation.[10]

DACA recipients are also integral members of amici States' institutions of higher learning. Thousands are enrolled in the States' public universities and colleges, including, as of November 2020, 1,700 DACA recipients in the University of California system alone.[11] Amici States benefit not just from these grantees' tuition dollars, which are substantial,[12] but also from their unique experiences, which help further the States' important interest in fostering diverse and inclusive educational environments. Because of DACA, amici States' public universities and colleges are able to employ grantees in a variety of roles, including as professors, teachers, teaching assistants, administrators,

---

[10] *Id.* at 18-19.

[11] *See id.* at 13-14 & n.64 (listing estimated enrollment numbers of DACA grantees in public universities and colleges in the States of New York, California, New Jersey, Connecticut, Massachusetts, Hawaii, Pennsylvania, Washington, Illinois, Nevada, and Minnesota).

[12] *See id.* at 15.

14

research assistants, and postdoctoral researchers.[13]  These individuals have made significant contributions to the research expertise and exchange of ideas that are central to these institutions' academic missions.[14]

DACA recipients not only strengthen our communities, but also bolster our economies.  Recipients and their households pay an estimated $6.2 billion in federal taxes and $3.3 billion in state and local taxes annually, including over $2.1 billion in state and local tax revenue to amici States.[15]  The spending power of DACA recipients—estimated at $25.3 billion annually—also contributes substantially to the overall economic health of amici States.[16]  DACA recipients own 68,000 homes and make $760 million in annual mortgage payments.[17] And nearly eight

---

[13] *Id.* at 16 & n.75.  For example, as of November 2021, the California State University system estimated that it employs approximately 500 DACA grantees.  *Id.* at 16-17.

[14] *See id.* at 13.

[15] *See* Svajlenka & Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition, supra* n.5.

[16] *Id.*

[17] *Id.*

percent of recipients ages 25 and older have started small businesses.[18]

These investments create jobs and new spending in local economies.[19]

### 2. DACA enhances public safety, promotes self-reliance, and reduces the strain on social safety net programs

In addition to creating significant economic and educational benefits, DACA improves the public safety and health of residents in amici States. As amici's experiences demonstrate, public safety is best protected when all members of the community—regardless of immigration status—are encouraged to report crimes and to participate in policing efforts without fear of immigration consequences.[20]  Multiple studies have shown that, by deferring the possibility of immediate removal, DACA removes a significant obstacle to reporting crime.[21]

---

[18] Democrats of the Comm. on Small Bus., *Economic Impact of DACA: Spotlight on Small Business* 7 (2018), https://tinyurl.com/2p96wrst.

[19] *See id.*; Comment Letter from Att'ys Gen., *supra* n.8, at 29-30; *see also* DACA Final Rule, 87 Fed. Reg. at 53,169-70 (considering economic contributions of DACA recipients and determining "on balance" that "various positive economic impacts of DACA outweigh the potential adverse impacts to the labor market").

[20] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 17.

[21] *See id.* at 23; *see also* DACA Final Rule, 87 Fed. Reg. at 53,171 (recognizing that "reduction of fear among DACA recipients contributes to improved law enforcement and community relations, which improves public safety").

16

Amici States' experiences also confirm that DACA enhances public health outcomes and reduces healthcare costs to the States.[22] As studies repeatedly have shown, DACA improves mental health not only among DACA recipients, but also their family members.[23] For example, a recent survey showed that over 46 percent of DACA recipients have been able to obtain jobs that provide health insurance or other benefits.[24] These jobs allow DACA recipients to become more productive, economically self-reliant members of our States and communities. Without DACA, these individuals (and their dependents) would likely be forced to forgo needed healthcare, including preventative care, creating costly health problems in the long run.[25] They would also likely rely on state-funded or state-

---

[22] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 18-21, 24-25.

[23] *See* Atheendar S. Venkataramani et al., *Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study*, 2 Lancet Pub. Health 175, 178-79 (2017), https://tinyurl.com/5dkmp8r3; Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357 Science 1041, 1043 (2017), https://tinyurl.com/3uvz3mvt.

[24] Tom K. Wong et al., *DACA Boosts Recipients' Well-Being and Economic Contributions: 2022 Survey Results*, *supra* n.3.

[25] *Cf.* Jennifer Tolbert et al., *Key Facts About the Uninsured Population,* Kaiser Fam. Found. (Dec. 19, 2022), https://tinyurl.com/2wyb7c6m.

administered healthcare (or both), as well as other safety net programs, increasing the strain on amici States' budgets.[26]

### 3.    Amici States have structured their laws and regulations in reliance on DACA and its benefits

In light of DACA recipients' many contributions to our States and the associated societal benefits, many amici States have adopted programs and laws to ensure that individuals eligible for deferred action can reach their full potential.  For example, amici States have invested in DACA recipients' higher education and professional development. Many of the amici States, including Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Nevada, New Mexico, Massachusetts, Minnesota, Oregon, and Washington, have extended in-state tuition benefits to DACA recipients who are state residents.[27]  Some, including New York, California, and Minnesota, have not only extended in-state tuition benefits but also allowed grantees to apply for state-administered student aid and scholarships.[28]  And several States have enacted laws and regulations to integrate DACA recipients into professional licensing

---

[26] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 19-20.

[27] *See id.* at 15.

[28] *See* N.Y. Educ. Law §§ 355(2)(h)(10), 661(5)(a), 6206(7)(e); Cal. Educ. Code §§ 66021.7, 68130.5(a); Minn. Stat. Ann. § 135A.043; *id.* ch. 136A.

schemes: DACA recipients in Illinois may now apply for law licenses, and those in New York may obtain teaching certifications and other professional licenses, including for law and nursing.[29]

A number of amici States have also structured healthcare access programs in reliance on DACA.[30] New York, for example, currently funds Medicaid coverage for low-income undocumented immigrants who have received deferred action; undocumented immigrants who are not DACA grantees may qualify only for Medicaid coverage for necessary emergency services.[31] If DACA were terminated or limited, New York would be compelled to seek a legislative change of its scheme: The State would either have to spend additional state funds to maintain the current level

---

[29] *See* 705 Ill. Comp. Stat. Ann. 205/2(a), (b); 20 Ill. Comp. Stat. Ann. 2105/2105-140; 105 Ill. Comp. Stat. Ann. 5/21B-15(f); *Matter of Vargas*, 131 A.D.3d 4, 6, 12, 27-28 (N.Y. App. Div. 2015) (per curiam) (DACA grantee may satisfy standard for good character and general fitness necessary for admission to practice law in New York); Press Release, N.Y. State Educ. Dep't, *Board of Regents Permanently Adopts Regulations to Allow DACA Recipients to Apply for Teacher Certification and Professional Licenses* (May 17, 2016), https://tinyurl.com/y5dnw9sx.

[30] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 20.

[31] *See* Office of Health Ins. Programs, N.Y. Dep't of Health, GIS 13 MA/011, Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens (May 7, 2013), https://tinyurl.com/4hemznr9.

of Medicaid coverage or be forced to limit coverage for some or all of those formerly eligible for DACA to treatment of emergency conditions.[32]

### B.  Abrupt Termination of DACA Would Disrupt and Harm Amici States

Sudden termination of a decade-old policy of deferred action would upend the programs and laws that many amici States have adopted in reliance on DACA, in addition to devastating the lives of hundreds of thousands of individuals and their families.  Amici States would be forced to quickly hire new employees to replace the DACA recipients we have already trained and hired (see *supra* at 8-9), and we would lose the benefit of the substantial investments we have made in the higher education of DACA grantees (see *supra* at 9).  Additionally, many amici States would be forced to spend time and resources changing the many laws and regulations we have enacted over the last decade in reliance on the DACA policy—laws governing everything from financial aid and professional licensing to Medicaid coverage—and to do so expeditiously. See *supra* at 11-12.

---

[32] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 20-21.

Abruptly ending or limiting DACA would also inflict substantial economic harm on DACA grantees, their families, their employers and employees, and their States.  It would cause recipients to sustain significant losses in income, with negative tax and other consequences for the States in which they reside.[33]  These consequences could well include an increase in home foreclosures for the almost 70,000 DACA recipients who are homeowners, *see supra* at 15, which could in turn lead to a decline in property values, abandoned homes, and other social ills.[34]  In addition, a full rollback of DACA is projected to result in a loss of an estimated $280 billion in national economic growth over the course of a decade.[35]  It would also throw thousands of businesses into disarray, as employers would have to scramble to replace (often highly trained) employees who are DACA recipients; and the many businesses owned by DACA recipients could be forced to close, laying off their workers.  And a

---

[33] *See* Ike Brannon & M. Kevin McGee, *The Costs of Closing DACA Initial Enrollments*, Regulation, Winter 2020-2021, at 30, 32, https://tinyurl.com/536rzmrr (freeze on new DACA enrollments projected to result in a $26.1 billion loss in income for DACA-eligible individuals over next 20 years).

[34] G. Thomas Kingsley et al., *The Impacts of Foreclosures on Families and Communities*, The Urb. Inst. 13 (May 2009), https://tinyurl.com/GTKUrban.

[35] Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst.: Cato at Liberty (Jan. 18, 2017), https://tinyurl.com/2au7a3cj.

full rollback of DACA would lead to an estimated loss of $33.1 billion in Social Security contributions and $7.7 billion in Medicare contributions—funds that are critical to ensuring the financial health of these national programs upon which residents of amici States rely.[36]

In addition, a sudden removal of DACA's protections would weaken amici States' social safety nets and threaten serious public health consequences. Absent work authorization, many DACA recipients and their dependents would lose access to their employer-sponsored health insurance, thus limiting their access to care and increasing their reliance on state-funded and state-administered health services. The projected costs to amici States are substantial. To illustrate: New York and Illinois would have incurred an estimated $18.5 million and $20.2 million, respectively, in additional public health costs if the previous attempt to rescind DACA had not been reversed.[37]     In addition, children of

---

[36] Jose Magaña-Salgado & Tom K. Wong, Immigrant Legal Res. Ctr., *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare* 1 (2017), http://tinyurl.com/423f9ddc.

[37] *See* Comment Letter from Att'ys Gen., *supra* n.8, at 20.

undocumented immigrants are often sicker when seeking emergency room care, and frequently miss preventive annual exams.[38]

Ending the deferred action component of DACA would also have grave consequences for our communities. An estimated 1.3 million people across the country live in a household with a DACA recipient, including 300,000 U.S.-born children who have at least one recipient parent.[39] Sudden termination of the policy would threaten the security of these families,[40] and could strain state foster care and social services systems if children are deprived of their parents or guardians. An abrupt termination of DACA would negatively affect community welfare and safety as well. According to a 2022 survey of DACA recipients, without deferred action, recipients would be 34.8 percent less likely to report crimes committed against them, and nearly 50 percent less likely to

---

[38] Katherine Yun et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization*, 17 MATERN. CHILD HEALTH J. 1913, 1913-21 (2013).

[39] Svajlenka & Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition*, *supra* n.5.

[40] *See* Tom K. Wong et al., *DACA Boosts Recipients' Well-Being and Economic Contributions: 2022 Survey Results*, *supra* n.3 (reporting recipients' fears of deportation and family separation if DACA were to end).

report wage theft by employers.[41]  This statistic is a matter of particular concern given the heightened vulnerability to crime faced by immigrant communities.[42]

These considerations underscore the importance to amici States of preserving the benefits of DACA and minimizing the harms that would result from its termination.  If this Court concludes that the DACA Final Rule is unlawful, the Court in formulating a remedy must take into account the substantial reliance interests at stake—including those of amici States—which DHS appropriately considered in promulgating the Final Rule.[43]

## CONCLUSION

The judgment of the district court should be reversed.

---

[41] *Id.*

[42] *See, e.g.*, Stefano Comino et al., *Silence of the Innocents: Undocumented Immigrants' Underreporting of Crime and Their Victimization*, 39 J. Pol'y Analysis & Mgmt. 1214, 1216 (2020), https://tinyurl.com/3xx4325j.

[43] *See, e.g.*, DACA Final Rule, 87 Fed. Reg. at 53,174, 53,289 (discussing States' reliance interests).

Dated:  February 1, 2024

Respectfully submitted,

s/ Ester Murdukhayeva
Ester Murdukhayeva

ROB BONTA
  *Attorney General*
  *State of California*
MICHAEL J. MONGAN
  *Solicitor General*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney General*
JOSHUA PATASHNIK
  *Deputy Solicitor General*
JAMES F. ZAHRADKA II
  *Supervising Deputy*
  *Attorney General*
VIRGINIA CORRIGAN
  *Deputy Attorney General*

1300 I Street
Sacramento, CA  95814
(916) 445-9555
josh.patashnik@doj.ca.gov

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
GRACE X. ZHOU
  *Assistant Solicitor General*

28 Liberty Street
New York, NY  10005
(212) 416-6279
ester.murdukhayeva@ag.ny.gov

*(Counsel listing continues on following pages)*

KRISTIN K. MAYES
*Attorney General*
*Arizona*

PHILIP J. WEISER
*Attorney General*
*Colorado*

WILLIAM TONG
*Attorney General*
*Connecticut*

KATHLEEN JENNINGS
*Attorney General*
*Delaware*

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*

ANNE E. LOPEZ
*Attorney General*
*Hawai'i*

KWAME RAOUL
*Attorney General*
*Illinois*

AARON M. FREY
*Attorney General*
*Maine*

ANTHONY G. BROWN
*Attorney General*
*Maryland*

ANDREA JOY CAMPBELL
*Attorney General*
*Massachusetts*

DANA NESSEL
*Attorney General*
*Michigan*

KEITH ELLISON
*Attorney General*
*Minnesota*

AARON D. FORD
*Attorney General*
*Nevada*

RAÚL TORREZ
*Attorney General*
*New Mexico*

JOSHUA H. STEIN
*Attorney General*
*North Carolina*

ELLEN F. ROSENBLUM
*Attorney General*
*Oregon*

MICHELLE A. HENRY
*Attorney General*
*Pennsylvania*

PETER F. NERONHA
*Attorney General*
*Rhode Island*

CHARITY R. CLARK
*Attorney General*
*Vermont*

JOSHUA L. KAUL
*Attorney General*
*Wisconsin*

ROBERT W. FERGUSON
*Attorney General*
*Washington*

27

**CERTIFICATE OF SERVICE**

I certify that on February 1, 2024, I electronically filed the
foregoing document with the Clerk of the Court of the United States
Court of Appeals for the Fifth Circuit by using the appellate CM/ECF
system. I certify that all other participants in this case are registered
CM/ECF users and that services will be accomplished by the appellate
EM/EC system.

Date:  February 1, 2024             *s/ Ester Murdukhayeva*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 4,818 words, according to Microsoft Word. I further certify that this brief complies with typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in Microsoft Word using 14-point Century Schoolbook font for regular text and 12-point Century Schoolbook font for footnotes.


Date:  February 1, 2024                    *s/ Ester Murdukhayeva*