No. 23-40653

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

State of Texas; State of Alabama; State of Arkansas; State of Louisiana; State of Nebraska; State of South Carolina; State of West Virginia; State of Kansas; State of Mississippi,

*Plaintiffs – Appellees,*

v.

United States of America; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; Patrick J. Lechleitner, Acting Director of U.S. Immigration and Customs Enforcement; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; Jason D. Owens, Chief of the U.S. Border Patrol,

*Defendants – Appellants,*

María Rocha; José Magaña-Salgado; Nanci J. Palacios Godínez; Elly Marisol Estrada; Karina Ruíz de Díaz; Carlós Aguilar González; Luis A. Rafael; Darwin Velásquez; Jin Park; Óscar Álvarez; Denise Romero; Jung Woo Kim; Ángel Silva; Hyo-Won Jeon; Elízabeth Díaz; Blanca González; Moses Kamau Chege; María Díaz,

*Intervenor Defendants – Appellants,*

State of New Jersey,

*Intervenor – Appellant.*

On Appeal from the United States District Court for the
Southern District of Texas, Brownsville Division, No. 1:18-CV-68

## BRIEF OF UNITED WE DREAM AND 116 ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLANTS IN SUPPORT OF REVERSAL

WHITNEY CLOUD
DLA Piper LLP (US)
One Liberty Place
1650 Market Street Suite 5000
Philadelphia, PA 9103-7300
(215) 656-2440
whitney.cloud@us.dlapiper.com

PETER KARANJIA*
JULIA DEUTSCH (not admitted)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
(202) 799-4000
peter.karanjia@us.dlapiper.com
*Counsel of Record

*Counsel for Amici Curiae United We Dream and 116 organizations*
*Additional Counsel Listed on Inside Cover*

ELIZABETH J. JONAS (not admitted)
DLA Piper LLP (US)
51 John F. Kennedy Pkwy Suite 120
Short Hills, NJ 07078-2704
(973) 307-3031
elizabeth.jonas@us.dlapiper.com

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rules 29.2 and 28.2.1, the undersigned counsel of record for *Amici* certifies that the following persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:**

> State of Texas; State of Alabama; State of Arkansas; State of Louisiana; State of Nebraska; State of South Carolina; State of West Virginia; State of Kansas; State of Mississippi

**Defendants-Appellants:**

> United States of America; Alejandro N. Mayorkas, Secretary, U.S. Department of Homeland Security; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; Patrick J. Lechleitner, Acting Director of U.S. Immigration and Customs Enforcement; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; Jason D. Owens, Chief of the U.S. Border Patrol

**Intervenor Defendants-Appellants:**

> Maria Rocha; Jose Magaña-Salgado; Nanci J. Palacios Godinez; Elly Marisol Estrada; Karina Ruiz de Diaz; Carlos Aguilar Gonzalez; Luis A. Rafael; Darwin Velasquez; Jin Park; Oscar Alvarez; Denise Romero; Jung Woo Kim; Angel Silva; Hyo-Won Jeon; Elizabeth Diaz; Blanca Gonzalez; Moses Kamau Chege; Maria Diaz;

**Intervenor-Appellant:**

> State of New Jersey

i

**Amici**:

For Defendants-Appellants: United We Dream; Acacia Center for Justice; Alliance San Diego; American Federation of Teachers; American Humanist Association; American Immigration Council; Americans for Immigrant Justice; America's Voice; Asian Americans Advancing Justice – AAJC; Asian Americans Advancing Justice Southern California; Asian American Legal Defense and Education Fund; Asian Law Alliance; Asian Pacific Institute on Gender-Based Violence; Bend the Arc: A Jewish Partnership for Justice; Brazilian Women's Group; Breakthrough Central Texas; California Immigrant Policy Center; Capital Area Immigrants' Rights (CAIR) Coalition; CASA; Catholic Charities of Louisville, Inc.; Catholic Legal Immigration Network, Inc.; Center for American Progress; Center for Popular Democracy; Central American Legal Assistance; Central American Resource Center – CARECEN – of California; Central Conference of American Rabbis; Centreville Immigration Forum; Centro de los Derechos del Migrante, Inc.; Centro Romero; Citizen Action/Illinois; Cleveland Jobs with Justice; Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA); Columbia Legal Services, in Washington State; Community Legal Services in East Palo Alto; Congregation of Our Lady of Charity of the Good Shepherd, U.S. Provinces; Dorothy Day Catholic Worker, Washington DC; Fair Work Center; Families for Freedom; Florence Immigrant & Refugee Rights Project; Friends Committee on National Legislation; Hispanic Federation; Holy Trinity Lutheran Church, Minneapolis; Hope Border Institute; Immigrant Defenders Law Center; Immigrant Justice Corps; Immigrant Legal Defense; Immigrant Legal Resource Center; Immigrants Rising; Immigration Hub; Immigration Law & Justice Network; Inter-Faith Committee on Latin America (IFCLA); Interfaith Council for Peace & Justice; Interfaith Council for Peace & Justice, Ann Arbor, MI; International Refugee Assistance Project; Jobs with Justice; Just Futures Law; Just Neighbors; Justice Action Center; Justice at Work; Kentucky Coalition for Immigrant and Refugee Rights; La Raza Centro Legal; Las Americas Immigrant Advocacy Center; Lawyers' Committee for Civil Rights of the San Francisco Bay Area; Legal Aid at Work; Legal Aid Justice Center; Maryknoll Office for Global Concerns; Men of Reform Judaism; Michigan Immigrant Rights Center, part of the Michigan Advocacy Program; Micronesian Islander Community; Minkwon Center; Mississippi Center for Justice; Mississippi Workers' Center for Human Rights; Mixteco/Indígena Community Organizing Project (MICOP); MoveOn.org Political Action; National Advocacy Center of the Sisters of the Good Shepherd; National Asian Pacific American Women's Forum; National

Center for Law and Economic Justice; National Education Association; National Employment Law Project; National Immigration Law Center; National Korean American Service & Education Consortium; National Organization for Women; National Partnership for New Americans; NETWORK Lobby for Catholic Social Justice; New American Leaders; North Carolina Justice Center; Northwest Immigrant Rights Project; Oasis Legal Services; People Power United; Planned Parenthood Federation of America; Presente.org; RAICES; Raise the Floor Alliance; Rocky Mountain Immigrant Advocacy Network; San Diego Immigrant Rights Consortium (SDIRC); Services, Immigrant Rights and Education Network; Sojourners; Sonoma Immigrant Services; South Bay People Power; South Carolina Appleseed Legal Justice Center; Tennessee Immigrant & Refugee Rights Coalition; The Right to Immigration Institute/Dignidad; T'ruah: The Rabbinic Call for Human Rights; UndocuBlack Network; Unemployed Workers United, a project of Working Families Organization; Unidad Latina en Acción NJ; Unidos US; Union for Reform Judaism; Unitarian Universalists for Social Justice; We Are All America; Wind of the Spirit Immigrant Resource Center; Women of Reform Judaism; Woori Juntos; Worker Justice Center of New York; Workers Defense Project; Worksafe; Young Center for Immigrant Children's Rights

**Counsel:**

For Plaintiffs-Appellees: Joseph N. Mazzara (Texas Office of the Attorney General); Ryan Daniel Walters (Texas Office of the Attorney General); Eric Alan Hudson (Terrazas, PLLC); James Andrew MacKenzie (Office of the Attorney General Office of the Solicitor General); Michael Christopher Toth (Rex Legal)

For Defendants-Appellants: Melissa Nicole Patterson (U.S. DOJ Civil Division, Appellate Section); Nicholas S. Crown (U.S. DOJ Civil Division, Appellate Section); Joshua Koppel (U.S. DOJ Civil Division, Appellate Section); James J. Walker (U.S. DOJ Office of Immigration Litigation);

For Intervenor Defendants-Appellants: Nina Perales (MALDEF); Mark A. Cianci (Ropes & Gray LLP); Carlos Moctezuma Garcia (Garcia & Garcia Attorneys at Law); Douglas Harry Hallward-Driemeier (Ropes & Gray LLP); Emerson A. Siegle (Ropes & Gray LLP)

For Intervenor-Appellant: Jeremy M. Feigenbaum (New Jersey Office of the Attorney General); Mayur P. Saxena (New Jersey Office of the Attorney General).

For *Amici* United We Dream and other *amici* identified above: Peter Karanjia (DLA Piper LLP); Whitney Cloud (DLA Piper LLP); Elizabeth Jonas (DLA Piper LLP); and Julia Deutsch (DLA Piper LLP)

Further, pursuant to Federal Rule of Appellate Procedure 26.1, United We Dream and the *amici* listed in the Appendix to this brief hereby state that they each have no parent corporation and that no publicly held company owns 10 percent or more of their stock.

*/s/ Peter Karanjia*
Peter Karanjia

*Counsel for Amici Curiae*

## **RULE 29(a) STATEMENT**

This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of (or without the opposition of) all parties. Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici* and their counsel have contributed money for this brief.

/s/ Peter Karanjia
Peter Karanjia

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................ I

RULE 29(A) STATEMENT .................................................................................. V

TABLE OF CONTENTS ...................................................................................... VI

TABLE OF AUTHORITIES ................................................................................ VII

INTEREST OF AMICI CURIAE ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 2

ARGUMENT ........................................................................................................ 5

I.    DACA IS CRITICAL TO IMPROVING THE LIVES OF
      PROMISING IMMIGRANT YOUTH, THEIR FAMILIES, LOCAL
      COMMUNITIES, AND THE NATION ....................................................... 5

      A.    DACA Has Allowed Recipients to Maximize Their Potential,
            While Enriching American Schools and Universities ...................... 8

      B.    DACA Has Empowered Recipients to Found Start-up
            Businesses, Create Jobs, and Otherwise Realize Their Career
            Potential ........................................................................................ 13

            1.    DACA Increases Job Opportunity and Earning Power ........... 13

            2.    DACA Has Jump-Started a Wave of Entrepreneurialism ....... 16

      C.    DACA Has Enabled Recipients to Support Their Families and
            Social Networks, Which Include Many United States Citizens ....... 18

      D.    DACA Has Made It Possible for Recipients to Pursue Careers
            that Serve the American Public ...................................................... 22

      E.    DACA Has Enabled Recipients to Serve Their Communities as
            Volunteers and Organizers ............................................................ 26

CONCLUSION .................................................................................................. 29

APPENDIX ....................................................................................................... 30

CERTIFICATE OF COMPLIANCE .................................................................. 36

CERTIFICATE OF SERVICE ........................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Department of Homeland Security et al. v. Regents of the University of California et al.*,
   Nos. 18-587, 18-588, 18-589 (S. Ct. Oct. 2, 2019) ...............................................3

**Statutes**

Ala. Code § 31-13-8.....................................................................................................9

S.C. Code Ann. § 59-101-430......................................................................................9

**Other Authorities**

Alexandra A. Chaidez & Sanjana L. Narayanan,
   *Harvard Senior Becomes First DACA Recipient to Win Rhodes Scholarship*, Harv. Crimson, Nov. 19, 2018 ......................................................10

American Immigration Council,
   *Deferred Action for Childhood Arrivals (DACA): An Overview*,
   Sept. 30, 2021 ..........................................................................................................2

Caitlin Patler & Jorge A. Cabrera, *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program Three Years Following its Announcement*, Inst. for Rsch. on Lab. & Employ. 18 (June 2015)...............8, 19

Catalina Amuedo-Dorantes & Francisca Antman, *Can Authorization Reduce Poverty among Undocumented Immigrants? Evidence from the Deferred Action for Childhood Arrivals Program*, 147 Econs. Letters 1–4 (2016)...............................................................................................18

Deferred Action for Childhood Arrivals, Proposed Rule, 86 Fed. Reg. 53,736, 53,738 (Sept. 28, 2021).............................................................................19

Elira Kuka et al.,
   *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA*, NBER (Feb. 2018)........................................9

Ike Brannon & Logan Albright,
    *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst.
    (Jan. 18, 2017) .................................................................................8

Jin Park,
    *Opinion: I'm a Dreamer and Rhodes Scholar. Where Do I
    Belong?*, N.Y. Times, Jan. 11, 2009 ...............................................10

Jose Magaña-Salgado & Tom K. Wong, *Draining the Trust Funds:
    Ending DACA and the Consequences to Social Security and
    Medicare*, Immigr. Legal Res. Ctr. (Oct. 2017) .................................7

Misha E. Hill & Meg Wiehe, Inst. on Tax'n & Econ. Pol'y, *State &
    Local Tax Contributions of Young Undocumented Immigrants*
    (Apr. 2018) ...................................................................................14

Nicole Prchal Svajlenka,
    *What We Know About DACA Recipients in the United States*, Ctr.
    for Am. Progress (Sep. 5, 2019) .....................................................22

Nicole Prchal Svajlenka et al.,
    *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr.
    for Am. Progress (July 21, 2017) ......................................................8

Nicole Prchal Svajlenka & Trinh Q. Truong,
    *The Demographic and Economic Impacts of DACA Recipients:
    Fall 2021 Edition*, Ctr. for Am. Progress (Nov. 24, 2021) .................6

*Portal to the States*, Higher Ed Immigr. Portal,
    https://www.higheredimmigrationportal.org/states/ (last visited
    Feb. 1, 2024) .................................................................................9

Presidents' All. on Higher Educ. and Immigr., *Undocumented
    Students in Higher Education: How Many Students are in U.S.
    Colleges and Universities, and Who Are They?* (Mar. 2, 2021) ..........9

*Protecting Dreamers and TPS Recipients: Hearing Before the
    Committee on the Judiciary House of Representatives*,
    116 Cong. 10-12 (Mar. 6, 2019) .....................................................10

Rachel Gillett,
*Rescinding DACA could cost 700,000 workers their jobs and
employers $6.3 billion in employee turnover costs*, Bus. Insider,
Sep 5, 2017 ..................................................................................16

Roberto G. Gonzales & Angie M. Bautista-Chavez, *Two Years and
Counting: Assessing the Growing Power of DACA*, Am. Immigr.
Council 3 (June 2014) ...................................................................13

Sari Pekkala Kerr & William R. Kerr,
*Immigrants Play a Disproportionate Role in American
Entrepreneurship*, Harv. Bus. Rev. (Oct. 3, 2016) ...........................16

Sofar Sounds,
*Mannywellz - Alright Rendition | Sofar NYC*, YouTube (Jan. 23,
2017) ...........................................................................................17

Tom K. Wong et al.,
*Results from Tom K. Wong et al., 2020 National DACA Study*
(Oct. 2020) ...................................................................................14

Tom K. Wong et al.,
*Results from Tom K. Wong et al., 2022 National DACA Study*
(Apr. 2023)................................................................................*passim*

Trinh Q. Truong & Silva Mathema,
*DACA Recipients Bolster Social Security and Medicare*, Ctr. for
Am. Progress (Jan. 25, 2024)...........................................................7

U.S. Citizenship & Immigration Services, "Number of Form I-821D,
Consideration of Deferred Action for Childhood Arrivals, Requests
by Intake & Case Status, by Fiscal Year," 8/15/12-6/30/23................2

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* United We Dream ("UWD") is the largest immigrant youth-led community in the United States. UWD is a national non-profit, non-partisan, membership-based organization comprising more than 900,000 immigrant youth and their allies, with more than 28 affiliate, chapter and hub organizations located in 25 States. UWD's primary purpose is to advocate for the dignity and fair treatment of immigrant youth and their families, regardless of their immigration status. Among UWD's members are recipients of deferred action under the Deferred Action for Childhood Arrivals ("DACA") initiative announced on June 15, 2012. Because the decision below seeks to undo DACA's protections—protections that have formed the basis for the most consequential life decisions of hundreds of thousands of immigrant youth—UWD has a substantial interest in the proper resolution of the issues presented here.

UWD is joined by 116 organizations, including social service, educational, trade, legal, research, national advocacy, and religious advocacy organizations, that work with DACA recipients and beneficiaries in Texas and across the United States. A full listing of *amici* appears in the Appendix. *Amici* have a strong interest in—and are particularly well-situated to provide the Court with insight into—the proper resolution of the issues presented in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this brief, United We Dream and 116 organizations offer a glimpse into the lives of the more than 835,092 young people who have placed their trust in, and organized their lives around, the DACA program since its inception. *See* U.S. Citizenship & Immigration Services, "Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Requests by Intake & Case Status, by Fiscal Year," 8/15/12-6/30/23, https://www.uscis.gov/sites/default/files/document/data/daca_performancedata_fy2023_q3.pdf.

DACA has accomplished far more than deferring removal actions. Critically, DACA's work authorization program has created life-changing opportunities for hundreds of thousands of promising young people to advance their education, further their careers, provide critical help to their families, and give back to their communities. With the ability to avail themselves of the same basic building blocks of a productive life that U.S. citizens enjoy—work authorization, a Social Security number, and a driver's license, for example—DACA recipients have thrived. They are students, teachers, health care workers, community leaders, and small business owners. They are also spouses, neighbors, classmates, friends, and co-workers. Collectively, they are parents of over a quarter-million U.S. citizens, and over 70% of DACA recipients have an immediate family member who is a U.S. citizen. American Immigration Council, *Deferred Action for Childhood Arrivals (DACA):*

*An Overview*, Sept. 30, 2021, https://www.americanimmigrationcouncil.org/researc

h/deferred-action-childhood-arrivals-daca-overview; Tom K. Wong et al., *Results*

*from Tom K. Wong et al., 2022 National DACA Study* 15 (Apr. 2023),

https://www.americanprogress.org/wp-content/uploads/sites/2/2023/04/DACA-

Survey-2022-Toplines.pdf ("Wong 2022 Survey"). They pay taxes, contribute to

their local economies, and spur a virtuous cycle of further opportunity for many

Americans.

The sample stories below include, among many others, a graduate of the

University of North Texas at Dallas who started a nonprofit to promote higher

education and provide youth counseling services; an ICU nurse who provides urgent

care at hospitals (and offered critical services during the COVID-19 pandemic); a

Rhodes scholar from South Korea with a bright future in health science; a small-

business owner and Grammy-award winning musician, born in Nigeria; and an

entrepreneur and mother of five who launched her own translation and interpreter

business, helping over 400 people become naturalized or legal permanent residents.[1]

---

[1]    Some of these exemplary young people were featured in videos submitted to
the U.S. Supreme Court in connection with United We Dream's *amicus* brief in
*Department of Homeland Security et al. v. Regents of the University of California et
al.*, Nos. 18-587, 18-588, 18-589 (S. Ct. Oct. 2, 2019). These videos can be viewed
at: https://uwdamicusbrief.com/.

*Amici* hope to illustrate how DACA recipients with diverse backgrounds spanning the globe are now fully part of their communities and the broader fabric of America.

Their stories of resilience, generosity, entrepreneurial drive, and accomplishment epitomize the American dream. The District Court's decision puts countless DACA recipients in grave danger of deportation and causes massive disruption to their lives. If affirmed, it would tear families apart and uproot productive members of society from their communities. Eliminating DACA protections, such as the ability to work, would have devastating ripple effects extending well beyond DACA recipients into every community in the United States.

**ARGUMENT**

I.     **DACA is Critical to Improving the Lives of Promising Immigrant Youth, Their Families, Local Communities, and the Nation.**

DACA has enabled hundreds of thousands of immigrant youth to live their lives in the open, fully realize their potential, and contribute to their local communities. Most DACA recipients arrived in the United States when they were just six years old or younger; indeed, nearly 40% of DACA recipients surveyed in 2022 were under the age of four when they arrived. Wong 2022 Survey at 15.

For these promising young people, the United States is the only home they have ever known. They have grown up here, gone to school here, played sports here, and built families here. They play critical roles in their communities as entrepreneurs who create jobs, as family members, as public servants, and as essential health care workers. In short, they have become fully integrated into the fabric of American society.

Despite these deep and longstanding ties to the United States, before DACA, many of these young immigrants, who arrived in the country as children, struggled to survive due to their undocumented status and lived in constant fear of deportation. DACA was life-changing. For the first time, these individuals could obtain work authorization, a Social Security number, and a driver's license. As a result, DACA recipients were able to open bank accounts, apply for credit for their small

businesses, and access other resources to support their families, local communities, and local economies.

With these essential keys to self-reliance and success, DACA recipients have drawn on their remarkable talents, ingenuity, and dedication to make ever greater contributions to this nation. About 70% of DACA recipients surveyed in 2022 pursued educational opportunities previously foreclosed to them. Wong 2022 Survey at 4. Almost 90% of DACA recipients are employed or enrolled in an educational program. *Id.* at 2, 4.

More educational opportunities and better jobs have translated into increased financial independence for these young people—crucial to supporting their families and social networks and contributing to broader national economic growth. A 2021 study found that DACA recipients and their households hold a combined annual spending power of $25.3 billion. Nicole Prchal Svajlenka & Trinh Q. Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition*, Ctr. for Am. Progress (Nov. 24, 2021), https://www.americanprogress.org/article/the-demographic-and-economic-impacts-of-daca-recipients-fall-2021-edition/ ("2021 CAP Report"). Sixty-six percent of DACA recipients surveyed in 2022 reported that their increased earnings have helped them become financially independent. Wong 2022 Survey at 2. Approximately 51% of DACA recipients bought a car. *Id.* Over 20% became new homeowners. *Id*. Sixty-eight thousand DACA recipients own

homes, making $760 million in mortgage payments. *See* 2021 CAP Report. That is in addition to the $2.5 billion in rental payments DACA recipients make annually. *Id*. Seventy percent of DACA recipients have applied for and received their first credit card, and more than half have opened a bank account. Wong 2022 Survey at 2. In short, DACA, and the work authorization it provides, has opened a world of financial independence and opportunity that was once inaccessible.

These higher wages (nearly $2.79 billion annually) increase tax revenues at all levels of government. Trinh Q. Truong & Silva Mathema, *DACA Recipients Bolster Social Security and Medicare*, Ctr. for Am. Progress (Jan. 25, 2024), https://www.americanprogress.org/article/daca-recipients-bolster-social-security-and-medicare/ ("2024 CAP Report"). One report estimated that DACA recipients and their households pay $6.2 billion in federal taxes and $3.3 billion in state and local taxes annually. *See* 2021 CAP Report. Employers now automatically deduct payroll taxes from DACA recipients' paychecks, contributing more than $1.6 billion to Social Security and Medicare—even though DACA recipients are ineligible for these programs. On a yearly basis, DACA recipients contribute $2.1 billion to Social Security and Medicare in federal, state, and local taxes. *See* 2024 CAP Report. A 2017 study estimated that ending DACA would result in $39.3 billion in losses to Social Security and Medicare contributions over the next decade. Jose Magaña-Salgado & Tom K. Wong, *Draining the Trust Funds: Ending DACA and the*

*Consequences to Social Security and Medicare*, Immigr. Legal Res. Ctr. (Oct. 2017), https://bit.ly/2mTN9F7. And, even under a conservative estimate, the combined economic costs and fiscal impact of deporting DACA recipients or stripping them of work authorization amounts to $283 billion over a decade. Ike Brannon & Logan Albright, *The Economic and Fiscal Impact of Repealing DACA*, Cato Inst. (Jan. 18, 2017), https://bit.ly/2k1hn1R. Other estimates are even higher. *See, e.g.*, Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017), https://ampr.gs/2uI9Deh (estimating $460.3 billion impact to national GDP).

### A.   DACA Has Allowed Recipients to Maximize Their Potential, While Enriching American Schools and Universities.

By design, DACA opens a world of educational opportunities for young immigrants. *First*, many undocumented students are forced to drop out because they are unable to work to cover tuition fees and study at the same time. DACA allows recipients to obtain better-paying jobs, so they can more easily afford school. Caitlin Patler & Jorge A. Cabrera, *From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program Three Years Following its Announcement*, Inst. for Rsch. on Lab. & Employ. 18 (June 2015), http://bit.ly/1R7Sz1c ("Patler Report"). Among DACA recipients currently in school, 58% say they are better able to fund their education by earning more. Wong 2022 Survey at 2; *accord* Patler Report at 5. As a result, young immigrants are better

equipped to respond to the current needs of the labor market, fulfill their career potential, and serve as role models for their communities. This is just one of many reasons why work authorization is so pivotal to the success of DACA recipients, their families, and local communities.

*Second*, DACA offers a pathway to higher education. DACA recipients can enroll in public colleges and universities in states where undocumented students would otherwise be barred from attending such as Alabama and South Carolina. *See, e.g.*, Ala. Code § 31-13-8; S.C. Code Ann. § 59-101-430. Twenty-four States— including Texas—provide in-state tuition to the undocumented students in the state. *Portal     to     the     States*,     Higher     Ed     Immigr.     Portal, https://www.higheredimmigrationportal.org/states/ (last visited Feb. 1, 2024).

With barriers to opportunity removed, it is not surprising that thousands of DACA recipients have pursued higher education. In 2018, the National Bureau of Economic Research found that DACA eligibility correlated with greater high-school attainment and college attendance. Elira Kuka et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA*, NBER (Feb. 2018), https://bit.ly/3dMA1ID. Indeed, across the country, there were approximately 181,000 DACA recipient and DACA-eligible students in higher education as of March 2021. Presidents' All. on Higher Educ. and Immigr., *Undocumented Students in Higher Education: How Many Students are in U.S. Colleges and Universities, and*

*Who Are They?* (Mar. 2, 2021), https://www.presidentsalliance.org/undocumented-students-in-higher-education-updated-march-2021/. Of the respondents currently in school, 69% were pursuing a bachelor's degree or higher. Wong 2022 Survey at 4.

Like hundreds of thousands of other immigrant youth, ***Jin Park*** used DACA as a springboard to greater educational opportunities. The first DACA recipient to receive a Rhodes Scholarship, Jin arrived in New York from South Korea when he was just seven years old.[2] For years, his father worked in restaurants and his mother worked in beauty salons to build a life for their family in Flushing, Queens. A brilliant student, Jin nonetheless applied to 34 colleges out of fear that his immigration status would limit his opportunities. He took his insights into the college admissions process to found Higher Dreams, a non-profit that partnered with the Boston Public School system to help undocumented students access higher education. He has also served as a chapter leader for Define American, a non-profit that advocates for fair representation of immigrants in the media. Jin has even testified before Congress about how DACA fundamentally changed his life.[3] Today,

---

[2]    Jin Park, *Opinion: I'm a Dreamer and Rhodes Scholar. Where Do I Belong?*, N.Y. Times, Jan. 11, 2009, https://nyti.ms/2FuPTiW; *see also* Alexandra A. Chaidez & Sanjana L. Narayanan, *Harvard Senior Becomes First DACA Recipient to Win Rhodes Scholarship*, Harv. Crimson, Nov. 19, 2018, https://bit.ly/2QTJz7H.

[3]    *Protecting Dreamers and TPS Recipients: Hearing Before the Committee on the Judiciary House of Representatives*, 116 Cong. 10–12 (Mar. 6, 2019) (statement of Jin K. Park), https://bit.ly/2mWoIGZ.

Jin is also a Harvard graduate with a degree in Molecular and Cellular Biology. He currently attends Harvard Medical School. His scholarship has been published in, among other publications, *The American Journal of Bioethics*.

***Yazmin I.***'s mother left behind a career as a physician in Mexico to give her three daughters better opportunities in the United States. An excellent student who dreamed of following in her mother's footsteps, Yazmin discovered at age 16 that she was undocumented when she tried to find work to support her family following her mother's stroke. Her status as an undocumented immigrant in Arizona (and later New Mexico) was a serious obstacle to continuing her education and accessing scholarships. Thanks to DACA, Yazmin is able to serve as a General Surgery Resident at the University of New Mexico Hospital ("UNM"), which was particularly stretched during the COVID-19 pandemic. Yazmin was honored with an intern-of-the-year award by the UNM Department of Surgery. And she has mentored young people through the New Mexico Dream Team and volunteered her time to provide free health check-ups for immigrant families. However, Yazmin needs a Social Security number to continue providing health care services as a resident physician, and her professional aspirations depend on DACA's continuation.

After migrating with his parents from Mexico at just three years old, ***Yahir L.*** spent his childhood in Kansas City. A strong student, Yahir dreamed of entering the

medical field to help expand access to health care for immigrants, who still worry that a trip to the doctor could expose them to the risk of deportation. Because of DACA, he is able to pursue his dreams of becoming a doctor, first graduating from Donnelly College with an associate's degree and now attending Rockhurst University where he is working toward a degree in biochemistry. Yahir also obtained a certificate in medical Spanish, which allows him to translate in hospitals. Despite these successes, Yahir has faced many obstacles. While Yahir's first-time DACA application was under review during his senior year of high school, he was accepted by Northwest Missouri State University. Facing severe processing delays amidst the pandemic, he waited patiently to hear back about his DACA application—but it was too late: He was forced to decline his offer to Northwest Missouri State to pursue a bachelor's degree, and instead enrolled in an associate's degree program. Now, students applying to college are in a similar position given that applications are on hold because of the uncertainty of DACA's future as a result of the District Court's decision.

Despite their hard work and accomplishments, the futures of Jin, Yazmin, and Yahir are precarious. Forcing these exceptional young people—with a wealth of opportunities ahead of them—to abandon their plans and live in fear of deportation would not only destroy their personal prospects, but also deprive their communities and the nation of their economic and societal contributions. As Yahir eloquently

states: "For though our roots are in another country, our life, our education, our culture are American."

By authorizing undocumented individuals to work, DACA has broadened the diversity and skill set of our nation's workforce. Deferred action is especially important when it comes to the education, science, technology, engineering, mathematics, and health care sectors, where maintaining U.S. leadership in an increasingly global economy is critical. As the stories of the young people described above demonstrate, undocumented immigrants represent a pool of highly skilled talent that is in fierce demand. The District Court's decision threatens to destroy all of this.

## B. DACA Has Empowered Recipients to Found Start-up Businesses, Create Jobs, and Otherwise Realize Their Career Potential.

### 1. DACA Increases Job Opportunity and Earning Power

Before DACA, even highly-educated and skilled undocumented immigrants often had no option but to accept very low-paying jobs with bleak prospects for advancement. Without a Social Security number, driver's license, and work authorization, jobs better suited to their talents were simply unobtainable.

DACA, however, has enabled these young people to obtain work authorization for the first time. As a result, in 2014—just sixteen months into the program—almost 60% of respondents in one survey reported having found a new job. Roberto G. Gonzales & Angie M. Bautista-Chavez, *Two Years and Counting:*

*Assessing the Growing Power of DACA*, Am. Immigr. Council 3 (June 2014), https://bit.ly/2mTP5xe. In another survey—conducted from August to September 2020—approximately two-thirds of respondents over the age of 25 reported that DACA had allowed them to get a job that either made the best use of their qualifications or paid better. Tom K. Wong et al., *Results from Tom K. Wong et al., 2020 National DACA Study* 2 (Oct. 2020), https://americanprogress.org/wp-content/uploads/sites/2/2020/10/DACA-Survey-20201.pdf.

DACA's benefits are also mutually reinforcing. When freed from the fear of looming deportation and able to work legally, DACA recipients work harder, are more productive, and earn more. *See* Misha E. Hill & Meg Wiehe, Inst. on Tax'n & Econ. Pol'y, *State & Local Tax Contributions of Young Undocumented Immigrants* (Apr. 2018), https://bit.ly/2mWzYTL; Wong 2022 Survey at 2. Overall, DACA recipients' salaries doubled on average—from an average annual salary of $24,131 (pre-DACA) to $68,885 (post-DACA). Wong 2022 Survey at 3–4. As a result, one of the most dramatic effects of DACA is to catapult low-income individuals with great potential into higher-earning jobs. In short, DACA facilitates the American Dream.

**Sana A.**, born in Pakistan and raised in Saudi Arabia, today works as an innovation strategy consultant at a top-four, global auditing firm, where she is paid double her previous salary. She has purchased a home and is also a mother of a two-

year-old U.S. citizen. Although she is now a permanent resident and grateful to be "mak[ing] more money than [her] parents have ever made in their life," from her previous experience, Sana remains acutely aware of how vulnerable the situation is for many DACA recipients. After a problem with her DACA paperwork caused Sana to temporarily lose her deferred-action status and work authorization, her previous employer was forced to place her on a three-month leave of absence and then let her go. The instant her status was restored, she was re-hired. Sana is currently applying for citizenship. She hopes that her siblings continue to be protected under DACA and are afforded the same opportunities to succeed.

**Susana L.**, born in Mexico, volunteered as a receptionist at a local Houston law firm while in high school. But, without a Social Security number, the firm was unable to hire Susana when she graduated. DACA, and its access to work authorization, changed the landscape instantly. Susana's former manager hired her as a full-time, salaried administrative assistant. Over the years, Susana has worked her way up to office administrator, then paralegal, and now practice assistant.

**Frida A.** immigrated to the United States with her mother, father and sister when she was 10 years old. Since Frida's father was detained and deported 12 years ago, DACA has allowed her to support her mother and sister. Upon receiving DACA protections, Frida was hired at an ice-skating rink. Following swift promotions, Frida is now proud to serve as project manager for ten ice-skating venues across the United

States. If she loses her DACA status and the work authorization it provides, Frida fears she will be unable to support herself and her family and advance in her career. Losing these protections would also stymie Frida's plans to become a homeowner and her aspirations of pursuing higher education.

As Sana's, Susana's, and Frida's stories illustrate, rescinding DACA or taking away access to work authorization not only hurts recipients, but also hurts U.S. employers, who will lose an estimated $6.3 billion in worker turnover costs (including hiring and training) if talented young people are forced out of the country's workforce. Rachel Gillett, *Rescinding DACA could cost 700,000 workers their jobs and employers $6.3 billion in employee turnover costs*, Bus. Insider, Sep 5, 2017, https://www.businessinsider.com/if-daca-is-rescinded-what-happens-to-workers-employers-2017-9.

### 2. DACA Has Jump-Started a Wave of Entrepreneurialism

Immigrants are among our nation's most prolific small business founders and entrepreneurs. DACA recipients are no exception. *See, e.g.*, Sari Pekkala Kerr & William R. Kerr, *Immigrants Play a Disproportionate Role in American Entrepreneurship*, Harv. Bus. Rev. (Oct. 3, 2016), https://hbr.org/2016/10/immigrants-play-a-disproportionate-role-in-american-entrepreneurship (reporting that 40% of startup firms are affiliated with an immigrant). Indeed, over 6% of DACA recipients have started their own business—

double the rate of entrepreneurship among native-born Americans. *See* Wong 2022 Survey at 2. Again, the benefits of DACA extend far beyond DACA recipients themselves.

***Emmanuel A.*** is a prime example of this inspiring entrepreneurialism. Emmanuel was only nine years old when his family migrated from Nigeria and settled in Maryland. Although he was a talented athlete, his undocumented status made him ineligible for many college scholarships. Emmanuel was forced to leave college because his family could not afford his tuition. Despite these obstacles, Emmanuel has excelled as a musician, producer, and small business owner. He enjoys substantial national and international acclaim—videos of his performances on YouTube have received hundreds of thousands of views—and he has worked on several Grammy Award-winning projects.[4] DACA allows Emmanuel the freedom to travel to perform for his fans in concerts across the nation. Ever-grateful for these opportunities, Emmanuel is also proud to give back: Proceeds from his merchandise sales have helped support other DACA recipients, and he has mentored youth through his church. His single, "American Dream," has become a major success, and he aims to deliver a message of hope to all people that they too can thrive amidst adversity.

---

[4] *See, e.g.*, Sofar Sounds, *Mannywellz - Alright Rendition | Sofar NYC*, YouTube (Jan. 23, 2017), https://bit.ly/2man6ct.

*Maricruz A.* immigrated from Mexico in 2002 at the age of fifteen to reunite with her mother. For years, Maricruz worked odd jobs to make ends meet and support her family—including a son and twin daughters, all U.S. citizens. When Maricruz received DACA and work authorization in 2016, her life drastically changed. She was able to study at Baltimore City Community College, where she became the first Latina in history to be appointed to the Baltimore City Community College Board of Trustees and founded a related affinity organization. She purchased a house. In 2023, Maricruz was hired as an instructional mentor at a local public school district, where she had been working for six years. She is currently looking into pursuing a license to become a school administrator.

The District Court's decision threatens to undo all of this. The continuation of DACA and its access to work authorization are critical not only to maintain the businesses of talented immigrant youth, but also to permit other individuals to grow and prosper.

### C.    DACA Has Enabled Recipients to Support Their Families and Social Networks, Which Include Many United States Citizens.

With the greater job, salary, and financial-planning opportunities that come with work authorizations and Social Security numbers, DACA recipients are better able to support themselves and their families. A 2016 study found that DACA-eligible households were 38% less likely than non-eligible undocumented immigrant households to live in poverty. Catalina Amuedo-Dorantes & Francisca Antman, *Can*

*Authorization Reduce Poverty among Undocumented Immigrants? Evidence from the Deferred Action for Childhood Arrivals Program*, 147 Econs. Letters 1–4 (2016), https://www.sciencedirect.com/science/article/abs/pii/S0165176516302968?via%3 Dihub. Over 64% of surveyed DACA recipients reported that they could make enough money to financially support their family. Wong 2022 Survey at 2. Three-quarters of individuals granted deferred action under DACA have an immediate family member who is a U.S. citizen. Wong 2022 Survey at 7; Patler Report at 26. According to another survey, 20% of DACA recipients have a U.S. citizen spouse, and 28% have a U.S. citizen child. Wong 2022 Survey at 8. Altogether, 300,000 U.S. citizen children have a parent who is a DACA recipient. 2021 CAP Report; *see also* Deferred Action for Childhood Arrivals, Proposed Rule, 86 Fed. Reg. 53,736, 53,738 (Sept. 28, 2021) ("Proposed Rule"). In fact, current DACA recipients have lived in the United States for an average of 24 years, sharing households with more than 1 million U.S. citizens. 2024 CAP Report.

As a mother of five children—all U.S. citizens—***Angelica V.*** worked long hours at a fast-food restaurant to help support her family. The work authorization she obtained through DACA provided tremendous opportunity, allowing Angelica to accept a higher-paying position at the Chamber of Commerce as a program coordinator for disabled persons in Oklahoma. This, in turn, helped her realize her dreams as an entrepreneur and become the owner of a successful and growing

translation and interpretation business. In addition to overseeing her business, Angelica has served for the past four years as a Department of Justice-accredited representative at her church, helping many low-income clients access immigration legal support and services. More than 400 of Angelica's clients have become naturalized citizens or legal permanent residents. Angelica also volunteers regularly to support local entrepreneurs and help children who have terminal illnesses via the Make-A-Wish Foundation. In addition, Angelica is close to completing a bachelor's degree at the National Autonomous University of Mexico and has enrolled at Oklahoma State University, where she hopes to receive a bachelor's degree so that she can eventually attend law school. Angelica is proud of what she has achieved with DACA: "I'm living proof that I've been able to accomplish a lot . . . and help my community. . . . [Yet, w]e have to continue to prove that we are people."

*Victor E.* likewise helps provide for his family's financial needs—and he has put his family's interests ahead of his own. As one of only two people in his immediate family of five legally able to work, he put his college plans on hold while paying his family's bills and supporting his siblings' tuition by working full-time as a manager of a clothing store in Houston, Texas. Victor is currently in a two-year program studying to become a certified veterinarian tech and is training to be able to provide translation to Spanish speaking clients in medical care services as well as to become a certified fitness coach. Previously rejected from two veterinary

programs due to his uncertain immigration status, Victor knows firsthand the importance of DACA and the access to work authorization it provides.

When *Aurora L.*, 23-years-old, who currently lives in San Antonio, Texas, learned that her DACA application would be frozen, she was devastated and worried about her family's financial security. Aurora arrived in the United States when she was just one year old. A straight-A student with dreams of becoming a child psychologist, Aurora is attending school on a scholarship to receive a bachelor's degree. Aurora's mother became severely ill with a kidney infection, and Aurora's father's medical issues have made it difficult for him to find regular work, which put significant pressure on her two older siblings—her sister is a U.S. citizen and her brother is a DACA recipient—to support the family of six. Aurora feels especially anxious about the toll the additional work has taken on her older sister, who is currently battling leukemia. Aurora hopes that by getting DACA protection and securing a job, she can provide much-needed financial support to her family and relieve the burden on her sister.

*Sofia C.* immigrated to the United States at the age of three and soon after moved to Texas with her mother, father and brother. Sofia is currently pursuing a master's degree in public administration at Texas A&M University, and she expects to graduate in May. Sofia also works as a graduate research assistant, focusing her research on how recently arrived refugees navigate higher education. After

graduation, Sofia hopes to pursue a career where she can conduct qualitative research and inform policy to benefit her community and marginalized people. If DACA is taken away—which will end her work authorization—Sofia fears her career aspirations will be unattainable. She also worries about no longer being able to support her family.

For these inspiring young people and their families, DACA has been a critical lifeline. DACA recipients have been able to secure better jobs that take full advantage of their skills, translating into greater pay and financial support for their loved ones. Without DACA, many of these families would become more isolated and less secure—and would face the devastating possibility of separation due to deportation. In these and other ways, DACA strengthens the families of undocumented immigrants and U.S. citizens alike.

### D.    DACA Has Made It Possible for Recipients to Pursue Careers that Serve the American Public.

DACA recipients also dedicate their lives to public service—further enriching their local communities and the country in a manner that will no longer be possible if DACA is eliminated. According to a 2019 analysis, some 25,000 DACA recipients work for nonprofit organizations, and 22,000 work in the public sector. Nicole Prchal Svajlenka, *What We Know About DACA Recipients in the United States*, Ctr. for Am. Progress (Sep. 5, 2019), https://www.americanprogress.org/article/the-demographic-and-economic-impacts-of-daca-recipients-fall-2021-edition/.

Moreover, approximately 16,000 DACA recipients (including many of the above) are educators and 27,000 are health care professionals. *Id.*

*Maricruz R.* is just one example. At just seven years old, Maricruz, along with her mother and siblings, escaped an abusive father in Mexico to build a life in the United States. Before DACA, Maricruz's life was difficult: She struggled to earn a living to support her family and herself, cycling through jobs at a fast-food restaurant, a fishery, and a waste disposal facility. As an undocumented immigrant, finding consistent work was impossible, and—lacking a driver's license—it was often difficult to get to interviews with potential employers and, even if lucky to find a job, commute to work. With DACA's protection, Maricruz was able to go back to school. She completed an associate's degree in Early Childhood Education, followed by a bachelor's degree, and, most recently, a master's degree in Education with an emphasis on English for Students who Speak Other Languages. She also looks forward to starting a master's program in Special Education & Disabilities Studies.

Now a schoolteacher in Salem, Oregon, Maricruz has taught children ranging from pre-kindergarten to elementary school. With DACA and its critical access to work authorization, she is able to drive to work, build a credit history, and support her family. Through her work with the Oregon DACA Coalition and the Oregon Child Development Coalition, Maricruz has been a powerful advocate for the rights

of immigrants and agricultural workers. She finds deep fulfillment in her teaching and volunteering: "I want to be able to give back. We are part of this community."

At the age of five, ***Josue D.*** left Mexico for Los Angeles with his mother. When Josue entered university many years later, he was undocumented and felt hopeless about how he would use his degree. But, as a sophomore, he enrolled in DACA—which changed everything. Josue landed a job with Girls Who Code after graduation and eventually founded the nonprofit First Tech Fund in New York, which provides free laptops, Wi-Fi, and professional development for low-income students. In 2020, the organization's first year, 50 students participated in the program. In 2022, First Tech Fund welcomed 250 students. Today, Josue is a scholarship recipient and is completing a residency at Columbia University.

Other DACA recipients help meet the urgent health care needs of their communities. For instance, ***Luis A.***, who came to the United States from Mexico at the age of seven, has been working as an ICU nurse since receiving DACA's protection in 2013. He recently married a United States citizen and started a family. In 2010, Arkansas passed a law prohibiting anyone without a Social Security card from obtaining a nursing license. Luis, then a nursing student and living in the state, was devastated. But, through DACA, Luis was able to get a Social Security number, obtain his nursing license, and begin work as a nurse in a cardiovascular ICU. Then, in June 2021, during the pandemic, Luis's DACA protection expired, and he

encountered renewal delays. Although his renewal application has since been granted, he waited for months to receive his updated DACA card. While he was out of work and unable to care for patients in a critical time of need, Luis was reminded of how DACA's continuation is crucial not only to his own future, but also to his ability to help those around him whose lives are literally at stake.

Likewise, through her work at a hospital, **Sandra A.**, a graduate of the University of North Texas at Dallas, has become acutely aware of the lack of access to mental-health services faced by youth in her Texas hometown. As her passion for immigration-related issues grew, Sandra was able to start a non-profit—Professional Opportunity Connection for All—that offers services to the immigrant community including providing career support and employment opportunities for entrepreneurs.

DACA recipients who have devoted their careers to serving the public are not only teachers and nurses. **Juan S.**, who arrived in the United States from Mexico as a 13-year-old, works as a loan officer for a Community Development Financial Institution. He assists farmers and entrepreneurs in the food industry in rural communities and provides local business owners with technical assistance and business development. Advance parole made it possible for Juan to travel abroad to present his research findings about civic engagement among indigenous young people in the San Joaquin valley. Juan is also a consultant for the Valley Community Small Business Development Center in Fresno, California, where he provides

business-management coaching to start-ups and small businesses. Juan feels empowered by DACA and the knowledge that his actions have had a positive impact on his local community—but he still worries daily that, with DACA's fate in peril, all of his hard work could be undone in an instant.

### E.    DACA Has Enabled Recipients to Serve Their Communities as Volunteers and Organizers.

Many DACA recipients understand deeply the challenges faced by those who lack resources and opportunities, and they aspire to serve their local and national communities as a result. Deferred action under DACA has helped to make those ideals a reality.

***Tasneem A.*** learned that he was undocumented at the age of 15, when his parents decided that his performing at Carnegie Hall would put him in too much danger of deportation. Born with a weak immune system, Tasneem was brought to the United States from Bangladesh when he was just nine months old. While a full-time student at the University of Oklahoma, Tasneem worked tirelessly to financially support his family. In addition to supporting his family's businesses, he founded a business that provides fundraising, communications, and graphic design for local, state, and federal campaigns. DACA has given Tasneem a voice: He has supported the work of the Human Rights Taskforce in Oklahoma City, Oklahoma Progress Now, and local electoral campaigns; as a professional community organizer, he has mobilized his local community to support Afghan refugees and others and

26

empowered survivors of violence; and, as a performer, he has encouraged others to express themselves through the arts.

*Bartosz K.* immigrated to the United States from Poland when he was ten years old. After receiving DACA protection in 2012, he completed undergraduate studies in Michigan before getting his juris doctor from Wayne State University Law School. Along the way, Bartosz became a professional organizer. He has been involved in electoral campaigns at all levels—from door-knocker to campaign manager—and believes that his work strengthens American political discourse. Now, Bartosz works as the national organizer for Community Change, using his talents to help make life better for low-income people. "For me," Bartosz explains, "the U.S. has always felt like home, but prior to DACA, I worried every day about what would happen to me."

*Cinthia P.* was only one year old when her family entered the United States. Experiencing her father's traumatic detention and deportation—coupled with the anxiety of living as an undocumented immigrant in Louisiana—led Cinthia into a downward spiral of depression and even thoughts of suicide. Despite her 4.0 GPA, Cinthia's undergraduate options were limited due to her undocumented status: She was excluded from most scholarships, and her family had to work multiple full-time jobs to pay for college. Work authorization under DACA, however, allowed her to take a summer job as a law clerk for a nonprofit legal-services organization. Cinthia

went on to graduate from the Loyola University New Orleans College of Law and become an Assistant District Attorney in New Orleans. Today, Cinthia works to overturn wrongful convictions and incarcerations, including as pro bono counsel with the Innocence Project. "With DACA," she says, "I am able to serve the people of Orleans, advance public safety, [and] aid victims of domestic violence and violent crimes."

*Moises R.* was just five years old when his family left Mexico and relocated to Tennessee in search of a better life. Before DACA, "every single day was a gamble." Between his parents saving for weeks for his initial $465 DACA application fee and a nonprofit helping him file it, DACA was a worthwhile investment that has already unlocked tremendous opportunities for Moises. The proud recipient of a scholarship, Moises graduated from the University of Chicago and is the co-founder and Field Director of Semillas—a grassroots community organization in his hometown of Chattanooga. In addition to his role at Semillas, Moises volunteers as a college advancement mentor. "[A]fter I got DACA," he observed, "I was able to . . . start living."

\* \* \*

As the stories discussed above illustrate, DACA has had a profound and positive impact on the lives of hundreds of thousands of immigrant youth with deep ties to this country—and for the even larger numbers of family members, friends,

classmates, colleagues, neighbors, and community members whose lives are enriched by their contributions and fellowship. The lives of both DACA recipients and American citizens are inextricably interwoven. And, by any measure, DACA has been an unqualified success. The decision below threatens to obliterate this success, upending the lives of countless DACA recipients—as well as the lives of their friends, families, and communities. All have relied on DACA's promise of not only deferred removal action but also access to critical programs like work authorization to grow and deepen roots in the country that DACA recipients call home.

## CONCLUSION

For the foregoing reasons and the reasons explained by Defendants-Appellants, this Court should reverse the judgment of the U.S. District Court for the Southern District of Texas.

Dated: February 1, 2024

Respectfully submitted,

/s/ *Peter Karanjia*

PETER KARANJIA
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C. 20004
Tel. (202) 799-4000
peter.karanjia@us.dlapiper.com

*Counsel for Amici Curiae*

# APPENDIX

## LIST OF *AMICI*

1.  United We Dream

2.  Acacia Center for Justice

3.  Alliance San Diego

4.  American Federation of Teachers

5.  American Humanist Association

6.  American Immigration Council

7.  Americans for Immigrant Justice

8.  America's Voice

9.  Asian Americans Advancing Justice

10. Asian Americans Advancing Justice Southern California

11. Asian American Legal Defense and Education Fund

12. Asian Law Alliance

13. Asian Pacific Institute on Gender-Based Violence

14. Bend the Arc: A Jewish Partnership for Justice

15. Brazilian Women's Group

16. Breakthrough Central Texas

17. California Immigrant Policy Center

18. Capital Area Immigrants' Rights (CAIR) Coalition

19. CASA

20. Catholic Charities of Louisville, Inc.

21. Catholic Legal Immigration Network, Inc.

22. Center for American Progress

23. Center for Popular Democracy

24. Central American Legal Assistance

25. Central American Resource Center - CARECEN - of California

26. Central Conference of American Rabbis

27. Centreville Immigration Forum

28. Centro de los Derechos del Migrante, Inc.

29. Centro Romero

30. Citizen Action/Illinois

31. Cleveland Jobs with Justice

32. Coalition for Humane Immigrant Rights of Los Angeles (CHIRLA)

33. Columbia Legal Services, in Washington State

34. Community Legal Services in East Palo Alto

35. Congregation of Our Lady of Charity of the Good Shepherd, U.S. Provinces

36. Dorothy Day Catholic Worker, Washington DC

37. Fair Work Center

38. Families for Freedom

39. Florence Immigrant & Refugee Rights Project

40. Friends Committee on National Legislation

41. Hispanic Federation

42. Holy Trinity Lutheran Church, Minneapolis

43. Hope Border Institute

44. Immigrant Defenders Law Center

45. Immigrant Justice Corps

46. Immigrant Legal Defense

47. Immigrant Legal Resource Center

48. Immigrants Rising

49. Immigration Hub

50. Immigration Law & Justice Network

51. Inter-Faith Committee on Latin America (IFCLA)

52. Interfaith Council for Peace & Justice

53. Interfaith Council for Peace & Justice, Ann Arbor, MI

54. International Refugee Assistance Project

55. Jobs with Justice

56. Just Futures Law

57. Just Neighbors

58. Justice Action Center

59. Justice at Work

60. Kentucky Coalition for Immigrant and Refugee Rights

61. La Raza Centro Legal

62. Las Americas Immigrant Advocacy Center

63. Lawyers' Committee for Civil Rights of the San Francisco Bay Area

64. Legal Aid at Work

65. Legal Aid Justice Center

66. Maryknoll Office for Global Concerns

67. Men of Reform Judaism

68. Michigan Immigrant Rights Center, part of the Michigan Advocacy Program

69. Micronesian Islander Community

70. Minkwon Center

71. Mississippi Center for Justice

72. Mississippi Workers' Center for Human Rights

73. Mixteco/Indígena Community Organizing Project (MICOP)

74. MoveOn.org Political Action

75. National Advocacy Center of the Sisters of the Good Shepherd

76. National Asian Pacific American Women's Forum

77. National Center for Law and Economic Justice

78. National Education Association

79. National Employment Law Project

80. National Immigration Law Center

81. National Korean American Service & Education Consortium

82. National Organization for Women

83. National Partnership for New Americans

84. NETWORK Lobby for Catholic Social Justice

85. New American Leaders

86. North Carolina Justice Center

87. Northwest Immigrant Rights Project

88. Oasis Legal Services

89. People Power United

90. Planned Parenthood Federation of America

91. Presente.org

92. RAICES

93. Raise the Floor Alliance

94. Rocky Mountain Immigrant Advocacy Network

95. San Diego Immigrant Rights Consortium (SDIRC)

96. Services, Immigrant Rights and Education Network

97. Sojourners

98. Sonoma Immigrant Services

99. South Bay People Power

100. South Carolina Appleseed Legal Justice Center

101. Tennessee Immigrant & Refugee Rights Coalition

102. The Right to Immigration Institute/Dignidad

103. T'ruah: The Rabbinic Call for Human Rights

104. UndocuBlack Network

105. Unemployed Workers United, a project of Working Families Organization

106. Unidad Latina en Acción NJ

107. Unidos US

108. Union for Reform Judaism

109. Unitarian Universalists for Social Justice

110. We Are All America

111. Wind of the Spirit Immigrant Resource Center

112. Women of Reform Judaism

113. Woori Juntos

114. Worker Justice Center of New York

115. Workers Defense Project

116. Worksafe

117. Young Center for Immigrant Children's Rights

## CERTIFICATE OF COMPLIANCE

I certify that this corrected brief complies with the applicable type-volume limitation set forth in Federal Rule of Appellate Procedure 29(a)(5), because it contains 6,497 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

*/s/ Peter Karanjia*
Peter Karanjia

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 1, 2024, I caused to be filed electronically the foregoing corrected brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Peter Karanjia*
Peter Karanjia

*Counsel for Amici Curiae*