# In the United States Court of Appeals for the Fifth Circuit

———

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF WEST VIRGINIA; STATE OF KANSAS; STATE OF MISSISSIPPI,

*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY; TROY MILLER, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION; PATRICK J. LECHLEITNER, ACTING DIRECTOR OF U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; UR M. JADDOU, DIRECTOR OF U.S. CITIZENSHIP AND IMMIGRATION SERVICES; JASON D. OWENS, CHIEF OF THE U.S. BORDER PATROL,

*Defendants-Appellants*,

MARIA ROCHA; JOSE MAGANA-SALGADO; NANCI J. PALACIOS GODINEZ; ELLY MARISOL ESTRADA; KARINA RUIZ DE DIAZ; CARLOS AGUILAR GONZALEZ; LUIS A. RAFAEL; DARWIN VELASQUEZ; JIN PARK; OSCAR ALVAREZ; DENISE ROMERO; JUNG WOO KIM; ANGEL SILVA; HYO-WON JEON; ELIZABETH DIAZ; BLANCA GONZALEZ; MOSES KAMAU CHEGE; MARIA DIAZ,

*Intervenor Defendants-Appellants*,

STATE OF NEW JERSEY

*Intervenor-Appellant*,

———

On Appeal from the United States District Court
for the Southern District of Texas, Brownsville Division

———

**BRIEF FOR PLAINTIFFS-APPELLEES**

———

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General

JOSEPH N. MAZZARA
Assistant Solicitor General
Joe.Mazzara@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Plaintiffs-Appellees

No. 23-40653

State of Texas; State of Alabama; State of Arkansas; State of Louisiana; State of Nebraska; State of South Carolina; State of West Virginia; State of Kansas; State of Mississippi,

*Plaintiffs-Appellees*,

v.

United States of America; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security; Troy Miller, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; Patrick J. Lechleitner, Acting Director of U.S. Immigration and Customs Enforcement; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services; Jason D. Owens, Chief of the U.S. Border Patrol,

*Defendants-Appellants*,

Maria Rocha; Jose Magana-Salgado; Nanci J. Palacios Godinez; Elly Marisol Estrada; Karina Ruiz De Diaz; Carlos Aguilar Gonzalez; Luis A. Rafael; Darwin Velasquez; Jin Park; Oscar Alvarez; Denise Romero; Jung Woo Kim; Angel Silva; Hyo-Won Jeon; Elizabeth Diaz; Blanca Gonzalez; Moses Kamau Chege; Maria Diaz,

*Intervenor Defendants-Appellants*,

State of New Jersey

*Intervenor-Appellant*,

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellees, as a governmental party, need not furnish a certificate of interested persons.

/s/ Joseph N. Mazzara
Joseph N. Mazzara
*Counsel of Record for*
*Plaintiffs-Appellees*

## Statement Regarding Oral Argument

This Court resolved the relevant issues in this appeal in *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) (*Texas II*). Because *Texas II* "is a published opinion that provides a substantive analysis" of the "the question that [Appellants] attempt to relitigate now . . . the rule of orderliness must apply." *Cascino v. Nelson*, No. 22-50748, 2023 WL 5769414, at *3-4 (5th Cir. 2023). Furthermore, "[u]nder the law of the case doctrine, an issue of law or fact decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5th Cir. 2002). Oral argument accordingly is unlikely to assist the Court. Nonetheless, given the significance of the issues and number of parties, Texas would be pleased to participate in oral argument.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ........................................................................... ii

Statement Regarding Oral Argument ..................................................................... iii

Table of Authorities ............................................................................................... vi

Introduction ........................................................................................................... 1

Issue Presented ...................................................................................................... 2

Statement of the Case ............................................................................................ 2

    I.   The Statutory Framework ......................................................................... 2

    II.  The DACA and DAPA Programs ............................................................. 3

    III. Prior Proceedings ................................................................................... 5

    IV. Proceedings on Remand ........................................................................ 8

Summary of the Argument ..................................................................................... 9

Standard of Review ................................................................................................ 12

Argument ............................................................................................................... 12

    I.   *Texas II* Determines the Outcome of This Appeal. ................................ 12

        A.  The DACA Rule is substantively identical to the DACA
             Memorandum addressed in *Texas II*. .................................................13

        B.  Because there has been no change in the law, *Texas II*'s legal
             determinations are binding under the rule of orderliness. ...................13

        C.  This Court's application of law to the facts is the law of the
             case. ................................................................................................. 14

            1.   Standing ....................................................................................15

            2.   Zone of interest ........................................................................17

            3.   Substantive legality .................................................................. 18

            4.   Remedy .....................................................................................19

    II.  Even if *Texas II* Were Not Binding, the States Are Entitled to
        Judgement. ...............................................................................................19

        A.  The States have standing to challenge the DACA Rule. ....................19

            1.   The States established classic pocketbook standing. ................. 20

               a.   The States have suffered injury in fact. ............................. 20

    b.   The States' injuries are fairly traceable to the DACA Rule. ...................................................................... 22

    c.   The States' injuries are redressable by a favorable ruling. ................................................................. 25

  2.  The States have shown standing by a violation of their quasi-sovereign interests in the well-being of their residents. ..... 27

B.  The States are within the INA's zone of interests and therefore have a cause of action under the APA. .............. 30

C.  The DACA Rule is substantively unlawful. .........................................31

  1.  Even if *Texas II* does not control, DACA contravenes the INA for the reasons described in *DAPA*. .................................. 32

  2.  Appellants' counterarguments are not to the contrary. ............. 38

  3.  The DACA Rule suffers two additional problems. ...................... 41

    a.   The DACA Rule is arbitrary and capricious. ....................... 42

    b.   DACA Violates the Constitution's Take Care Clause. ............................................................................. 44

D.  The district court properly vacated the DACA Rule and entered a nationwide injunction. ........................................... 45

  1.  Vacatur is the appropriate remedy. ............................................. 45

  2.  The district court appropriately granted nationwide relief. ......... 46

Conclusion ............................................................................................ 47

Certificate of Service ........................................................................... 49

Certificate of Compliance ................................................................... 49

# Table of Authorities

Page(s)

**Cases:**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021).................................................................34, 41

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
458 U.S. 592 (1982) ...........................................................10, 27, 29

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
522 U.S. 359 (1998)........................................................................ 44

*Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*,
272 F.3d 276 (5th Cir. 2001) ........................................................15

*Antilles Cement Corp. v. Fortuno*,
670 F.3d 310 (1st Cir. 2012) .................................................. 26-27

*Arizona v. United States*,
567 U.S. 387 (2012).................................................................... 2, 31

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,
563 U.S. 776 (2011) .......................................................................36

*Block v. Meese*,
793 F.2d 1303 (D.C. Cir. 1986) ...................................................24

*Carnival Leisure Indus., Ltd. v. Aubin*,
53 F.3d 716 (5th Cir. 1995) ................................................13, 15-16

*Cascino v. Nelson*,
No. 22-50748, 2023 WL 5769414 (5th Cir. 2023) ........................ iii

*Cent. United Life Ins. Co. v. Burwell*,
827 F.3d 70 (D.C. Cir. 2016).........................................................35

*Chamber of Com. v. Whiting*,
563 U.S. 582 (2011).......................................................................19

*Chapman v. NASA*,
736 F.2d 238 (5th Cir. 1984) .........................................................25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 842 (1984).............................................. 6, 11, 19, 33-35

*City of Arlington v. F.C.C.*,
569 U.S. 290 (2013) .......................................................................35

*City of Chicago v. Fulton*,
592 U.S. 154 (2021)........................................................................36

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)................................................................ 20

*Cruz-Miguel v. Holder,*
650 F.3d 189 (2d Cir. 2011) ................................................. 37

*Czyzewski v. Jevic Holding Corp.,*
580 U.S. 451 (2017)..........................................................10, 21

*Demore v. Kim,*
538 U.S. 510 (2003) ............................................................. 43

*Dep't of Com. v. New York,*
139 S.Ct. 2551 (2019) ................................................... 10, 23-24

*DHS v. Regents of the Univ. of California,*
140 S.Ct. 1891 (2020)...................................................*passim*

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ............................................................. 47

*FCC v. Prometheus Radio Project,*
141 S.Ct. 1150 (2021)........................................................... 42

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ............................................................. 33

*Ferreira v. Borja,*
93 F.3d 671 (9th Cir. 1996), *cert. denied,* 519 U.S. 1122 (1997)............16

*Free v. Abbott Labs., Inc.,*
164 F.3d 270 (5th Cir. 1999)................................................15-16

*Garland v. Aleman Gonzalez,*
596 U.S. 543 (2022) ............................................................. 41

*Georgia v. Pa. R.R. Co.,*
324 U.S. 439 (1945)............................................................. 28

*Gilbert v. Donahoe,*
751 F.3d 303 (5th Cir. 2014)..................................................16

*Haaland v. Brackeen,*
599 U.S. 255 (2023) ............................................................. 30

*Hearth, Patio& Barbecue Ass'n v. U.S. Dep't of Energy,*
706 F.3d 499 (D.C. Cir. 2013).............................................. 35

*Hines v. Davidowitz,*
312 U.S. 52 (1941) ................................................................ 2

*Hoffman Plastic Compounds, Inc. v. NLRB,*
535 U.S. 137 (2002).............................................................. 2

*INS v. Natl. Ctr. for Immigrants' Rights Inc.*,
    502 U.S. 183 (1991) .................................................. 43

*Jacobs v. Nat'l Drug Intel. Ctr.*,
    548 F.3d 375 (5th Cir. 2008) .............................. 1, 14

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ............................................ 18, 30

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) .................................................. 44

*King v. Burwell*,
    576 U.S. 473 (2015) .................................................. 34

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973) ................................................... 17

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ...........................20, 21, 24, 28-30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ......................................... 18, 30-31

*Med. Ctr. Pharmacy v. Holder*,
    634 F.3d 830 (5th Cir. 2011) ................................... 15

*Medellin v. Texas*,
    552 U.S.491 (2008) .................................................. 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.*,
    463 U.S. 29 (1983) .................................................. 43

*NCAA v. Governor of N.J.*,
    730 F.3d 208 (3d Cir. 2013) ................................... 23

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................. 48

*Northshore Dev., Inc. v. Lee*,
    835 F.2d 580 (5th Cir. 1988) ................................... 12

*Pub. Int. Rsch. Grp. v. Magnesium Elektron, Inc.*,
    123 F.3d 111 (3d Cir.1997) ..................................... 16

*Sanchez v. R.G.L.*,
    761 F.3d 495 (5th Cir. 2014) ...........................10, 26-27

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) .................................................. 30

*Texas v. Alabama-Coushatta Tribe*,
    918 F.3d 440 (5th Cir. 2019) ................................... 12

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*,
    142 S.Ct. 2528 (2022) ...................................................................... 18

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) (per curiam) ........................................ 44

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) (*Texas II*) ................................... *passim*

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .................................................. *passim*

*Texas v. United States*,
    No. 1:18-CV-00068, 2023 WL 5950808 (S.D. Tex. Sept. 13, 2023) ............... 46

*Tollett v. City of Kemah*,
    285 F.3d 357 (5th Cir. 2002) ....................................................... iii, 1

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................................ 21

*United States v. Castillo-Rivera*,
    853 F.3d 218 (5th Cir. 2017) ......................................................... 14

*United States v. Lee*,
    358 F.3d 315 (5th Cir. 2004) .......................................................... 15

*United States v. Texas*,
    579 U.S. 547 (2016) (per curiam) ............................................... 4, 38

*United States v. Texas*,
    599 U.S. 670 (2023) ...................................................... 16-17, 19, 21-22

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ...................................................... 45

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) .......................................................... 42

*W. Virginia v. Env't Prot. Agency*,
    597 U.S. 697 (2022) .............................................................. 11, 34

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:
    art. II, §3 ............................................................................. 42, 44

    §8, cl.4 ....................................................................................... 2

ix

5 U.S.C.:

    §704 ............................................................... 18, 30

    §706(2)(A) ........................................................ 42

    §706(2)(b) ...................................................... 42, 45

6 U.S.C. §202(5) ................................................... 40

8 U.S.C.:

    §1101(a)(15)(H) .............................................. 39

    §1101(a)(15)(P) .............................................. 39

    §1103(a)(1) ..................................................... 40

    §1105a(a) ....................................................... 40

    §1158(c)(1)(B) ................................................ 40

    §1158(d)(2) .................................................... 40

    §1160(d)(3)(A) ............................................... 40

    §1182(a)(9)(B)(i) ............................................ 37

    §1182(d)(5)(A) .......................................... 7, 37, 40

    §§1221-1232 ................................................... 41

    §1225 ............................................................ 35

    §1227(a)(1)(C)(i) ........................................... 35

    §1229a(e)(2) .................................................. 35

    §1252(f)(1) ................................................. 41-42

    §1254a(a)(1)(B) .............................................. 40

    §1324a ........................................................... 39

    §1324a(h)(3) .............................................. 39, 41

    §1611(a) ........................................................ 28

26 U.S.C. §4980H(b) ............................................. 28

Tex. Health & Safety Code:

    §61.001 *et seq.* .............................................. 22

    §311.043 ........................................................ 22

U.S. Code Tit. 8 ...................................................... 2

Fed. R. Civ. P.:

    52(a)(6) ......................................................... 27

    56(a) .............................................................. 12

**Other Authorities:**

142 Cong. Rec. 26,680 (1996) ................................ 3

87 Fed. Reg. 53,152 (Aug. 30, 2022) ................... *passim*

86 Fed. Reg. 53,736 (proposed Sept. 28, 2021) ....... 7

H.R. Rep. No. 99-682(I), (1986), reprinted in 1986 U.S.C.C.A.N. 5649 ............... 36

H.R. Rep. No. 99-682(I), at 46, 1986 U.S.C.C.A.N. at 5650 ............................ 36, 39

S. Rep. No. 104–249, p. 7 (1996) ................................................................. 43

*Saturday Night Live: How a Bill Does Not Become a Law* (NBC
    broadcast Nov. 22, 2014), www.nbc.com/saturday-night-
    live/video/how-a-bill-does-not-become-a-law/2830152 .................................. 41

Suppl. Br. for Fed. Appellants, *Texas II*, 50 F.4th 498 (No. 21-40680),
    2022 WL 4080252 ............................................................................. 1

Appellants' Rule 28(j) Letter 1-2, DACA, No. 21-40680 (5th Cir.)
    (Aug. 24, 2022), ECF 234 .................................................................... 1

# Introduction

Even the federal government acknowledges (at 36) the Court has already held that Texas has standing to challenge the lawfulness of the Deferred Action for Childhood Arrivals program (DACA). *See Texas II*, 50 F.4th at 498. Indeed, the Court has gone further than that: It has already held that DACA violates the Immigration and Nationalization Act (INA). *Id.* at 528. That conclusion holds with respect to the 2012 DACA Memorandum and the "indistinguishable"[1] DACA Rule from 2022, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (DACA Rule). Furthermore, the Court has held that vacatur is the appropriate remedy. *Id.* at 530. In fact, the Court remanded in 2022 so that the district court could review the DACA Rule in the first instance and because it did not have the full administrative record. *Id.* at 512. *Texas II* thus should be the beginning and end of this Court's analysis under both the law-of-the-case doctrine, *see, e.g.*, *Tollett*, 285 F.3d at 363, and *stare decisis*, *see, e.g.*, *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

Even if Appellants *could* re-litigate the same arguments (and they can't), they would still lose for all the reasons the Court has previously identified. The basic features of DACA have not changed: It allows individuals who came to this country in violation of federal law to remain, work, and potentially become citizens in ways that are "foreclosed by Congress's careful plan" in—and indeed are "manifestly

---

[1] Suppl. Br. for Fed. Appellants, *Texas II*, 50 F.4th 498 (No. 21-40680), 2022 WL 4080252, at *3; *see also* Appellants' Rule 28(j) Letter 1-2, DACA, No. 21-40680 (5th Cir.) (Aug. 24, 2022), ECF 234.

contrary to"—the INA. *Texas II*, 50 F.4th at 528. Because presidents cannot unilaterally override duly enacted statutes, DACA remains illegal.

ISSUE PRESENTED

Whether the district court properly granted summary judgment to Texas after finding that the DACA Rule is identical to the DACA Memorandum the Court has already held unlawful.

STATEMENT OF THE CASE

## I.  The Statutory Framework

Congress has used its authority "[t]o establish an uniform Rule of Naturalization," U.S. Const. §8, cl.4., and to enact "extensive and complex" statutes governing "immigration and alien status," *Arizona v. United States*, 567 U.S. 387, 395 (2012). Title 8 of the U.S. Code functions as a "single integrated and all-embracing system" governing the federal "[p]olicies pertaining to the entry of aliens and their right to remain here." *Id.* at 400, 409 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941)). In total, Congress has enacted complex provisions detailing how over 40 classes of immigrants, nonimmigrants, refugees, and other aliens can attain lawful presence in the country. *See Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015) (*DAPA*).

In the Immigration Reform and Control Act of 1986 (IRCA), Congress likewise created "a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)). Congress reinforced these laws with the Illegal

Immigration Reform and Immigrant Responsibility Act of 1996 and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, responding to the States' concerns about the effects of extending benefits to unlawfully present aliens. *E.g.*, 142 Cong. Rec. 26,680 (1996). By statute, "[u]nlawfully present aliens are generally not eligible to receive federal public benefits . . . or state and local benefits unless the state otherwise provides." *DAPA*, 809 F.3d at 148. Congress has never authorized the Executive Branch to unilaterally abandon this framework.

## II. The DACA and DAPA Programs

After Congress declined to enact the DREAM Act in 2012—as it has declined to do in every Congress since 2001, ROA.22406-07—DHS Secretary Janet Napolitano announced the DACA program in the 2012 DACA Memorandum. ROA.25185; ROA.22455-58. That Memorandum instructed immigration officials not to remove "certain young people who were brought to this country as children," ROA.22456, who would be deemed eligible for a renewable two-year period of lawful presence through "deferred action," ROA.25186. "The DACA Memorandum made up to 1.9 million otherwise removable aliens eligible for the program," and "[a]s of 2018, 814,000 individuals had applied for and received 'lawful presence' via DACA." ROA.25188.

The DACA Memorandum created "a program for conferring affirmative immigration relief." *DHS v. Regents of the Univ. of California*, 140 S.Ct. 1891, 1906 (2020). Specifically, "[b]y granting deferred action, the memorandum also made recipients eligible for certain state and federal benefits, including Medicare and Social Security," *id.* at 1920 (Thomas, J., concurring in part in the judgment);

ROA.25187, "state benefits" like "Texas's state-subsidized work-study program," ROA.25187, and "work authorization," *Regents*, 140 S.Ct. at 1920 (Thomas, J., concurring in part in the judgment); ROA.25187. Indeed, DACA "*require[ed]* its recipients to apply for work authorization." ROA.25187.

In November 2014, DHS expanded DACA and created, by another memorandum, a related program called Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). *Texas II*, 50 F.4th at 509. The "Expanded DACA" did several things, including removing the age limit and extending the entry date from 2007 to 2010. *Id.* DAPA essentially provided similar relief to adults. Over four million people would have been eligible. *Id.*

Twenty-six States sued. *Id.* at 510. A nationwide preliminary injunction was entered, and this Court affirmed it and held that DAPA was procedurally infirm and "violated substantive APA requirements because it was 'manifestly contrary' to the INA." *Id.* at 510 (citing *DAPA*, 809 F.3d at 182). The Supreme Court affirmed without an opinion by an equally divided vote. *United States v. Texas*, 579 U.S. 547 (2016) (per curiam).

After President Trump took office, his administration rescinded DACA. *Id.* The recission was challenged, and then, in *Regents*, the Supreme Court held that because DACA conferred benefits in addition to laying out a non-enforcement policy, it was reviewable under the APA, and that the recission was arbitrary and capricious because it was accompanied with no explanation and did not take into account reliance interests. *Regents*, 140 S.Ct. at 1907-1913.

### III. Prior Proceedings

The States brought this suit in May 2018, ROA.25190, following successful litigation challenging implementation of the similarly structured DAPA and Expanded DACA. Litigation, however, was stayed after the federal government agreed to terminate DACA and subsequently pending resolution of a challenge to that termination in *Regents*. ROA.25190. Once litigation resumed, the States, the private Intervenors, and New Jersey filed motions for summary judgment. ROA.25184.

The district court granted summary judgment to the States in a 77-page opinion, although it stayed its order to permit an orderly appellate process. ROA.25184-25260. First, the district court determined that the States have standing. Relying on this Court's precedent in *DAPA*, 809 F.3d at 151-56, the district court held that the States were entitled to special solicitude in the standing analysis. ROA.25198-25207. It held the States both have *parens patriae* standing, ROA.25207-25211, and had suffered a traditional pocketbook injury. ROA.25211-16.

The district court then concluded that DACA is reviewable under the APA, ROA.25216, and is procedurally invalid, ROA.25217-27. In doing so, the district court agreed with the conclusion reached by Justices Thomas, Alito, and Gorsuch in *Regents* that "DACA was more than a simple non-enforcement policy." ROA.25226 (citing *Regents*, 140 S.Ct. at 1918). The district court concluded, as Justice Thomas did, that DACA must be "a substantive or legislative rule" rather than a mere general statement of policy, because "[o]therwise, the majority would have to accept that DACA was nothing more than a policy of prosecutorial discretion, which would

make its rescission unreviewable." ROA.25226 (quoting *Regents*, 140 S.Ct. at 1927 n.8). Because the DACA Memorandum had not been promulgated through notice-and-comment procedures despite the APA's requirement, it was procedurally invalid.

The district court further held that the DACA Memorandum was substantively unlawful. ROA.25227-56. Assuming the *Chevron* two-step framework applied, and applying *DAPA*, 809 F.3d at 179-81, the district court first concluded "that Congress had directly addressed the precise question of whether DHS could adopt DAPA and Expanded DACA"; it saw "no reason that the Fifth Circuit's holding . . . d[id] not bind" it in this case. ROA.25229. The district court also explained that "Congress's clear articulation of laws for removal, lawful presence, and work authorization" "illustrate[d] a manifest intent to reserve for itself the authority to determine the framework of the nation's immigration system." ROA.25244. "The Executive Branch," the court concluded, "cannot just enact its own legislative policy when it disagrees with Congress's choice to reject proposed legislation," ROA.25234, and thus "may not award lawful presence and work authorization to approximately 1.5 million aliens for whom Congress has made no provision," ROA.25244 (quoting *DAPA*, 809 F.3d at 186).

The district court held in the alternative that even if Congress had not spoken directly, DHS's interpretation of the statutes was unreasonable under *Chevron*'s second step because "DACA . . . usurps the power of Congress to dictate a national scheme of immigration laws and is contrary to the INA." ROA.25245. Ultimately,

the district court believed that this Court's "reasoning in *[DAPA]* controls this case; it is binding case law for this Court, and the result here is inescapable." ROA.25248.

Appellants appealed, and DHS issued a notice of proposed rulemaking that would "preserve and fortify DHS's DACA policy," Deferred Action for Childhood Arrivals, 86 Fed. Reg. 53,736, 53,773 (proposed Sept. 28, 2021), which subsequently became the DACA Rule, *Texas II*, 50 F.4th at 511-12.

The DACA Rule is materially indistinguishable from the DACA Memorandum. Both, for example, purport to confer legal benefits, ROA.34172-73, to Texas's significant cost. Appellants' expert estimated that DACA "impose[s] a cost of more than $250,000,000 on Texas per year and another $533,000,000 annually [on] local Texas communities." *Texas II*, 50 F.4th at 518.

The DACA Rule also purports to create an otherwise unobtainable pathway to citizenship by allowing DACA recipients to adjust their status by means of advance parole. Advance parole allows aliens to leave and lawfully reenter the United States at a port of entry. *See* 8 U.S.C. §1182(d)(5)(A). Although Congress designed parole to be awarded only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," *id.*, the DACA Rule makes the entire DACA population eligible to apply, ROA.33689.

In *Texas II*, the federal government represented to the Court that the 2022 DACA Rule is substantively identical to the 2012 DACA Memorandum. *Texas II*, 50 F.4th at 512. The Court nonetheless declined to assess in the first instance whether "material differences" existed between them. *Id.* at 512. Instead, the Court affirmed the district court's judgment that the DACA Memorandum was procedurally

improper because it was a substantive rule that had not undergone notice-and-comment rulemaking. *Id*. at 522-24.

Critical to this appeal, the Court further affirmed the district court's judgment that Texas has standing to challenge DACA, *id*. at 520, and that the DACA Memorandum was substantively unlawful. The Court explained that DACA, like DAPA before it, contravenes Congress's statutory schemes for classification and removal as well as the award of lawful presence and work authorization. *Texas II*, 50 F.4th at 525-26. The Court also concluded that DACA is "an unreasonable interpretation of the INA," has no "clear congressional authorization," and cannot be justified as an "exercise of [DHS's] inherent prosecutorial discretion." *Id*. at 526-27. Finally, the Court affirmed that vacatur is the appropriate remedy. *Id.* at 530.

## IV. Proceedings on Remand

As the district court observed, this Court's remand in *Texas II* was limited to "whether the already established rulings concerning the 2012 DACA Memorandum apply to the [DACA] Rule." ROA.36373. The district court held that "the easy response to the assignment given to this Court on remand is: there are no material differences between the DACA Rule and the 2012 DACA Memorandum." ROA.36379. Indeed, "the Federal Defendants candidly admit[ted] that the DACA Rule suffers from the same problems as the 2012 DACA Memorandum and that it is contrary to the Fifth Circuit's opinion in *Texas II*." ROA.36379. It had to, the district court found, because such a conclusion was "compelled by countless statements to the same effect found throughout the administrative record." ROA.36380.

Notwithstanding the federal government's concession, the district court went through the DACA Rule and explained how it "codifies without material change the threshold criteria that have been in place for a decade," ROA.36380; *see also* ROA.36380 (reiterating that "[t]his rule does not establish a new program"). For example, the Rule adopts the criteria in the 2012 Memorandum defining "the population of those who may request DACA," ROA.36380, without any alteration to the "eligibility criteria, grant lawful immigration status or citizenship for noncitizens or provide a means for entry into the United States," ROA.36381. And under the DACA Rule "DHS anticipates no change in U.S. population as a direct effect of this rule." ROA.36381.

Moreover, notwithstanding that the remand "clearly [did] not permit the parties to relitigate previously established issues," such as standing and the appropriateness of vacatur, the district court reviewed and re-affirmed its prior holdings on these issues. *See, e.g.*, ROA.36373; ROA.36382. The district court again granted summary judgment, ROA.36399, entered a permanent injunction, ROA.36399-401, and vacated the DACA Rule, while staying it as to all DACA recipients who received their status prior to July 2021, ROA.36401. The Appellants timely appealed. ROA.36411-20.

## Summary of the Argument

**I.** This appeal is ripe for summary affirmance. Because the DACA Rule is the same in all material parts as the DACA Memorandum, this Court's decision in *Texas II* is binding as to standing, the DACA Rule's infirmities under the APA, and the district court's proper exercise of discretion in ordering vacatur.

**II.** Even if the Court could reconsider the issue, the States have standing. "For standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (internal quotation marks omitted). The amount of money here is anything but small. Texas alone "spends tens" if not hundreds "of millions of dollars annually to provide emergency Medicaid services to illegal aliens," through social services, healthcare, and education costs. ROA.25212 (estimating $250,000,000 in costs annually to the State and $533,000,000 to local communities). This injury is traceable to the DACA Rule, which has the same "predictable effect" as the DACA Memorandum, *Dep't of Com. v. New York*, 139 S.Ct. 2551, 2566 (2019), by encouraging over 100,000 aliens who would otherwise be legally required to leave to remain in Texas. The States' harm is redressable by an injunction and vacatur because at least *some* DACA recipients who cost the States money are likely to return to their countries of origin absent DACA's immigration benefits. *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014). That is sufficient even without the special solicitude to which States are entitled in this analysis. *See, e.g., DAPA*, 809 F.3d at 151-55.

The States also have standing based on their quasi-sovereign interests "in the well-being of [their] populace" by asserting their procedural rights under the APA. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 602 (1982). DACA recipients are allowed to compete with the States' lawful residents in the market for employment, and the States' lawful residents are harmed. The States have standing to defend their lawful residents' economic well-being.

**III.** The States are within the INA's zone of interest. The "test . . . is not meant to be especially demanding and is applied in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *DAPA*, 809 F.3d at 162 (cleaned up). Even without *Texas II*, this Court's precedent conclusively decides that States fall within the INA's zone of interest. *Id.* at 163.

**IV.** The DACA Rule is also substantively unlawful for the reasons described in *DAPA*, 809 F.3d at 178-86. Assuming *Chevron* applies, "Congress has directly addressed the precise question[s] at issue" including removal, lawful presence, work authorization, and advance parole. *Id.* at 186 (quotation marks omitted). Because DACA is "manifestly contrary" to the INA's comprehensive scheme, it "is foreclosed by Congress's careful plan." *Id.* (cleaned up). Furthermore, it is hard to imagine a more major question. *See W. Virginia v. EPA*, 597 U.S. 697, 724-32 (2022).

**V.** The DACA Rule also violates the Constitution's Take Care Clause. Presidents cannot exercise legislative power—and they certainly cannot dispense with statutes addressing unlawful presence by declaring an entire class of aliens to henceforth be present lawfully. Yet the Executive did just that through DACA, dispensing with Congress's carefully delineated immigration policies for its own preferred legal regime. *See DAPA*, 809 F.3d at 166.

**VI.** The district court did not abuse its discretion or reward overbroad relief vacating the DACA Memorandum and DACA Rule or permanently enjoining them nationwide. This Court previously explained why nationwide relief is appropriate in cases like this one. *Id.* at 187-88. It considered all the appropriate factors and stayed

a portion of its vacatur and injunction with respect to current DACA recipients. The decision was well within its discretion.

## Standard of Review

This Court reviews a district court's "grant of summary judgment *de novo*, applying the same standards as the district court." *Texas II*, 50 F.4th at 521. Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 521-22 (quoting Fed. R. Civ. P. 56(a)).

This Court reviews "the district court's decision to vacate for abuse of discretion." *Texas II*, 50 F.4th at 529. It likewise reviews the district court's decision to enter permanent injunctive relief for abuse of discretion. *Id.* at 530. This standard is "highly deferential." *Texas v. Alabama-Coushatta Tribe*, 918 F.3d 440, 447 (5th Cir. 2019). Under abuse-of-discretion review it "is not enough" that a different decision "might have been permissible, or even warranted"; instead, the district court's decision "must have been so unwarranted as to constitute an abuse of discretion." *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 582 (5th Cir. 1988).

## Argument

### I.   *Texas II* Determines the Outcome of This Appeal.

The DACA Rule fails to cure the deficiencies of DACA, and the mere fact that the DACA Memorandum is now codified as a final rule does not create a "change in the law" that would remove this case from under the rule of orderliness or law-of-the-case doctrine. *See Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718-19 (5th

Cir. 1995). This appeal is instead essentially identical to this Court's decision in *Texas II*, apart from removing the States' procedural objection that the DACA Memorandum required notice and comment. The Court need go (and can go) no further than to announce that fact.

## A. The DACA Rule is substantively identical to the DACA Memorandum addressed in *Texas II*.

The district court correctly found that there is no difference from the DACA Memorandum to today's DACA Rule: "DACA remains the same. All of the deficiencies noted before by this Court and the Fifth Circuit still exist." ROA.36381-82. Indeed, the federal government admitted below that "the [DACA] Rule is substantively the same policy as the DACA Memorandum." ROA.34571-72. And it does so again here. U.S. Br. 36. For good reason: The entire purpose of this Rule was to "preserve[] and fortif[y] in regulation a policy that has been in place for 10 years," ROA.25811—that is, "formaliz[ing] the 2012 DACA Memorandum, a program [this court has] already found to be wanting," ROA.36398. Consistent with that purpose, the DACA Rule "codifies without material change the threshold criteria that have been in place for a decade," ROA.25923, doing "nothing to change or resolve the substantive problems found by" this Court or the district court, ROA.36379.

## B. Because there has been no change in the law, *Texas II*'s legal determinations are binding under the rule of orderliness.

Because the DACA Rule is identical to the DACA Memorandum, and there have been no relevant changes in the law, *Texas II* resolves this under the rule of orderliness. That rule prohibits one panel from "overturn[ing] another panel's

decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court," or the Court sitting en banc. *Jacobs*, 548 F.3d at 378. This rule means "simply that [the Court is] to apply stare decisis in determining whether an earlier panel opinion is controlling." *United States v. Castillo-Rivera*, 853 F.3d 218, 227 (5th Cir. 2017) (en banc) (Higginbotham, J., concurring).

*Texas II* is such a published opinion, the application of which is dispositive because it addressed: (1) the legal sufficiency of Texas's standing evidence, *Texas II*, 50 F.4th at 517-20; (2) Texas's position within the INA's zone of interest, *id.* at 520-21; (3) the incompatibility of the DACA program with the INA, *id.* at 524-28; and (4) the required remedy of vacatur, *id.* at 528-30. Because these legal rulings were sufficient to set aside the 2012 DACA Memorandum, and there have been no contrary Supreme Court or en banc rulings, the Court is legally bound to set aside the DACA Rule.

## C. This Court's application of law to the facts is the law of the case.

This Court's decision in *Texas II* is also binding under "[t]he law-of-the-case doctrine," which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (quotation omitted). Moreover, "[t]he law of the case doctrine, as formulated in this circuit, generally precludes reexamination of issues of . . . fact decided on appeal, either by the district court on remand or by the appellate court itself on a subsequent appeal." *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.*, 272 F.3d 276, 279 (5th Cir. 2001).

Under this doctrine, any issue of law or fact "decided on appeal may not be reexamined by the district court on remand or by th[is] appellate court on a subsequent appeal." *United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004) (cleaned up). Because the Appellants have not shown "manifest error, or an intervening change in the law," *Texas II*'s rulings regarding the same four case-dispositive issues "must be followed in all subsequent proceedings in the same case." *Carnival Leisure*, 53 F.3d at 718-19.

### 1. Standing

To start, while this case was on limited remand, the district court did not revisit standing except to strengthen its finding with recent precedent and cites to the administrative record confirming that the DACA Rule imposes largely the same costs on the States as the DACA Memorandum, ROA.36374, which this Court has already determined that Texas has standing to challenge, *Texas II*, 50 F.4th at 513-20. This analysis was entirely correct.

The district court was correct that the law of the case applies to determinations of subject-matter jurisdiction. After all, courts need not engage in "perpetual re-examination of precisely the same issue of subject matter jurisdiction." *Free v. Abbott Labs., Inc.,* 164 F.3d 270, 272-73 (5th Cir. 1999) (citing, *inter alia*, *Ferreira v. Borja,* 93 F.3d 671, 674 (9th Cir. 1996), *cert. denied,* 519 U.S. 1122 (1997) ("Surely a court that has decided that it has jurisdiction is not duty-bound to entertain thereafter a series of repetitive motions to dismiss for lack of jurisdiction.")). *Texas II* held, among other things, that Texas was entitled to summary judgment on the question of pocketbook standing. *Texas II*, 50 F.4th at 517. Because nothing about codifying

DACA changes that analysis, ROA.36373, and there has been no intervening change in the case law, that decision remains binding, *Gilbert v. Donahoe*, 751 F.3d 303, 313 (5th Cir. 2014); *Carnival Leisure*, 53 F.3d at 718-19. Appellants' assertions to the contrary are unavailing.

Intervenors miss the point when they criticize the district court (at 19) for "implicitly invok[ing] the doctrine of law of the case to avoid considering standing afresh." The *purpose* of the law-of-the-case doctrine is to preserve judicial resources by "limit[ing] re-examination of prior decisions to 'extraordinary circumstances [that] warrant such reconsideration.'" *Free*, 164 F.3d at 273 n.1 (quoting *Pub. Int. Rsch. Grp. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 118 (3d Cir.1997)). Because Intervenors cannot point to one of the extraordinary circumstances that merit an exception to this rule, the district court had no "obligation to consider standing afresh." Intervenor.Br.20; *see Carnival Leisure*, 53 F.3d at 718-19.

The federal government tries to assert such an exception by arguing (at 16-17) that the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023) (*Immigration Priorities*) represents an intervening change in the law. But the Supreme Court expressly *declined* to revisit whether injuries similar to those Texas demonstrated here would support "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and the Executive Branch's provision of legal benefits or legal status*," explaining that it "could lead to a different standing analysis." *Id.* at 683 (emphasis added). Although the Court did not reference DACA by name, it might as well have. After all, this Court already held that DACA confers benefits such as work authorization and Medicare

eligibility, and thus implicates more than simply the Executive's traditional enforcement discretion. *Regents*, 140 S.Ct. at 1906-07. And, in the DACA Rule, "DHS acknowledges that by applying a more formal administrative framework to forbearance from enforcement with respect to DACA recipients, *DHS has enabled a range of additional benefits to this population.*" ROA.25797 (emphasis added).

The federal government's reliance on *Immigration Priorities* is particularly misplaced because *Texas II* presaged the same distinction the Supreme Court would draw between challenges to pure "non-prosecution" and "non-prosecution with benefits." 599 U.S. at 681-83. Indeed, this distinction between cases that "concern only nonprosecution" and those that concern "both nonprosecution and the conferral of benefits" was also recognized in *DAPA*. 809 F.3d 154 (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 615-16 (1973)). Because there is no intervening change in the law, the law of the case applies, and the States still have standing.

### 2. Zone of interest

*Texas II* also conclusively resolves whether Texas's claims fall "within the zone of interests to be protected or regulated by the statute." *Texas II*, 50 F.4th at 521 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). As *Texas II* explained, this test is a low bar, and the only time that review is foreclosed is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225). Texas's claims clear this bar because, among other reasons, the States sought to reduce—rather than avoid—their

obligation to pay for benefits afforded DACA recipients. *Id.* Recent Supreme Court precedent confirms that this falls within the zone of interest of the INA because "[t]he INA encompasses [the States] concerns about the financial burdens of illegal immigration." And "[i]t's clear that the INA aimed, at least in part, to protect States from just those kinds of [fiscal] harms." *Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021), *rev'd on other grounds*, 142 S.Ct. 2528 (2022). Because of that, Appellants' arguments that Texas lacks a cause of action fail on their merits and under the law of the case. *See* 5 U.S.C. §704; *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

### 3. Substantive legality

Although some of *Texas II*'s procedural holdings are less relevant after the federal government went through notice and comment to produce the DACA Rule, *Texas II*, 50 F.4th at 522-24, what remains is still more than sufficient to affirm the district court's vacatur of the DACA Rule. After all, the INA and related immigration statutes still set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Id.* at 50 521 (internal quotations omitted) (quoting *Chamber of Com. v. Whiting,* 563 U.S. 582, 587 (2011)). The DACA Rule, which is substantively identical to the DACA Memorandum, still contravenes Congress's rigorous and comprehensive statutory schemes for classification, removal, allocation of lawful presence, and allocation of work authorization. *Id.* at 525-26. And the DACA Rule still flunks *Chevron* because it is not an "exercise of [DHS's] inherent prosecutorial

18

discretion," but instead "an unreasonable interpretation of the INA" granting immigration benefits without "clear congressional authorization." *Id.* at 526.

### 4. Remedy

Finally, *Texas II* concluded that "in light of DACA's critical substantive failings, the district court was well within its discretion to order vacatur." *Id.* at 530. The federal government admits (at 36) that it did nothing to address those failings in the DACA Rule. Nor has there been any intervening change in the law. To the contrary, the federal government raised many of the same arguments regarding the propriety of vacatur in *Immigration Priorities*. *Compare* Appellants Br. at 41-43 2024 WL 406078, *with* Pet.Br. at 40-49, 2022 WL 4278395, *Immigration Priorities*, 599 U.S. 670. The Supreme Court did not adopt them, issuing only a "narrow" opinion. *Immigration Priorities*, 599 U.S. at 686. Because nothing about DACA has changed, and the law remains the same, *Texas II* requires vacatur—again.

## II. Even if *Texas II* Were Not Binding, the States Are Entitled to Judgement.

### A. The States have standing to challenge the DACA Rule.

If the Court determines that the law-of-the-case doctrine or rules of *stare decisis* do not apply, the States still have standing because they suffer classic—and significant according to Appellants' own expert—pocketbook injuries from DACA. They also have standing to assert their procedural rights under the APA to defend the economic well-being of their lawful residents.

19

### 1. The States established classic pocketbook standing.

Only one State must have standing, *Massachusetts v. EPA*, 549 U.S. 497, 516, 518 (2007), which requires "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling,'" *DAPA*, 809 F.3d at 150 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)). The States meet this standard: DACA recipients "impose a cost of over $250,000,000 on Texas per year and another $533,000,000 annually in costs to local Texas communities." ROA.25212. These harms are traceable to—indeed, exacerbated by—the DACA Rule, which expands DACA recipients' benefits, further encouraging them to remain in the United States when they could not otherwise lawfully do so. *See* ROA.25797. The district court's injunction redresses the States' injuries at least in part because many of those aliens would and will return to their countries of origin without DACA.

### a. The States have suffered injury in fact.

As this Court already held, Texas has demonstrated standing based on its direct injury, *Texas II*, 50 F.4th at 518-20 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021); *DAPA*, 809 F.3d at 155-56), namely "costs incurred as a result of DACA," ROA.25211. And as the district court highlighted on limited remand, in the administrative record DHS admits repeatedly that the DACA Rule imposes costs on the States. ROA.36374. Indeed, the States' evidence shows that Texas and its local communities bear almost a billion dollars of costs in providing social services to unlawfully present aliens. *E.g.*, ROA.22980; ROA.23040-41. Appellants' own experts acknowledge this includes an "overall . . . cost of over $250,000,000 [to]

Texas per year and another $533,000,000 annually in costs to local Texas communities." ROA.25212; ROA.23047. And "[i]f DACA recipients leave, Texas would no longer be obligated to pay for those costs associated with DACA recipients' entitlement to social services;" "[n]ecessarily this would reduce some of the state's financial expenditures." ROA.25212-13. This is more than sufficient, and the States need not demonstrate their harm with mathematical precision. "For standing purposes, a loss of even a small amount of money is ordinarily an injury." *Texas II*, 50 F.4th at 518 (quoting *Czyzewski*, 580 U.S. at 464). The counterarguments offered are unpersuasive.

The federal government principally objects (at 16-19) that intervening precedent after *Texas II* has closed the door to finding standing in the immigration context. Specifically, it cites to the footnote in *Immigration Priorities* that refused to extend *Massachusetts*. 599 U.S. at 685 n.6. But as noted above, and recognized by the district court, ROA.36374-76, *Immigration Priorities* acknowledged that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities and the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." 599 U.S. at 683. Further, as the district court rightly pointed out, *Immigration Priorities* also stated that standing exists where the federal government, as it has here, engages in "an extreme case of non-enforcement" that arguably exceeds "the bounds of enforcement discretion." *Id*. This case presents those precise questions.

The Private Intervenors counter (at 19-23) that there are material differences to the costs imposed by the DACA Rule from the DACA Memorandum such that the

record does not support a finding of standing. But the DACA Rule does not affect other "[f]ederal law [that] requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status." *Texas II*, 50 F.4th at 517. The record reflects that as "required by federal law," ROA.25212, Texas alone "spends tens of millions of dollars annually to provide emergency Medicaid services to illegal aliens," ROA.25212.

And on top of these federally required costs, other expenditures are required by preexisting state law. Texas law, for instance, requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§61.001 *et seq.* Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id.* §311.043.

It is no rejoinder to say that these costs may be offset by gains elsewhere. *Texas II*, 50 F.4th at 518. This Court's "standing analysis is not an accounting exercise . . . ." *DAPA*, 809 F.3d at 156 (quoting *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)). Instead, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id.* at 155-56. The States have thus suffered classic pocketbook injuries.

### b. The States' injuries are fairly traceable to the DACA Rule.

The States' injury is fairly traceable to the DACA Rule because DACA provided lawful presence to almost a million aliens, *see* ROA.25188, over 100,000 of whom reside in Texas, ROA.25212. In *Department of Commerce*, the Supreme Court explained that traceability is present where "third parties will likely react in

predictable ways . . . even if they do so unlawfully." 139 S.Ct. at 2566. That is, it's entirely permissible to rest traceability "on the predictable effect of Government action on the decisions of third parties." *Id*. And it is not necessary for *all* "noncitizen[s]" to so act—rather, where the States "show[ed] that if noncitizen households are undercounted by as little as 2%," they "w[ould] lose out on federal funds distributed on the basis of state population," even that comparatively small amount sufficed. *Id*. at 2565. Here, traceability is both predictable within the meaning of *Department of Commerce* and demonstrable through facts on the ground in Texas.

That DACA will impose costs is predictable because DACA eliminates multiple mechanisms Congress created to deter unlawful presence and it encourages aliens illegally present to remain when they otherwise would not. On its own terms the DACA Rule "continues the longstanding practice of treating DACA recipients the same as other recipients of deferred action in that all such recipients are subject to forbearance from removal while they have deferred action, may obtain discretionary employment authorization based on economic need, may obtain advance parole to travel, continue to be deemed 'lawfully present' for purposes of receiving certain Social Security benefits . . . and do not accrue unlawful presence for purposes of [the] INA." ROA.25923. The causal link between furnishing lawful presence and allowing valuable benefits and work authorization and costs to the States is both predictable and demonstrable.

Indeed, it is all but unavoidable that the DACA Rule and accompanying benefits have caused some unlawfully present aliens to remain in the States. After all, *Department of Commerce* recognized that "Article III 'requires no more than *de facto*

causality.'" 139 S.Ct. at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)). DACA gives putative lawful presence to aliens who would not be entitled to it otherwise, which the district court found leads many DACA recipients to remain in the United States when they might otherwise return to their countries of origin. ROA.25215-16. This imposes costs in a more straightforward causal chain than that which the Supreme Court recognized in *Massachusetts*, 549 U.S. at 522-24.

Apart from the predictable result of the benefits provided DACA recipients, "the causal chain is especially direct," *DAPA*, 809 F.3d at 153, from facts on the ground. Indeed, Intervenor Appellants' own expert concluded that almost a quarter of surveyed DACA recipients are likely or very likely to leave the country should DACA end. ROA.25214-15 & n.26. The district court credited that report, explaining this would "equate to over 20,000 individuals in Texas alone." ROA.34109; *see also* ROA.34113 ("[I]t is reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S."). And, again, Appellants' own expert also concluded that "there would be some people in the DACA population who are likely to have some type of care that is reimbursed in some way by the state." ROA.25212.

The Private Intervenors object (at 35-36) that the district court relied upon this survey. But "it was the Defendant-Intervenors who decided to seek ... expert assistance and submitted his survey for consideration in this lawsuit." ROA.15426; *see also* ROA.822-26. That Appellants now have buyer's remorse is no grounds to find that the district court clearly erred by relying on the evidence. *See, e.g.*, *Chapman v. NASA*, 736 F.2d 238, 242 n.2 (5th Cir. 1984).

The federal government counters (at 22-24) that the States would have to pay for emergency medical care, social services, and education for DACA recipients irrespective of whether they receive DACA. But as the district court explained, at least some "DACA recipients have expressed the sentiment that the key factor in their ability to remain in the United States is DACA." ROA.25215. The district court further found that "Defendant-Intervenors have not argued, nor could they, that no DACA recipients would leave the United States should DACA be terminated." ROA.25216. Again, this is confirmed by Appellants' expert who reported that more than one in five DACA recipients would be likely or very likely to leave the country should DACA end. ROA.34109. That other DACA recipients may remain in the United States regardless of whether they are lawfully present does not change that Texas endures significant costs that would be alleviated when some DACA recipients depart. The district court thus correctly determined that the States' financial harms are traceable to the DACA program.

### c. The States' injuries are redressable by a favorable ruling.

**a.** The injuries imposed by the DACA Rule are redressable for many of the same reasons that they are traceable to the DACA program—namely, as the district court explained, at least some DACA recipients would leave the United States (and the Plaintiff States) if the program were terminated, thus reducing the States' expenses related to healthcare and education spending. ROA.25215-16. True, perhaps "some DACA recipients would remain in the United States if the DACA program were terminated," but the district court considered that evidence alongside substantial evidence that many would not. ROA.25214-15. "When 'establishing redressability,

[a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm.'" *Sanchez*, 761 F.3d at 506 (quoting *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012)). Partial redress is sufficient. *Id.*

Here, there was ample evidence that enough DACA recipients would depart should the program end to establish redressability. For example, the district court credited evidence from Texas's State Demographer that "it is reasonable to conclude that some DACA participants would return to their country of origin if they lose or are not given permission to work in the U.S." ROA.25214. This is enough. *See Texas II*, 50 F.4th at 519.

Nonetheless, the federal government maintains (at 23-24) that the States' injury is not redressable because DACA recipients are particularly unlikely to leave the United States. But the district courts factual findings are reviewed for clear error, which none of the Appellants have meaningfully argued the record overcomes. *See* Fed. Rule Civ. Proc. 52(a)(6) ("Findings of fact … must not be set aside unless clearly erroneous."). And though the district court found that "there is contrary evidence in the record that *some* DACA recipients would remain in the United States if the DACA program were terminated," ROA.25215 (emphasis added), that does not disturb the conclusion that *some* DACA recipients would leave. The States must "only show that a favorable ruling could potentially lessen [their] injury; [they] need not definitively demonstrate that a victory would completely remedy the harm." *Sanchez*, 761 F.3d at 506 (quoting *Antilles*, 670 F.3d at 318).

## 2. The States have shown standing by a violation of their quasi-sovereign interests in the well-being of their residents.

Apart from their pocketbook injury, the States properly established standing by showing a violation of their quasi-sovereign interests in the well-being of their residents for many of the same reasons this Court explained in *Texas II*. 50 F.4th at 514-15. States have quasi-sovereign interests "in the well-being of [their] populace," *Snapp*, 458 U.S. at 602, including particularly the "physical and economic" well-being of their lawful residents, *id.* at 607; *see also id.* at 609. Injury to those interests can establish standing just like any other injury. Indeed, the traceability and redressability analysis is often easier when a State establishes such injury because their unique role in the federal system entitles them to special solicitude.

**a.** The States have shown that DACA—whether under the DACA Memorandum or the DACA Rule—has injured their quasi-sovereign interests in a way that federal courts can and should redress. In *Massachusetts*, the Supreme Court explained "that there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' . . . and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. 520 n.17 (quoting *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447 (1945)). Just as there, the States "do[] not here dispute that the [INA] *applies* to [their] citizens; [they] rather seek[] to assert [their] rights under" the APA. *Id.* Put another way, "[t]he Plaintiff States are not seeking protection *from* the operation of federal law; they want the Executive Branch to enforce the law as Congress has written it." ROA.25208-09.

DACA causes injury to the States' "quasi-sovereign interest in the economic well-being of their legal residents." ROA.25209. This is because "it alone grants lawful presence and requires that USCIS accept applications from DACA recipients for work authorization, which enables recipients to compete with lawful workers for jobs." ROA.25209. Because the DACA Rule grants its recipients work authorization, it allows hundreds of thousands of additional workers to compete with the States' legal residents despite Congress's determination that these unauthorized workers may not do so. This necessarily increases competition and drives down wages for the States' lawful residents. ROA.25202-20. There is no dispute on this point—Appellants' own experts conceded as much. ROA.25202.

The Affordable Care Act makes this problem worse. Under the ACA businesses are not required to provide health insurance to DACA recipients as they must do for other employees. *See* 26 U.S.C. §4980H(b); 8 U.S.C. §1611(a). In turn, this makes DACA recipients less costly to employ, incentivizing employers to hire DACA recipients over similarly qualified lawful residents of the States, creating more competition for legal workers, and decreasing their wages. ROA.25202-03.

These harms are traceable to the DACA Rule and redressable by its vacatur. Absent DACA and attendant work authorization, DACA beneficiaries would have neither lawful presence nor work authorization. They would necessarily leave the labor market, at least in part, and their absence would abate these labor-market distortions, raising wages for workers in the States. In short, the States seek to enforce federal law "to assure [their] residents that they will have the full benefit of federal laws designed to address this problem." *Snapp*, 458 U.S. at 609-10.

That analysis is even clearer when considering the fact that the States are "entitled to special solicitude in the standing inquiry" for sovereign interests, which if nothing else, makes redressability easier to establish. *See Texas II*, 50 F.4th at 520; *see also Massachusetts*, 549 U.S. at 517-18 (A State "can assert [its] right[s] without meeting all the normal standards for redressability and immediacy."). "Special solicitude has two requirements: (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests." *Texas II*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151-52). Both elements are met here.

*First,* "[a]s in *DAPA*, Texas asserts a procedural right under the APA to challenge agency action." *Id.* (citing *DAPA*, 809 F.3d at 152). There, as here, "Texas ... challenges DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *DAPA*, 809 F.3d at 152. And the APA "authorizes challenges to 'final agency actions for which there is no other adequate remedy in a court.'" *Id.* (quoting 5 U.S.C. §704). This procedural right is sufficient, and simply parallels the challenge the States brought against DAPA.

*Second*, the States have a quasi-sovereign interest because this challenge involves the federal government's failure to protect specific formerly "sovereign prerogatives [that] are now lodged in the Federal Government." *Massachusetts*, 549 U.S. at 520. The States here, like Massachusetts, have "surrendere[d] certain sovereign prerogatives" and "cannot invade" or "negotiate [a] ... treaty" to address the problems created by the DACA Memorandum. *Massachusetts*, 549 U.S. at 519.

In arguing the contrary, the federal government cites (at 31-32) *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023), and *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), for the proposition that a State cannot establish standing to protect its citizens' well-being vis-à-vis the federal government. But the States do not seek to protect their citizens from the operation of federal law, but instead assert their "rights under federal law (which [they] ha[ve] standing to do)." *Massachusetts*, 549 U.S. 520 n.17. The Supreme Court explained this is "a critical difference," *id.*, which allows the States to sue here.

## B. The States are within the INA's zone of interests and therefore have a cause of action under the APA.

The States are also within the INA's zone of interests and therefore have a cause of action under 5 U.S.C. §704, *see Japan Whaling Ass'n*, 478 U.S. at 230 n.4, for the very reasons discussed in *Texas II*. "[I]n keeping with Congress's 'evident intent'" in "mak[ing] agency action presumptively reviewable," *Patchak*, 567 U.S. at 225, a plaintiff need only show that it is "arguably within the zone of interests to be protected or regulated by the statute" to access the federal courts, *id.* at 224. "The Supreme Court ha[s] always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," *DAPA*, 809 F.3d at 162; and though rooted in legislative intent, the States need not point to "any indication of congressional purpose to benefit" them, *Patchak*, 567 U.S. at 225. Thus, "the test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id*. As this Court

has repeatedly recognized, States fall within the zone of interests of the INA, because "'[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States,' which 'bear[] many of the consequences of unlawful immigration.'" *DAPA*, 809 F.3d at 163 (quoting *Arizona*, 567 U.S. at 397).

The federal government nevertheless contends (at 46) that this case is different because Texas relies on expenditures for public education and emergency medical services that are unconnected to any INA provision. But this ignores that such costs incurred in part as a result of the deferral plus benefits scheme are enough to establish standing. *See DAPA*, 809 F.3d at 163. Therefore, under precedent that was well established before *Texas II*, "[t]he States easily clear th[e] low bar" set by the zone-of-interests test. *Id.*

## C.  The DACA Rule is substantively unlawful.

Even apart from *Texas II*, abundant precedent demonstrates why the federal government cannot do what it has attempted in the DACA Rule. As this Court recognized regarding DAPA, *DAPA*, 809 F.3d at 149-150, three Supreme Court Justices explained regarding the DACA Memorandum, *Regents*, 140 S.Ct. at 1922 (Thomas, J., concurring in part and dissenting in part), and the district court said regarding the DACA Rule, ROA.25257-56, "Congress has not authorized DHS to reclassify an entire class of removable aliens as lawfully present or to categorically exempt aliens from statutory removal provisions," *Regents*, 140 S.Ct. at 1922 (Thomas, J., concurring in part and dissenting in part). Nor has Congress authorized the federal government to grant work authorization and attendant benefits to any group of aliens of the White House's choosing. *DAPA*, 809 F.3d at 180-82.

1. **Even if *Texas II* does not control, DACA contravenes the INA for the reasons described in *DAPA*.**

Apart from the effects of *Texas II*, *DAPA*, which held that DAPA and Expanded DACA were substantively unlawful, demonstrates why Texas is entitled to vacatur. *DAPA*, 809 F.3d at 178-86. Specifically, the Court held that "[t]hrough the INA's specific and intricate provisions, Congress has directly addressed the precise question at issue." *Id.* at 186 (cleaned up). Other than perhaps the size of the eligible populations, the program created by the DACA Rule is materially identical to the one created by the DAPA Memorandum (which created DAPA and Expanded DACA). Thus, like DAPA, DACA "is foreclosed by Congress's careful plan; the program is manifestly contrary to the statute and therefore was properly enjoined." *Id.* (cleaned up).

**a.** In *DAPA*, this Court described in detail how, "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present and confers eligibility for discretionary relief allowing aliens in deportation proceedings to remain in the country." *DAPA*, 809 F.3d at 179 (cleaned up). "Congress has also identified narrow classes of aliens eligible for deferred action, including certain petitioners for immigration status under the Violence Against Women Act of 1994, immediate family members of lawful permanent residents ('LPRs') killed by terrorism, and immediate family members of LPRs killed in combat and granted posthumous citizenship." *Id.* (footnotes omitted). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA were it not enjoined." *Id.* This Court

further explained it "'must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a decision of such economic and political magnitude to an administrative agency.'" *Id.* at 181 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

This Court held, even assuming "Congress had not directly addressed the precise question at hand, we would still strike down DAPA as an unreasonable interpretation that is manifestly contrary to the INA." *DAPA*, 809 F.3d at 182 (internal quotation marks omitted); *Texas II*, 50 F.4th at 526-27 (explaining the DACA Memorandum, which Appellants admit is identical to the DACA Rule, fails *Chevron* step two).

Everything that was true about the 4.3 million aliens provided benefits under DAPA can be said of the 1.5 million aliens eligible for lawful presence were DACA not enjoined, approximately 825,000 of which having already "received deferred action under the DACA policy." ROA.25786. Like DAPA, DACA makes provisions related to cancellation of removal and work authorization that have not been authorized by Congress. *DAPA*, 809 F.3d at 180-81. And, like DAPA and Expanded DACA, DACA "undoubtedly implicates 'question[s] of deep "economic and political significance" that [are] central to this statutory scheme; had Congress wished to assign that decision to an agency, it surely would have done so expressly.'" *Id.* at 181 (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). "Even if the text were ambiguous, the sheer scope of [DHS's] claimed authority . . . would counsel against the Government's interpretation." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021); *see also W. Virginia*, 597 U.S. at 724-32.

As to *Chevron* (assuming it even applies), the DACA Rule is, if anything, worse than DAPA because it ignores the requirements for cancellation of removal that this Court previously found relevant. *DAPA*, 809 F.3d at 181. Notwithstanding that this Court highlighted that "Congress forcefully made combating the employment of illegal aliens central to the policy of immigration law," *id.* at 181 (cleaned up), the DACA Rule nonetheless grants work authorization to 825,000 aliens, *see* ROA.25786, allowing them to work in the United States. ROA.25923. It thereby is an unreasonable interpretation of the INA because it undermines Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully present in the country.

**b.** Apart from its reliance on the law-of-the-case doctrine and *Texas II*, the district court properly applied the same analytical framework that this Court applied in the DAPA case and correctly determined that the DACA Memorandum and DACA Rule substantively violate the APA. Like this Court, the district court "assumed without deciding that the *Chevron* deference rules appl[y]" to the DACA Memorandum. ROA.25228. Under that framework, "applying the ordinary tools of statutory construction, the court must determine 'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter.'" *City of Arlington v. F.C.C.*, 569 U.S. 290, 296 (2013) (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 842 (1984)). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (internal quotation marks omitted). The district court determined that

Congress has spoken to the precise question at issue, and that the DACA Rule either contradicted or is an unreasonable construction of the INA for at least four separate reasons. ROA.25227-56.

*First*, it explained that "Congress has already determined that the DACA-eligible population is removable through a variety of provisions of the INA." ROA.25234. As described above, because Congress declined to make special provision for these populations, the entire DACA-eligible population is removable under portions of the INA—including 8 U.S.C. §1225, §1227(a)(1)(C)(i), §1229a(e)(2). DHS cannot simply choose to ignore this congressional scheme. *Cent. United Life Ins. Co. v. Burwell*, 827 F.3d 70, 73 (D.C. Cir. 2016); *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 507 (D.C. Cir. 2013). Yet DHS admits that is what the DACA Rule does: It continues

> the longstanding practice of treating DACA recipients the same as other recipients of deferred action in that all such recipients are subject to forbearance from removal while they have deferred action, may obtain discretionary employment authorization based on economic need, may obtain advance parole to travel, continue to be deemed lawfully present for purposes of receiving certain Social Security benefits . . . and do not accrue unlawful presence for purposes of [the] INA.

ROA.25923 (quotation marks omitted).

*Second*, the district court concluded that the DACA Rule contradicts INA's comprehensive scheme for allocating work authorization. ROA.25237-40; *see, e.g.*, ROA.25789. Like this Court did in *DAPA*, the district court explained that "[w]here Congress has expressed its intent to provide certain groups of aliens with work

authorization, it has promulgated specific laws requiring DHS to do so." ROA.25237 & n.48 (collecting examples). If DHS may simply extend work authorization to whomever it pleases, these laws are surplusage; this interpretation should be rejected. *City of Chicago v. Fulton*, 592 U.S. 154, 159-60 (2021); *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011).

*Third*, the district court concluded that the DACA Rule undermines IRCA, ROA.25238, which "prohibit[s] the employment of aliens who are unauthorized to work in the United States because they either entered the country illegally, or are in an immigration status which does not permit employment," H.R. Rep. No. 99-682(I), at 46, 51-52 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5650, 5655-56. IRCA supplements removal as an immigration-enforcement tool, by powerfully reducing the economic incentive for unlawful presence. *See id.* at 51-56, 1986 U.S.C.C.A.N. at 5655-60.

*Fourth*, the district court concluded that the DACA Rule contradicts the INA by allowing recipients to access advance parole. ROA.25241-42. As the district court explained, aliens who entered the United States illegally or remained in the United States longer than allowed are, by statute, prohibited from re-entering the country. ROA.25243; *see* 8 U.S.C. §1182(a)(9)(B)(i). Even though DACA recipients necessarily fall into this category, DACA's grant of advance-parole eligibility has allowed at least 20,000 aliens to leave and reenter through a lawful point of entry. ROA.25243. As the federal government concedes (at 37-38), this allows some aliens who entered the country illegally or overstayed their visas to obtain an adjustment of status (that is, receive a "green card"). The district court concluded that this had

occurred in at least 3,000 cases. ROA.25243. The States submitted evidence that this is a gross underestimate and that "[a]s of August 21, 2017, 45,447 DACA recipients have been approved for advance parole," "39,514 have been approved" for a green card," and "1,056 have become U.S. Citizens." ROA.381. And, even according to Appellants, DACA has enabled approximately 14,000 recipients who otherwise would be ineligible to adjust their status. ROA.33487. Thus, on the federal government's telling, a program that creates no rights or obligations allows aliens who entered the United States illegally to ultimately obtain an adjustment of status.

Such a grant of class-wide parole cannot be justified by 8 U.S.C. §1182(d)(5)(A). That statute allows parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" for an alien "applying for admission to the United States." 8 U.S.C. §1182(d)(5)(A); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011) (explaining that Congress "specifically narrowed the executive's discretion" to grant parole due to "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy.").

**c.** The federal government and none of the Intervenors provide any meaningful distinction between the DACA Rule and other programs that this Court has found unlawful under the INA. For example, the Private Intervenors are wrong (at 17) that *DAPA* and this case are distinguishable because enjoining DACA is on a smaller scale than DAPA. DACA may be a smaller program, but it is still a deferred-action program conferring significant immigration benefits on potentially millions of people. *Regents* 140 S.Ct. at 1902. Because "[d]eferred action . . . [is] much more

than nonenforcement," *id.*, a bright line separates the legality of the DACA Rule from any individual enforcement decision DHS may decide to undertake.

Nor does the Supreme Court's decision in *Regents* alter this analysis. *Contra* U.S. Br. 44-45; 48-49; Private Intervenors Br. 55-56. To the contrary, the Supreme Court affirmed this Court's decision in *DAPA*. *United States v. Texas*, 579 U.S. 547, 548 (2016) (per curiam). And though that decision was itself nonprecedential, *Regents* repeatedly relied on this Court's analysis when deciding, among other things, that "the states do not challenge the Secretary's decision to 'decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation.'" *Regents*, 140 S.Ct. at 1911 (quoting *DAPA*, 809 F.3d at 168).

### 2. Appellants' counterarguments are not to the contrary.

Taken together, Appellants make five arguments why this Court should depart from *DAPA* to uphold the very program on which DAPA was patterned. Not one is persuasive.

*First*, the federal government contends (at 35) that 8 U.S.C. §1324a(h)(3) grants DHS authority to provide work authorization. But it is "a provision that does not mention lawful presence or deferred action, and that is listed as a '[m]iscellaneous' definitional provision expressly limited to §1324a, a section concerning the 'Unlawful employment of aliens'—an exceedingly unlikely place to find authorization for" DACA. *DAPA*, 809 F.3d at 183.

*Second*, the federal government asserts (at 29-30) that historical practice confirms it can grant work authorization. Leaving aside that history hasn't changed since the Court examined a similar argument in 2015, "historical practice . . . 'does

not, by itself, create power.'" *Id.* at 184 (quoting *Medellin v. Texas*, 552 U.S. 491, 532 (2008)). In any event, historical practice before IRCA cannot support DACA's grant of work authorization because before IRCA there was no general federal ban on hiring unauthorized aliens. Post-1986 historical practice is equally unhelpful to the legislative-acquiescence theory because after IRCA defined "unauthorized alien" in 8 U.S.C. §1324a(h)(3), Congress never amended that provision. Congress has thus consistently maintained its intent to generally "prohibit the employment of aliens" who "entered the country illegally." H.R. Rep. No. 99-682(I), at 46, 1986 U.S.C.C.A.N. at 5650.

*Third*, the federal government contends (at 35, 37-38) that DHS may grant DACA recipients benefits like work authorization and advance parole merely by operation of law. Congress said otherwise. For example, Congress has authorized employment for only about twenty nonimmigrant visa categories. *E.g.*, 8 U.S.C. §1101(a)(15)(H) (defined specialty occupations), (P) (entertainment work). Congress has required the Executive to authorize employment of other categories of aliens. *E.g.*, *id.* §1158(c)(1)(B) (asylum seekers), *id.* §1254a(a)(1)(B) (aliens granted temporary protected status). And Congress has provided that aliens in certain categories are "eligible" for or "may" receive work authorization from the Executive. *E.g.*, *id.* §1158(d)(2) (asylum applicants); *id.* §1105a(a) (certain battered spouses of nonimmigrants); *id.* §1160(d)(3)(A) (certain agricultural worker preliminary applicants). Congress has likewise determined that advance parole is available "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" for an alien "applying for admission to the United States." *Id.*

§1182(d)(5)(A). Again, DACA departs from this "careful plan," *DAPA*, 809 F.3d at 186, rendering it largely superfluous, by allowing work authorization and advanced parole based on the Executive's policy preferences notwithstanding Congress's direct instructions.

*Fourth*, at various points, the federal government points (*e.g.*, at 34-35) to various grants of statutory authority to justify the DACA Rule. For example, it cites (at 34-35) 6 U.S.C. §202(5) for the proposition that the Secretary may "[e]stablish[] national immigration enforcement policies and priorities," and (at 35) 8 U.S.C. §1103(a)(1) for the power to carry out the "administration and enforcement of . . . other laws relating to the immigration and naturalization of aliens," including authority to establish regulations, issue instructions, and perform other acts. But the federal government made the same arguments in the DAPA case *and lost*. Evaluating those statutes, this Court explained "the broad grants of authority" in them "cannot reasonably be construed as assigning decisions of vast economic and political significance, such as DAPA, to an agency." *DAPA*, 809 F.3d at 183 (internal quotation marks and footnotes omitted); *see also Ala. Ass'n of Realtors*, 594 U.S. at 764.[2] The same is true for DACA, which removes eligibility bars for numerous significant benefits—including Medicare and Social Security benefits—just like DAPA and expanded DACA did. By any measure, DACA is a major question (in fact, one of the most major questions of our time), and by no measure has Congress authorized it—let alone "clearly." *Id.; cf. Saturday Night Live: How a Bill Does Not*

_____

[2] To the extent Appellants rely (at 35) on 8 U.S.C. §1324a(h)(3) on this point, this Court rejected this argument in the same paragraph. *DAPA*, 809 F.3d at 183.

*Become a Law* (NBC broadcast Nov. 22, 2014), www.nbc.com/saturday-night-live/video/how-a-bill-does-not-become-a-law/2830152.

*Fifth*, the Private Intervenors heavily rely in their brief on *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) to argue the district court could not enjoin the DACA Rule under 8 U.S.C. §1252(f)(1), and the federal government argues (at 29) that §1252(f)(1) deprives the district court of jurisdiction. But *Aleman Gonzalez* is inapposite as it did not involve a challenge to a regulation, but instead involved a class-action challenge to the actual enforcement of immigration laws against particular individuals. *Aleman Gonzalez*, 596 U.S. at 546-549. The plaintiffs in *Aleman Gonzalez* sought to enjoin the enforcement of a statute, *id.*, not to vacate a regulation Congress never authorized federal regulators to impose. Further, the district court had jurisdiction to vacate and enjoin the DACA Rule as §1252(f)(1) does not prevent the injunction of programs like DACA which involve not only deferral but also the conferring of benefits outside the scope of §§1221-1232. Appellants' argument regarding §1252(f)(1) also fails for the reasons given in *Texas II*. *See* 50 F.4th at 528-529.

### 3. The DACA Rule suffers two additional problems.

In addition to the reasons discussed in *DAPA*, the DACA Rule is substantively unlawful because it (a) is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. §706(2)(A), and (b) contravenes the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, §3. The district court's (entirely correct) conclusion that this case is resolved by *Texas II* obviated any need to address these questions. But they were raised below,

ROA.33447-48; ROA.36376, and this Court can affirm the judgment of the district court "on any grounds supported by the record," *DAPA*, 809 F.3d at 178.

### a. The DACA Rule is arbitrary and capricious.

Because the DACA Rule is a new agency action, this Court's prior rulings do not resolve whether it remains arbitrary and capricious. *Texas II*, 50 F.4th at 512. Because the Rule is not remotely authorized by statute, extra reasons why it is unlawful are irrelevant. But it plainly is arbitrary and capricious. While a court must not "substitute" its "own policy judgment for that of the agency" and must apply this standard deferentially, agency action must still "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021). Courts "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation marks omitted). The DACA Rule fails reasoned decisionmaking for at least two reasons.

*First*, the DACA Rule flips Congress's priorities, which have "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *DAPA,* 809 F.3d at 181 (cleaned up). And "as Congress [has] explained, '[a]liens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others.'" *Demore v. Kim*, 538 U.S. 510, 518 (2003) (quoting S. Rep. No. 104–249, p. 7 (1996)). DACA, by contrast, prioritizes the interests of unlawfully present alien labor and the businesses that employ them, ROA.25808, repeatedly treating unlawfully present aliens being participants in the U.S. workforce as a positive, *e.g.*, ROA.25797;

ROA.25800; ROA.25803. In doing so, the DACA Rule never addresses the existence of specific, congressionally delineated categories, much less how DACA's employment authorization can be squared with them—even though the district court twice raised concerns about the issue. ROA.15445-49; ROA.25237-41. The Rule also improperly "relied on factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., Co.*, 463 U.S. 29, 43 (1983), such as how to evade Congress's eligibility requirements.

*Second*, the DACA Rule creates disincentives to hire American workers, even though "a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Natl. Ctr. for Immigrants' Rights Inc.*, 502 U.S. 183, 194 (1991). As the district court has observed, employers "may offer to DACA-recipient employees coverage that does not provide minimum essential coverage [under the Affordable Care Act] without risking a penalty," thereby "mak[ing] DACA recipients less costly to employ for some employers, [and] incentivizing employers to hire DACA recipients over similarly qualified legal Texas residents." ROA.25202. Notably, the DACA Rule adopts a cost-benefit analysis that relies on potential downstream effects that could help some American workers without once addressing harms to those directly competing with DACA recipients. *See* ROA.25800. This "dismissive analysis, ... dots 'i's' and crosses 't's' without actually saying anything," and "is no[] ... substitute for considering" the district court's concerns. *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam).

Although the Court need never reach the issue due to the numerous other flaws in the DACA Rule, the failure by DHS to engage in "reasoned decisionmaking" provides further basis to set aside the rule. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (quotation marks omitted).

### b. DACA Violates the Constitution's Take Care Clause.

The district court declined to rule on the fully briefed claim that the DACA Memorandum and the DACA Rule violate the Take Care Clause. ROA.25256-57, 36373-76. Presidents cannot exercise legislative power—and they cannot dispense with statutes addressing unlawful presence. U.S. Const. art. II, §3. "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838). Any other conclusion would "vest[] in the President a dispensing power." *Id.* at 525.

In DACA, the President has dispensed with Congress's carefully delineated immigration policies in favor of its own preferred legal regime. *See DAPA*, 809 F.3d at 166. The President then used this putative dispensation to grant a pathway to citizenship. ROA.25243. The President did this by treating DACA recipients as eligible for advance parole, which allowed the program to function as a pathway to permanent legal residence and citizenship. Because DACA dispenses with the law in violation of the Take Care Clause, it is unconstitutional and "shall" be "h[e]ld unlawful and set aside." 5 U.S.C. §706(2)(B).

### D. The district court properly vacated the DACA Rule and entered a nationwide injunction.

Finally, because the district court concluded that "DHS violated the APA with the creation of DACA and its continued operation," it properly granted the States' motion for summary judgment, and "vacated and remanded to DHS for further consideration." ROA.25259. On the limited remand to consider the DACA Rule, the district court supplemented "[t]he existing injunction and vacatur order . . . to include the [DACA] Rule." ROA.36399. But the "order of immediate vacatur as it applies to current DACA recipients" was "temporarily stayed until a further order," ROA.25260, and remains stayed for now, ROA.36399.

#### 1. Vacatur is the appropriate remedy.

The federal government (41-43) and Private Intervenors (at 48-50) contend that vacatur was not the appropriate remedy under the APA. It was, for the reasons given in *Texas II*, 50 F.4th at 529-531, and below, among other reasons. This Court's test for vacatur focuses on "'(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur.'" *Id.* (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)).

The history of this litigation, however, belies any notion that the federal government *would* cure any deficiencies even if it *could*. As detailed above, the legality of DACA in its various offshoots and in its various forms has been subject to litigation for over a decade. DHS effectively got remand without vacatur last time because the district court stayed its judgment of vacatur as to everyone who received DACA

relief prior to July 2021 to prevent any disruptive consequences. ROA.25264-65. Yet rather than address "DACA's critical substantive failings" that led the Court to conclude eighteen months ago that "the district court was well within its discretion to order vacatur," *Texas II*, 50 F.4th at 530, DHS merely "formalized the 2012 DACA Memorandum, a program [this Court had] already found to be wanting," ROA.36398. This may have cured the lack of notice-and-comment rulemaking, but it did "nothing to change or resolve the substantive problems found" with the DACA Memorandum that were replicated in gross in the DACA Rule. ROA.36379. There is no suggestion that yet another remand will change that outcome, and the relief is certainly not overbroad nor, given how each part of DACA hangs together, could it be more narrowly tailored by severing any part of DACA from the rest.

Moreover, any future disruption is necessarily hypothetical at this juncture, contrary to New Jersey's concern (at 22-23), as vacatur is still stayed as to any DACA recipients who received their DACA status prior to July 16, 2021. ROA.36400-01. The district court—the appropriate venue at this juncture for deciding how to "wind down" DACA, contrary to the federal government (at 51)—appropriately vacated the DACA Memorandum and DACA Rule and considered reliance interests when it maintained its stay as to aliens who received DACA relief prior to July 2021.

### 2. The district court appropriately granted nationwide relief.

The district court also properly applied the four-factor test set out in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006), to permanently enjoin implementation of DACA whether under the DACA Memorandum or the DACA Rule, and this relief was not overbroad. ROA.25261-65. This Court reviews the entry

of a permanent injunction for abuse of discretion. *Texas II*, 50 F.4th at 530. And it has already explained why nationwide relief regarding DAPA was appropriate: "[T]he Constitution requires an uniform Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and uniformly; and the Supreme Court has described immigration policy as a comprehensive and unified system." *DAPA*, 809 F.3d at 187-88 (cleaned up).

The same factors are present here. "Partial implementation" of DACA "would detract from the integrated scheme of regulation created by Congress, and there is a substantial likelihood that a geographically limited injunction would be ineffective because DAPA beneficiaries would be free to move among states." *Id.* at 188 (cleaned up). After all, since DACA recipients can move freely within the United States no less than DAPA recipients, absent nationwide relief, nothing prevents them from moving to the Plaintiff States and creating the same harms the district court crafted the injunction to mitigate. Moreover, the Supreme Court has made clear that "[t]here is always a public interest in prompt" enforcement of the immigration laws. *Nken v. Holder*, 556 U.S. 418, 436 (2009). Because DACA is both procedurally and substantively unlawful, it frustrates that interest.

## Conclusion

The Court should affirm the district court's judgment.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

AARON L. NIELSON
Solicitor General

LANORA C. PETTIT
Principal Deputy Solicitor General

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA
Assistant Solicitor General
Joe.Mazzara@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Plaintiffs-Appellees

## Certificate of Service

On April 9, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,555 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Joseph N. Mazzara
JOSEPH N. MAZZARA