No. 23-40653

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE OF LOUISIANA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA; STATE OF WEST VIRGINIA; STATE OF KANSAS; STATE OF MISSISSIPPI,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary, U.S. Department of Homeland Security; TROY MILLER, Senior Official Performing the Duties of the Commissioner, U.S. Customs and Border Protection; PATRICK J. LECHLEITNER, Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement; UR M. JADDOU, Director of U.S. Citizenship and Immigration Services; JASON D. OWENS, Chief of the U.S. Border Patrol,

Defendants-Appellants,

MARIA ROCHA; JOSE MAGANA-SALGADO; NANCI J. PALACIOS GODINEZ; ELLY MARISOL ESTRADA; KARINA RUIZ DE DIAZ; CARLOS AGUILAR GONZALEZ; LUIS A. RAFAEL; DARWIN VELASQUEZ; JIN PARK; OSCAR ALVAREZ; DENISE ROMERO; JUNG WOO KIM; ANGEL SILVA; HYO-WON JEON; ELIZABETH DIAZ; BLANCA GONZALEZ; MOSES KAMAU CHEGE; MARIA DIAZ,

Intervenor Defendants-Appellants,

STATE OF NEW JERSEY,

Intervenor-Appellant.

On Appeal from the United States District Court for the Southern District of Texas

## REPLY BRIEF FOR FEDERAL GOVERNMENT APPELLANTS

*Of Counsel:*

JONATHAN E. MEYER
*General Counsel*

*U.S. Department of Homeland Security*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

ALAMDAR HAMDANI
*United States Attorney*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
NICHOLAS S. CROWN
*Attorneys, Appellate Staff*
*Civil Division, Room 7259*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1201*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................iii

SUMMARY OF ARGUMENT ...............................................................................1

ARGUMENT ...........................................................................................................3

I.    PLAINTIFFS LACK STANDING ...........................................................................3

      A.    Plaintiffs Cannot Challenge DACA Based On Incidental Effects On State Spending ...........................................................................3

            1.    *Immigration Priorities* abrogates the Court's prior decision in this case ..................................................................3

            2.    Plaintiffs did not meet their burden at summary judgment to establish standing ....................................................9

      B.    Plaintiff-States Cannot Assert *Parens Patriae* Standing Against The Federal Government ...........................................................13

II.    PLAINTIFFS LACK A CAUSE OF ACTION UNDER THE APA ................................ 13

III.    THE DACA RULE IS LAWFUL ...................................................................... 14

      A.    The DACA Rule Is Fully Consistent With The INA ................................14

      B.    The DACA Rule Is Consistent With The Take Care Clause And The APA's Procedural Requirements ...........................................17

IV.    THE DISTRICT COURT'S REMEDIAL ORDER IS UNLAWFUL ................................ 19

      A.    The District Court Lacked Authority To Enjoin Or Vacate The Rule ...................................................................................20

      B.    Plaintiffs Disregard The DACA Rule's Express Severability Provision ...............................................................................22

      C.    The District Court Erred By Issuing Nationwide Relief ...........................23

      D.     DHS Should Be Charged With Making Policy Judgments
            Regarding Any Wind-Down..........................................................................25

V.     At A Minimum, This Court Should Maintain The Stay Pending
     Further Review ...................................................................................................... 27

CONCLUSION ................................................................................................................ 28

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*BCCA Appeal Grp. v. U.S. E.P.A.*,
  355 F.3d 817 (5th Cir. 2003), *as amended*, (Jan. 8, 2004) ............................................. 19

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ................................................................................................ 16

*Bonvillian Marine Serv., Inc., In re*,
  19 F.4th 787 (5th Cir. 2021) ........................................................................................ 3, 4

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..................................................................................................... 17

*Department of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ................................................................................................ 11

*Department of Educ. v. Brown*,
  600 U.S. 551 (2023) ....................................................................................................... 8

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ..................................................................... 22, 23, 25, 26, 27

*Dibidale of La., Inc. v. American Bank & Tr. Co., New Orleans*,
  916 F.2d 300 (5th Cir. 1990) ...................................................................................... 10

*Florida v. Mellon*,
  273 U.S. 12 (1927) ......................................................................................................... 8

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ..................................................................................................... 17

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ............................................................................................... 20, 21

*Gill v. Whitford*,
  585 U.S. 48 (2018) ....................................................................................................... 24

*Guzman v. Allstate Assurance Co.*,
  18 F.4th 157 (5th Cir. 2021) ....................................................................................... 12

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ..................................................................................................... 13

*Hernandez v. Reno,*
    91 F.3d 776 (5th Cir. 1996) ........................................................................ 24

*Lewis v. Casey,*
    518 U.S. 343 (1996) ................................................................................... 24

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ................................................................................... 12

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ..................................................................................... 4

*Massachusetts v. Laird,*
    400 U.S. 886 (1970) ..................................................................................... 8

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ..................................................................................... 17

*Reno v. American-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ................................................................................... 21

*Southwest Elec. Power Co. v. U.S. EPA,*
    920 F.3d 999 (5th Cir. 2019) ...................................................................... 23

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
    576 U.S. 519 (2015) ................................................................................... 16

*Texas v. EEOC*
    933 F.3d 433 (5th Cir. 2019) ...................................................................... 20

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ........................................................................ 4

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ............................................................... 3, 4, 20

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ..................................................................................... 9

*United States v. Texas,*
    599 U.S. 670 (2023) ........................................................ 3, 4, 5, 6, 7, 14, 24

*United States v. Williams,*
    517 F.3d 801 (5th Cir. 2008) ........................................................................ 3

iv

**Statutes:**

Administrative Procedure Act (APA),
   5 U.S.C. § 701(a)(1) ............................................................... 14

Immigration Reform and Control Act of 1986 (IRCA):
   8 U.S.C. § 1324a(a) ................................................................ 15
   8 U.S.C. § 1324a(b)(2) ........................................................... 15
   8 U.S.C. § 1324a(h)(3) ........................................................... 15

6 U.S.C. § 202(5) ................................................................. 15, 17

8 U.S.C. § 1101(a)(13)(B) ......................................................... 16

8 U.S.C. § 1103(a) ................................................................... 17

8 U.S.C. § 1182(d)(5) ............................................................... 16

8 U.S.C. § 1182(d)(5)(A) .......................................................... 16

8 U.S.C. §§ 1221-1232 ............................................................. 20

8 U.S.C. § 1225 ...................................................................... 21

8 U.S.C. § 1226 ...................................................................... 21

8 U.S.C. § 1226a .................................................................... 21

8 U.S.C. § 1229a .................................................................... 21

8 U.S.C. § 1252(b)(9) .............................................................. 14

8 U.S.C. § 1252(f)(1) ............................................................. 2, 20

8 U.S.C. § 1252(g) ................................................................... 14

**Regulations:**

8 C.F.R. § 212.5(f) .................................................................. 16

8 C.F.R. § 236.21(c)(1) ............................................................ 14

8 C.F.R. § 236.24 ................................................................ 22, 23

8 C.F.R. § 274a.12(c)(14) ........................................................................... 14

**Rules:**

Fed. R. Civ. P. 52(a)(1) .............................................................................. 12

Fed. R. Civ. P. 52(a)(6) .............................................................................. 12

**Other Authorities:**

52 Fed. Reg. 46,092 (Dec. 4, 1987) .......................................................... 15

87 Fed. Reg. 53,152 (Aug. 30, 2022) ................................ 6, 8, 11, 18, 19, 21, 22, 23, 27

89 Fed. Reg. 39,392 (May 8, 2024) ........................................................... 19

U.S. Citizenship & Immigration Servs., USCIS-2021-0006-15366,
  *Comment Submitted by Texas Office of the Attorney General* (Dec. 2, 2021),
  https://www.regulations.gov/comment/USCIS-2021-0006-15366 ......................... 19

## SUMMARY OF ARGUMENT

For over a decade, the enforcement discretion embodied in Deferred Action for Childhood Arrivals (DACA) has enabled the Department of Homeland Security (DHS) to focus its limited resources on noncitizens who threaten national security and public safety—individuals who are much higher priorities for removal from the United States than the DACA population of students, veterans, medical professionals, and others who contribute to their communities and have known only this country as home. The federal government has previously explained, and now preserves for further review, its position that DACA is entirely lawful, finding ample support in the Immigration and Nationality Act (INA) and historical practice approved by Congress and the Supreme Court.

Plaintiffs argue that the Court's prior decision in this litigation resolves this challenge to the 2022 DACA final rule in their favor. The federal government recognizes that some aspects of that decision currently bind this Court, but this Court's previous merits analysis does not dictate the outcome here. This Court can and should reexamine its earlier rulings given intervening Supreme Court precedent confirming that plaintiffs lack standing to challenge the DACA rule. This Court's prior decision concluding that Texas established injury traceable to DACA relied on theories—such as "special solicitude" for States' interests in immigration enforcement and indirect effects on state spending—that the Supreme Court has recently rejected.

Similarly, this Court's conclusion that plaintiffs fall within the INA's zone of interests has been undermined by intervening Supreme Court precedent.

Nor does this Court's prior decision control any remedy here. This Court has not yet addressed the DACA rule's express severability determination, which makes clear that DHS considers a forbearance-only policy a workable alternative if other aspects of DACA are invalidated. The district court wrongly disregarded the regulation embodying that determination, which plaintiffs fail to even cite. Apart from severability issues, this Court previously upheld the prior injunction only in light of a stay covering the hundreds of thousands of current DACA recipients. While the government disagrees that the stay cured the injunction's impropriety under 8 U.S.C. § 1252(f)(1), the key point in this posture is that this Court's prior ruling did not address the lawfulness of an *unstayed* injunction. In addressing the vacatur of the DACA rule and the new nationwide injunction now on appeal, this Court should revisit the prohibition on injunctive relief under § 1252(f)(1), tailor any relief ordered to any injuries the Court concludes Texas established, and heed the Supreme Court's admonition that any DACA wind-down involves policy choices reserved for DHS. And—importantly—there is no dispute that this Court should maintain the stay of any remedial order as to current DACA recipients, whose weighty reliance interests are shared by their families, their local communities, and the States that do not share plaintiffs' disagreement with the enforcement choices DACA encompasses.

## ARGUMENT

I. **PLAINTIFFS LACK STANDING**

    A. **Plaintiffs Cannot Challenge DACA Based On Incidental Effects On State Spending**

        1. *Immigration Priorities* **abrogates the Court's prior decision in this case**

Plaintiffs contend (Br. 13-17) that the Court's prior decision, *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022), establishes their standing and is binding as precedent and law of the case. Plaintiffs concede (Br. 14), however, that a panel may depart from an earlier panel's decision after an "intervening change in the law" by "the Supreme Court." *In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) (quotation marks omitted). Likewise, the law-of-the-case doctrine does not apply where "controlling authority has since made a contrary decision of the law applicable to such issues." *United States v. Williams*, 517 F.3d 801, 806-807 (5th Cir. 2008) (quotation marks omitted).

As explained (U.S. Br. 16-22, 27-30), the Supreme Court's intervening decision in *United States v. Texas* (*Immigration Priorities*), 599 U.S. 670 (2023), makes clear that plaintiffs here are not entitled to special solicitude, cannot establish standing based on DACA's alleged indirect effects on States' independent spending obligations, and lack standing to seek an order requiring increased immigration enforcement. Plaintiffs argue (Br. 16) that *Immigration Priorities* is not controlling because it did not "resolve the Article III consequences" of "an Executive Branch policy that involves both the

3

Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status," *Immigration Priorities*, 599 U.S. at 683. But this Court may conclude that its prior ruling no longer binds it even when an intervening Supreme Court decision did not "explicitly overrule" circuit precedent "or specifically address the precise question of law at issue." *Bonvillian Marine Serv.*, 19 F.4th at 792. A later panel need "simply determine that a former panel's decision has fallen unequivocally out of step with some intervening change in the law," such as where "a subsequent Supreme Court opinion establishes a rule of law inconsistent with" this Court's precedent or "fundamentally changes the focus of the relevant analysis." *Id.* (alteration and quotation marks omitted). That standard is satisfied here.

a. In previously concluding that plaintiffs have standing, the Court relied on the "special solicitude" afforded the States in *Massachusetts v. EPA*, 549 U.S. 497 (2007), stating that plaintiffs have a "procedural right under the [Administrative Procedure Act (APA)] to challenge agency action" and that DACA affects plaintiffs' "quasi-sovereign interest in classifying aliens." *Texas*, 50 F.4th at 514-515; *see id.* at 514-517, 520. In *Immigration Priorities*, however, Texas and Louisiana asserted that they were entitled to special solicitude for the same reasons—a procedural "right under the APA" and a quasi-sovereign interest in "[c]ontrol over immigration." Brief for Respondents at 16-17, *Immigration Priorities*, 599 U.S. 670 (No. 22-58); *see Texas v. United States*, 40 F.4th 205, 216-217, 216 n.4 (5th Cir. 2022) (per curiam) (adopting that

reasoning). Although this Court had accepted such reasoning, the Supreme Court rejected it, explaining that *Massachusetts* "d[id] not control" because that case "involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion," and thus declined to give the plaintiff-States any special solicitude. *Immigration Priorities*, 599 U.S. at 685 n.6; *see id.* at 688-689 (Gorsuch, J., concurring in the judgment) (explaining that special solicitude has not "played a meaningful role in this Court's decisions" since *Massachusetts* and that "it's hard not to think[] … that lower courts should just leave that idea on the shelf"). The Supreme Court thus took a different approach than this Court in evaluating States' immigration-related interests.

That the DACA rule pairs deferred action with eligibility for certain benefits (such as employment authorization) does not distinguish this case from *Immigration Priorities* with respect to plaintiffs' request for special solicitude. Those benefits do not support plaintiffs' asserted procedural rights under the APA, nor are they relevant to plaintiffs' asserted (Br. 27) quasi-sovereign interest due to their "unique role in the federal system." Insofar as DACA implicates any such interest, it is because DHS has decided to forbear from removing certain low-priority individuals from the United States—the same type of enforcement-discretion decision at issue in *Immigration Priorities* and that the Supreme Court confirmed is unreviewable. Special solicitude— which featured prominently in this Court's earlier decision—is accordingly unavailable to plaintiffs, and this Court should reexamine its standing analysis.

b. *Immigration Priorities* also abrogated this Court's prior conclusion that plaintiffs could establish standing based on alleged incidental social-services expenditures. The plaintiffs in *Immigration Priorities* made the same arguments—that the challenged policy increases the number of unlawful immigrants in the United States and thus increases a plaintiff-State's education and healthcare costs. *See* Brief for Respondents at 13, *Immigration Priorities*, 599 U.S. 670 (No. 22-58). The Supreme Court rejected that argument, holding that it failed to "overcome[] the fundamental Article III problem" with the lawsuit. *Immigration Priorities*, 599 U.S. at 680 n.3.

This case is materially indistinguishable. Through DACA, the Executive Branch has identified circumstances where it "elects *not* to arrest or prosecute," thereby setting enforcement priorities just as it had done in the policy at issue in *Immigration Priorities*. 599 U.S. at 678. Plaintiffs' claims here, as in *Immigration Priorities*, thus implicate Article II's assignment to the Executive, not the Judiciary, of the "authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Id.* And DACA, like the policy at issue in *Immigration Priorities*, rests on the reality that the Executive "invariably lacks the resources to arrest and prosecute every violator of every law," and of the immigration laws in particular. *Id.* at 680; *see* 87 Fed. Reg. 53,152, 53,155 (Aug. 30, 2022). Although the Supreme Court declined to "resolve the Article III consequences of" an enforcement policy involving "legal benefits" in *Immigration Priorities*, 599 U.S. at 683, the fundamental reasoning—that plaintiffs generally lack standing to seek an order

requiring the Executive Branch to increase its enforcement actions—applies here because DACA is an enforcement-discretion policy at its core.

Plaintiffs cannot distinguish *Immigration Priorities* by asserting that DACA is "'an extreme case of non-enforcement' that arguably exceeds 'the bounds of enforcement discretion.'" Response Br. 21 (quoting *Immigration Priorities*, 599 U.S. at 683). Whatever injuries other plaintiffs might be able to establish in an "extreme" case, *these* plaintiffs give no reason why any alleged "extremity" alters the inadequacy of the actual injuries they assert. In any event, plaintiffs have not even attempted to demonstrate that DHS has "wholly abandoned its statutory responsibilities to make arrests or bring prosecutions," *Immigration Priorities*, 599 U.S. at 682. *See* U.S. Br. 30-31.

Moreover, the Supreme Court's reasoning in *Immigration Priorities* is not limited to challenges to non-prosecution policies. The Court explained that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Immigration Priorities*, 599 U.S. at 680 n.3. When a State claims "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* The Court thus held that the indirect effects on state revenues or spending asserted in *Immigration Priorities* were not cognizable Article III injuries. Plaintiffs offer no reason why that logic would change based on the type of *federal policy or action* challenged, without any difference in

7

the type of *state injury* asserted. Indeed, the cases the Supreme Court relied upon in *Immigration Priorities*—*Massachusetts v. Laird*, 400 U.S. 886 (1970), and *Florida v. Mellon*, 273 U.S. 12 (1927)—did not involve challenges to the federal government's exercise of enforcement discretion. *Laird* involved a challenge to the United States' participation in the Vietnam War, and *Mellon* a federal inheritance tax. *See* U.S. Br. 20-22; *see also Department of Educ. v. Brown*, 600 U.S. 551, 568 (2023) (holding plaintiffs lacked standing to challenge a program providing benefits to other borrowers on the theory such benefits "might have some incidental effect" on plaintiffs). Plaintiffs thus could not avoid this aspect of the reasoning in *Immigration Priorities* even if they were challenging a different type of federal action.

The Supreme Court's analysis in *Immigration Priorities* is thus highly relevant to plaintiffs' standing here, even though the challenged policy involves nonenforcement decisions paired with certain legal benefits for persons other than plaintiffs. A third party, including a State, lacks standing to challenge the federal government's award of federal benefits to someone else, just as it cannot challenge the exercise of federal discretion that benefits someone else. Such benefits, including employment authorization, permit individuals to be self-reliant and to contribute to American society during their deferred-action period, and prevent them from needing the limited public assistance available to them. *See* 87 Fed. Reg. 53,195. Moreover, these benefits are not necessary to DHS's exercise of enforcement discretion, as the final rule makes clear. *See id.* 53,248-53,249; *see also infra* Section IV.B (discussing

8

severability).  Furthermore, even if the Court were to conclude that plaintiffs have standing to challenge the provision of benefits, *Immigration Priorities* underscores that they lack standing to challenge the grant of deferred action itself—that is, the decision to forbear from removing certain individuals.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek ….").

### 2.    Plaintiffs did not meet their burden at summary judgment to establish standing

Even assuming Texas could assert an injury based on a federal rule's indirect effects on state spending, the district court erred in concluding that plaintiffs met their burden of satisfying Article III's remaining requirements, particularly given its recognition that there was disputed evidence that should not be resolved at summary judgment.  *See* ROA.25215-25216.  That is because Texas claims injury from the cost of emergency medical services and public education that the State must provide to *any* undocumented immigrant, whether covered by DACA or not.  Texas's alleged injury is thus not traceable to DACA, nor would it be redressed by an order ending DACA.[1]

---

[1] Plaintiffs' brief does not mention Texas's supposed driver's-license costs—a theory forfeited in district court and now forfeited again on appeal.  *See* U.S. Br. 25-27.  And since the government filed its opening brief, the Department of Health and Human Services finalized a rule concerning certain noncitizens', including DACA recipients', eligibility for some healthcare-related benefits.  The district court thought the proposed rule, if finalized, would "buttress[]" its conclusions about plaintiffs'

*Continued on next page.*

As the federal government explained (Br. 23-25), plaintiffs provided no evidence that *DACA* has caused a net increase in the number of undocumented individuals in Texas requiring social services, nor have they proven that any DACA recipients would leave absent the policy.  Plaintiffs repeatedly rely (Br. 7, 10, 20-21) on an estimate that Texas spends $250,000,000 annually on DACA recipients.  But as the expert offering that estimate made clear, plaintiffs misunderstood his reports and testimony on this score; he had only "assumed" such spending but "provide[d] no evidence" that DACA imposed any costs on Texas, given that "[t]he sources on which [he] relied to form [his] assumptions[] … estimate costs related to undocumented immigrants and their children and do not identify any costs *attributable to DACA recipients*."  ROA.18080-18081 (emphasis added); *see* U.S. Br. 24.  The district court erred in ignoring this expert's clarifying affidavit.  *See Dibidale of La., Inc. v. American Bank & Tr. Co., New Orleans*, 916 F.2d 300, 307 (5th Cir. 1990) ("To the extent they exist, discrepancies in [a witness's] averments present credibility issues properly put to the trier-of-fact.").  These unsubstantiated costs, insofar as they merit any weight whatsoever, are thus attributable to certain individuals being present in Texas; they are not attributable to DACA itself.

---

standing.  ROA.36376.  As the government explained in district court, however, the final rule does not adopt all measures proposed and imposes no costs on plaintiffs. *See* D. Ct. Dkt. No. 745.

Plaintiffs attempt to connect their claimed injury to DACA by contending (Br. 23) that it is "predictable" that DACA recipients would leave Texas absent deferred action "because DACA eliminate[d] multiple mechanisms Congress created to deter unlawful presence." But in so predicting, plaintiffs ignore key facts. For example, an individual may receive DACA only if she resided in the United States for at least five years before the policy was created. 87 Fed. Reg. 53,298. Therefore, DACA recipients already have a history of residing in the United States without deferred action, making it far from predictable that they would leave if not for deferred action. *See id.* 53,173. And plaintiffs' reliance on cases where litigants "have met their burden of showing that third parties will likely react in predictable ways" to establish traceability, *Department of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019), is particularly misplaced because they failed to support such predictions with evidence, and because defendants introduced credible evidence that "rescission of the DACA initiative will [not] cause recipients to leave the United States," ROA.17989, ¶ 43; *see* U.S. Br. 23-24; *cf. Department of Commerce*, 139 S. Ct. at 2566 (noting the plaintiffs supported their predictions though "evidence at trial establish[ing]" certain "historical[]" past behavior).

Like the district court, plaintiffs also rely (Br. 24-25) on a survey riddled with methodological errors, *see* U.S. Br. 24; ROA.18082-18083, ¶¶ 15-16, without addressing those errors. Plaintiffs further invoke (Br. 26) the report of a Texas state demographer who, the federal government explained (Br. 24), the district court

acknowledged had not "thought through all the implications of" DACA ending and so relied only on what the court considered a "common-sense assertion," ROA.25214 n.25. Plaintiffs again do not address these substantial evidentiary defects. Instead, plaintiffs assert (Br. 24) that "[t]he district court credited" such evidence. But the district court did not purport to resolve any standing-related factual disputes. ROA.25215-25216. Because there was conflicting evidence regarding jurisdictional facts, the court should have denied plaintiffs' motion for summary judgment.

Plaintiffs likewise err in arguing that "the district court[']s factual findings" on these standing questions "are reviewed for clear error." Response Br. 26 (citing Fed. R. Civ. P. 52(a)(6)). Again, the district court did not resolve factual disputes, ROA.25215-25216, and a grant of summary judgment is reviewed de novo, *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021). Federal Rule of Civil Procedure 52 provides plaintiffs no support, since it applies when "an action [is] tried on the facts without a jury," Fed. R. Civ. P. 52(a)(1), not on a motion for summary judgment. At most, there was competing evidence regarding whether Texas's alleged injury is fairly traceable to DACA and whether that injury is likely to be redressed by a judgment in plaintiffs' favor. On this record, the district court could not grant summary judgment for plaintiffs. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation").

### B.    Plaintiff-States Cannot Assert *Parens Patriae* Standing Against The Federal Government

The Supreme Court recently reaffirmed that "State[s] do[] not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quotation marks omitted); *see* U.S. Br. 32-33.  Plaintiffs make no argument here that they can establish standing on this basis.  *See* Response Br. 5 (referring to *parens patriae* only in the Statement).  In seeking special solicitude, they briefly assert (Br. 30) that *Brackeen* does not apply because plaintiffs "do not seek to protect their citizens from the operation of federal law."  But Texas's labor-market-based theory makes plain that it *does* seek to protect "the economic well-being of [its] legal residents" from the claimed effects of DACA-related employment authorizations.  Response Br. 28 (quotation marks omitted).  In any event, plaintiffs provide no response to the federal government's identification (Br. 33) of a genuine dispute of material fact undermining Texas's asserted labor-market injury, given the evidence that, *e.g.*, "deferred action for low-priority individuals would *increase* the wages of all native workers by 0.1 percent on average by 2024," ROA.10377.

## II.    PLAINTIFFS LACK A CAUSE OF ACTION UNDER THE APA

Plaintiffs have no right to review under the APA because their claims fall outside the relevant statutory zone of interests, and because the INA precludes judicial review.

Although the Court previously found that plaintiffs satisfy the zone-of-interests test, that determination has been undermined by the Supreme Court's recent reaffirmation that a plaintiff lacks a cognizable interest in the enforcement of immigration laws against third parties.  *See Immigration Priorities*, 599 U.S. at 677; U.S. Br. 33-34.  Plaintiffs offer no explanation why the zone-of-interests ruling should not be revisited given that decision, or any response to the arguments (U.S. Br. 34) that the INA limits judicial review in this context only to noncitizens, 8 U.S.C. § 1252(b)(9), (g), and thus "preclude[s] judicial review" under the APA, 5 U.S.C. § 701(a)(1).  That is an independent reason to reject plaintiffs' APA challenge.

## III.   THE DACA RULE IS LAWFUL

### A.    The DACA Rule Is Fully Consistent With The INA

Plaintiffs ground (Br. 31-41) their merits analysis in this Court's prior decision. As noted (U.S. Br. 34-38), the federal government recognizes that decision currently forecloses its merits arguments in this Court, respectfully maintains its disagreement, and preserves its arguments for further review.  Plaintiffs' brief, however, highlights their case's many fundamental defects.

First, plaintiffs are incorrect that because the "DACA-eligible population is removable," DACA is unlawful.  Response Br. 35.  All deferred-action policies apply solely to removable individuals, temporarily deferring removal as an "administrative convenience."  8 C.F.R. § 274a.12(c)(14); *see id.* § 236.21(c)(1).  Just as deferred action does not change a noncitizen's removability, a noncitizen's removability has no

bearing on deferred action's legality.  Plaintiffs still cannot demonstrate that DACA's forbearance aspect—which reflects the Secretary's express authority to set enforcement priorities, *see* 6 U.S.C. § 202(5)—conflicts with any provision of the INA.

Next, plaintiffs' assertion (Br. 35-36, 38-39) that DACA is unlawful because recipients may receive work authorization ignores the language of the very statutes plaintiffs invoke.  The Immigration Reform and Control Act of 1986 (IRCA) makes it unlawful to hire "an *unauthorized* alien (as defined in subsection (h)(3))."  8 U.S.C. § 1324a(a) (emphasis added).  In turn, subsection (h)(3) defines an "unauthorized" individual as someone "not at that time either (A) … lawfully admitted for permanent residence, *or* (B) authorized to be so employed by [the INA] *or* by the Attorney General" (now, the Secretary).  *Id.* § 1324a(h)(3) (emphases added).  By allowing employment of noncitizens "authorized to be so employed" *either* by the INA "or" by the Secretary, Congress recognized that the Secretary may grant work authorization even to people not lawfully admitted and not otherwise authorized to work under the INA.  *Id.*; *see id.* § 1324a(b)(2) (contemplating that noncitizens may be authorized "by the Attorney General to be hired"); U.S. Br. 35.  Plaintiffs' reading would render these provisions nugatory; it also ignores that Congress crafted IRCA's language against the backdrop of longstanding regulations granting work authorization to deferred-action recipients.  *See* 52 Fed. Reg. 46,092, 46,092-46,093 (Dec. 4, 1987) (discussing pre-IRCA statutory authority).  Such legislative action is not mere "historical practice," Response Br. 38-39, but rather Congress's decision to "accept[] and ratif[y]" the

"background understanding in the legal and regulatory system," *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536-537 (2015).

Plaintiffs' arguments (Br. 37) regarding advance parole are equally mistaken: Advance parole is not a feature—"class-wide" or otherwise—of DACA and has no bearing on DACA's lawfulness.  Rather, Congress has long authorized DHS to parole "any" noncitizen applying for admission on a case-by-case basis and provided that "parole … shall not be regarded as an admission."  8 U.S.C. § 1182(d)(5)(A); *see id.* § 1101(a)(13)(B); 8 C.F.R. § 212.5(f).  Nor is advance parole specific to DACA recipients; being a DACA recipient does not guarantee DHS will issue an advance-parole document, and having an advance-parole document does not guarantee DHS will parole the individual.  *See* U.S. Br. 37-38.  Plaintiffs have not challenged this independent and well-established framework under 8 U.S.C. § 1182(d)(5), which would continue to operate without DACA.

Finally, plaintiffs' passing reference (Br. 40-41) to the major-questions doctrine is misplaced.  Consistent "past practice under" the relevant statutory authority bears directly on whether an agency action comports with that doctrine.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023).  As detailed (U.S. Br. 5-7, 35-36), the agency has implemented similar deferred-action programs since at least the 1970s, and Congress has expressly endorsed such policies—including policies involving work authorization for far more individuals than the roughly 530,000 current DACA recipients—without

16

ever prohibiting the agency's longstanding practice of granting such discretionary relief to low-removal-priority individuals.

### B.     The DACA Rule Is Consistent With The Take Care Clause And The APA's Procedural Requirements

Straying from the district court's reasoning, plaintiffs ask this Court to invalidate DACA on constitutional and procedural grounds. Neither request has merit.

1. Plaintiffs briefly contend (Br. 44) that DACA violates the Take Care Clause, which directs the President to take care that the Nation's laws are faithfully executed. The district court did not address this claim, ROA.36373, which in any case fails.

First, the Take Care Clause is addressed to the President; it does not create a judicially enforceable interest or support an APA suit. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-803 (1992); *Mississippi v. Johnson*, 71 U.S. 475, 498-499 (1866). Second, plaintiffs' theory rehashes their contrary-to-law claim; such "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). Finally, the DACA rule reflects the Secretary's exercise of his duty to set immigration-enforcement priorities. *See, e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a). That is not a failure to execute the laws; it is a faithful exercise of discretion and use of limited resources under those laws. The settled history of prosecutorial discretion confirms that the Take Care Clause does not preclude the Executive from exercising such discretion. U.S. Br. 34-38.

17

2.  Equally unpersuasive is plaintiffs' assertion (Br. 42-43) that the DACA rule reflects arbitrary-and-capricious decision-making.  The district court did not address this claim either, ROA.36373, and plaintiffs ignore the rule's extensive reasoning.[2]

First, plaintiffs contend (Br. 42-43) that DACA "flips Congress's priorities" by "treating unlawfully present" individuals "in the U.S. workforce as a positive," which cannot "be squared with" the INA's "delineated categories" of employment authorization.  These contentions merely parrot plaintiffs' erroneous contrary-to-law arguments; they fail for the same reasons.  *See supra* pp. 15-16.  And insofar as plaintiffs suggest DHS failed to consider the legality of employment authorization or DACA's workforce effects, they ignore the agency's explicit discussion of that topic.  *See* 87 Fed. Reg. 53,198-53,200 (responding to comments); *id.* 53,286 (explaining that "estimated annual increases in the active DACA population … are small relative to the total U.S. and individual State labor forces" and "changes in wages depend on many factors"); *id.* 53,287 (identifying "positive dynamic effects" of permitting DACA recipients to work, including by "help[ing] to protect U.S. workers and employers against the possible effects of unauthorized labor").  As DHS detailed, plaintiffs rely on "a misuse of the 'expressio unius est exclusio alterius' canon," since Congress's

---

[2] As in district court, plaintiffs limit their arbitrary-and-capricious challenge on appeal to the DACA rule's employment-authorization aspects.  *See* Response Br. 42-44; ROA.33448-33452.  Thus, even were plaintiffs to prevail on this claim, the employment-authorization provisions should be severed, leaving the rest of the DACA rule (including forbearance and lawful presence) intact.  *See infra* § IV.B.

express authorization for employment of certain noncitizens is "supplemental to the general authority that already existed, and not in derogation of it or contradictory to it," and because Congress has both "ratified" and declined to "disturb … or alter" the statutory authority long invoked by DHS and its predecessors to grant work authorization.  87 Fed. Reg. 53,199; *see id.* 53,198-53,200.

Second, plaintiffs maintain (Br. 43) that the rule is arbitrary and capricious based on their contention that the Affordable Care Act encourages employers to hire DACA recipients over citizens.  Plaintiffs failed to raise that fact-bound issue in their comments and thus forfeited it.  *See* U.S. Citizenship & Immigration Servs., USCIS-2021-0006-15366, *Comment Submitted by Texas Office of the Attorney General* (Dec. 2, 2021), https://www.regulations.gov/comment/USCIS-2021-0006-15366; *BCCA Appeal Grp. v. U.S. E.P.A.*, 355 F.3d 817, 829 & n.10 (5th Cir. 2003), *as amended*, (Jan. 8, 2004).  Regardless, plaintiffs identify no evidence that any employer ever denied DACA recipients the health-insurance coverage that it offered citizen employees or preferred to hire DACA recipients on this asserted basis.  Moreover, because DACA recipients are now eligible for premium tax credits, *see* 89 Fed. Reg. 39,392 (May 8, 2024), large employers are now subject to taxes for not offering health insurance to DACA recipients on the same basis as they would be for other employees.

## IV.   THE DISTRICT COURT'S REMEDIAL ORDER IS UNLAWFUL

Plaintiffs offer a perfunctory defense of the vacatur and nationwide injunction of the DACA rule, *see* Response Br. 45-47, relying on this Court's previous ruling and

failing to address fundamental defects in the remedial order, *see* U.S. Br. 38-54. Most notably, plaintiffs address neither the applicability of 8 U.S.C. § 1252(f)(1) to the injunction absent a stay nor the rule's express severability provision, matters on which this Court has not yet ruled. Nor do they acknowledge that the scope of the new injunction on appeal is reviewed de novo, *see Texas v. EEOC*, 933 F.3d 433, 450 (5th Cir. 2019), underscoring this Court's duty to ensure that any relief comports with constitutional and equitable principles and the Supreme Court's decision regarding DHS's role in crafting any DACA wind-down.

## A.    The District Court Lacked Authority To Enjoin Or Vacate The Rule

Under the INA, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1232]." 8 U.S.C. § 1252(f)(1); *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); U.S. Br. 39-40.

Plaintiffs observe (Br. 41) that this Court concluded § 1252(f)(1) did not bar the earlier injunction in this case, but this Court's reasoning was contingent on the continued existence of the stay pending appeal, *see Texas*, 50 F.4th at 529 (reasoning that "§ 1252(f)(1) [does not] apply to the injunction" given the stay and that "[n]o present DACA recipient is subject to removal under the district court's existing judgment"). The government disagrees that the stay renders the injunction lawful, rather than simply partially postponing implementation of an order forbidden by

§ 1252(f)(1) with respect to existing DACA recipients.  But even apart from that disagreement, insofar as any future judicial orders alter that stay's contours, this Court's prior § 1252(f)(1) analysis would no longer govern.

Plaintiffs do not dispute that they invoke statutory provisions triggering § 1252(f)(1)'s prohibition.  Instead, they argue (Br. 41) that the jurisdictional bar is inapplicable because they challenge a "regulation," rather than "enforcement of a statute," and because DACA "involve[s] not only deferral but also the conferring of benefits outside the scope of" the covered provisions.  But § 1252(f)(1) does not prohibit injunctions of only certain *types* of actions taken (or not taken) to "carry out" the specified laws, *Aleman Gonzalez*, 596 U.S. at 550; it prohibits injunctions of *any* such action (or inaction).  A grant of deferred action under DACA is an action taken to delay implementation of a removal statute, generally 8 U.S.C. § 1229a.  *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483-484 (1999).  Benefits that DACA recipients may realize as an incidental effect of being granted deferred action are available to all deferred-action recipients and are not unique to DACA.  And even assuming DACA's legal benefits were independently relevant, they would independently implicate § 1252(f)(1)'s statutory bar because they are triggered by a grant of deferred action.  *See, e.g.*, 87 Fed. Reg. 53,185 & n.139 (citing 8 U.S.C. §§ 1225, 1226, 1226a as authority for DACA).

21

Plaintiffs similarly fail to dispute that the APA's text, structure, and history show that it does not authorize universal "vacatur" of a rule, instead contemplating party-specific relief consistent with traditional equitable principles. *See* U.S. Br. 41-43.

## B.    Plaintiffs Disregard The DACA Rule's Express Severability Provision

The district court failed to apply the DACA rule's express severability provision. *See* 8 C.F.R. § 236.24; 87 Fed. Reg. 53,248-53,249. In doing so, the court misapplied bedrock severability principles and disregarded the Supreme Court's explanation that DACA's "forbearance and benefits are legally distinct and can be decoupled." *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020); U.S. Br. 43-49.

Plaintiffs venture no defense of the district court's severability analysis or any argument to support ignoring the severability provision in 8 C.F.R. § 236.24: They devote (Br. 46) just a half-sentence to an unsupported assertion that it would be impossible to "sever[] any part of DACA from the rest." Plaintiffs do not even acknowledge either 8 C.F.R. § 236.24 or the Supreme Court's *Regents* discussion regarding "decoupl[ing]," 591 U.S. at 30, let alone offer any reason that this Court should adopt their *ipse dixit* assertion instead of DHS's unambiguous policy determination that "forbearance remains workable and desirable without work authorization," 87 Fed. Reg. 53,248-53,249. In the final rule, DHS remedied its prior "fail[ure] to consider" the possibility of maintaining a forbearance-only policy, which

22

the Supreme Court explained is an "important aspect of the problem[s]" that would accompany ending DACA. *Regents*, 591 U.S. at 30 (quotation marks omitted). DHS made clear that it "would have adopted the forbearance portion of the policy even if it did not believe that the work authorization portion of the rule were legally authorized." 87 Fed. Reg. 53,249. Neither plaintiffs nor this Court may disregard DHS's determination.

The Court should thus at minimum vacate the remedial order and remand for entry of relief that preserves any aspect of the DACA rule not found unlawful. *See* 8 C.F.R. § 236.24; *Southwest Elec. Power Co. v. U.S. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (limiting relief to "unlawful … portions" of agency rule).

## C. The District Court Erred By Issuing Nationwide Relief

The district court erred in granting *nationwide* relief based on its finding that DACA injures *one* State. *See* U.S. Br. 49-51. Plaintiffs defend the universal injunction by noting that this case involves immigration law—an argument that contradicts Texas's recent position in another immigration-law case and, more fundamentally, contravenes equitable principles.

Weeks ago, Texas properly recognized that courts should "cabin[] injunctive relief to the actually injured party" in a case involving immigration policy. Solicitor General of Texas Rule 28(j) Letter at 2, *United States v. Texas*, No. 24-50149 (5th Cir. Apr. 17, 2024). Although that principle did not limit the available relief in that case, in which the United States was the plaintiff, it is reason to vacate the overbroad

23

injunction here.  For DACA, however, Texas takes the opposite tack, arguing that

nationwide relief is appropriate because this case involves immigration policy.

Response Br. 47.  But even in immigration cases, this Court has recognized that

equitable remedies should not exceed those "necessary to give the prevailing party the

relief to which he or she is entitled." *Hernandez v. Reno*, 91 F.3d 776, 781 & n.16 (5th

Cir. 1996); *see Immigration Priorities*, 599 U.S. at 693-695, 702-704 (Gorsuch, J.,

concurring in the judgment).

Texas is not entitled to nationwide relief when it is the only State that has even

attempted to show cognizable harm.  Relief beyond Texas is not "necessary to remedy

the wrong" that Texas, alone, allegedly suffered, *Hernandez*, 91 F.3d at 781, especially

since "[c]ourts have no power to presume and remediate harm that has not been

established," *Lewis v. Casey*, 518 U.S. 343, 360 n.7 (1996).  Underscoring the

importance of hewing to these established remedial principles is that most DACA

recipients live in States that embrace DACA.  *See* N.J. Br. 9-11; States Amici Brief 1.

Texas is wrong (Br. 47) that it is entitled to nationwide relief because DACA

recipients could hypothetically "mov[e] to" another plaintiff-State.  Texas has no

standing to assert another State's rights.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018)

(remedies "must be tailored to redress the plaintiff's particular injury").  And Texas's

speculative claim of spillover harm is hard to reconcile with this lawsuit: As Texas

observes (Br. 45), the district court's injunction has been "stayed" as to the hundreds

24

of thousands of current DACA recipients for years, yet no State besides Texas has ever attempted to identify any cognizable injury.

On the other side of the ledger, the negative effects of the universal injunction and vacatur on DACA recipients, their families, and their home States—and on educational institutions, businesses, and the economy—tilt sharply against nationwide relief.  *See* U.S. Br. 50-51; Intervenor-Defendants Br. 52-56; N.J. Br. 21-41; States Amici Brief 11-24.

### D.    DHS Should Be Charged With Making Policy Judgments Regarding Any Wind-Down

The remedial order—which bars DHS from "implementing" the DACA rule absent the stay, ROA.36400—further contravenes the Supreme Court's *Regents* decision.  Were DACA ultimately found unlawful, the appropriate remedy would be a remand to DHS to craft an orderly "wind-down."  *Regents*, 591 U.S. at 32.  As the Supreme Court emphasized, "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA"—and "[t]hose policy choices are for DHS."  *Id.* at 25; *see id.* at 30-33; U.S. Br. 51-53.  The district court disregarded those instructions.

Here, too, plaintiffs offer no substantive response.  Instead, they note (Br. 46) that a remand would not "change" DACA's legality and that the remedial order will not be "disruptive" because it is currently "stayed."  But neither observation has any

25

bearing on the ultimate (or appropriate) remedy: Plaintiffs confuse the existence of a stay pending appeal with the permanent relief that the district court announced. Once it takes effect, the injunction means that "each recipient would lose their grant of DACA as soon as their most recent two-year renewal period expires." U.S. Br. 51. Plaintiffs articulate no justification for such a blunt remedy. Nor do they attempt to reconcile it with the Supreme Court's repeated admonitions that: (1) "[m]aking th[e] difficult decision" about how to weigh factors like DACA-related "reliance interests," "policy concerns," and "other interests" is "the agency's job," *Regents*, 591 U.S. at 32; (2) DHS has "considerable flexibility" to, among other things, adopt "more accommodating termination dates for recipients" with educational, military, or medical obligations and needs, *id.*; and (3) "winding down the program"—which involves many policy-based choices—falls within the "scope of [DHS's] discretion," *id.* at 26.

Equally unpersuasive is plaintiffs' unsupported statement (Br. 46) that the district court (rather than DHS) is "the appropriate venue at this juncture for deciding how to 'wind down' DACA." That claim is inconsistent with *Regents*. Given the "serious reliance interests that must be taken into account" and weighed against other "policy concerns" within the agency's expertise, *Regents*, 591 U.S. at 30, 32-33 (quotation marks omitted), this Court should clarify that if DACA were ultimately found unlawful following exhaustion of all available review, the matter should be remanded to DHS to craft an orderly wind-down.

## V.    AT A MINIMUM, THIS COURT SHOULD MAINTAIN THE STAY PENDING FURTHER REVIEW

Plaintiffs do not contest the propriety of extending the stay until after the Supreme Court has had an opportunity to review this matter. U.S. Br. 53-54. Because the district court's order has the potential to cause enormous disruption in the lives of millions, including hundreds of thousands of "U.S.-citizen children," *Regents*, 591 U.S. at 31, and their communities, 87 Fed. Reg. 53,154, the Court should grant appellants' unopposed request to continue the stay.

## CONCLUSION

The Court should reverse the grant of summary judgment, vacate the permanent injunction and the order of vacatur, and remand with instructions for further proceedings as appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

*Of Counsel:*

ALAMDAR HAMDANI
*United States Attorney*

JONATHAN E. MEYER
*General Counsel*
*Department of Homeland Security*

*s/ Joshua M. Koppel*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
NICHOLAS S. CROWN
*Attorneys, Appellate Staff*
*Civil Division, Room 7259*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-1201*

May 2024

28

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Joshua M. Koppel*
Joshua M. Koppel

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,492 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Joshua M. Koppel*
Joshua M. Koppel