No. 23-40653

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF ALABAMA; STATE OF ARKANSAS; STATE
OF LOUISIANA; STATE OF NEBRASKA; STATE OF SOUTH CAROLINA;
STATE OF WEST VIRGINIA; STATE OF KANSAS; STATE OF MISSISSIPPI,
*Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, Secretary, U.S.
Department of Homeland Security; TROY MILLER, Senior Official Performing
the Duties of the Commissioner, U.S. Customs and Border Protection; PATRICK
J. LECHLEITNER, Senior Official Performing the Duties of the Director of U.S.
Immigration and Customs Enforcement; UR M. JADDOU, Director of U.S.
Citizenship and Immigration Services, JASON D. OWENS, Chief of the U.S.
Border Patrol,
*Defendants-Appellants*

MARIA ROCHA; JOSE MAGANA-SALGADO; NANCI J. PALACIOS
GODINEZ; ELLY MARISOL ESTRADA; KARINA RUIZ DE DIAZ; CARLOS
AGUILAR GONZALEZ; LUIS A. RAFAEL; DARWIN VELASQUEZ; JIN
PARK; OSCAR ALVAREZ; DENISE ROMERO; JUNG WOO KIM; ANGEL
SILVA; HYO-WON JEON; ELIZABETH DIAZ; BLANCA GONZALEZ;
MOSES KAMAU CHEGE; MARIA DIAZ,
*Intervenor Defendants-Appellants*

STATE OF NEW JERSEY,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the
Southern District of Texas, Brownsville Division; No. 1:18-cv-68

## REPLY BRIEF OF INTERVENOR-APPELLANT
## STATE OF NEW JERSEY

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
JEREMY M. FEIGENBAUM
*Solicitor General*
MAYUR P. SAXENA
*Assistant Attorney General*
AMANDA I. MOREJÓN
ASHLEIGH B. SHELTON
BRYCE K. HURST
SAMUEL L. RUBINSTEIN
VIVIANA M. HANLEY
*Deputy Attorneys General*
New Jersey Attorney General's Office
124 Halsey St., 5th Floor
Newark, New Jersey 07101
*Attorneys for Intervenor-Appellant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

ARGUMENT .....................................................................................3

I.   PLAINTIFFS-APPELLEES ARE UNABLE TO REHABILITATE THE
     DISTRICT COURT'S REMEDIAL ORDER.....................................................3

     A.  *Texas II* Did Not Address These Remedial Questions.................................4

     B.  Plaintiffs-Appellees Otherwise Fail To Rehabilitate
         The Remedial Order.......................................................................8

     C.  Plaintiffs-Appellees Fail To Justify The District Court's Refusal
         To Afford DHS The Opportunity To Consider Next Steps.........................13

II.  The Final Rule Is Not Arbitrary and Capricious. .............................................16

CONCLUSION .................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   78 F.4th 210 (5th Cir. 2023) ...................................................................5

*Arizona v. United States*,
   567 U.S. 387 (2012).................................................................................18

*Baum v. Blue Moon Ventures, LLC*,
   513 F.3d 181 (5th Cir. 2008) ..................................................................13

*Cascino v. Nelson*,
   No. 22-50748, 2023 WL 5769414 (5th Cir. Sept. 6, 2023)......................8

*Cordova v. Univ. Hosp. & Clinics, Inc.*,
   92 F.4th 266 (5th Cir. 2024) ....................................................................8

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020)........................................................................... passim

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021).................................................................................16

*Labrador v. Poe*,
   144 S. Ct. 921 (April 15, 2024) ................................................................4

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010).................................................................................14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)...................................................................................21

*N. Carolina v. Covington*,
   581 U.S. 486 (2017)...................................................................................9

*N. Plains Resource Council v. U.S. Army Corps of Engineers*,
  460 F. Supp. 3d 1030 (D. Mont. 2020).................................................................10

*New Era Publications Int'l v. Henry Holt & Co.*,
  873 F.2d 576 (2d Cir. 1989)...................................................................................9

*Newman v. Plains All Am. Pipeline, L.P.*,
  23 F.4th 393 (5th Cir. 2022) .................................................................................8

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
  572 U.S. 663 (2014)...............................................................................................9

*Reno v. Cath. Soc. Servs., Inc.*,
  509 U.S. 43 (1993).................................................................................................7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021).......................................................................5, 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*,
  239 F. Supp. 3d 77 (D.D.C. 2017).........................................................................9

*Texas v. Becerra*,
  89 F.4th 529 (5th Cir. 2024) .................................................................................4

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ....................................................................... passim

*United States v. Lawrence Cnty. Sch. Dist.*,
  799 F.2d 1031 (5th Cir. 1986) .............................................................................13

*United States v. Louisiana*,
  9 F.3d 1159 (5th Cir. 1993) ...................................................................................7

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................................9

**Statutes**

26 U.S.C. § 4980H ....................................................................................21

**Regulations**

*Deferred Action for Childhood Arrivals*, 87 Fed. Reg. 53,152
  (Aug. 30, 2022) ............................................................................ *passim*

*Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA)
  Recipients and Certain Other Noncitizens for a Qualified Health Plan through
  an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing
  Reductions, and a Basic Health Program*, 89 Fed. Reg. 39,392
  (May 8, 2024) ......................................................................................20

# **INTRODUCTION**

Plaintiffs-Appellees insist that every issue in this appeal was fully resolved by *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022) (*Texas II*). But contrary to their misapprehension, *Texas II* leaves key questions unresolved—questions that are now properly before this Court, as it considers the challenge to the Final Rule.

Most importantly, *Texas II* did not address the remedial issues at the heart of this appeal. *Texas II*, to be sure, addressed DACA's validity. And it held the DACA Memorandum was properly vacated. But *Texas II* did not address what comes next— *i.e.*, whether and how to accommodate the tremendous reliance interests that 600,000 current DACA recipients and their communities developed during the years in which the policy was in place without challenge. Vacatur does not explain how to address already-accumulated reliance interests. Nor did *Texas II* say whether vacatur spelled the end of deferred action for current recipients, let alone on what timeline, or which entity—the district court or DHS—should assess those problems in the first instance. For good reason: while *Texas II* vacated the DACA Memorandum, the Final Rule was still in place, and the panel justifiably left the district court to consider the Final Rule on remand. In this appeal, the question of remedy is squarely presented.

Plaintiffs-Appellees otherwise fail to rehabilitate the district court's remedial approach. The district court on remand inexplicably ordered the DACA Final Rule vacated and enjoined nationwide without ever addressing the impacts on hundreds

1

of thousands of current DACA recipients who have structured their lives around the policy for twelve years. It did so without considering the impacts on their families, businesses, state and local governments, and U.S.-citizen children. It did so without considering any remedy that maintains the status quo of deferred action and work authorization for current DACA recipients. And it did so without first remanding to DHS to allow the agency to consider how to wind-down DACA in light of recipients' overwhelming reliance interests. Although the court considered reliance interests in agreeing to stay the remedy pending appeal—a ruling Plaintiffs-Appellees do not challenge—a decision postponing the effective *date* of a remedy is no substitute for evaluating the *scope* of that remedy. Plaintiffs-Appellees deny none of this, and offer no defense of the district court's reasoning other than to cite *Texas II*.

Moreover, Plaintiffs-Appellees also introduce a question that *Texas II* did not resolve—whether the Final Rule is arbitrary and capricious. This Court, as Plaintiffs-Appellees acknowledge, need not reach that issue if it concludes the Final Rule is substantively invalid under the Immigration and Nationality Act (INA). But if it does consider this issue, the answer is clear: The Final Rule is not arbitrary and capricious because DHS explained in detail how DACA's extraordinary benefits far outweigh even the alleged costs, which are minimal. And DHS has squarely addressed in the Final Rule every argument now raised by Plaintiffs-Appellees. The States and their

residents benefit tremendously from the policy, and nothing in Plaintiffs-Appellees'
briefing justifies the disruption that would follow from the ruling they demand.

## ARGUMENT

I.  **PLAINTIFFS-APPELLEES ARE UNABLE TO REHABILITATE THE DISTRICT COURT'S REMEDIAL ORDER.**[1]

As New Jersey detailed in its opening brief, the district court's remedial order
cannot be squared with its own accounting of the equities—particularly the reliance
interests of current DACA recipients, and their families, businesses, state and local
governments, and U.S.-citizen children. *See* N.J. Br. 35-38 (explaining that although
the district court noted the dissolution of DACA will cause tremendous harm and
disruption to hundreds of thousands of DACA recipients, its remedial order would
effectuate that result at the end of this appeals process). Plaintiffs-Appellees offer
just one response: that this Court already affirmed this remedy in *Texas II*. Plaintiffs-
Appellees, however, badly misread *Texas II*. Further, Plaintiffs-Appellees do not—
and cannot—otherwise rehabilitate the district court's remedial order.

---

[1] Although New Jersey's consistent position remains that the DACA Final Rule is
lawful under the INA, given this Court's holding in *Texas II*, 50 F.4th at 528, and
the arguments pressed by the other Appellants, New Jersey focuses on the remedial
issues for this appeal, while reserving its right to challenge any holding that DACA
is substantively unlawful either en banc or before the U.S. Supreme Court.

### A.    *Texas II* Did Not Address These Remedial Questions.

Although Plaintiffs-Appellees contend that *Texas II* fully resolves this case, they do so only by ignoring the remedial questions New Jersey presses in its opening brief. In the two pages Plaintiffs-Appellees devote to remedy, they address only the propriety of vacatur and of nationwide[2] relief. Br. 45-47. But New Jersey's central point is that even assuming vacatur is proper, an additional remedial inquiry remains: whether and how to accommodate reliance interests that developed *before* the policy

---

[2] While this Court upheld a nationwide injunction of DACA in *Texas II*, 50 F.4th at 530-31, subsequent decisional developments underscore the error of that holding. In *Labrador v. Poe*, 144 S. Ct. 921 (April 15, 2024) (Mem), a majority of the Supreme Court expressed concern about nationwide injunctions. In his concurrence, Justice Gorsuch (joined by Justices Thomas and Alito) emphasized that injunctions "may go no further than necessary to provide interim relief to the parties," but found there that "the district court went much further, prohibiting a State from enforcing any aspect of its duly enacted law against anyone." *Id.* at 921, 923. To rectify that issue, the Court stayed the district court's injunction to the extent it provided relief beyond the named parties. *Id.* at 921. Justice Gorsuch noted several other recent cases where the Court similarly set aside nationwide injunctions. *Id.* at 924 n.1 (collecting cases). Justices Kavanaugh and Barrett joined in the Court's stay order, and recognized that "prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law." *Id.* at 931. These opinions raise serious doubts as to the propriety of issuing a nationwide injunction purely on the basis that an immigration policy is involved—without any record evidence from the plaintiffs to establish a nationwide remedy is needed. *Compare Texas II*, 50 F.4th at 530-31, *with Texas v. Becerra*, 89 F.4th 529, 546 (5th Cir. 2024) (finding that federal agency guidance letter should be enjoined only to the extent it prevented Texas from enforcing its law). The grant of nationwide relief without making findings is particularly inappropriate here, where it dramatically disrupts the lives of 600,000 DACA recipients across the country and upends their schools, families, workplaces, and communities—even though only one state even sought to demonstrate an Article III injury. *See* ROA.23-40653.33403-04 (only alleging costs to Texas); Appellees' Br. 20-22 (same).

was vacated, and what entity should make that decision in the first instance. Contrary to Plaintiffs-Appellees' claim, *Texas II* is silent on these important questions.

Even a cursory review of *Texas II* shows what the panel did and did not decide. The panel concluded that the DACA Memorandum was inconsistent with the INA, and on that basis, held that the district court's decision to vacate the Memorandum was not an abuse of discretion. *See* 50 F.4th at 529-30. But that does not resolve the questions here—namely, what relief is proper vis-à-vis 600,000 current recipients who indisputably structured their lives around DACA for over a decade, including working, raising U.S.-citizen children, attending school, taking out mortgages, and starting businesses. *See All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023) (holding "vacatur does not order the defendant to do anything; it only removes the source of the defendant's authority"); *cf. also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1039 (D.C. Cir. 2021) (finding vacatur of a pipeline approval does not necessarily mean the pipeline must be destroyed or that its ongoing use must cease).

Said another way, *Texas II* provides no guidance as to what happens to current DACA recipients, their families, and their communities the moment the stay pending appeal is lifted and the district court's order takes effect. *Texas II* does not address whether, as New Jersey explained, *see* Br. 21-33, the current DACA recipients can have their status quo preserved pursuant to both precedent and remedial principles.

*Texas II* also does not address whether, as New Jersey also explained, *see* Br. 41-45; *see also* U.S. Br. 51-53, DHS must first have an opportunity to evaluate how DACA would be wound down before a court order terminating their deferred action would take effect. Scouring *Texas II* for answers to these questions turns up nothing.

It makes sense that *Texas II* did not deal with these remedial questions. *Texas II* disposed of Plaintiffs-Appellees' challenge to the DACA policy as established in a 2012 Memorandum. *See* ROA.23-40653.34420-22; *Texas II*, 50 F.4th at 508. But by the time of the *Texas II* decision in October 2022, the DACA policy had been re-established in the form of a DHS rule. *See Deferred Action for Childhood Arrivals*, 87 Fed. Reg. 53,152 (Aug. 30, 2022) (to be codified at 8 C.F.R. pts 106, 236, and 274a); *Texas II*, 50 F.4th at 511-12. Although this Court held that the 2012 DACA Memorandum was unlawful and that it was not an abuse of discretion to vacate that Memorandum as a result, *see* 50 F.4th at 528, it declined to review the Final Rule, reasoning that the "district court is in the best position to review the administrative record … and determine whether our holdings as to the 2012 DACA Memorandum fully resolve issues concerning the Final Rule." 50 F.4th at 512.

Given that the Final Rule provided for work authorization and deferred action for current DACA recipients independently of the DACA Memorandum, *see* 87 Fed. Reg. 53,155-56, vacatur of *only* the DACA Memorandum—leaving the Final Rule intact—did not immediately raise the serious remedial problems that arise now. That

6

is, when the Court in *Texas II* affirmed the vacatur of the DACA Memorandum but remanded for an assessment of the Final Rule, it did not have to confront the question of what would happen to hundreds of thousands of current recipients when all forms of the DACA policy were stripped away. *Cf. Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 66-67 & n.29 (1993) (declining to "reach the question of remedy" where remand to district court was necessary first); *United States v. Louisiana*, 9 F.3d 1159, 1171 (5th Cir. 1993) (declining to "reach the State Defendants' final assigned errors relating to remedy" in light of "remand for a determination of liability, and remedy if necessary"). That context confirms why *Texas II* did not answer the consequential remedial questions now squarely presented by this appeal.

Plaintiffs-Appellees' positions below implicitly recognized that *Texas II* left remedial questions open. Plaintiffs-Appellees acknowledged to the district court that vacatur could be "tempered with" a more tailored "injunction and remedy" to reduce "disruptive consequences." ROA.23-40653.35385, 35390. Specifically, Plaintiffs-Appellees argued that vacatur was proper *and* that the district court should issue a separate remedial order establishing "an orderly wind[] down" of DACA over a two-year period, including a court order allowing DHS to approve "renewal applications" for up to "two years" from judgment. ROA.23-40653.33432. Although New Jersey believes that proposed remedy would be woefully insufficient to accommodate the extraordinary reliance interests at play, *see* Br. 34-35, this is a recognition that some

7

additional crafting of a remedy is possible notwithstanding vacatur. In short, *Texas II* did not resolve these remedial issues, and this Court must now do so.[3]

**B.   Plaintiffs-Appellees Otherwise Fail To Rehabilitate The Remedial Order.**

If *Texas II* does not resolve the remedial question, then Plaintiffs-Appellees have offered nothing to address the primary error New Jersey detailed in its opening brief. Plaintiffs-Appellees contend that vacatur is the proper remedy under the APA, but they are silent as to how vacatur interacts with the reliance interests that *already accumulated* in the last twelve years. *See* Br. 29-30. In its opening brief, however, New Jersey explained how, even if vacating DACA is proper, the district court still had to consider reliance interests—especially reliance born of Plaintiffs-Appellees' delay. *See* N.J. Br. 22-28. Because the reliance interests are so extraordinary in this case, the district court should have crafted a remedy that avoids disruption to current recipients, their families, businesses, state and local governments, and U.S.-citizen

---

[3] Thus, Plaintiffs-Appellees' request for summary affirmance under *Texas II*, the rule of orderliness, and the law of the case doctrine, *see* Br. iii, 1, must be rejected. "[T]he rule of orderliness binds" this panel "to follow a prior panel's decision on an issue." *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400 (5th Cir. 2022). "In other words, the rule of orderliness applies when a prior panel decision already answer[ed] the issue before" a later panel. *Cascino v. Nelson*, No. 22-50748, 2023 WL 5769414, at *4 (5th Cir. Sept. 6, 2023). Similarly, "[u]nder the law of the case doctrine, 'an issue of law or fact decided on appeal may not be reexamined … on a subsequent appeal.'" *Cordova v. Univ. Hosp. & Clinics, Inc.*, 92 F.4th 266, 273 (5th Cir. 2024) (quotation omitted). Because *Texas II* neither confronted nor resolved the remedial questions pressed by New Jersey in this appeal, summary affirmance under either of these doctrines would be improper as to those yet-unaddressed issues.

children. *See* N.J. Br. 28-33. But the court considered none of this. See *id.* at 35-38; *N. Carolina v. Covington*, 581 U.S. 486, 489 (2017) (vacating order where "minimal reasoning" threw doubt on whether "the court adequately grappled with the interests on both sides of the remedial question"). And Plaintiffs-Appellees do not either.

Instead, the court, and now Plaintiffs-Appellees, conflate the merits (whether DACA was unlawful) with the remedy. But these inquiries are distinct: even when a policy has been vacated as unlawful, courts engage in a separate inquiry to evaluate how to accommodate reliance interests that have developed in the years in which a policy was in effect. *See* N.J. Br. 22-28; *cf. Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (recognizing the selection of injunctive remedy "is a matter of equitable discretion; it does not follow from success on the merits as a matter of course"). This is especially true where reliance interests have developed at least in part due to plaintiffs' delay. *See* N.J. Br. 27-28, 31-32; *see, e.g., Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 686-87 (2014) (noting it would be "inequitable" to order "total destruction" of a "book [that] had been printed, packed and shipped," where the challenger delayed two years in filing suit (citing *New Era Publications Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584-585 (2d Cir. 1989))); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.*, 239 F. Supp. 3d 77, 86-88 (D.D.C. 2017) (barring injunction where plaintiffs waited two years to challenge pipeline project, during which time company had built pipeline to near completion).

The Supreme Court has made this exact point about DACA, emphasizing that the legality of DACA and how to accommodate the extraordinary reliance interests that have developed since its enactment are distinct analyses. *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). In *Regents*, the Court explained that, while the Attorney General found that DACA was unlawful, DHS's response still had to "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 30 (citation omitted). Put another way, "nothing about" finding DACA illegal "foreclosed or even addressed" this remedial analysis, including the import of "particular reliance interests." *Id.* at 33. That logic should have compelled the district court to adopt (and at least grapple with) a remedy clarifying that DHS may maintain the twelve-year-old status quo for current DACA recipients. *Cf. N. Plains Resource Council v. U.S. Army Corps of Engineers*, 460 F. Supp. 3d 1030, 1041 (D. Mont. 2020) (modifying vacatur order to preclude only the construction of new pipelines while allowing maintenance of existing pipelines).

Plaintiffs-Appellees do not even seek to refute this point. Plaintiffs-Appellees do not dispute that district courts have discretion to order an equitable remedy that accommodates reliance interests even after that court vacated the underlying policy. *Compare* Br. 45-47. Indeed, Plaintiffs-Appellees acknowledged below that, "in light of the reliance interests that do exist," a vacatur order could be "tempered with" a

tailored "injunction and remedy" to reduce the "disruptive consequences," ROA.23-40653.35385, 35390. Instead, Plaintiffs-Appellees' only response appears to be that because the district court *stayed* the remedy pending appeal, the district court did not have to decide what the proper *scope* of that remedy should be. *See* Br. 46 (arguing "any future disruption is necessarily hypothetical at this juncture" because "vacatur is still stayed as to any DACA recipients who received their DACA status prior to July 16, 2021"). But while New Jersey agrees that a stay pending appeal is proper—a point Plaintiffs-Appellees do not oppose—that is no substitute for evaluating what remedial order is proper in the first place. After all, if an appeal ends in affirmance, that underlying remedy kicks in and thus must still reflect the proper relief.

This case well illustrates why staying a remedy does not cure defects inhering in the remedy itself. If these appeals ultimately lead to the affirmance of the district court's orders (although they should not), the stay would expire, and chaos would ensue, since the injunction barring DHS from administering DACA even for current recipients would take effect immediately. The convulsive impacts on those 600,000 current recipients, and their families, businesses, state and local governments, and U.S.-citizen children can scarcely be overstated; indeed, New Jersey is unaware of any other court decision that threatened to remove hundreds of thousands of people from the workforce so suddenly. *Compare Regents*, 591 U.S. at 31 (detailing some disruptive consequences that could follow from ending DACA without addressing

reliance interests). Because the district court looked only at the practical impacts while the stay was in effect, not what would happen under its order should the stay expire, it considered none of this. *See* ROA.23-40653.25263, 36400 ("stay[ing] the effective date" of its remedy in light of reliance interests, not narrowing the remedy's scope).[4] Neither the court nor Plaintiffs-Appellees can brush off such disruption just because the appeals are still pending; otherwise, granting a stay would categorically immunize a district court's injunction from appellate review. Indeed, New Jersey is unaware of a single other case in which a court justified the scope of a remedial order exclusively by staying the order pending appeal.[5]

Likewise, the district court's decision not to enter a final judgment but instead to "retain[] jurisdiction of th[e] matter for purposes of construction, modification,

---

[4] The district court considered these equities when issuing its initial stay in July 2021, *see* ROA.23-40653.25263. The district court did not reanalyze those interests in its September 2023 order on remand from this Court, but rather incorporated the prior remedial order by reference and "supplemented" its "existing injunction and vacatur order." *See* ROA.23-40653.36399.

[5] As before, *Texas II* is not to the contrary. *Texas II* affirmed the propriety of vacating the DACA Memorandum notwithstanding the "disruptive consequences" of vacatur, noting the district court "stay[ed] the effects of vacatur as to the existing [DACA] recipients … *pending the outcome of [DHS's] rulemaking proceeding.*" 50 F.4th at 530 (emphasis added). That is a different posture entirely: at that time, the disruptive consequences of vacating the DACA Memorandum were mitigated by the Final Rule and thus no disruption necessarily followed. That is a sharp contrast to this case, in which the remedy—enjoining DHS from administering DACA immediately—is (by the terms of the order) to kick in once the appeal ends. In the latter circumstance, it is incumbent on the appellate court to consider the propriety of the remedy itself, or else risk the remedy evading appellate review entirely.

and/or enforcement of the terms of the original and th[e] Supplemental Injunction," ROA.23-40653.36401, does not absolve it of the duty to consider reliance interests in crafting the initial remedy. After all, courts always retain the "equitable power to modify any final decree that has prospective application." *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1046 (5th Cir. 1986); *see also United States v. Northshore Min. Co.*, 576 F.3d 840, 848 (8th Cir. 2009) (noting that "a federal court of equity has inherent jurisdiction in the exercise of its equitable discretion and subject to appropriate appellate review to vacate or modify its injunctions" (quotation omitted)). That a court could amend an inappropriate remedy later is no substitute for ensuring that the remedy it has chosen thus far is legally proper. Said another way, "the power of a [district] court of equity to modify an injunction" is "not a substitute for a direct appeal" of the remedy it has chosen to date, whatever more sensible approach it might select later. *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 187-88 (5th Cir. 2008) (citations omitted). That is the task at hand.

### C.    Plaintiffs-Appellees Fail To Justify The District Court's Refusal To Afford DHS The Opportunity To Consider Next Steps.

Plaintiffs-Appellees likewise fail to engage with the argument that, if this Court declines to accommodate these exceptional reliance interests, it should remand to DHS to first consider the appropriate next steps. *See* U.S. Br. 51-53; N.J. Br. 41-45, Plaintiffs-Appellees assert that the district court was "the appropriate venue at

this juncture for deciding how to 'wind down' DACA," Br. 46, but nowhere explain how this Court could do so without disregarding *Regents*, 591 U.S. at 33.

Courts repeatedly have acknowledged that even where an agency's particular policy has been found unlawful, that agency still maintains an important role to play in the first instance in assessing the appropriate next policy. *Cf.*, *e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 159 (2010) (finding such policy decisions are first "for the agency"). And until the agency in fact considers and issues those next steps, "judicial review of such a decision is premature." *Id.* at 160. That is particularly true in assessing how to handle already-accumulated reliance interests. *Cf. Standing Rock*, 985 F.3d at 1054 (agreeing "how and on what terms the Corps will enforce its property rights" against a pipeline that was now operating without a valid easement, in light of the court's decision vacating that easement, "is, absent a properly issued injunction, a matter for the Corps to consider in the first instance" given "the discretion owed" to the agency).

In *Regents*, the Supreme Court made crystal clear that affording DHS similar choices in the first instance is necessary before terminating DACA for the 600,000 current recipients who rely on it. *See* 591 U.S. at 30-33. The Court rejected the notion that merely finding DACA illegal meant that it had to "cease immediately." *Id.* at 33. To the contrary, the Court expressly found that "deciding how best to address a finding of illegality moving forward can involve important policy choices," and that

"[t]hose policy choices are for DHS" to make in the first instance. *Id.* at 25. After all, DHS has the greater ability to exercise "considerable flexibility" and to leverage expertise in accommodating these "reliance interests." *Id.* at 32; *see also id.* at 31 (citing, among other practical concerns, the disruption that ending DACA would inflict on current recipients who "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children"; the harm it would impose on "families," "U.S.-citizen children," "schools," and "employers"; and the harsh consequences of removing so many from the labor force).

The district court erred by failing to follow the path that *Regents* required, and Plaintiffs-Appellees make no meaningful attempt to defend this failure or to grapple with the language of *Regents*. Instead of allowing DHS to consider appropriate next steps in light of the court's finding of illegality, the district court vacated DACA and issued a sweeping injunction outright, while reserving for itself the exclusive right to make modifications. *See* ROA.23-40653.36400-01. The district court offered no reasoning for diverging from *Regents*, and Plaintiffs-Appellees have not supplied the missing explanation on appeal. Accordingly, if this Court does not craft a remedy preserving the status quo for existing DACA recipients or require the district court to do so, *Regents* requires affording DHS the opportunity to consider how to address these extraordinary reliance interests before any disruption arises.

## II.    THE FINAL RULE IS NOT ARBITRARY AND CAPRICIOUS.

In *Texas II*, this Court remanded the lawfulness of the Final Rule, and did not

rule on Plaintiffs-Appellees' claim that it is arbitrary and capricious. 50 F.4th at 512.

On remand, New Jersey disputed that claim at length. ROA.23-40653.34291-341.

However, the district court did not reach the issue, and this Court need not do so.

But if this Court does evaluate whether the Final Rule is arbitrary and capricious,

*see* Appellees' Br. 42-44, it should reject Plaintiffs-Appellees' arguments.

DHS's analysis of the costs and benefits of DACA amply satisfies the APA's

standard. An agency's action is not arbitrary and capricious if it is "reasonable and

reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

This review is especially "deferential, and a court may not substitute its own policy

judgment for that of the agency. A court simply ensures that the agency has acted

within a zone of reasonableness and, in particular, has reasonably considered the

relevant issues and reasonably explained the decision." *Id.* Deference is particularly

appropriate here, because DHS had unusually powerful evidence on which to base

its conclusions: a decade of experience with DACA. *See* 87 Fed. Reg. 53188. Indeed,

as DHS explained, it was able to compare the "pre-guidance" baseline before DACA

and the impacts of the 2012 DACA Memorandum, and found based on its analysis

that DACA was necessary to protect the reliance interests of hundreds of thousands

of recipients and that DACA (and the related work authorization) produced tens of

16

billions of dollars in annual net benefits. *See* 87 Fed. Reg. 53,271, 53,280-84 (citing benefits to a range of sectors, including health, education, and law enforcement).

The record contains myriad evidence of DACA's benefits, which Appellees ignore. *See* ROA.23-40653.34310-19. DACA promotes public safety by focusing DHS's resources on the greatest threats to border and national security, rather than a low-risk population. 87 Fed. Reg. 53,179, 53,271. It promotes crime reporting by DACA recipients, increasing safety in the communities in which they live. 87 Fed. Reg. 53,180. DACA promotes school attendance and thus boosts funding for local school districts. 87 Fed. Reg. 53,224. Thousands of recipients are enrolled in post-secondary education, including in New Jersey, 87 Fed. Reg. 53,164, and the State's universities would be harmed by the loss of valued students and their contributions to campus life, 87 Fed. Reg. 53,176 (noting higher education institutions "have relied upon the existence of the DACA policy over the course of 10 years in the form of DACA recipients' tuition payments and academic and research contributions"). And all of that is in addition to the "family security" DACA provides current recipients, thousands of whom have U.S.-citizen children. 87 Fed. Reg. 53,154, 53,162.

Because Plaintiffs-Appellees cannot refute this evidence, they wrongly argue that DHS should have ignored it altogether. Plaintiffs-Appellees suggest that DHS improperly "flip[ped] Congress's priorities," Br. 42, by considering the benefits of DACA and the reliance interests that it engendered for more than a decade. But the

opposite is true: the Final Rule would have been arbitrary and capricious had DHS *not* considered DACA's benefits, including reliance—the central holding in *Regents*, 591 U.S. at 26-33; *see also Arizona v. United States*, 567 U.S. 387, 394-95 (2012) (describing a wide range of interests impacted by immigration policy). Furthermore, Plaintiffs-Appellees' insistence that DACA is contrary to Congress's objectives in enacting the INA, *see* Br. 42-43, is derivative of their argument that DACA violates the INA outright, and thus does no additional work in this case.

Plaintiffs-Appellees' remaining arguments are belied by the record. Plaintiffs-Appellees claim that DACA deprives U.S.-citizen workers of job opportunities. Br. 42-43. But contrary to Plaintiffs-Appellees' unsupported assertion that the current DACA recipients "compet[e]" with U.S.-citizen workers for scarce jobs, Br. 43, the Final Rule found DACA recipients fill labor *shortages* in critical industries, such as healthcare and education. *See* 87 Fed. Reg. 53,176 (teacher shortages); 87 Fed. Reg. 53,196 (healthcare shortages); 87 Fed. Reg. 53,154 (finding that DACA-recipient healthcare workers "are more likely to work in underserved communities where shortages are particularly dire"). DHS considered the possibility that DACA workers could displace U.S.-citizen workers, but found such an effect could not be causally established. 87 Fed. Reg. 53,167. In fact, without DACA, the record indicates that U.S.-born workers could *lose* their jobs, in part because 6% of DACA recipients are small business owners, which accounts for 4.5 jobs created on average per business

(among those with full-time employees). *See* ROA.23-40653.34510. Similarly, DHS found that DACA could raise wages of U.S.-citizen workers by promoting high-skill labor. 87 Fed. Reg. 53,287. The record makes clear that DHS did not act arbitrarily with respect to its consideration of DACA's impacts on the labor market.

Appellees' assertions that DACA imposes direct costs on States are similarly contradicted by the record; instead, the evidence establishes that the States, including New Jersey and Plaintiffs-Appellees alike, benefit substantially from DACA. While Plaintiffs-Appellees claim undocumented immigrants overall (not DACA recipients specifically) cost Texas $250 million per year at the state level and $533 million locally, Br. 20-21, the record shows that recipients alone contribute $3.7 *billion* in spending power to the Texas economy and pay $436.8 million in state and local taxes to Texas annually. ROA.23-40653.34505.[6] Similarly, DACA recipients pay $112.8 million in state and local taxes to New Jersey and contribute $793.4 million to the state economy. *Id.* And nationally, DHS found that current DACA recipients contribute $5.6 billion in annual federal taxes and $3.1 billion in state and local taxes, 87 Fed. Reg. 53,174, which far exceed the costs of administering the policy, 87 Fed. Reg. 53,160-61. Finally, the record shows that current recipients contribute broadly to the economy—they hold $25.3 billion in spending power, make $566.7 million in

---

[6] Plaintiffs-Appellees do not even try to make a showing that DACA imposes costs for any of the other plaintiff States. *See supra* at 4 n.2 (emphasizing that Plaintiffs-Appellees built no record to support a demand for nationwide relief).

annual mortgage payments and $2.3 billion in rental payments, and buy cars, apply for credit, and open businesses. 87 Fed. Reg. 53,170. DHS did not err in considering the substantial economic loss from the cessation of DACA.

Last, Plaintiffs-Appellees' remaining argument regarding the Affordable Care Act is likewise unsupported. They claim that the ACA "mak[es] DACA recipients less costly to employ" because the penalties for not providing adequate healthcare insurance to workers do not apply to DACA recipients, since they are ineligible for marketplace subsidies. Br. 43 (quoting ROA.25202). Initially, a newly-issued final rule from the Department of Health & Human Services makes DACA recipients eligible for marketplace subsidies, eliminating this argument entirely. *See Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients and Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, and a Basic Health Program*, 89 Fed. Reg. 39,392, (May 8, 2024) (to be codified at 42 C.F.R. pts. 435, 457, 600 and 45 C.F.R. pts. 152, 155); *see also id.* at 89 Fed. Reg. 39,393 (clarifying that this Final Rule does not expand eligibility for state-run Medicaid and CHIP programs, and thus does not require expenditure of any "State resources").

And in any event, Plaintiffs-Appellees' concern has always been speculative: Plaintiffs-Appellees never proffered evidence that this phenomenon is playing out

among *any* real-world employers, and DHS was not required to consider unfounded hypotheticals. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) (an agency need not consider "every alternative device and thought conceivable by the mind of man ... regardless of how uncommon or unknown that alternative may have been").[7] By contrast, the record shows that if current DACA recipients were stripped of work authorization (and therefore from any employment-based health insurance) they would become an exploitable low-wage labor pool that is in need of social services—exacerbating the problems of which Plaintiffs-Appellees complain. *See* 87 Fed. Reg. 53,195. This claim, like Plaintiffs-Appellees' others, is inconsistent with the record.

As the record makes clear, DHS's analysis for the Final Rule is supported by overwhelming evidence and is not arbitrary or capricious.

---

[7] Plaintiffs-Appellees' theory of ACA-induced disincentives is especially unlikely considering that the statute, 26 U.S.C. § 4980H(a), applies its penalty to any large employers not offering minimum essential coverage so long as "at least one full-time employee" obtains a subsidy on the insurance marketplace. Thus, for Plaintiffs-Appellees' hypothetical to play out, a large employer would need every one of its employees to be ineligible for subsidies in order to avoid the penalty.

21

## **CONCLUSION**

This Court should reverse the Supplemental Order of Injunction.

Respectfully submitted,

/s/ Mayur P. Saxena

MAYUR P. SAXENA
*Assistant Attorney General*

JEREMY M. FEIGENBAUM
*Solicitor General*
AMANDA I. MOREJÓN
ASHLEIGH B. SHELTON
BRYCE K. HURST
SAMUEL L. RUBINSTEIN
VIVIANA M. HANLEY
*Deputy Attorneys General*

New Jersey Attorney General's Office
124 Halsey St., 5th Floor
Newark, New Jersey 07101
(973) 648-6255
Mayur.Saxena@law.njoag.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2024, I filed the foregoing Brief of Intervenor Defendant-Appellant State of New Jersey with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Mayur P. Saxena
Mayur P. Saxena

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,521 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point regular font.

Dated:      May 28, 2024

/s/ Mayur P. Saxena

Mayur. P. Saxena